GALLAGHER & KENNEDY, P.A.
John R. Clemency (Bar No. 009646)
Todd A. Burgess (Bar No. 19013)
Lindsi M. Weber (Bar No. 25820)
2575 East Camelback Road
Phoenix, Arizona 85016-9225
Telephone: (602) 530-8000
Facsimile: (602) 530-8500
Email: john.clemency@gknet.com
todd.burgess@gknet.com
lindsi.weber@gknet.com

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>ARMORWORKS ENTERPRISES, LLC,<br>TECHFIBER, LLC,<br><br>Debtors.<br><br>This Filing Applies to:<br><br>X   Both Debtors<br>☐   Specified Debtor | Chapter 11 Proceedings<br><br>Case No. 2:13-bk-10332-BMW<br>Case No. 2:13-bk-10333-DPC<br><br>(Motion for Joint Administration Pending)<br><br>**Expedited Hearing Requested** |

### MOTION FOR INTERIM AND FINAL ORDERS DETERMINING ADEQUATE ASSURANCE OF PAYMENT FOR FUTURE UTILITY SERVICES

ArmorWorks Enterprises, LLC ("ArmorWorks") and its wholly-owned subsidiary TechFiber, LLC ("TechFiber" and together with ArmorWorks, the "Debtors"), debtors and debtors-in-possession in the above-captioned bankruptcy cases (the "Bankruptcy Case"), hereby move the Court for interim and final orders under 11 U.S.C. §§ 105(a) and 366: (a) finding that all utility providers have been provided with adequate assurance of payment within the meaning of Bankruptcy Code §366, pending the entry of a final order; (b) prohibiting the utilities from altering, refusing, or discontinuing services on account of pre-petition amounts outstanding or the commencement of these cases; and (c) determining that debtor is not required to provide any additional adequate assurance

beyond what is proposed in this Motion. AS ADEQUATE ASSURANCE OF FUTURE PAYMENT, AND IN LIEU OF PROVIDING ANY UTILITY DEPOSITS, THE DEBTORS' PROPOSE THAT THEY PAY, AND REQUEST AUTHORITY TO PAY, ALL PRE-PETITION AMOUNTS OWED TO ITS UTILITY PROVIDERS IN THE ORDINARY COURSE OF BUSINESS POST-PETITION. THIS MOTION IS BROUGHT ON AN EMERGENCY BASIS ON EXPEDITED NOTICE UNDER LOCAL BANKRUPTCY RULE 9013-1(h) TO AVOID IMMEDIATE AND IRREPARABLE HARM TO THE DEBTORS.

This Motion is supported by the *Declaration of William J. Perciballi in Support of Debtors' Chapter 11 Petitions and First Day Motions* (the "Perciballi Declaration") filed by the Debtors concurrently herewith. In further support of the Motion, the Debtors state as follows:

**JURISDICTION**

1. On June 17, 2013 (the "Petition Date"), the Debtors each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"). The Debtors continue to operate their business and manage their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. An Official Committee of Unsecured Creditors has not been appointed.

2. This Court has jurisdiction over this case and this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A). Venue is proper in this district pursuant to 28 U.S.C. § 1409(a).

3. The statutory predicates for the relief requested are 11 U.S.C. §§ 105(a) and 366.

## FACTUAL BACKGROUND

4. ArmorWorks and its wholly-owned subsidiaries develop advanced survivability technology and design and manufacture high-tech military personal body armor, vehicle armor, aircraft and marine armor, and energy attenuating seats for protection against a broad spectrum of ballistic threats primarily for use in military and nuclear safety and security applications. ArmorWorks systems are in-service around the world in several United States Military applications. ArmorWorks's engineering and fabrication services take armor systems projects from concept to production with customer input and collaboration throughout the process. ArmorWorks specializes in all aspects of military armor technology. ArmorWorks has produced over 1.25 million ceramic armor and composite armor protection components for a variety of personnel armor, aircraft, and vehicle applications.

5. ArmorWorks sells the majority of its products through two channels. The primary channel is as a prime contractor for United States Military agencies. ArmorWorks has contractual relationships with many government entities for the purchase and service of its products, and provides a substantial amount of the armor and protective equipment used by all branches of the United States Military. The second primary channel involves ArmorWorks subcontracting with other prime government contractors to U.S. Military agencies.

6. Because of (i) the life-critical nature of its products, (ii) the use of critical defense technology including classified Executive Level/Presidential national defense information, and (iii) the United States Military's critical need for armor to protect its troops in a time of war, ArmorWork's contracts include special delivery priorities and requirements which subject ArmorWorks to stringent government regulations, requirements, and oversight.

7. ArmorWorks is functioning as, and is exercising the competitive advantage of, a Small Business within the meaning of applicable federal acquisition regulations, including but not limited to 13 C.F.R. § 121.404. This special status under SBA programs is critical to ArmorWork's continued success because it provides many advantages that allow ArmorWorks to successfully bid on government contracts and subcontracts. ArmorWork's also enjoys the benefits of a veteran-owned business based, in important part, upon my control over ArmorWorks.

8. ArmorWorks is vertically integrated with several wholly-owned subsidiaries providing complementary survivability products as well as components used by ArmorWorks to manufacture the armor products and systems it sells.

9. TechFiber is a wholly-owned Delaware limited liability company that supplies ballistic fiber to ArmorWorks and the armor industry. The ballistic fiber is used by ArmorWorks to manufacture ceramic armor and composite armor systems.

10. Non-debtor subsidiary ShockRide, LLC ("ShockRide") is a wholly-owned Arizona limited liability company that designs, manufactures, and sells energy attenuating seats, which protect passengers from the shock of IED and mine blasts beneath a vehicle. ShockRide's energy absorption, rollover, and crash protection technology is used in a wide variety of military vehicles with over 70,000 seats in service worldwide. ShockRide is self-sufficient and does not require any significant restructuring at this time. Therefore, ArmorWorks did not file a chapter 11 petition for ShockRide.

11. Non-debtor subsidiary Mandall BarrierWorks, LLC ("MBW") is a wholly-owned Delaware limited liability company that designs and produces high-end vaults, vault doors, and armored door systems providing architectural blast protection and security, including passive and reactive high value asset protection systems, safes, security doors, and fixed and portable guard stations for government, military, nuclear, and commercial installations. The company's work in the area of nuclear safety and security

requires additional security clearances beyond those required by the Department of Defense. MBW is self-sufficient and does not require any significant restructuring at this time. Therefore, ArmorWorks did not file a chapter 11 petition for MBW.

12. Non-debtor subsidiary Applied Heat Technologies, LLC is an Arizona limited liability company wholly owned by ArmorWorks that provides portable armor and composite repair products and services. AHT is self-sufficient and does not require any restructuring, and therefore did not file a chapter 11 case.

13. Non-debtor Protective Ceramics, LLC is a Delaware limited liability company wholly owned by ArmorWorks. Protective Ceramics does not conduct any business operations and likely will be dissolved.

14. Non-debtor subsidiary ArmourWorks International Limited (AIL) is a wholly-owned subsidiary of ArmorWorks located in the United Kingdom that supplies armor and protective products to customers in the United Kingdom and internationally.

15. Non-debtor subsidiary ArmorWorks Enterprises Canada, ULC is a wholly-owned subsidiary of ArmourWorks International Limited (AIL) located in British Columbia that supplies soft body armor products to the Canadian military and law enforcement communities.

16. The majority of ArmorWorks' business operations are conducted from leased commercial space in Chandler and Tempe, Arizona.

17. ArmorWorks' primary facility, located at 305 N. 54th Street, Chandler, Arizona, houses the corporate headquarters, vehicle armor assembly, body armor, flat armor, and applied heat production facilities, as well as research and development. Additional research and development and storage facilities are located at 205 S. Beck Avenue, Chandler, Arizona.

18. Until February 2013, non-debtor subsidiary ShockRide's production facilities and research and development were located at 500 N. 54th Street, Chandler,

Arizona. Effective February 1, 2013, in an effort to reduce operating costs, ArmorWorks surrendered the premises to the landlord and relocated the Shockride operations to 305 N. 54th Street. ArmorWorks is attempting to negotiate a settlement of the remaining lease obligation with the landlord.

19. TechFiber production facilities are located at 6955 South Priest, Tempe, Arizona.

20. Non-debtor subsidiary Mandall Barrier Works operates from a facility located at 7071 W. Frye Road, Chandler, Arizona.

21. Non-debtor subsidiary ArmourWorks International Limited (AIL) leases commercial space located at 26 Bamel Way, Glouchester Business Park, Brockworth Glouchester GL3 4BH, United Kingdom. Non-debtor subsidiary ArmorWorks Enterprises Canada, ULC leases commercial space located at Suite B2-8775 Jim Bailey Cresent, Kelowa, BC V4V 2L7, Canada.

22. Historically, the independent certified public accounting firm of Mayer Hoffman McCann P.C. has audited the financial statements of ArmorWorks and its subsidiaries on a consolidated basis. ArmorWorks uses a calendar year accounting cycle.

23. In 2009, ArmorWorks and its subsidiaries had net income of $14,838,000 on total sales of $190,531,000. Sales declined materially in 2010, to $128,375,000, and ArmorWorks realized a net loss from operations of $11,475,000 based in large measure on a $20 million inventory write-off recorded by the company.

24. Sales increased dramatically in 2011 to $313,763,000 based in large measure on a $236,247,162 contract awarded to ArmorWorks in late 2010 by AM General for the production of upgraded armor for the U.S. Military's HMMWV fleet. The increased sales 2011 generated net income of $27,917,000 in 2011. ArmorWorks completed the AM General contract in 2011.

25. ArmorWorks' record sales in 2011 enabled the company to pay-off substantially all of its secured debt, including a $40 million revolving line of credit from JPMorgan Chase, and approximately $3.0 million of secured equipment financing from Chase Equipment Financing.

26. Despite ArmorWorks strong performance in 2011, the business deteriorated substantially in 2012 tracking an industry-wide defense trend. ArmorWorks experienced a net loss of $9,988,000 on total sales of $100,229,000 in 2012.

27. ArmorWorks poor performance in 2012 in many ways mirrored that of the defense industry as a whole that continues to suffer from the anticipated and actual implementation of sequestration; from a federal government that cannot agree on a budget; from military force reductions and planned pull-outs in both Iraq and Afghanistan; and from a general belief that defense spending will most likely decrease in the foreseeable future. In this environment, government funding simply is not flowing to military and defense contracts like it once did. For ArmorWorks, the slow-down has manifested itself in follow-on orders to our largest vehicle armor contract that have not materialized, seat programs being delayed or cancelled, and military demand for body armor plates virtually disappearing. As a result, ArmorWorks, like many other defense contractors, is restructuring and reducing the size of its operations.

28. However, despite the slowdown, ArmorWorks remains optimistic for the future and there are many positives. The company's core strength has been and will continue to be innovation. ArmorWorks innovated from hard body armor to vehicle armor to seats and to soft protective under and over garments. ArmorWorks has a number of other new technologies and products in the queue. The Debtors are in a good market and resource position to continue innovating and delivering new solutions to our customers for the long-run.

29. In the near-term, ArmorWorks continues to operate its business and prepare for the future. The company has contracts and continues to land new orders. The numbers are smaller than the Debtors would like, but they do have business and there is profitable business to be had in the short-term.

30. As of May 26, 2013, on a consolidated basis, ArmorWorks had total assets (at book value) of approximately $30,949,00 consisting of: (i) cash of $959,000, (ii) accounts receivable of $3,676,000, (iii) inventory of $8,608,000, (iv) other current assets of $889,000, (v) personal property and equipment of $12,054,000, (vi) intellectual property and intangibles assets of $1,188,000, and (vii) other assets of $3,575,000.

31. As of May 26, 2013, on a consolidated basis, ArmorWorks had total liabilities (at book value) of approximately $12,040,000 consisting of: (i) trade accounts payable of $5,973,000, (ii) accrued expenses of $2,328,000, (iii) deferred revenue of $1,354,000, (iv) notes payable of $1,810,000, and (v) other long term liabilities of $575,000. More detailed information concerning the assets, liabilities, and financial condition of the Debtors may be found in the statement of financial affairs and schedules filed by each of the Debtors.

32. Although the Debtors continue to operate, and believe ultimately they will "weather the storm," ongoing litigation with its minority owner has made it impossible for ArmorWorks to obtain working capital financing to replace the $40 million line of credit paid off in 2012. Without working capital financing, ArmorWorks is in jeopardy of running out of cash in the short term. As discussed in the Perciballi Declaration, ArmorWorks has identified a lender that is willing to provide up to $3.5 million of debtor in possession financing.

33. The working capital financing, if approved and obtained, should be sufficient to allow ArmorWorks to continue to operate and restructure its operations, including (i) divesting business units that no longer fit within the strategic framework of

8

Case 2:13-bk-10332-BMW    Doc 11    Filed 06/17/13    Entered 06/17/13 13:47:30    Desc
Main Document    Page 8 of 13

ArmorWorks' long-term plan; and (ii) reducing the companies' Arizona facilities footprint through the rejection of burdensome long-term leases.

34.	In addition to restructuring its debt, reducing its facilities footprint, and divesting portions of its business, the Debtors are hopeful that the Chapter 11 filing will assist ArmorWorks in resolving the ongoing dispute with C Squared by allowing ArmorWorks to redeem C Squared's 40% minority interest, or alternatively, allow C Squared to purchase the 60% majority interest of AWI. As discussed above, C Squared's efforts to interject itself into a position of control threaten ArmorWorks' small business status, security clearances, and future ability to obtain government contracts. In addition, the demands of the continually escalating litigation from both a time and financial standpoint are detracting from management's ability to operate and grow the business.

35.	Therefore, with their voluntary Chapter 11 petitions, the Debtors have filed a plan of reorganization that provides for the payment in full of all of the Debtors' creditors, and that also provides C Squared with an election: either accept a redemption of their 40% minority interest or purchase the 60% majority interest of AWI.

## UTILITY PROVIDERS AND RELIEF REQUESTED

36.	The Debtors currently use the following utility providers for services essential to its business: (1) mobile telephone – AT&T and Verizon; (ii) electric – SRP; (iii) trash disposal – Waste Management; (iv) telephone – Century Link and Avaya, Inc.; and (v) water/sewer – City of Chandler. The Debtors do not have deposits with any of its utility providers. Over the years all utility deposits were refunded based on the companies' good payment history and financial stability.

37.	The Debtors seek, on an emergency basis, the entry of interim and final orders: (a) finding that the Debtors utility providers have been provided with adequate assurance of payment within the meaning of Bankruptcy Code §366, pending the entry of a final order; (b) prohibiting the utility providers from altering, refusing, or discontinuing

services on account of pre-petition amounts outstanding or the commencement of this case; and (c) determining that the Debtors are not required to provide any additional adequate assurance beyond what is proposed in the motion.

38. As adequate assurance of future payment, and in lieu of providing any utility deposits, the Debtors propose that they pay, and request authority to pay, all pre-petition amounts owed to its utility providers in the ordinary course of business.

39. The relief requested in the utility motion is necessary because uninterrupted utility services are critical to the Debtors' continued business operations. If utility companies cease providing service, the Debtors' business and estate will be severely damaged, jeopardizing its reorganization efforts. Moreover, the utility companies will not suffer any tangible economic harm because ArmorWorks will compensate the utility companies in full for all post-petition services that they provide.

40. Historically, the Debtors have made timely and full payments to all utility providers. To the best of my knowledge, there currently are no defaults or arrearages with respect to undisputed utility service invoices.

41. Concurrently with this Motion and other First Day Motions, the Debtors have sought authority to obtain up to $3.5 million of debtor in possession financing. If the proposed debtor-in-possession financing is approved as requested, the Debtors will have adequate liquidity to continue paying all utility charges and other post-petition operating expenses on a current basis. Thus, the Debtors seek authorization to continue their customary practice of paying all utility bills as they become due in the ordinary course of business post-petition.

42. The Debtors propose that their projected cash flow, existing cash on hand, agreement to honor pre-petition checks that have not cleared, intent to continue paying bills currently owing, and the proceeds of the proposed DIP Loan, that are more than sufficient to cover all operating shortfalls, are sufficient to create an adequate assurance of

1  future payment for the utility companies. As a result of these various payment sources,
2  and collateral available for the benefit of the utilities, Debtors request that the Court
3  determine, on an interim basis, that no advanced deposits be required.

**BASIS FOR RELIEF REQUESTED**

Continued and uninterrupted utility service is essential to the Debtors' ability to sustain their business operations during these cases. The Debtors are required to oversee the operation of their businesses and manage properties associated with the operation of their businesses. Any interruption in utility service would severely disrupt the Debtors' business operations, their restructuring efforts, and jeopardize the Debtors' ability to preserve the value of the estates.

The Debtors historically have made timely and complete payments to all of their utility providers. As of the Petition Date, the Debtors believe that all such utility payments were paid on a timely basis in the ordinary course of business. The only amounts remaining outstanding are for pre-petition utility services for which a bill has not been delivered, or for which a bill has not yet become due. Some or all of the amounts owing to utility providers on account of prepetition services result from the fact that the Petition Date occurred during the middle of a billing cycle, and/or that certain checks issued by the Debtors have not yet cleared.

Even though some outstanding arrearages may exist with respect to some of the utilities, the Debtors believe that any utility seeking to terminate services would be doing so as an automatic reaction to a filing for relief under the Bankruptcy Code. The Debtors have and will continue to have sufficient funds to make timely payments to utilities for all post-petition utility services. The Debtors request that this Court authorize the Debtors to pay their utility providers post-petition in the ordinary course of business for any pre-petition amounts that may be due, and direct banks to honor any checks that may be outstanding for pre-petition utility services.

1 Bankruptcy Code §366(c) defines "assurance of payment" to include certain specified forms of security. It is important to recognize, however, that the recent amendments to §366 did not replace the fundamental premise of Bankruptcy Code §366(b) or the pertinent case law construing that section. Accordingly, the courts remain free to determine whether a utility has been provided with adequate assurance of payment. The Bankruptcy Code prevents the Court from considering certain facts in reaching this determination; however, nothing in that section prohibits a court from determining that the amount of such adequate assurance of payment is zero. Therefore, the Court can determine that the amount of adequate assurance of payment is zero, or some other nominal amount.

11 U.S.C. §366 only requires that the assurance of payment be "adequate." Courts construing §366(b) have long recognized that adequate assurance of performance does not constitute an absolute guarantee of payment. *Steinebach v. Tucson Electric Power Company*, 303 B.R. 634, 641 (Bankr. D. Ariz. 2004) ("adequate assurance of payment is not, however, absolute assurance . . . all §366(b) requires is that a utility be protected from an unreasonable risk of nonpayment.")

Furthermore, courts have recognized that "in deciding what constitutes 'adequate assurance' in a given case, a bankruptcy court must 'focus upon the need of the utility for assurance, and to require that the debtor supply no more than that since the debtor almost perforce has a conflicting need to conserve scarce financial resources'." *See Virginia Electric & Power Company v. Caldor, Inc.*, 117 F.3d 646, 650 (2nd Cir. 1997).

**CONCLUSION**

Based on the foregoing, Debtors respectfully request that the Court enter an Interim Order, in the form attached hereto as Exhibit "A": (a) finding that all utility providers have been provided with adequate assurance of payment within the meaning of Bankruptcy Code §366, pending the entry of a final order; (b) prohibiting the utilities from altering, refusing, or discontinuing services on account of pre-petition amounts

outstanding or the commencement of these cases; and (c) determining that debtor is not required to provide any additional adequate assurance beyond what is proposed in this Motion; and (d) granting such additional and further relief as is necessary and appropriate under the circumstances of this case.

RESPECTFULLY SUBMITTED this 17th day of June, 2013.

GALLAGHER & KENNEDY, P.A.

By */s/Todd A. Burgess*
  John R. Clemency (Bar No. 009646)
  Todd A. Burgess (Bar No. 19013)
  Lindsi M. Weber (Bar No. 25820)

Proposed Attorneys for Debtors