GALLAGHER & KENNEDY, P.A.
John R. Clemency (Bar No. 009646)
Todd A. Burgess (Bar No. 19013)
Lindsi M. Weber (Bar No. 25820)
2575 East Camelback Road
Phoenix, Arizona 85016-9225
Telephone:    (602) 530-8000
Facsimile:    (602) 530-8500
Email:       john.clemency@gknet.com
             todd.burgess@gknet.com
             lindsi.weber@gknet.com
Proposed counsel for the Debtors

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>ARMORWORKS ENTERPRISES, LLC, ☐<br>TECHFIBER, LLC, ☐<br><br>Debtors. | Chapter 11 Proceedings<br><br>Case No.  2:13-bk-10332-BMW<br>Case No.  2:13-bk-10333-BMW<br><br>(Jointly Administered) |
| This Filing Applies to:<br><br>X      Both Debtors<br>☐      Specified Debtor | **Hearing Date: July 12, 2013**<br>**Hearing Time: 10:00 a.m.**<br>**Location:        U.S. Bankruptcy Court**<br>**                     38 S. Scott Avenue**<br>**                     Tucson, Arizona**<br>**Courtroom:      329** |

**RESPONSE IN OPPOSITION TO EMERGENCY MOTION TO DISMISS
OR, IN THE ALTERNATIVE, TO ABSTAIN**

ArmorWorks Enterprises, LLC ("AWE") and TechFiber, LLC ("TechFiber" and with

AWE, the "Debtors"), debtors and debtors-in-possession in the above-captioned jointly-

administered Chapter 11 cases (the "Case"), hereby respond to the *Emergency Motion to Dismiss*

*or, in the Alternative, To Abstain* filed on June 20, 2013 (Dkt. #39; the "Motion") by C Squared

Capital Partners, LLC ("C Squared") and Anchor Management, LLC ("Anchor") (together, the

"C Squared Parties").   For the reasons set forth in the following Memorandum of Points and

Authorities, the Motion should be denied.  This Response is supported by all germane matters of

record in this Case, including the matters of record in the Appendix of evidentiary items

supporting the filing of this Case (the "App.").

GALLAGHER & KENNEDY, P.A.
2575 EAST CAMELBACK ROAD
PHOENIX, ARIZONA 85016-9225
(602) 530-8000

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION AND SUMMARY OF THE MOTION.

1. In the Motion, the C Squared Parties allege that the Debtors' manager, William Perciballi, lacked authority to file the Petitions; and therefore this Chapter 11 Case should be dismissed. Alternatively, the C Squared Parties argue that the Petitions were filed in bad faith, apparently asserting that the Debtors do not need the protections or opportunity for reorganization afforded under the Bankruptcy Code. The C Squared Parties are wrong on both fronts.

2. Since the formation of AWE a dozen years ago, the duly authorized representative and manager of the AWE is, and always has been, William Perciballi. As the Debtors' duly authorized manager, Perciballi possesses the ability and authority to file a Chapter 11 Petition on behalf of the Debtors, and there is nothing in the parties' operative agreements or Arizona law that would preclude him from exercising his authority. The C Squared Parties have repeatedly affirmed Perciballi's control and authority in sworn declarations and testimony over the past decade, and confirmed their own lack of control and involvement in the company's operations and management. C Squared and its manager, Anchor, have trumpeted over time their very limited role as a passive investor in AWE.

3. In addition, irrefutable evidence shows that the Debtors are prototypical candidates for Chapter 11 relief, and thus the Case was filed in good faith. The resolution of a festering, expensive, and business-stifling ownership dispute is simply an added benefit that Chapter 11 affords to the Debtors, their creditors, their owners, their employees, and their end users (the men and women of the U.S. Armed Forces that put their lives on the line every day for each of us).

4. Accordingly, the Petitions are proper, and dismissal of these pending Chapter 11 proceedings or abstention by this Court is not in the best interests of creditors, equity holders, the estate, or any other party in interest.

## II. BACKGROUND.

5. The extensive background on AWE is set forth in the *Declaration of William Perciballi in Support of Debtors' Chapter 11 Petitions and First Day Motions* (Dkt. #3; the "Perciballi Dec."), the Debtors hereby incorporate the Perciballi Dec. in its entirety.

6.     A large portion of the following facts were taken directly from the C Squared Motion, and should require no proof at the hearing. The facts from the Motion are supplemented further by evidence from State court proceedings that is excerpted in the App.[1]

**A.     The formation and organization of AWE.**

7.     AWE is a manufacturer of military body armor, aircraft armor, and vehicle armor. AWE was formed in 2001, during a time when lucrative contracts for defense spending were ramping up.[2] The formation documents for AWE were thrown together hastily (and they were generated largely, if not entirely, by the C Squared Parties and their counsel). The AWE formation documents were not negotiated, were riddled with mistakes and internal and external inconsistencies, and eventually were "thrown in a drawer"[3] and were not consulted, followed, or implemented by the parties who effectively left all decisions and responsibility for the management and operation of AWE to William Perciballi ("Perciballi"), the founder and key man for the company.[4]

8.     AWE has two members: (a) C Squared, with a 40% membership interest; and (b) Armorworks, Inc. ("AWI"), with a 60% membership interest. Motion at ¶1.

---

[1] Much of the materials contained in the App. are matters of record in Maricopa County Superior Court Case No. CV2011-008179 and 2011-009812 (together, the "C2 Case"). References to the hearing transcripts in the C2 Case will be listed by Case abbreviation, date, page and line (e.g., C2 Case - 1/2/13 TR 1:23). References to the deposition transcripts will be listed by deponent name, date, page and line (e.g., T.Crown 4/8/09 TR 1:23). Corresponding cites to the App. will also be provided (e.g., App. Ex. 23).

According to the C Squared Parties, the issues in the evidentiary proceedings were very narrow in the C2 Case that resulted in the Ruling attached as Exhibit C to the Motion. Nevertheless, a large amount of evidence germane to this Case was presented and developed in the C2 Case.

[2] App. Ex. 45, C2 Case – 10/10/12 TR 24:19-25:11; 27:6-23.

[3] App. Ex. 45, C2 Case – 10/10/12 TR 35:9-37:3; *see also* App. Ex. 28, T.Crown 4/8/09 TR 16:19-22 (Tim Crown testifying that with regard to the 2001 Operating Agreement, "we put it [the 2001 Operating Agreement] in the file cabinet and didn't literally look at it for five or seven years, or whatever it was.")

[4] In stark contrast, the C Squared Parties have repeatedly avowed and admitted that they were simply "passive investors" in AWE, and did not take any active role in the management of the company. App. Ex. 23 at p. 23. When asked about involvement with day-to-day activities of AWE, Eric Crown acknowledged that his involvement was limited to obtaining or imparting information, not control. App. Ex. 43, C2 Case – 7/25/12 TR 54:9-15.

3

9.      Perciballi is the sole shareholder of AWI.  Timothy Crown and Eric Crown (the "Crowns") are the two members of both C Squared and Anchor.  Anchor is C Squared's manager.  Motion at ¶2.

10.     AWE is the successor to Advance Protection Products, Inc., a company that was owned and operated by Perciballi, and that (like AWE) designed, manufactured, and sold body armor, aircraft armor, and vehicle armor.  Motion at ¶3.

11.     In connection with the hurried formation of AWE, the Articles of Organization for ArmorWorks Enterprises, LLC (the "Original Articles of Organization") were filed with the Arizona Corporation Commission (the "ACC") on August 27, 2001.  The Original Articles of Organization listed Perciballi and C Squared as the two (2) managers of AWE. App. Ex. 1.  The parties did not intend for C Squared to serve as a manager, and in fact C Squared has never served as a manager of AWE.  Motion at ¶10.

12.     C Squared obtained its 40% interest in AWE for a $1 million capital contribution (the "C2 Capital") and a $2 million line of credit (the "C2 Loan").  *See* App. Ex. 3.  AWI obtained its 60% interest in AWE in consideration of the transfer certain specified assets and business operations to AWE.  Motion at ¶4.  Since 2001, C Squared has received $21,646,000 on account of its investment in AWE, which includes a complete pay off of the C2 Loan and a full return of the C2 Capital. Perciballi Dec. at ¶45; App. Ex. 40.

13.     Contemporaneous with AWE's formation, Anchor and AWE also entered into a ("2001 Consulting Agreement").  Motion at ¶5; App. Ex. 4.  If Anchor truly performed management functions for AWE, the 2001 Consulting Agreement would be superfluous.  As it turns out, Anchor never provided for AWE anything that resembled actual consulting services, and the 2001 Consulting Agreement was just another vehicle used to get C Squared an additional return on its investment in AWE. The 2001 Consulting Agreement expired in 2006.[5]

---

[5] In December 2008, the C Squared Parties agreed to increase Perciballi's salary to $500,000 per year.  At the same time, AWE and Anchor entered into the Management Consulting Fee Agreement (the "2008 Consulting Agreement").  The 2008 Consulting Agreement provides that AWE will pay Anchor $200,000 per year and that Anchor would "assist[] the Company in analyzing potential strategic alternatives." Motion at ¶27; App. Ex. 34.  Like the 2001

4

14.     In addition to serving as an AWE manager, Perciballi has at all times been employed by AWE as its President and CEO.   Motion at ¶24.

15.     Also around the time of formation, an operating agreement for AWE ("2001 Operating Agreement") was prepared by the C Squared Parties, but was never fully executed because AWI did not sign it.  App. Ex. 2.

16.     The parties currently dispute whether the 2001 Operating Agreement governs AWE.[6]  The C Squared Parties now contend that the 2001 Operating Agreement is effective and governs the operations of AWE even though it is missing the signature of the majority member (AWI).[7]  The Debtors contend that the 2001 Operating Agreement is not effective because it lacks the signature of the majority member of AWE (AWI).[8]  As a consequence, the Debtors contend that AWE is governed by the Arizona Limited Liability Company Act (A.R.S. §§ 29-601 et.seq.) as supplemented through the course of performance of AWE and other writings executed by the parties (including the Perciballi Employment Contracts and submissions by AWE, Perciballi, and Anchor to the SBA which are described below).  Motion at ¶9.

---

Consulting Agreement, the 2008 Consulting Agreement was simply another way for the C Squared Parties to increase their return on investment in AWE.

[6] The C Squared Parties have drastically changed their tune from only a few short years ago. When asked in 2009 whether AWE had a valid operating agreement, Tim Crown testified under oath that "we currently do not have an operating agreement because this one was not signed so it was not valid."  App. Ex. 28, T.Crown 4/8/09 TR 16:24-17:1.

[7] The C Squared Parties rely on an undated, partially executed, January 2003 document entitled "Amendment No. 1 to Operating Agreement" to support the assertion that the unsigned 2001 Operating Agreement is somehow effective.  A review of the 2003 document reveals that it too is littered with inconsistencies, refers to undefined terms and misuses other defined terms, and like the 2001 Operating Agreement, is not fully executed. *See* Motion at Ex. B.

In addition, the 2003 document was presented to Perciballi when AWE was still under threat of foreclosure by the C Squared Parties (described below), and Perciballi believed that he had to sign it to avert more collection efforts by the C Squared Parties.  Perciballi did not believe that the 2003 document was intended to amend the unsigned operating agreement. App. Ex. 46, C2 Case - 10/29/12 TR 14:1-16:14.

[8] And Tim Crown has testified that the reason why AWI did not sign the 2001 Operating Agreement was because of serious problems that would be caused by various provisions contained in that agreement, including potential disqualification from SBA status, and that these issues were discussed with legal counsel.  App. Ex. 28, T.Crown 4/8/09 TR 11:18-12:1.

5

**B.** **The Crowns' pretextual "foreclosure" of the C2 Loan.**

17.     The Crowns were originally and have always remained passive investors in AWE, and the sum total of their contribution was their $3 million debt and equity investment in 2001.[9] Like a debt investor and unlike an owner/manager, the Crowns orchestrated a "foreclosure" of the C2 Loan shortly after the formation of AWE, based on a fabricated default.  App. Ex. 5.

18.     According to Eric Crown, C Squared threatened foreclosure on AWE's $2 million line of credit in 2002, and AWE shortly thereafter paid the C2 Loan in full.  App. Ex. 43, C2 Case - 7/25/12 TR 62:12-14; 65:3-9.

19.     Eric Crown admitted that C Squared accelerated the debt and called the line of credit despite the fact that these actions could have put AWE out of business and would have cut off the military from AWE's armor. App. Ex. 44, C2 Case - 7/26/12 TR 19:14-20:3.

20.     The purported reason for the foreclosure was AWE's alleged failure to make interest payments to C Squared. *See* App. Ex. 5; *see also* App. Ex. 45, C2 Case - 10/10/12 TR 155:22-158:1.   However, the person at AWE responsible for making these payments to C Squared was Kimo Seymour, a personal friend of Tim Crown who had been hired by AWE in 2001 at Tim Crown's suggestion.  App. Ex. 43, C2 Case - 7/25/12 TR 64:6-17; App. Ex. 45, 10/10/12 TR 156:1-14.

21.     The pretextual foreclosure of the C2 Loan compelled AWI and Perciballi to assume full responsibility for the debts, liabilities, contracts, and obligations of AWE.  App. Ex. 46, C2 Case - 10/29/12 TR 15:10-20, 87:23-88:10.  To save the company from the dire consequences of C Squared's actions, Perciballi pledged and surrendered all of AWI's stock to an escrow agent in order to obtain the funds to pay back the C2 Loan.  *Id.*

22.     In connection with the C2 Loan foreclosure, the C Squared Parties prepared and delivered a "Consent Agreement" to Perciballi for execution.  The Consent Agreement was

---

[9] No C Squared Party was ever listed on a management organizational chart prepared for AWE. App. Ex. 45, C2 Case - 10/10/12 TR 75:22-76:20.  When asked directly what role C Squared played in AWE, Tim Crown testified that "it's an investor."  App. Ex. 28, T.Crown 4/8/09 TR 7:9.  Similarly, Eric Crown confirmed that C Squared always has been a passive investor in AWE.  App. Ex. 43, C2 Case - 7/25/12 TR 68:5-9.

prepared exclusively by the C Squared Parties, and only required the signature of Perciballi on behalf of AWE to avoid the threatened foreclosure. App. Ex. 6.[10]

**C. The initial attempts to correct the faulty formation documents through amendment of the Articles of Organization.**

23. As noted above, the initial formation documents provided by the C Squared Parties were rife with errors. To fix one of the initial errors listing C Squared as a manager, the Original Articles of Organization for AWE were amended through the filing with the ACC of Articles of Amendment to the Articles of Organization of ArmorWorks Enterprises, LLC dated October 3, 2005 (the "2005 Amended Articles of Organization"). The 2005 Amended Articles of Organization reflected the managers of AWE as Perciballi and Anchor. Motion at ¶14; App. Ex. 7.[11]

**D. The 2007 SBA Bid Protest.**

24. AWE receives a significant portion of its business through contracts with the U.S. government or U.S. government prime contractors. Small businesses, and particularly veteran owned small businesses, receive certain advantages in the award of government contracts.[12] The Small Business Act requires the federal government to award a "fair proportion" of its contracts to small businesses. In furtherance of this requirement, the Federal Acquisition Regulation ("FAR") establishes small business set-asides. The SBA has developed size standards for entities to qualify as a small business based on the industries identified in the North American Industry Classification System ("NAICS"). Motion at ¶15.

---

[10] The unsigned 2001 Operating Agreement called for the execution of loan and related agreements like the Consent Agreement by all managers of AWE. App. Ex. 2. As is shown by the evidence, the Crowns, C Squared, and Anchor often acted in ways with respect to AWE that are diametrically opposite of how they should have acted if their behavior conformed to the terms of the 2001 Operating Agreement.

[11] By C Squared's disavowal of any management responsibilities, AWE evidently was managed exclusively by name and by conduct by Perciballi before the 2005 Amended Articles of Organization were filed. At all times, the manager of Anchor (Matt Gallaher) has confirmed his belief that the C Squared Parties did not have the power, control, or authority to prevent Perciballi from doing anything in relation to his management of AWE. App. Ex. 41, C2 Case - 6/18/12 TR 130:1-21.

[12] Perciballi is a veteran of the Gulf War, and provides AWE with the veteran advantage in the award of government contracts. *See* App. Ex. 45, C2 Case – 10/10/12 TR 5:7-18.

25. Most of the work AWE has performed for the U.S. government falls under NAICS code 339113. To qualify as a small business under the regulations, a company and its affiliates must have less than 500 employees. Motion at ¶16.

26. In 2007, AWE was the successful bidder on a long-term contract from the federal government that included a small business set-aside. Motion at ¶17. The original value of the contract was estimated at $65 million, but to date the contract has generated revenues in excess of $145 million. App. Ex. 45, C2 Case – 10/10/12 TR 87:21-88:8.

27. On November 29, 2007, one of AWE's competitors, Ceramic Protection Corporation of America, filed a bid protest with the SBA to challenge AWE's status as a small business (the "2007 Bid Protest"). As a result of the 2007 Bid Protest, the SBA investigated AWE's small business status. Motion at ¶18; App. Ex. 8.

28. In December of 2007, AWE, through its outside counsel, Arnold & Porter LLP, submitted its response to the 2007 Bid Protest (the "AWE Bid Protest Response"). Motion at ¶19; App. Ex. 9.

29. Following the initial submission of the AWE Bid Protest Response to the SBA on December 13, 2007, a SBA size specialist asked several follow-up questions regarding the involvement of the C Squared Parties, with a focus on the degree of control of the C Squared Parties over AWE.

30. AWE responded to the follow-up SBA questions through a December 24, 2007 letter (the "12/24/07 Letter"), in which AWE asserted that there was no valid or controlling written operating agreement for the company because the 2001 Operating Agreement was not fully executed. The 12/24/07 Letter further represented that neither C Squared nor Anchor (nor the Crowns) had the expertise or ability to exercise any sort of control over AWE or its operations, and that historically they had not exercised any control over AWE. App. Ex. 23.[13]

31. In this regard, AWE attached to the 12/24/07 Letter and submitted to the SBA

---

[13] Notably, the position asserted to the SBA was consistent with the way the parties actually handled the operations of the company from 2001 through 2007. App. Ex. 45, C2 Case - 10/10/12 TR 102:2-6; App. Ex. 46, C2 Case - 10/29/12 TR 128:15-129:18.

sworn declarations from Perciballi (the "12/24/07 Perciballi Declaration") and Matthew Gallaher, the CFO for Anchor (the "12/24/07 Gallaher Declaration"). Motion at ¶20-22; App. Ex. 23.[14]

32.     The C Squared Parties and their counsel (Squire Sanders)[15] were heavily involved with the preparation and delivery of the 12/24/07 Letter to the SBA. They offered substantial input and specific drafting suggestions, and reviewed several iterations of the 12/24/07 Letter, including the final iteration of the 12/24/07 Letter, before it was submitted to the SBA. App. Ex. 45, C2 Case – 10/10/12 TR 116:1-117:3; 118:20-119:2; 120:8-122:3; 123:14-124:8; 129:3-18; 130:21-131:25; 133:9-135:2; *see also* App. Ex. 10-24. However, as admitted in the Motion, neither of the Crowns submitted a declaration and "the C Squared Parties refused to support either position. Instead, Anchor provided a declaration…." Motion at ¶21.

33.     During the course of the discussions and collaborations to prepare the 12/24/07 Letter responding to the SBA concerns regarding control of the C Squared Parties over AWE, Eric Crown was apparently out of the county and too busy to be involved in the process. App. Ex. 45, C2 Case – 10/10/12 TR 129:19-22. His brother, Tim Crown, indicated that he did not want to sign any documentation submitted to the SBA, a government agency. App. Ex. 45, C2 Case – 10/10/12 TR 129:23-130:8. The apparent reason for the Crowns' reluctance to sign or submit documentation to the SBA was that the Crowns did not wish to "open [their] kimono" to a federal agency like the SBA while their crown jewel (Insight Enterprises) was being investigated for potential SEC violations. App. Ex. 46, C2 Case – 10/29/12 TR 170:4-22; App. Ex. 19 ("We are still in the middle of an SEC investigation in one company about just this sort of thing….")[16]

34.     On December 28, 2007, the SBA issued a formal determination that AWE was a small business, and thereby overruled the 2007 Bid Protest. In its determination that AWE was a

---

[14] A copy of the final 12/24/07 Letter was placed in the corporate minute book of AWE. App. Ex. 46, C2 Case - 10/29/12 TR 33:12-20. Noticeably absent from the AWE corporate minutes book are minutes from any AWE member or manager meetings, because there weren't any board like meetings for AWE. App. Ex. 44, C2 Case – 7/26/12 TR 136:6-23.

[15] In connection with AWE's follow up response to the 2007 Bid Protest, counsel for the C Squared Parties stated that "proving that C Squared is a minority investor should not be a problem." App. Ex. 24.

[16] App. Ex. 19 was never revealed to AWE until after the C2 Cases were commenced years later.

small business for purposes of awarding the contract, the SBA determined that the 2001 Operating Agreement was not legally executed, or effective, and that Perciballi was the control person for AWE. Motion at ¶23; App. Ex. 25. The defeat of the 2007 SBA Bid Protest translated into approximately $140 million in revenues for AWE. App. Ex. 45, C2 Case – 10/10/12 TR 87:21-88:8.

**E.** **The attempts to correct the faulty formation documents through execution of a mutually agreeable, compliant, and valid operating agreement.**

35.     After the SBA size protest, the parties engaged in various attempts to draft a new operating agreement that would be compliant with the SBA's regulations and that would square with the representations previously made by AWE to the SBA in December 2007. App. Ex. 45, C2 Case - 10/10/12 TR 151:17-152:3; 152:10-20; 172:17-173:9; App. Ex. 27; 29-33.

36.     Shortly after the 2007 Bid Protest, Perciballi had discussions with Stanley Laybourne, the former CFO of Insight Enterprises, who the Crowns had designated as their representative in communicating with Perciballi regarding a new operating agreement. App. Ex. 45, 10/10/12 TR 154:4-21; App. Ex. 46, C2 Case - 10/29/12 TR 153:17-154:13.

37.     Several months later, Perciballi and the Crowns continued to discuss the negotiation of a new operating agreement. App. Ex. 45, C2 Case - 10/10/12 TR 159:16-160:2

38.     In July and September 2009, the parties continued trying to negotiate a new operating agreement, with assistance from Michael O'Brien, a former Skadden Arps attorney who was then the in-house counsel for Anchor. *Id.* at 152:10-20.

39.     No mutually acceptable operating agreement was ever produced.

**F.** **Intereference by the Crowns in the operation of AWE.**

40.     Rather than provide useful and constructive "management" services to AWE, the Crowns (and C Squared and Anchor) actually engaged in further efforts that could have had very deleterious effects for AWE.

41.     For example, in September 2009, the Crowns refused to sign documents in relation to an extension of the Chase credit line, insisting instead that AWE agree to a new operating agreement that was inconsistent with the representations made to the SBA in 2007. After much

10

effort by Perciballi, Chase ultimately extended the line on the basis of a Perciballi signature only. App. Ex. 45, C2 Case 10/10/12 TR 190:21-191:6; App. Ex. 35.

42.    Also in 2009, the Crowns invested with a body armor competitor of AWE known as Diamondback Tactical. App. Ex. 45, C2 Case 10/10/12 TR 176:16-177:10.

43.    The C Squared Parties' refusal to execute documents to extend the Chase credit line, failure to reach any agreement on a form of operating agreement, and decision to invest in competing businesses were detrimental to AWE, and are indicative of the utter lack of care and concern that the C Squared Parties have demonstrated consistently with regard to AWE.

**G.    The AWE Bankruptcy Filing.**

44.    Prior to the bankruptcy filing, and throughout the past year or more, AWE has suffered significant financial strain based on a combination of factors, including but not limited to, the sequestration and cutbacks in federal spending, and difficulties caused by the disputes among the AWE members.  App. Ex. 46, C2 Case – 10/29/12 TR 141:2-142:10; Perciballi Dec. at ¶¶71-72. AWE has responded to these difficulties by downsizing, consolidating its operations, and reducing expenses. *Id.*[17]

45.    AWE's financial condition is and was well known to the C Squared Parties, as they were provided with regular financial statements and related information by the Debtors' CFO, David Wirthlin.  App. Ex. 36.

46.    As set forth above, and admitted on numerous occasions by the C Squared Parties, Anchor's role in AWE was solely to monitor the Crowns' passive investment, and Anchor has played no role in the operations or business of AWE since its inception.[18]  Consequently,

---

[17] The Crowns received financial forecasts for AWE through 2012, and the forecasts turned from projected profit to mounting losses attributable to down turns in government spending, which led to employee layoffs and other downsizing measures for AWE – all of which were accomplished by Perciballi alone. App. Ex. 46, C2 Case – 10/29/12 TR 105:12-106:20.

[18] Anchor's role as a manager of AWE was described as ceremonial; months would go by without any conversations between Perciballi, the Crowns, or Anchor regarding AWE.  App. Ex. 46, C2 Case – 10/29/12 TR 144:13-21.

Apparently, to this day, Eric Crown does not where the control of the C Squared Parties over AWE "starts or stops."  App. Ex. 43, C2 Case – 7/25/12 TR 82:11-14.  Based on the evidence, the C Squared Parties' control over AWE certainly does not start with the power to prevent a

Perciballi authorized the filing of the AWE Chapter 11 case without the need to obtain the consent of Anchor for the filing. *See* Motion at ¶50.

47.     According to the statements and schedules on file in the AWE bankruptcy case (the "Statements and Schedules") [Dkt. 1], and as of the filing date, the Debtors had: (a) cash on hand of approximately $46,000; (b) accounts receivable of approximately $1.4 million (at book value); (c) fixed assets of approximately $3 million (at book value); (d) approximately $560,000 in unpaid payroll owed to AWE's approximately 125 employees; and (e) trade accounts payable of approximately $4 million, much of which is 60 days or more past due. App. Ex. 37.

48.     As of the filing of the Chapter 11 case, AWE had no available line of credit or working capital source. Perciballi Dec. at ¶77. Without access to the line of credit that has been approved on an interim basis, AWE likely would not have been able to continue in business. *See* App. Ex. 47, Declaration of Morris C. Aaron, MCA Financial Group, Ltd (Dkt. # 71; the "MCA Dec.") at ¶¶31-32.

49.     The Debtors have filed their *Disclosure Statement* [Dkt. 18] and *Joint Plan of Reorganization dated June 17, 2013* (the "Plan") [Dkt. 17]. App. Ex. 38-39. The Plan calls for 100% payment of creditors and a resolution of the festering ownership dispute through a "buy-sell" procedure which is practically identical to a procedure in the 2001 Operating Agreement that the Crowns now insist is binding (even though it is not). *Id.*[19]

## III.     ARGUMENTS AND AUTHORITIES.

50.     Based on the C Squared Parties own admissions on multiple occasions and in various contexts (including administrative proceedings with sworn declarations provided to a federal agency), C Squared is a passive investor with no positive or negative control over AWE.

---

much need rehabilitation of the company.

[19] Since at least 2008, the C Squared Parties have expressed a desire to have their interest in AWE bought out. *See, e.g.,* App. Ex. 41, C2 Case – 6/18/12 TR 164:11-13. The Plan fulfills the stated desires of the C Squared Parties, and provides them with an opportunity for a buyout of their interest at a fair price to be determined by this Court.

Based on the evidence, there is no genuine dispute that:[20]

- The 2001 Operating Agreement is unsigned;

- The 2003 Amendment is only partially executed;

- There are internal and external inconsistencies between the formation documents of AWE which, by all accounts, were "thrown into a drawer" and ignored;

- The representations made to the SBA in 2007 affirmed the lack of a valid operating agreement and the lack of control by the C Squared Parties over AWE;

- The representations in 2007 confirmed the sole control over AWE by Perciballi;

- AWE has never kept formal board minutes or other documentation, other than the inclusion of the 12/24/07 Letter in the AWE corporate books;

- The C Squared Parties have testified time and again that their involvement with AWE was limited to "passive investment," and they have exercised no control over business operations;

- Historically, Perciballi alone executed documents on behalf of AWE, including documents prepared by the C Squared Parties that under the 2001 Operating Agreement would require the signature of C Squared and/or Anchor if they really played a management role with AWE; and

- At best, and by its own admissions, Anchor is a "nominal" or "ceremonial" manager that is virtually unknown to AWE employees, does not visit the company premises, does not hold the necessary security clearances, does not have the expertise to operate the business, and has not been involved in any government contract awarded to AWE.

The Motion includes nothing to contradict these indisputable facts, and the C Squared Parties cannot controvert the self-described, admitted, passive role of the C Squared Parties in AWE. Accordingly, there is no basis in fact or law for the C Squared Parties' assertions that Perciballi was not authorized to file the Petitions on behalf of the Debtors.

---

[20] While the C Squared Parties would have this Court believe that the Superior Court made findings or otherwise ruled on the validity of the unsigned 2001 Operating Agreement, that issue was expressly withdrawn from consideration by the C Squared Parties in the C2 Case before the evidentiary proceedings. Rather, the only matter presented to the Superior Court was a narrow one - limited exclusively to the issue of whether the 2009 amendment to the Articles of Organization was authorized.

In fact no tribunal, other than the SBA administrative proceedings, has directly addressed the validity and effectiveness of the 2001 Operating Agreement. Accordingly, this Court is tasked with making a determination regarding the effectiveness of the unsigned 2001 Operating Agreement – bearing in mind that the C Squared Parties asserted unequivocally to the SBA that "ArmorWorks Inc. never signed the Operating Agreement" and "Anchor has never been actively involved with operations of ArmorWorks Enterprises, LLC." App. Ex. 23 at p. 23-24.

**A.  The Petitions were duly authorized by the Manager of the Debtors.**

51.  Contrary to the arguments set forth by the C Squared Parties in the Motion, there is no requirement under the parties' operative agreements or under Arizona law that would require the consent of both managers or members of AWE in order to proceed with a Chapter 11 Petition for a company that is struggling with cash flow issues and in need of restructuring.

**1.  The question of whether the party filing a bankruptcy case on behalf of an entity is authorized to do so is determined under state law.**

52.  Bankruptcy courts generally look to state law and the terms of an entity's organizational documents (if they exist) to determine the question of whether the filing of a bankruptcy petition by an entity was authorized.  *See In re Corporate and Leisure Event Productions, Inc.,* 351 B.R. 724, 731 (Bankr. D. Ariz. 2006); *see also In re Oasis at Wild Horse Ranch, LLC,* 2011 WL 4502102, at *9 (B.A.P. 9th Cir. Aug. 26, 2011).[21]  There is no requirement under Arizona law that would require the consent of a majority of the members or managers of a LLC to authorize the filing of the bankruptcy petition.

---

[21] The C Squared Parties rely heavily on the *In re Oasis* decision in the Motion – ignoring the fact that this is an unpublished decision that expressly provides it is not entitled to precedential effect.  *See In re Oasis,* at fn. 2.  Moreover, the facts of *Oasis* are readily distinguishable from the present Case, where the Debtors are in desperate need of financial reorganization in addition to seeking relief from the member disputes that have plagued the Company for years.

In circumstances similar to the instant Case, bankruptcy courts have found ample good faith and determined that the bankruptcy courts are an appropriate forum to resolve control issues between members as well as accomplish financial restructuring.  *See, e.g., In re Avalon Hotel Partners, LLC,* 302 B.R. 377, 384-85 (Bankr. D. Or. 2003) (emphasis supplied) denying request to dismiss or abstain filed by non-filing member of LLC:

> However, this case involves more than a simple two party dispute. Mr. Walls also testified credibly that he had to act to file bankruptcy in order to protect the interests of creditors, by maximizing value for all of the creditors, who were not being protected in the State Court Litigation.
> …
> To date, the State Court Litigation has dealt primarily with control issues between some members of AHP, without dealing effectively with the underlying financial problems of the Avalon Hotel….Creditor claims are going unpaid while new "capital call" litigation may have to be initiated to sort out disputes that have been simmering unresolved among the AHP members for more than a year. <u>Chapter 11 may provide a useful breathing space and mechanism for the efficient resolution of creditor claims and possibly, member claims as well.</u>

Accordingly, the C Squared Parties' heavy reliance on *Oasis* is improper both as a matter of fact and law.

14

### a. Arizona law does not require consent by a majority of the managers or members of a LLC to authorize a bankruptcy filing.

53.     As acknowledged in the 12/24/07 Letter, because there is no effective, written operating agreement for AWE, the Arizona LLC statutes control. App. Ex. 23. The Arizona Limited Liability Company Act (Title 29, Chapter 4) is noticeably silent on the issue of consent to file a bankruptcy petition on behalf of a LLC. However, the Act does set forth certain actions that require consent of all members, and a bankruptcy filing is not one of the enumerated actions. *See* A.R.S. § 29-681(C) (actions requiring the affirmative vote of all members in four circumstances).

54.     Because bankruptcy is not included in the list of actions that require full member or manager consent, a decision to file bankruptcy does not require the approval of a majority of members or managers of a LLC. *See also In re Delta Starr Broadcasting, LLC,* 2006 WL 285974, at *5 (E.D.La. Feb. 6, 2006) ("If the Louisiana legislature intended to impose formal decisionmaking procedures on LLCs, it certainly could have included such a requirement in the statute. Indeed, it expressly did just that in at least one provision of the statute….the absence of any similar requirements elsewhere in the statute strongly suggests that the omission was intentional.") (internal citations omitted).

55.     Similarly, bankruptcy is not included in the enumerated actions requiring a majority of members or managers to consent, as set forth in A.R.S. § 29-681.

56.     The Motion argues, without any factual or legal support, that the filing of a bankruptcy petition requires the consent of all members of a LLC because it is an activity "unrelated to its purpose." Motion at 14.[22] Unsurprisingly, the C Squared Parties are unable to offer a single case or authority that supports this proposition under Arizona law or otherwise.[23]

---

[22] If the C Squared Parties' argument were correct, every bankruptcy petition filed on behalf of an Arizona LLC would require unanimous consent of all members. This is simply not the law, nor the requirement for filing a petition on behalf of a LLC.

[23] A review of the entirety of A.R.S. § 29-681(C), rather than only the portion cited by the C Squared Parties in the Motion, further reveals why this argument is fundamentally flawed: Subsection C of the statute limits its application to those activities expressly addressed in an operating agreement.

15

*Id.* As set forth more fully below, numerous courts have rejected similar arguments from parties attempting to shoehorn a prohibition against filing a bankruptcy petition into a statutory scheme where none exists. This Court similarly should reject the C Squared Parties' unsupported argument that Arizona law somehow requires the consent of all members to authorize the filing of a bankruptcy petition.

57.     Under Arizona law, a manager's authority is determined by the course of dealing with the members: "A manager also holds the office <u>and has the responsibilities that are accorded to him by the members</u> and that are provided in an operating agreement." A.R.S. § 29-681(B) (emphasis supplied). Without a valid operating agreement, Arizona law looks to "the responsibilities that are accorded to him by the members." Here, Perciballi has been the manager in control of the business operations and has made essentially all decisions for AWE since its inception.[24] There is nothing in the Arizona LLC statutes that would indicate that, as the manager, Perciballi is not authorized to file a bankruptcy petition on behalf of AWE.

58.     In analogous circumstances, where the organizational documents and state law are silent on the issue of authority to file a bankruptcy petition on behalf of the LLC, the Bankruptcy Court in *In re East End Dev., LLC* found that the managing member was authorized to file the Petition on behalf of the LLC, based in part on the lack of guidance from the parties' operative agreements. *See East End* at *5 ("The Operating Agreement, while granting broad powers to the Managing Member, is silent as to whether the Managing Member has authority to file a petition in bankruptcy on behalf of the Debtor without the consent of 21 West. Likewise, the New York LLC laws do not specify what type of consent is required by the members of a LLC prior to filing a petition in bankruptcy.")

---

[24] The Supreme Court has opined that with respect to corporations, the entity vested with 'the power of management' has the requisite authority to file a bankruptcy petition." *In re East End Dev., LLC,* 491 B.R. 633, 2013 WL 1820182, at *4, (Bankr. E.D.N.Y. April 30, 2013) (citing *Price v. Gurney,* 324 U.S. 100, 104, 65 S.Ct. 513, 89 L.Ed. 776 (1945)). In this Case, Perciballi is the party vested with the power of management of AWE, and therefore has the requisite authority to file the Petition.

59.	Here, the organizational documents, sworn declarations by both parties,[25] and the parties' course of conduct and dealing[26] support the conclusion that, as the manager of AWE, Perciballi was authorized to file the petition. *See East End* at *6 ("…the parties could, but did not, restrict the Managing Member's authority to file a petition in bankruptcy on behalf of the Debtor. Even if the Court were to turn to New York LLC law to fill in a perceived omission in the Operating Agreement, there is no specific provision in the law concerning the decision to file for bankruptcy. Based on the language of the Operating Agreement, and the clear intent to give the Managing Member broad authority to act on behalf of the Debtor and to bind third parties with respect to the Debtor, the Court finds that the Managing Member had the authority to file the petition for relief under Chapter 11."); *see also In re Delta Starr Broadcasting, LLC,* 2006 WL 285974, at *3 (Louisiana District Court reversed the Bankruptcy Court's dismissal of a voluntary Chapter 11 petition  reasoning that "the LLC statute contains no express requirement that member decisions must generally be made by resolution or at formal meetings, and the parties have not pointed the Court to any provision in Delta Starr's articles of organization or operating agreement governing the procedural requirements for valid member action.")

60.	Accordingly, because there is no prohibition on filing a bankruptcy petition by one manager of AWE in either the parties' agreements or applicable state law, the Petition was duly

---

[25] The sworn declaration submitted by Anchor in connection with the 2007 SBA Submission is particularly revealing regarding the issue of Anchor's passive, "nominal" role with AWE.  The careful wording of the Anchor Declaration provides that, with respect to C Squared, "**Anchor is the manager** of C Squared."  *See* App. Ex. 23 - 12/24/07 Gallaher Declaration at ¶3.  However, when discussing Anchor's role with AWE, Anchor is careful to distinguish its role and states that "**Anchor is also named as a manager** of ArmorWorks Enterprises, LLC in its Articles of Organization, as amended." *Id.*  Anchor further explains its role with AWE in the Declaration starting at paragraph 5, averring that "[a]lthough Anchor monitors C Squared's passive investment in ArmorWorks Enteprises, LLC, Anchor has never been actively involved in the operations of ArmorWorks, LLC."  Anchor goes on to list numerous examples of its lack of involvement with the operations and management of AWE, and confirms that Anchor does not possess the necessary skills, knowledge, or certifications to allow Anchor to manage AWE.  *Id.*

[26] *See, e.g.,* App. Ex. 28, T.Crown 4/8/09 TR 17:2-6 (Question to Tim Crown: "Do you operate – to your knowledge does [AWE] operate under this Exhibit 1 operating agreement even though it's not been signed by AWI?" Answer: "We do not.")

1    authorized, and the Case should be permitted to proceed in this Court.[27]

2        **B.    The 2001 Operating Agreement is does not control, and the C Squared Parties**
3            **are estopped from arguing that the unsigned operating agreement is effective**
             **or controlling based on the prior representations to the Small Business**
4            **Administration.**

5        61.    It is undisputed that Perciballi did not sign the 2001 Operating Agreement on
6    behalf of AWI.[28]  The C Squared Parties have provided extensive testimony on this point,

7    attesting that the 2001 Operating Agreement was invalid because it remained unsigned due to

8    problems created by the drafting and inclusion of negative covenants that could have seriously

9    compromised AWE's small business status if Perciballi had executed the document.   App. Ex.

10   28, T.Crown 4/8/09 TR 112:13-113:14.

11       62.    Likewise, the C Squared Parties through their involvement and delivery of the
12   12/24/07 Letter to the SBA, completely disavowed any real control over AWE.  The C Squared

13   Parties' cannot now do a "just kidding" and avoid the clear and forceful representations that they

14   made to the SBA regarding the invalidity of the 2001 Operating Agreement and Perciballi's

15   unfettered control over AWE.

16       63.    The doctrine of judicial estoppel prevents a party who prevails on one ground in an
17   action from then repudiating that ground in order to prevail in another action.  *Olds v. Routson*,

18   2008 WL 4108660, at *2 (Ariz. Ct. App. Feb. 26, 2008) (citing *State v. Towery*, 186 Ariz. 168,

19   182, 920 P.2d 290, 304 (1996)).  In Arizona, judicial estoppel requires three elements: (1) the

20   parties must be the same, (2) the question involved must be the same, and (3) the party asserting

21   the inconsistent position must have been successful in the prior judicial proceeding.  *Id.*

22   _____

[27] *Id.* at *5 ("Although parties are free to incorporate any manner of procedural decision-making
23   requirements into the articles of organization of a LLC, the statute contains no such default
     requirements, and the Court has found no evidence to indicate that this was the result of
24   legislative oversight. Accordingly, the Court finds that the bankruptcy judge erred in determining
     that the March 22, 2005 bankruptcy petition filed on behalf of Delta Starr was not properly
25   authorized under Louisiana law. The Court therefore reverses the bankruptcy judge's April 6,
     2005 order of dismissal and remands the case to the bankruptcy judge for further proceedings.")

26   [28] The Crowns' involvement with AWE is not the first time that the C Squared Parties have
     elected to proceed without a formal operating agreement for a LLC.  With regard to the Crowns'
27   interest in an entity known as Mammography Partners, LLC, "no operating agreement for that
     entity exists."  *See* App. Ex. 23 at fn. 1.

28

18

64. The doctrine also applies to administrative proceedings in which a party obtains a favorable outcome by asserting an argument or position that it later seeks to repudiate in a subsequent proceeding. *See Rissetto v. Plumbers & Steamfitters Local 343,* 94 F.3d 597, 604 (9th Cir. 1996) (citing *Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1427 (7th Cir. 1993)); *see also Smith v. Montgomery Ward & Co.,* 388 F.2d 291, 291 (6th Cir.1968); *Simon v. Safelite Glass Corp.*, 128 F.3d 68, 72 (2d Cir. 1997).

65. Here, the C Squared Parties represented in sworn declaration to the SBA, as well as in accompanying correspondence, that Anchor was a manager-in-name only of AWE, did not have "any regular interaction with any employee of [AWE], and has never been actively been involved in the operations of [AWE]." The C Squared Parties also through experienced counsel (including an expert on SBA issues) had direct involvement with the drafting of the 12/24/07 Letter which states in no uncertain terms that the 2001 Operating Agreement is not effective and that Anchor did not exercise control over AWE.

66. For the purposes of the instant Bankruptcy Case, the parties involved are the same parties that were involved in the matter before the SBA. The issue before the SBA, like the issue here, is whether the 2001 Operating Agreement is valid and effective and whether Perciballi had the requisite control and authority over AWE to make decisions for AWE. In addition to the 12/24/07 Gallaher Declaration, C Squared representatives helped craft the letter submitted to SBA that admits and attests that the 2001 Operating Agreement was not legally executed, and that Perciballi exercises managerial control over AWE.

67. C Squared and AWE ultimately succeeded in the SBA matter, with the SBA determining that AWE was a small business and accepting the C Squared Parties' assertion that C Squared and Anchor do not exercise control over AWE. *See* App. Ex. 25.[29]

68. Consequently, the C Squared Parties should be judicially estopped from flip-flopping, and now arguing that they control or otherwise manage AWE to the point where they can exercise veto power over this Chapter 11 Case.

---

[29] When Tim Crown was informed of the SBA decision, he declared: "There is justice!" *See* App. Ex. 26.

Case 2:13-bk-10332-BMW    Doc 73    Filed 07/03/13    Entered 07/03/13 18:52:32    Desc
Main Document    Page 19 of 23

**C. The Petitions were filed in good faith to protect the going concern value of the Debtors, and to preserve the estate for the benefit of all interested parties.**

69.     A fundamental principle of the Bankruptcy Code is to provide bankruptcy relief "for the benefit of many of the constituents of a business entity, including not only the creditor interests but also the equity interests and perhaps those of employees and customers as well." *In re Corporate and Leisure Event Productions, Inc.,* 351 B.R. 724, 732 (Bankr. D. Ariz. 2006) (citing *NLRB v. Bildisco and Bildisco,* 465 U.S. 513, 525 (1984)).  Here, the Debtors do not dispute that there is ongoing disagreement among the equity holders regarding the management of the business and its operations.  However, there is also very real concern about the financial state of the Debtors, their cash flows, and the ability of AWE to continue to operate in a very difficult political and economic climate and without access to financing which only can be accessed through Chapter 11.  The financial realities facing the Debtors make them prime candidates for Chapter 11 relief.  App. Ex. 47, MCA Decl. at ¶¶33-38.

70.     Similar to the circumstances present in *In re East End,* the Debtors in this Case have "filed a proposed plan with the Court and [] complied with Bankruptcy Code requirements applicable to Chapter 11 debtors."  *In re East End Dev., LLC,* 2013 WL 1820182, at *7 (Bankr. E.D.N.Y. April 30, 2013).  Likewise, "the fact that prepetition, the members of the Debtor disagreed over the course of conduct to take with respect to Amalgamated does not render this a bad faith filing. To the contrary, the Debtor acted to preserve the value of its assets, after negotiations with Amalgamated failed to resolve the issues between the parties."  Finally, the Debtors in this Case were and are "in financial distress at the time the petition was filed, and the Debtor has filed a proposed plan that attempts to satisfy the claims of the Debtor's creditors. The internecine disagreements between the members of the Debtor that arose prepetition are not relevant to this analysis and do not constitute cause to dismiss this case."  *Id.* at *1.

71.     Accordingly, under the facts and circumstances of this Case, the filing of a Chapter 11 bankruptcy petition to provide the necessary "breathing space and mechanism for the efficient resolution of creditor claims and possibly, member claims as well" is entirely appropriate.  *See In re Avalon Hotel Partners, LLC,* 302 B.R. 377, 385 (Bankr. D. Or. 2003).

20

**D. Regardless of whether Anchor consented to the filing of the Petitions, this Chapter 11 Case is necessary and essential to the survival of the Debtors and should be permitted to proceed.**

72. If this Court has any difficulty determining that, as the authorized manager and representative of the Debtors for more than the past decade, Perciballi possessed the requisite authority to file the voluntary petitions in this Case – then borrowing from partnership law (from which LLCs are derived) is appropriate, and the Court may treat this matter as an involuntary case.[30]

73. Pursuant to Section 303(a)(3) of the Bankruptcy Code, an involuntary case may be commenced on behalf of a partnership "by fewer than all of the general partners in such partnership". If the petition is controverted, "after trial, the court shall order relief against the debtor…only if the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount…" 11 U.S.C. § 303(h).

74. Here, based on the statements and schedules filed with the Petition, the Debtor has significant debts that have not been paid as they became due. And, AWE can fairly be characterized as or analogized to a partnership (with just two members). Indeed, the Crowns referred to Perciballi as their partner in AWE. App. Ex. 43, C2 Case - 7/25/12 TR 106:17-21; App. Ex. 44, C2 Case - 7/26/12 TR 66:12.

75. In circumstances where partners in an entity have disagreed regarding the filing of a voluntary bankruptcy petition, numerous courts have opted to treat those petitions as involuntary filings. *See, e.g., In re Century/ML Cable Venture,* 294 B.R. 9, 39 (Bankr. S.D.N.Y. 2003) (denying motion to dismiss or abstain filed by one partner of joint venture who did not consent to

---

[30] As recognized by bankruptcy courts, "LLCs are hybrid business entities, with attributes both of corporations and partnerships." *In re Avalon Hotel Partners, LLC,* 302 B.R. 377, 380 (Bankr. D. Or. 2003). In Arizona, the Arizona Limited Liability Company Act is contained in Title 29 (Partnerships) of the Arizona Revised Statutes and provides that Arizona LLCs shall be taxed "on an identical basis" to partnerships, lending further support to a finding that Arizona LLCs should be treated analogous to partnerships. A.R.S. § 29-857 ("A limited liability company established under this chapter or a foreign limited liability company transacting business in this state pursuant to this chapter shall pay the taxes that are imposed by the laws of this state or any political subdivision of this state on domestic and foreign limited partnerships on an identical basis….")

21

petition, and instead treating petition as involuntary under Section 303); *In re Roxy Roller Joint Venture*, 67 B.R. 474, 477 (Bankr. S.D.N.Y. 1985) (same); *Matter of R. S. Pinellas Motel P'ship*, 5 B.R. 269, 274 (Bankr. M.D. Fla. 1980) ("it is quite clear under the law that a petition filed on behalf of a partnership by not all the general partners must be treated as an involuntary petition").

76. Accordingly, regardless of whether a voluntary or involuntary mechanism is utilized, ample authority (including Section 303 of the Bankruptcy Code) supports the viability of this pending Chapter 11 proceeding.

**E.  Abstention is not appropriate in this Case.**

77. The C Squared Parties throw in a final, half-hearted, one paragraph argument on page 16 of the Motion asserting that this Court should abstain from hearing this Case. The Motion fails to provide any factual or legal support for abstention – which is not surprising in light of the substantial and urgent bankruptcy issues that are presented by this Case which requires immediate Bankruptcy Court involvement.

78. Like in the case of *In re Avalon Hotel Partners, LLC,* 302 B.R. 377, 384-85 (Bankr. D. Or. 2003), abstention is not appropriate where this Case involves "more than a simple two party dispute" and the Debtors have acted promptly in seeking the protections of the Bankruptcy Code "in order to protect the interests of creditors, by maximizing value for all of the creditors, who were not being protected in the State Court Litigation." *See also* fn. 21, *supra*. Accordingly, because this Court is precisely the right forum for "dealing effectively with the underlying financial problems…and possibly, member claims as well," abstention is not appropriate in this Case. *Id.*

**IV.  CONCLUSION.**

79. The C Squared Parties are passive investors in AWE who have been handsomely compensated for their relatively modest investment in AWE. The C Squared Parties have admitted that the 2001 Operating Agreement is invalid, and that Anchor has never controlled any portion of the AWE business or operations. AWE is in desperate need Chapter 11 relief, which may provide the added benefit of resolving years of infighting and substantial financial drain on the company. Accordingly, the Petitions were duly authorized and properly filed in good faith to

22

provide the Debtors with a legitimate opportunity to reorganize and emerge from Chapter 11 as viable going concerns. For all of these reasons, the Motion should be denied.

RESPECTFULLY SUBMITTED this 3rd day of July, 2013.

GALLAGHER & KENNEDY, P.A.

By____/s/ Lindsi M. Weber_____
       John R. Clemency (Bar No. 009646)
       Todd A. Burgess (Bar No. 19013)
       Lindsi M. Weber (Bar No. 25820)

Proposed Attorneys for Debtors

COPIES of the foregoing served
this 3rd day of July, 2013 via CM/ECF by
electronic mail to all parties who have
requested ECF notice and/or filed a notice
of appearance in this case.

  /s/ Rachel Milazzo, CP_____