Steven D. Jerome (#018420)
Evans O'Brien (#026521)
Jill H. Perrella (#026270)
Snell & Wilmer L.L.P.
One Arizona Center
400 E. Van Buren
Phoenix, Arizona 85004-2202
Telephone:   (602) 382-6000
Facsimile:   (602) 382-6070
E-mail:      sjerome@swlaw.com
             eobrien@swlaw.com
             jperrella@swlaw.com
Attorneys for C Squared Capital Partners, LLC and Anchor
Management, LLC

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In Re: | Proceedings Under Chapter 11 |
| ARMORWORKS ENTERPRISES, LLC, | Case No. 2:13-bk-10332-BMW |
| TECHFIBER, LLC | Case No. 2:13-bk-10333-BMW |
| Debtors. | (Jointly Administered) |
| | **REPLY IN SUPPORT OF EMERGENCY MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO ABSTAIN** |
| This pleading relates to: | **Hearing Date: July 12, 2013** |
| ■ ArmorWorks Enterprises, LLC | **Hearing Time: 10:00 a.m.** |
| ■ TechFiber, LLC | **Location: U.S. Bankruptcy Court** |
| | **38 S. Scott Ave.** |
| | **Tucson, AZ 85701** |
| | **Courtroom 329** |
| | Related DE:      39, 73 |

C Squared Capital Partners, LLC ("C Squared"), a 40% member and creditor of ArmorWorks Enterprises, LLC ("AWE"), and Anchor Management, LLC ("Anchor"), co-manager and creditor of AWE (collectively, C Squared and Anchor are hereinafter referred to as the "C Squared Parties"), reply in support of their "Emergency Motion to Dismiss or, in the Alternative, to Abstain" [DE #39] (the "Motion to Dismiss").[1]

---

[1] By appearing in these proceedings, the C Squared Parties do not ratify, consent to, or acquiesce to the bankruptcy filing.  Instead, the C Squared Parties file this Motion solely to protect their rights and in no way authorize, ratify, or consent to these proceedings.

Snell & Wilmer

L.L.P.

LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

I.    **INTRODUCTION**

As set forth in the Motion to Dismiss, and crystalized in the "Response in Opposition to Emergency Motion to Dismiss or, in the Alternative, to Abstain" [DE #73] (the "Response") filed by Gallagher & Kennedy, P.A. ("G&K") on behalf of AWE and TechFiber,[2] there is no legitimate bankruptcy purpose behind these Bankruptcy Cases. The alleged financial crisis in which AWE claims to find itself is the result of a carefully calculated and timed self-inflicted wound designed to give the appearance that these entities are unable to pay their creditors. However, these cases are not about reorganizing creditor-debtor relationships; they are about two things: (1) Perciballi's continuing scheme to squeeze out his business partners, and (2) judge shopping.

The Response is replete with factual "allegations" that are demonstrably false,  contradict admissions made by AWE and Perciballi in the State Court Proceedings and, more importantly, contradict findings by the State Court in the State Court Proceedings. For the sake of judicial economy, the C Squared Parties will not rebut each and every "factual" inaccuracy in the Response. Rather, the C Squared Parties will merely highlight a few of the more significant "errors" in this Reply and address the remainder at trial.

II.   **ARGUMENT**

The tortured and convoluted arguments raised by AWE and TechFiber in the Response are insufficient to defeat the Motion to Dismiss for at least three reasons. First, both the law and the facts establish that Perciballi filed the Petitions without the requisite corporate authority. Second, these cases should also be dismissed because, in addition to lacking the requisite corporate authority to commence these cases, Perciballi filed them in bad faith. Third, despite G&K's peculiar request that the Court do so, these improper filings cannot be salvaged by treating them as involuntary petitions. Accordingly, the Court should dismiss these cases. However, in the event the Court is not inclined to dismiss these cases at this juncture for lack of corporate authority or bad faith, the Court should abstain from these bankruptcy cases in light of the

---

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion to Dismiss.

Snell & Wilmer

L.L.P.

LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

1   pending State Court Proceedings where the issues of the state law issues of corporate authority

2   have been and continue to be litigated.

3   **A.      Perciballi Lacks the Requisite Corporate Authority to File the Petitions.**

4          AWE and TechFiber cannot meet their burden of proving that Perciballi had the requisite

5   corporate authority to unilaterally file the Voluntary Petitions. *See In re Oasis at Wild Horse*

6   *Ranch, LLC*, 2011 WL 4502102, *9 (B.A.P. 9th Cir. 2011) (citing *In re Real Homes*, 352 B.R.

7   221, 227-28 (Bankr. D. Idaho 2005)). Based on the theories espoused in the Response, in order

8   for the Voluntary Petitions to be considered valid, the Court would have to find: (1) that the 2001

9   Operating Agreement is invalid and unenforceable, and (2) that either (a) the alleged oral

10  operating agreement or (b) the Arizona Limited Liability Company Act (the "LLC Act"),

11  authorized Perciballi, as one of two co-managers of AWE, to unilaterally file the petitions without

12  the approval of either Anchor, as the other manager of AWE, or C Squared, as the 40% member

13  of AWE, or both. However, the undisputed facts, along with Judge Gama's February Ruling,

14  demonstrate that (1) the 2001 Operating Agreement is valid and enforceable, and (2) nothing in

15  either the alleged oral operating agreement or the LLC Act authorizes Perciballi to file these two

16  admittedly solvent companies into bankruptcy.

17         **1.      The 2001 Operating Agreement is Valid and Enforceable.**

18         There is no question that the Voluntary Petitions were not properly authorized if the 2001

19  Operating Agreement is valid and enforceable.[3] AWE and TechFiber, therefore, argue in the

20  Response that the 2001 Operating Agreement does not control. Their argument consists of two

21  equally-flawed parts. First, without citation to any legal authority, AWE and TechFiber proclaim

22  that the 2001 Operating Agreement is invalid because Perciballi did not sign it on behalf of AWI.

23  Second, without disclosing to this Court that the issue has already been decided by Judge Gama,

24  AWE and TechFiber attempt to rehash the Perciballi Parties'[4] failed argument that the C Squared

25  Parties are judicially estopped from asserting that the 2001 Operating Agreement is valid.

26  Neither of these arguments is supported by the facts or any applicable law. Accordingly, the

---

[3] *See* the Motion to Dismiss at Section II.A.1.
[4] The Perciballi Parties are Perciballi, AWI, AWE, and TechFiber.

- 3 -

Court should find that the 2001 Operating Agreement is valid and enforceable and, on that basis, dismiss these cases because they were not filed with the requisite corporate authority.

### a. Perciballi's one missing signature does not invalidate the 2001 Operating Agreement.

As a brief reminder to the Court, Perciballi did, in fact, sign the 2001 Operating Agreement. Specifically, he signed it in his personal capacity as one of the two co-managers of AWE. The missing signature is the result of his admittedly inadvertent failure to sign the 2001 Operating Agreement on behalf of AWI, as a member of AWE. **In more than two years of litigation, the Perciballi Parties have never cited a single legal authority to support their contention that the 2001 Operating Agreement _per se_ is invalid as the result of the one missing signature.**[5] Instead, AWE and TechFiber simply conclude, without explanation, that the one missing signature somehow renders the 2001 Operating Agreement null and void. Of course, this is not the law.

"Operating agreements are construed according to the general principles of contract law." _In re Ratliff_, 2010 WL 6259955, *7 (B.A.P. 9th Cir. 2010) (unpublished), _rev'd on other grounds_, 490 Fed.Appx. 896 (9th Cir. 2012). The only requirements for an enforceable contract to exist are "an offer, an acceptance, consideration, and sufficient specification of terms so that obligations involved can be ascertained." _K-Line Builders v. First Fed. Sav. & Loan Ass'n_, 139 Ariz. 209, 212, 677 P.2d 1317, 1320 (Ct. App. 1983). A signature is not required to accept an offer; an offeree need only manifest his assent to the terms of the offer. _Id._; _see also Phone Connection, Inc. v. Harbst_, 494 N.W.2d 445, 448 (Iowa Ct. App. 1992) ("The parties to an unsigned agreement are obligated to abide by the agreement, when the acceptance appears from the acts of the parties.").

Here, AWI and Perciballi manifested their assent to the terms of the 2001 Operating Agreement in several ways, including but not limited to the following:

- Perciballi admitted under oath at trial as follows:

---

[5] In the 23-page Response, AWE and TechFiber devote a grand total of five lines to their "legal" argument to this issue. _See_ the Response at ¶ 61.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

**Q:** Okay. Let's go over to page 19. Page 19 is the signature page for the 2001 Operating Agreement, sir. And this is the page that shows your missing signature on behalf of AWI. Do you see that?

**[PERCIBALLI]:** Yes.

**Q:** Okay. Now at the time, you did not intentionally refuse or fail to sign on behalf of AWI, did you?

**[PERCIBALLI]:** No.

**Q:** And it was your intention and the intention of AWE back in 2001 that this Operating Agreement be a valid agreement and in full force and effect, correct?

**[PERCIBALLI]:** Yes. The Operating Agreement and the loan agreement.

*See* Trial Exhibit 190 at p. 7, ll. 1-13.[6]

- Despite the suggestion in the Response that the 2001 Operating Agreement and other formation documents for AWE were "thrown together hastily" by the C Squared Parties and their counsel, the 2001 Operating Agreement was actually heavily negotiated between counsel over several months. *See, e.g.,* Trial Exhibits 115-121.

- On or about September 1, 2001, Perciballi signed the 2001 Loan Agreement (1) individually in his capacity as one of the two co-managers of AWE, and (2) on behalf of AWI. The 2001 Loan Agreement refers to the 2001 Operating Agreement in numerous places. Additionally, the parties to the 2001 Loan Agreement affirmatively agreed that "[t]he company will not make any amendment to the articles of organization of the Company or the Operating Agreement[7] which limits its legal capacity or ability to perform its obligations under this Agreement or any other Loan Document or which may adversely affect any of the rights of the Lender." *See* Trial Exhibit 3 at Section 6.7.

---

[6] Citations to "Trial Exhibits" refer to the exhibits identified in the C Squared Parties' "List of Witnesses and Exhibits" [DE #81], filed on July 8, 2013.

[7] Pursuant to Section 1.32 of the 2001 Loan Agreement, "'<u>Operating Agreement</u>' shall mean that certain Operating Agreement of ArmorWorks Enterprises, LLC of even date with this Agreement by and among ArmorWorks Inc. and the Lender, as members, and Perciballi and AM, as managers."

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

- 5 -

- On or about September 1, 2001, Perciballi entered into that certain "Security Agreement" with C Squared. The Security Agreement references the 2001 Operating Agreement in several places and defines the "Operating Agreement" as "the Company's Operating Agreement by and among [C Squared] and ArmorWorks, Inc. (as "Members") and [Perciballi] and Anchor Management, LLC (as "Managers") of even date and all documents incorporated by reference therein, attached as Exhibits thereto or executed in accordance therewith." *See* Trial Exhibit 101.

- On or about September 1, 2001, Perciballi also signed the 2001 Consulting Agreement (1) individually in his capacity as one of the two co-managers of AWE, and (2) on behalf of AWI. *See* Trial Exhibit 4.

- In the 2003 Operating Agreement Amendment,[8] which Perciballi executed (1) individually in his capacity as one of two co-managers of AWE, and (2) on behalf of AWI, as one of the two members of AWE, Perciballi and AWI affirmed that "[AWI, C Squared, Perciballi, and Anchor Management] are parties to that certain Operating Agreement, dated as of August 27, 2001 (the "Operating Agreement"), with respect to the operation and management, of ArmorWorks Enterprises, LLC, an Arizona limited liability company agreement (the "Company")." *See* Trial Exhibit 135.

- In November 2004, David Wirthlin, AWE's CFO, provided a copy of the 2001 Operating Agreement to Bank One in connection with AWE's efforts to obtain financing. *See* Trial Exhibit 125.

- In February 2007, Perciballi, in his capacity as President of AWI (the 60% member of AWE) provided a copy of the 2001 Operating Agreement to Chase

---

[8] Although not entirely clear, AWE and TechFiber apparently contend in the Response that the 2003 Operating Agreement Amendment is somehow invalid. In particular, they argue that the document is not fully executed, apparently because both Eric Crown and Tim Crown did not sign it. However, as the Perciballi Parties are well aware, the signature of Eric Crown alone is sufficient to bind C Squared to the 2003 Operating Agreement.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

Bank and represented that it was a "true, correct, and complete" copy of the document. *See* Trial Exhibit 128.

- From 2001 until late 2007 the parties operated in compliance with the 2001 Operating Agreement, as amended by the 2003 Operating Agreement Amendment.

- In 2007, in their initial response to the SBA, counsel for AWE submitted the 2001 Operating Agreement as evidence of "ArmorWorks' corporate formation and governance[.]" *See* Trial Exhibit 9 at n.1.

The overwhelming evidence establishes that, at least prior to the 2007 Bid Protest, Perciballi's intent at all times was for the 2001 Operating Agreement to be a valid and enforceable agreement. In fact, that is exactly Perciballi's testimony in the State Court Proceedings. It wasn't until late December 2007, as part of the SBA Bid Protest, that Perciballi, after huddling with his lawyers, changed his tune and attempted to seize upon the single missing signature as a means of wrestling complete and total control of AWE away from the C Squared Parties. As set forth below, the C Squared Parties have never adopted Perciballi's post-2007 view of the 2001 Operating Agreement. Accordingly, the 2001 Operating Agreement controls, and these cases must be dismissed because they were filed without the consent of C Squared, as required by Section 3.5 of the agreement.

        **b.**    **AWE's judicial estoppel and Anchor is a manager "in name only" arguments are foreclosed by the doctrine of issue preclusion.**

Borrowing from the Perciballi Parties' failed arguments in the State Court Proceedings, AWE and TechFiber argue that the C Squared Parties are judicially estopped from asserting that the 2001 Operating Agreement is valid and enforceable and that Anchor is a manger "in name only." What they fail to mention, however, is that these exact arguments were tried, considered, and rejected by Judge Gama in the State Court Proceedings. Accordingly, AWE and TechFiber are barred by the issue preclusion doctrine from attempting to relitigate this issue in their newly-chosen forum.

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

- 7 -

In Arizona,[9] a party is estopped from re-litigating an issue if:

> (1) the issue was actually litigated in a previous proceeding,
>
> (2) the parties had a full and fair opportunity and motive to litigate the issue,
>
> (3) a valid and final decision on the merits was entered,
>
> (4) resolution of the issue was essential to the decision, and
>
> (5) there was a common identity of parties.

*Short v. Dewald*, 244 P.3d 92, 97 n.4 (Ariz. App. 2010); *Hullet v. Cousin*, 63 P.3d 1029, 1035-36 (Ariz. 2003). All five of these elements are met here, and the best way to analyze the issue is a side-by-side comparison of what is alleged in the Response and Judge Gama's Ruling.

| The Response | Judge Gama's Ruling[10] |
| --- | --- |
| 62. Likewise, the C Squared Parties through their involvement and delivery of the 12/24/07 Letter to the SBA, completely disavowed any real control over AWE. The C Squared Parties' cannot now do a "just kidding" and avoid the clear and forceful representations that they made to the SBA regarding the invalidity of the 2001 Operating Agreement and Perciballi's unfettered control over AWE. | AW Parties[11] contend that C Squared Parties are precluded from pursuing Anchor's reinstatement as an AWE manager under either the doctrines of judicial or quasi estoppel; specifically, they contend that, because C Squared Parties collaborated to prepare the December 24, 2007 Letter and indirectly benefited from the SBA's size determination, they are now precluded from arguing either that the 2001 Operating Agreement is valid and enforceable or that Anchor has any right to exercise control over AWE. |
| 63. The doctrine of judicial estoppel prevents a party who prevails on one ground in | |

[9] Where the issue previously litigated was litigated under state law, a bankruptcy court will apply the law of collateral estoppel of the relevant state. *In re Nourbakhsh*, 67 F.3d 798, 800 (9th Cir. 1995); *In re Bugna*, 33 F.3d 1054, 1057 (9th Cir. 1994).

[10] For the avoidance of any doubt, on April 9, 2013, Judge Gama entered the "Rule 54(B) Judgment," which is a final judgment on the merits.

[11] In the Ruling, the AW Parties are defined as AWE, AWI, and Perciballi.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

an action from then repudiating that ground in order to prevail in another action. *Olds v. Routson*, 2008 WL 4108660, at *2 (Ariz. Ct. App. Feb. 26, 2008) (citing *State v. Towery*, 186 Ariz. 168, 182, 920 P.2d 290, 304 (1996)). In Arizona, judicial estoppel requires three elements: (1) the parties must be the same, (2) the question involved must be the same, and (3) the party asserting the inconsistent position must have been successful in the prior judicial proceeding. *Id.*

"Judicial estoppel prevents a party from taking an inconsistent position in successive or separate actions." *State v. Towery,* 186 Ariz. 168, 182 (1996). For the doctrine to apply: "(1) the parties must be the same, (2) the question involved must be the same, and (3) the party asserting the position must have been successful in the prior judicial proceeding," which means that "the party gained judicial relief as a result of asserting the particular position in the first proceeding." *Id.* at 182-83. "Judicial estoppel should be invoked cautiously." *Bank of Am.Nat"/ Trust & Sav. Ass'n v. Maricopa Cnty.,* 196 Ariz. 173, 175 (App. 1999).

64. The doctrine also applies to administrative proceedings in which a party obtains a favorable outcome by asserting an argument or position that it later seeks to repudiate in a subsequent proceeding. *See Rissetto v. Plumbers & Steamfitters Local 343,* 94 F.3d 597, 604 (9th Cir. 1996) (citing *Chaveriat v. Williams Pipe Line Co*., 11 F.3d 1420, 1427 (7th Cir. 1993)); *see also Smith v. Montgomery Ward & Co.,* 388 F.2d 291, 291 (6th Cir.1968); *Simon v. Safelite GlassCorp.*, 128 F.3d 68, 72 (2d Cir. 1997).

Assuming without deciding that the doctrine of judicial estoppel applies to the findings of an administrative agency, the requirements are not met here. **C Squared Parties did not argue to the SBA that the 2001 Operating Agreement was invalid or that they had no control over AWE**. Although C Squared Parties reviewed and commented on drafts of the December 24, 2007 Letter, AW Parties had ultimate authority over the Letter and, therefore, are the only parties that may be bound by the arguments contained

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

65. Here, the C Squared Parties represented in sworn declaration to the SBA, as well as in accompanying correspondence, that Anchor was a manager-in-name only of AWE, did not have "any regular interaction with any employee of [AWE], and has never been actively been involved in the operations of [AWE]." The C Squared Parties also through experienced counsel (including an expert on SBA issues) had direct involvement with the drafting of the 12/24/07 Letter which states in no uncertain terms that the 2001 Operating Agreement is not effective and that Anchor did not exercise control over AWE.

therein. (footnote omitted) *Cf Janus Capital Group, Inc. v. FirstDerivative Traders,* 131 S. Ct. 2296, 2305 (2011) (regarding false statement under Rule 10b-5, "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it ... "). There is no inconsistency between the SBA's findings and C Squared Parties' current claim seeking Anchor's reinstatement as an AWE manager because the SBA expressly recognized Anchor's status as a manager in its formal size determination. Further, AW Parties did not clearly gain any relief as a result of AWE's argument regarding the enforceability of the 2001 Operating Agreement, nor did the SBA find that Perciballi had exclusive control over AWE. Even assuming the SBA accepted AW Parties' argument that Anchor lacked the "requisite" control over AWE to create affiliation under SBA regulations, the SBA expressly recognized Anchor's status as a manager and nevertheless found that AWE was a small business. (footnote omitted) *See Size Appeal of Dooley Mack Gov't Contracting, LLC,* SBA No. SJZ-5085, 2009 SBA LEXIS 96, at * 18 (Nov. 10, 2009) (limits on

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

> "extraordinary actions not involved with the ordinary management of the company," but are "meant to protect the minority's investment" do not constitute negative control).

The Perciballi Parties are well-aware that their judicial estoppel theory has already been fully litigated to a final order. Specifically, in "ArmorWorks Enterprises, LLC's, ArmorWorks, Inc.'s and William Perciballi's Motion for Stay of Execution of a Judgment Under 62(A)" (the "Stay Motion"), the Perciballi Parties admit that the State Court rejected their contention that the C Squared Parties were judicially or quasi estopped based on the 12/24/2007 Letter, stating:

> The only area of dispute concerns whether and to what extent the C Squared Parties are bound, under the doctrines of judicial estoppel and/or quasi estoppel, by the representations made in the 12/24/2007 Letter from AWE's counsel, Christopher Yukins, to the SBA. <u>The AW Parties have argued that the C Squared Parties should be so bound because the letter was prepared through a collaborative process involving the C Squared Parties in which any and all changes to the letter that were requested by the C Squared Parties or their counsel were made.</u>
>
> <u>The Court rejected the AW Parties' contention</u>, …

*See* the Stay Motion, a copy of which is attached as **Exhibit A** (emphasis added.) Thus, no dispute can exist that the issue of judicial estoppel actually was litigated in the State Court Proceedings and essential to the State Court's Ruling.[12]

Moreover, before filing the Stay Motion, the Perciballi Parties asked for clarification of Judge Gama's February Ruling. Specifically, the Perciballi Parties requested that the Court clarify its Ruling by authorizing the Perciballi Parties to place the following specific limitation in the records of the Arizona Corporation Commission related to Anchor's status as co-manager:

> Anchor's role as a manager is limited to monitoring the interest of C Squared Capital Partners, LLC in ArmorWorks Enterprises, LLC. Anchor plays no role in the day-to-day operations of the Company and has no authority to transact business with third parties on behalf of the Company or to make statements to third

---

[12] AWE's and TechFiber's inexplicable failure to acknowledge to this Court that their judicial estoppel argument was tried and rejected in the State Court Proceedings is unclear, particularly in light of the judicial admissions contained in the Motion for Stay.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

parties that bind the Company. Notwithstanding its listing as a manager, Anchor is not an agent of the Company for the purpose of carrying on the Company's business in the usual way.

*See* "ArmorWorks Enterprises, LLC's, ArmorWorks, Inc.'s and William Perciballi's Response to Plaintiffs' Notice of Lodging Rule 54(b) Judgment and Cross Motion for Clarification of the Court's February 14, 2013 Minute Entry" (the "Motion for Clarification"), a copy of which is attached as **Exhibit B**, at p. 7.

Later, in the "ArmorWorks Enterprises, LLC's, ArmorWorks, Inc.'s and William Perciballi's Reply in Support of Cross Motion for Clarification of the Court's February 14, 2013 Minute Entry" (the "Reply in Support of Clarification") the Perciballi Parties again requested that the State Court limit Anchor's rights as co-manager. In the Reply in Support of Clarification, the Perciballi Parties stated:

> When the Court enters a final order reinstating Anchor, the Court must provide guidance on Anchor's managerial role pending resolution of that issue by a jury. In the interim, before a jury can address which operating agreement is in effect, the AW Parties respectfully request that the Court clarify its order to indicate that Anchor's managerial role after reinstatement is no greater than what it had been at the time of the 2007 SBA protest and at all times from 2005 through 2009. To that end, the AW Parties request that the Court permit the AW Parties to include the statement described in the Cross-Motion in any filing with the ACC that reinstates Anchor.

*See* the Reply in Support of Clarification, a copy of which is attached as **Exhibit C**, at p. 5.

The State Court, in denying the Perciballi Parties' request for clarification held that:

> The AW Parties do not oppose Plaintiffs' request for Rule 54(b) certification; however, the AW Parties "cross move" seeking clarification whether the Minute Entry requires action beyond the reinstatement of Anchor as manager, specifically with regard to the extent of Anchor's managerial role after reinstatement. The Court declines to issue what would amount to an advisory opinion declaring "as to future rights in anticipation of an event which may never happen." *Citibank (Ariz.) v. Miller & Schroeder Fin., Inc.*, 168 Ariz. 178, 182 (App. 1990), quoting *Klein v. Ronstadt*, 149 Ariz. 123 (App. 1986); *see also Thomas v. City of Phx.*, 171 Ariz. 69, 74 (App. 1991). The Court finds that the Minute Entry is eminently clear vis-a-vis the scope of the declaratory relief Plaintiffs sought.

*See* Trial Exhibit 205 at p. 1.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

- 12 -

Based on the foregoing, it is abundantly clear that the Perciballi Parties litigated and lost both the judicial estoppel and the Anchor is a manager "in name only" arguments proffered in the Response. Their good faith basis for attempting to relitigate this issue here is unclear.[13] However, what is clear is that the issue preclusion doctrine bars them from doing so.[14]

### 2. Neither The Alleged Oral Operating Agreement Nor The Arizona Limited Liability Company Act Authorized Perciballi to Unilaterally File the Petitions.

Even assuming, *arguendo*, AWE and TechFiber could somehow convince this Court that the 2001 Operating Agreement was never effective to begin with,[15] they would still need to establish that either the alleged oral operating agreement or the LLC Act authorizes one of AWE's two co-managers to unilaterally file voluntary Chapter 11 petitions without the consent of the other manager and/or the members. However, neither the alleged oral operating agreement nor the LLC Act authorizes the actions taken by Perciballi in filing the petitions. Accordingly, these cases must be dismissed.

### a. The alleged oral operating agreement does not authorize Perciballi's unilateral filings.

In the Perciballi Declaration, Perciballi <u>contends</u> that AWE is governed by an oral operating agreement.[16] In particular, he alleges that the terms of the oral operating agreement are

---

[13] To the extent Debtors seek to have this Court essentially overturn the State Court's Ruling or judgment, such an act violates the *Rooker-Feldman* doctrine. *Henrichs v. Valley View Dev.*, 474 F.3d 609, 613-14 (9th Cir. 2007) ("The *Rooker-Feldman* doctrine provides that federal district courts lack jurisdiction to exercise appellate review over final state court judgments."). This Court therefore lacks authority to overrule the State Court Ruling, which is currently on appeal before the Arizona State Court of Appeals (*see C Squared v. Perciballi*, 1-CA-CV 13-0351, Arizona State Court of Appeals, Division 1).

[14] Likewise, Perciballi's testimony in 2009 that "up through the end of 2007 and the first half of 2008, [the Crowns] – their position in their dealings with me was that there was an operating agreement" belies any suggestion in the Response that the C Squared Parties ever agreed with Perciballi's position regarding the validity of the 2001 Operating Agreement. *See* Trial Exhibit 154, p. 45, ll. 4-7.

[15] AWE and TechFiber cannot argue that the 2001 Operating Agreement has been amended by anything other than the 2003 Operating Agreement Amendment because Section 10.5 provides that the 2001 Operating Agreement may only be amended by unanimous written agreement of all of the members. Besides the 2003 Operating Agreement Amendment, no such document exists.

[16] Curiously, in "ArmorWorks Enterprises, LLC's, ArmorWorks, Inc.'s and William Perciballi's Reply in Support of Motion for Stay of Execution Under 62(A)" (the "<u>Stay Motion Reply</u>"), the Perciballi Parties admit that the corporate authority issue remains an open issue. *See* the Motion for Stay Reply, a copy of which is attached as **Exhibit D**, at p. 6, ll. 23-25.

- 13 -

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

set forth in declarations (the "2007 Declarations") that were submitted to the U.S. Small Business Administration ("SBA") on December 24, 2007. The 2007 Declarations, however, are silent as to who has authority to file AWE into bankruptcy. Instead, the 2007 Declarations only address ordinary day-to-day operations, not extraordinary acts. However, filing a company into bankruptcy is far from a day-to-day management decision. *See, e.g., In re Stavola/Mason Electric Co., Inc.*, 94 B.R. 21, 23-24 (Bankr. Conn. 1988) ("[E]ven if the Agreement may be read to grant Manson general authority to manage the daily affairs of the corporation as the debtor argues, the logic that from this the more specific authority to file a bankruptcy petition may be implied is flawed. It is well established that the president of a corporation has no general power to file a petition because such an act goes beyond the daily management of corporate affairs; it is a specific act requiring specific authorization."); *In re Al-Wyn Food Distributors, Inc.*, 8 B.R. 42, 43 (Bankr. M.D. Fla. 1980) ("[T]he rationale that the filing of any sort of bankruptcy petition is a special act requiring special authorization and not a general duty of an officer remains valid."). Therefore, to the extent the 2007 Declarations set forth the terms of the alleged oral operating agreement as asserted by Perciballi, these documents do not authorize the unilateral filing of Chapter 11 petitions on behalf of AWE and TechFiber by one of AWE's two co-managers.

> **b.** **Nor does the Arizona Limited Liability Company Act permit Perciballi's unilateral filings.**

Perhaps cognizant of the fact that the alleged oral operating agreement provides no support for the unauthorized filings, AWE and TechFiber argue in the Response that the LLC Act authorized Perciballi, as one of the two co-managers of AWE, to file the Voluntary Petitions. Specifically, AWE and TechFiber argue that since the LLC Act doesn't expressly prohibit one of two co-managers from unilaterally filing an LLC into bankruptcy without the consent of either the other manager or the LLC's members, the LLC Act authorizes Perciballi to do just that. Not only are AWE and TechFiber wrong; if their theory were correct, chaos would reign.

One thing the parties all agree on is that the LLC Act does not expressly address the issue of authority to file an LLC into bankruptcy. Rather, A.R.S. § 29-681(B) provides that "[i]f the articles of organization provide that management of the limited liability company is vested in one

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

or more managers, management of the limited liability company is vested in a manager or managers, subject to any provisions in an operating agreement restricting or enlarging the management rights or responsibilities of one or more managers or classes of managers or reserving specified management rights to the members or classes of members." In addition, "[a] manager also holds the office and has the responsibilities that are accorded to him by the members and that are provided in an operating agreement." *See* A.R.S. § 29-681(B).

However, A.R.S. §§ 29-681(C) requires unanimous <u>member</u> consent to take certain actions. For example, as set forth in the Motion to Dismiss, A.R.S. § 29-681(C)(1) provides that "[e]xcept as provided in an operating agreement, the affirmative vote, approval or consent of <u>all</u> members is required to … authorize a transaction, agreement or action on behalf of the limited liability company that is unrelated to its purpose or business as stated in the operating agreement or that otherwise violates the operating agreement." (emphasis added). In other words, unless an operating agreement provides otherwise, the LLC Act requires unanimous consent of all members in order for a manager to take an action outside the ordinary course of the LLC's business. As the case authority relied on by AWE and TechFiber in the Response acknowledges, "[a] decision to file for bankruptcy protection is a decision outside of the ordinary course of business, even for an entity in dissolution." *In re Avalon Hotel Partners, LLC,* 302 B.R. 377, 380 (2003); *see also In re DB Capital Holdings, LLC*, 463 B.R. 142 (2010) ("We believe, as did the bankruptcy court, that the filing of a Chapter 11 bankruptcy petition is an act that makes it impossible to carry on a company's 'ordinary business,' even though the company's ability to continue to 'do business' is not completely eliminated."). If filing a bankruptcy petition makes it impossible to carry on a company's ordinary business, or is at least outside the ordinary course of business, it necessarily follows that filing for bankruptcy protection is the type of action "unrelated to [a company's] purpose or business" that requires the unanimous consent of all LLC members, unless otherwise provided in an operating agreement.[17]

---

[17] *See also* A.R.S. § 29-654(C) ("An act of a member or manager that is not apparently for carrying on the business of the limited liability company in the usual way does not bind the limited liability company unless authorized in fact by the limited liability company in the particular matter.")

- 15 -

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

On the other hand, if filing a bankruptcy petition is not outside the ordinary course of business, but is instead connected with the business of an LLC, A.R.S. § 29-681(D)(1) circumscribes a co-manager's ability to unilaterally file a company into bankruptcy without the consent of the other manager(s). Specifically, A.R.S. § 29-681(D)(1) provides that "[e]xcept as provided in an operating agreement, the affirmative vote, approval or consent of a majority of the members, or if management of the limited liability company is vested in one or more managers, the affirmative vote, **approval or consent of** the sole manager or **a majority of the managers, is required to … [r]esolve any difference concerning matters connected with the business of the limited liability company**." (emphasis added). Here, of course, there are two managers: Perciballi and Anchor. The managers disagree on whether filing AWE and TechFiber into bankruptcy is an appropriate action. Assuming the decision to file the companies into bankruptcy is a "matter[] connected with the business of the [companies]," the approval of both Perciballi *and* Anchor is required. Without such approval, the filings are not authorized by the LLC Act pursuant to A.R.S. § 29-681(D)(1), and these cases must be dismissed.

**3.    The Corporate Authority Issue Impacts Every Aspect of These Cases.**

If AWE's theory is correct, and either manager could make <u>any</u> decision for the companies, chaos would ensue. This is because the corporate authority issue impacts every aspect of these cases. For example, under AWE's theory, one day Perciballi could retain counsel, and the next day Anchor (the other manager) could fire them. One day Anchor could agree to DIP financing with a particular lender, and on the next day Perciballi could cancel the loan. In short, under AWE's theory that a co-manager has free reign to do whatever he or she wants, the rights and duties of the managers remain undefined. In fact, AWE admits that the LLC Act gives each manager the authority to bind AWE in the ordinary course of its business. *See* the Motion for Stay at p. 11, ll. 13-21; *see also* the Motion for Clarification at p. 7. As a result, if the Court does not dismiss these cases, it will be forced to fashion an *ad hoc* operating agreement setting forth who governs what actions of the Debtors going forward.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

## B. The Bankruptcy Cases Were Filed in Bad Faith

AWE and TechFiber do not dispute that lack of good faith in filing a Chapter 11 petition constitutes "cause" for dismissal under Section 1112(b).  *In re Marsch*, 36 F.3d 825, 828 (9th Cir. 1994).  "Determining whether the debtor's filing for relief is in good faith depends largely upon the bankruptcy court's on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realities."  *Oasis at Wild Horse Ranch,* 2011 WL 4502102, *28-9 (9th Cir. BAP 2011) (quoting *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072 (5th Cir. 1986)).  A Chapter 11 case is filed in bad faith "when it is an apparent two-party dispute that can be resolved outside of the Bankruptcy Court's jurisdiction."  *Id.* at *29 (quoting *In re Landmark Capital Co.*, 27 B.R. 273, 279 (D. Ariz. 1983)).  "Bad faith exists where the debtor only intended to defeat state court litigation." *In re Eisen*, 14 F.3d 469, 470 (9th Cir. 1994).

Despite the Debtors' claim that they are "in desperate need of financial reorganization," *see* Response at n. 21, this so-called crisis was carefully engineered by Perciballi, his lawyers, and his financial advisors in a transparent attempt to legitimize the forum shopping of his dispute with the C Squared Parties.  Indeed, AWE's schedules, assuming they are accurate, show that AWE is solvent to the tune of *a minimum* of approximately $11 million. *See* DE #1 at p. 7 (listing AWE's total assets as $38,004,129.89 and total liabilities as $27,225,126.47).  However, the vast majority of AWE's debt is owed to insiders, including $22,658,151.70 to ShockRide, LLC, a wholly owned non-debtor subsidiary.  *See id.* at p. 11, 72.  If just the insider indebtedness allegedly owed to ShockRide is excluded, AWE is solvent by approximately $33 million.  Furthermore, in the twelve months leading up to the Voluntary Petitions, AWE made equity distributions to the members in a total amount of $550,000. *See* DE #1 at Exhibit 3.c.  Equity distributions are hardly the act of a struggling company.

Furthermore, Perciballi has stated that one of the purposes of filing the Bankruptcy Cases was to sell TechFiber.[18]  Upon information and belief, Perciballi has received an offer from a

---

[18] *See* "Declaration of William J. Perciballi in Support of Debtors' Chapter 11 Petitions and First Day Motions" [DE #3] ("Perciballi Declaration") at ¶ 14 ("ArmorWorks filed a Chapter 11 petition for TechFiber to facilitate a sale of the business as part of ArmorWorks' restructuring of its business operations.").

potential purchaser of TechFiber for a minimum of $6 million. The proceeds from the sale of TechFiber would not only pay off *all* of AWE's non-insider debt, it would provide AWE with approximately $2 million to utilize as working capital.

Not only is AWE solvent, the timing of the Petitions, along with the Debtors' efforts to marginalize the C Squared Parties, demonstrate that the purpose of the bankruptcies is to circumvent the State Court Proceedings and the Ruling, which is obvious bad faith supporting dismissal. *Eisen, supra.*

The C Squared parties filed the Verified Complaint on or about May 9, 2011. Despite earning in excess of $250 million in 2011 *See* DE #1 at p. 93 (Statement of Financial Affairs), by no later than August, 2011 or only 3 months after the filing of the Verified Complaint, Perciballi retained both bankruptcy counsel, G&K, and bankruptcy financial advisors, MCA.[19] G&K and MCA were engaged for nearly two years prior to the filing of the Voluntary Petitions. However, the Voluntary Petitions were not filed until after the Ruling had been issued in the State Court Proceedings, after the State Court denied the AWE Parties' request for clarification on the extent of authority and control of Anchor as co-manager over AWE, after the State Court denied two different motions to stay the effectiveness of the Ruling, and after the State Court awarded the C Squared Parties their reasonable costs and attorneys' fees.[20]

The representations made to the State Court in the motions seeking stay of the effect of the Ruling are telling. In the Stay Motion and the Stay Motion Reply filed by the Perciballi Parties in the State Court Proceedings (collectively, the "Stay Motions"), the Perciballi parties acknowledged that the "actual managerial impact of the [State Court Ruling] simply has not been resolved yet" and that there is a danger of potential deadlock between the two managers of AWE. *See* Stay Motion Reply at p. 6:19-26.

In the Stay Motion, the Perciballi Parties argue as follows:

_____

[19] *See* Trial Exhibit 233.
[20] Not only are the Debtors seeking to avoid the Ruling in the State Court Proceedings, the proposed Bankruptcy Plan is seeking to accomplish what was already denied in State Court-the forced expulsion of C Squared from AWE. Specifically, in the State Court Proceedings, AWI filed a one count counterclaim seeking to "expel" C Squared from its membership interest in AWE, which was dismissed by the State Court.

- 18 -

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

> The likelihood of a deadlock is increased exponentially by the uncertainty that currently exists as to the nature and extent of the C Squared parties' control over AWE.
>
> …
>
> The authority that is statutorily conferred upon Anchor as a result of the Court's [Ruling] grants the C Squared Parties a level of control they never previously had.

*See* Stay Motion at p. 11:6-8, 18-20.

Despite the admission that "The authority that is statutorily conferred upon Anchor as a result of the Court's [Ruling] grants the C Squared Parties a level of control they never previously had," AWE now contradicts itself and takes an inconsistent position regarding Anchor's role as co-manager, in a bad faith attempt to legitimize Perciballi's unauthorized filings. For example, in the Response the Debtors argue that "[a]t best… Anchor is a 'nominal' or 'ceremonial' manager," with only a passive role in AWE. *See* Response at ¶¶ 46, 50.[21]

Perciballi not only is talking out of both sides of his mouth, he is also attempting to use the bankruptcy to shield himself from the effects of the Ruling and to *de facto* continue his unlawful removal of Anchor as co-manager. How can Perciballi claim Anchor has no managerial rights in the Bankruptcy Cases, while prophesying in State Court pleadings only a month pre-bankruptcy that Anchor's exercise of its co-manager rights will damage AWE because Anchor now has full rights as co-manager under the LLC Act? This bad faith attempt to use the bankruptcy to evade the Ruling and should not be tolerated by the Court.

The Bankruptcy Cases are merely the result of a two-party dispute which is better resolved (and indeed, was being resolved prior to the filing of the Petitions) outside of bankruptcy. This fact, in combination with Perciballi's suspect motive for filing the Bankruptcy Cases,[22] the fact that the Debtors' financial condition is far from "desperate," and the Perciballi

---

[21] The Perciballi Parties further admitted in the Motion for Clarification, which Judge Gama denied, that "[t]he failure to allow such an express limitation on Anchor's authority would have the effect of enlarging Anchor's role beyond the limited role that Anchor, by its own admission through the Anchor Declaration, has historically played." *See* the Motion for Clarification at p. 7.

[22] Perciballi's bad faith is further demonstrated by the Debtors' plan of reorganization, which proposes to force C Squared to redeem its membership interest in AWE for <u>nearly $9 million less</u> than what was offered as a consensual redemption price only one business day before the Petition Date, on June 14, 2013.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

Parties' fondness for flip-flopping positions at their convenience, warrants dismissal of the Bankruptcy Cases as bad faith filings.

**C.**     **The Court Cannot Consider Perciballi's Unilateral Filings as Involuntary Petitions.**

11 U.S.C. § 303(b)(3)(A) provides that an involuntary bankruptcy case under Chapter 7 or 11 can be filed on behalf of a partnership by "fewer than all of the general partners." Notably, this section does not provide for an involuntary filing by members and/or managers of a limited liability company ("LLC"). Although LLCs share some characteristics of partnerships, an important distinction is that LLC members are shielded from personal liability, and therefore should not be able to benefit from the same protections under the Bankruptcy Code afforded to general partners in a partnership:

> An important feature of an LLC is that it is owned by members, rather than partners or shareholders, and the members enjoy the same general limited liability protection as that afforded to shareholders of a corporation. Though a few bankruptcy courts have analogized members of an LLC to partners of a partnership in certain contexts, such as when considering the effect of a member's bankruptcy on the member's continued exercise of membership rights, **LLCs are not partnerships and members are not general partners**. Therefore, section 303(b)(3) of the Bankruptcy Code, which provides that fewer than all general partners may file an involuntary petition against a partnership, should not be available to members of an LLC. Moreover, it would not further the purpose of section 303(b)(3), which is to protect general partners who are personally liable for debts of the partnership, to make it available to LLC members who have limited liability protection similar to that afforded shareholders of a corporation.

2-203 Collier on Bankruptcy ¶ 303.17[7] (16th ed.) (internal citations omitted, emphasis added). As Perciballi is not a general partner personally liable for the debts of AWE, he cannot involuntarily place AWE into bankruptcy.

Further, in interpreting the Bankruptcy Code, the U.S. Supreme Court has held that "Congress 'says in a statute what it means and means in a statute what it says there.'" *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (quoting *Conn. Nat. Bank v. Germain*, 503 U.S. 249, 254 (1992)). Although the Bankruptcy Code has been recently amended, Congress has chosen not to amend Section 303 to include LLCs. Where a "statute's language is plain, the sole function of the courts – at least where the disposition required by the

- 20 -

text is not absurd – is to enforce it according to its terms." *Id.* (internal citations omitted). Additionally, a statute which "authorizes specific action and designates a particular party empowered to take it is surely among the least appropriate in which to presume nonexclusivity." *Id.* (holding that language of 11 U.S.C. 506(c) limits relief to trustee, the only party listed in the statute). It is not this Court's job to rewrite Section 303(b)(3), the language of which is plain on its face, to include LLCs or other excluded parties. Therefore, that section does not and cannot apply to these Bankruptcy Cases, and Perciballi's unilateral filings should not be treated as involuntary petitions under Section 303.[23]

Lastly, the Debtors' argument that the Voluntary Petition by AWE can be treated as an involuntary petition by Perciballi as one manager against AWE under 11 U.S.C. § 303 merely confirms what the C Squared Parties have been asserting all along – that AWE's and TechFiber's proposed professionals, including G&K, represent Perciballi's (the petitioning "partner") interests only, not the interests of AWE, TechFiber, or these estates.

### D. The Court Should Abstain From Deciding the Corporate Governance of AWE and Tech Fiber.

This corporate authority and control dispute has been in front of the State Court for over two years, but it wasn't until after the Perciballi Parties suffered an adverse ruling, which culminated in a significant fee award against them, that Perciballi took the extraordinary step of unilaterally filing these companies into bankruptcy. Perciballi's attempt at judge-shopping is transparent. Therefore, because of the long history and familiarity the State Court has with this dispute, as an alternative to dismissal under Section 1112(b), this Court should abstain from exercising jurisdiction over the Bankruptcy Cases.

There are three statutory bases for abstention under the Bankruptcy Code: 11 U.S.C. § 305(a) and 28 U.S.C. § 1334(c)(1) – (2). Orders granting abstention under these sections are unreviewable by appellate courts. *See* 11 U.S.C. § 305(c); 28 U.S.C. § 1334(d); *In re Bellucci*,

[23] "If the requisite support for an involuntary petition exists, it should be filed. **Parties should not be allowed to bootstrap their way into an involuntary case through an improperly filed voluntary petition.**" *In re Stavola/Mason Electric Co., Inc.*, 94 B.R. at 25 (emphasis added).

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

- 21 -

119 B.R. 763, 771 Bankr. E.D. Cal. 1990) (statutory abstention cannot be appealed). As set forth below, grounds exist for the Court to abstain under all three statutory bases.

### 1. 11 U.S.C. § 305(a)

Section 305(a) provides, in pertinent part, as follows:

> The court, after notice and a hearing, may dismiss a case under this title or may suspend all proceedings in a case under this title, at any time if –
>
> > (1) the interests of creditors and the debtor would be better served by such dismissal or suspension…

Abstention by a bankruptcy court from exercising jurisdiction under this section is with regard to the entire bankruptcy case. *In re Owen-Johnson*, 115 B.R. 254, 257 (Bankr. S.D. Cal. 1990); *Bellucci*, 119 B.R. at 771 (Section 305(a) applicable on an "all-or-nothing basis" to the bankruptcy case). The standard to be applied in considering relief under Section 305(a) is whether the "interests of creditors and the debtor would be better served by" abstention. *Id.* (citing statute). It is appropriate to dismiss a Chapter 11 case under Section 305(a) if litigation which is only a related proceeding to the Chapter 11 case "overshadows" or "overwhelms" any core bankruptcy issues that are present. *In re Churchill Dev., Ltd.*, 74 B.R. 187, 190 (Bankr. D. Ariz. 1987).

In *Churchill Dev.*, the Court *sua sponte* dismissed the debtor's Chapter 11 under Section 305(a) where the case essentially involved two parties engaged in "a potentially prolonged and vitriolic dispute" over vacant real property, and the debtor had limited liabilities and assets. 74 B.R. at 190. In dismissing the case, Judge Curley stated that "the purpose of Chapter 11 is reorganization of a viable enterprise or business, not to serve as a caretaker. Chapter 11 is not to be invoked by some individual or individuals to pursue their own purposes or to engage in gamesmanship." *Id.* Section 305(a) has also been used to dismiss bankruptcy proceedings filed without corporate authority. *See In re D&W Ltd., LLC*, 467 B.R. 427, 432 (Bankr. E.D. Mich. 2012) ("A bankruptcy case filed by someone purportedly acting on behalf of an entity, but without authority to do so as determined under state law, is improper and dismissible.").

- 22 -

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

Further grounds to dismiss under Section 305(a) exist with regard to bankruptcy cases filed in bad faith, or "simple two-party disputes." *See Bellucci*, 119 B.R. at 772; *In re First Conn. Consulting Group, Inc.*, 340 B.R. 210 (D. Vt. 2006) (dismissal of debtor LLCs' bankruptcy petitions warranted based on bad faith, where filing party had no legitimate reorganization purpose in filing the petitions; rather, purpose in filing was party's attempt to regain control and stay state court litigation); *In re Schur Mgmt. Co.*, 323 B.R. 123 (S.D.N.Y. 2005) (dismissal for bad faith appropriate where debtors failed to show any need for protection of bankruptcy laws, had no valid intent to reorganize, and could meet all of their non-contingent liabilities); *In re St. Marie Dev. Corp. of Mont., Inc.*, 334 B.R. 663 (Bankr. D. Mont. 2005) (petition dismissed as having been filed in bad faith where most debts belonged to insiders of debtor and bankruptcy petition would disrupt state court litigation); *In re ABQ-MCB Joint Venture*, 153 B.R. 338 (Bankr. D. N.M. 1993) (involuntary petition filed by coventurer dismissed under Section 305(a) where coventurer was using bankruptcy process solely for purpose of moving state court litigation to bankruptcy court forum and to resolve its intra-partnership disputes with the debtor); *In re Jr. Food Mart of Ark., Inc.*, 241 B.R. 423 (Bankr. E.D. Ark. 1999) (bankruptcy case which was essentially a two-party dispute initiated by dissatisfied state court litigant dismissed where state court proceedings were ongoing and long pending).

Clearly, the interests of creditors and the Debtors in these Bankruptcy Cases would be better served if the Court abstains under Section 305(a). Akin to *Churchill Dev.*, the parties' litigation over the validity of the 2001 Operating Agreement "overshadows" and "overwhelms" any core bankruptcy issues present in these cases, and is essentially a two-party dispute. *See* 74 B.R. at 190. Moreover, the petitions initiating the Bankruptcy Cases were filed in bad faith, without proper corporate authority. As such, this Court should abstain from exercising jurisdiction over the Bankruptcy Cases and dismiss the cases in their entirety under Section 305(a).

## 2. 28 U.S.C. § 1334(c)(1)

Section 1334(c)(1) provides bankruptcy courts with broad discretionary powers to recommend that it abstain from hearing any proceeding "arising under title 11 or arising in or

- 23 -

Snell & Wilmer

L.L.P.

LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

related to a case under title 11" if "in the interest of justice, or in the interest of comity with State courts or respect for State law." In the Ninth Circuit, courts are to consider twelve factors in deciding whether or not to abstain under Section 1334(c)(1):

> (1) the effect or lack thereof on the efficient administration of the estate if a Court recommends abstention, (2) the extent to which state law issues predominate over bankruptcy issues, (3) the difficult or unsettled nature of the applicable law, (4) the presence of a related proceeding commenced in state court or other non-bankruptcy court, (5) the jurisdictional basis, if any, other than 28 U.S.C. § 1334, (6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case, (7) the substance rather than the form of an asserted "core" proceeding, (8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court, (9) the burden [on] the bankruptcy court's docket, (10) the likelihood that the commencement of the proceeding involves forum shopping by one of the parties, (11) the existence of a right to a jury trial, and (12) the presence in the proceeding of nondebtor parties.

*In re Tucson Estates, Inc.*, 912 F.2d 1162, 1167 (9th Cir. 1990).

This Court should determine, in its discretion, to abstain from exercising jurisdiction over the Bankruptcy Cases under Section 1334(c)(1), because the outcome of the parties' dispute regarding the validity of the 2001 Operating Agreement (and, in turn, whether or not the Bankruptcy Cases were filed with the requisite corporate authority) is more properly decided in state court, where litigation has been pending for several years. The Bankruptcy Cases are nothing more than an attempt by Perciballi to "forum-shop" purely state law issues after an unfavorable decision. *See Turturici v. Nat'l Mortg. Servicing, LP*, 2011 U.S. Dist. LEXIS 109242 (E.D. Cal. September 26, 2011) (abstention motion granted under Section 1334(c)(1) and *Tucson Estates* factors where issues had already been raised in state court action pending at time of bankruptcy filing, and bankruptcy action was "an attempt to repackage" the debtor's state law claims).

### 3. 28 U.S.C. § 1334(c)(2)

Lastly, Section 1334(c)(2) calls for mandatory abstention in non-core proceedings when "an action could not have been commenced in a court of the United States absent jurisdiction under this section" and such action has been "commenced, and can be timely adjudicated, in a

- 24 -

State forum of appropriate jurisdiction." Mandatory abstention requires seven elements: (1) a timely motion by the party seeking abstention; (2) the action involves purely state law questions; (3) the action is "related to a case under title 11"; (4) there is no independent federal jurisdiction over the action absent the petition under Title 11; (5) the action is commenced in a state court; (6) the state court action may be timely adjudicated; and (7) a state court forum of appropriate jurisdiction exists. *Bowen Corp. v. Sec. Pac. Bank Id., F.S.B.*, 150 B.R. 777, 781-82 (Bankr. D. Id. 1993).

As stated above, whether or not the Bankruptcy Cases were filed with the requisite corporate authority turns entirely on the outcome of the parties' dispute regarding the validity of the 2001 Operating Agreement. Litigation regarding this undecided issue,[24] which concerns purely state law questions, was commenced in state court over two (2) years ago, and would be more properly and timely adjudicated in state court. This Court lacks subject matter jurisdiction over the parties' dispute, which could not have been commenced in federal court absent Perciballi's Chapter 11 petitions. Accordingly, this Court must abstain from ruling on the validity and enforceability of the 2001 Operating Agreement under Section 1334(c)(2), and, as a result, abstain from presiding over the Bankruptcy Cases altogether.

## IV.   **CONCLUSION**

For the foregoing reasons, the C Squared Parties respectfully request that the Court enter an order dismissing these Bankruptcy Cases.

RESPECTFULLY SUBMITTED this 10th day of July, 2013.

SNELL & WILMER L.L.P.


By  AEO (#026521)
    Steven D. Jerome
    Evans O'Brien
    Jill H. Perrella
    One Arizona Center
    400 E. Van Buren
    Phoenix, Arizona 85004-2202
    Attorneys for Attorneys for C Squared Capital Partners, LLC and Anchor Management, LLC

---

[24] *See* Ruling at p. 8 ("[T]he validity of the 2001 Operating Agreement was then and remains now an open question.").

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

1   **COPY** of the foregoing served by
    U.S. Mail or electronic notification
2   this 10th day of July, 2013, to:

3   ArmorWorks Enterprises, LLC
    305 N. 54th St.
4   Chandler, AZ 85226

5   TechFiber, LLC
    305 N. 54th St.
6   Chandler, AZ 85226

7   John R. Clemency
    Todd A. Burgess
8   Lindsi M. Weber
    GALLAGHER & KENNEDY, P.A.
9   2575 E. Camelback Rd.
    Phoenix, AZ 85016-9225
10  Email: john.clemency@gknet.com
            todd.burgess@gknet.com
11          lindsi.weber@gknet.com
    *Proposed Attorneys for the Debtor*
12
    Jennifer A. Giaimo
13  Renee Sandler Shamblin
    OFFICE OF THE U.S. TRUSTEE
14  230 N. First Ave., Ste. 204
    Phoenix, AZ 85003
15  Email: jennifer.a.giaimo@usdoj.gov
            renee.s.shamblin@usdoj.gov
16
    Andrew Abraham
17  BURCH & CRACCHIOLO
    702 E. Osborn Rd., Ste. 200
18  Phoenix, AZ 85014
    Email: aabraham@bcattorneys.com
19  *Attorneys for DIP Lender*

20  Joseph E. Cotterman
    ANDANTE LAW GROUP OF DANIEL E. GARRISON, PLLC
21  Scottsdale Financial Center I
    4110 N. Scottsdale Rd., Ste. 330
22  Scottsdale, AZ 85251
    Email: joe@andantelaw.com
23  *Attorneys for North 54th Street Venture, LLC*

24  Elizabeth K. Flaagan
    FAEGRE BAKER DANIELS LLP
25  1700 Lincoln St., Ste. 3200
    Denver, CO 80203
26  Email: Elizabeth.Flaagan@faegrebd.com
    *Attorneys for CoorsTek, Inc.*

27

28

D. Lamar Hawkins
Heather Macre
AIKEN SCHENK HAWKINS & RICCIARDI P.C.
2390 E. Camelback Rd., Ste. 400
Phoenix, AZ 85016-3479
Email: dlh@ashrlaw.com
         ham@ashrlaw.com
*Attorneys for MS Guadalupe, LLC*

James B. Ball
POLI & BALL, P.L.C.
2999 N. 44th St., Ste. 500
Phoenix, AZ 85018
Email: ball@poliball.com
*Attorneys for ArmorWorks, Inc.*

Official Joint Committee of
Unsecured Creditors:

DISTRIBUTION BY AIR
Richard Golwitzer
5404 N. 99th Street
Omaha, NE 68134
Email: richg@dbaco.com

NORTH 54th STREET VENTURE, LLC
Joseph E. Cotterman, by proxy
Andante Law Group
Scottsdale Financial Center I
4110 North Scottsdale Road, Suite 330
Scottsdale, AZ 85251
Email: joe@andantelaw.com

HISCO
Monty Schlaht
1839 West Drake Drive
Tempe, AZ 85253
Email: mschlaht@hiscoinc.com


/s/ Janice L. Rogalla

# EXHIBIT A

1   FENNEMORE CRAIG, P.C.
    Christopher L. Callahan (No. 009635)
2   John J. Balitis, Jr. (No. 011801)
    Carrie Pixler Ryerson (No. 028072)
3   3003 North Central Avenue, Suite 2600
    Phoenix, AZ 85012-2913
4   Telephone: (602) 916-5000
    Email: ccallaha@fclaw.com
5   Email: jbalitis@fclaw.com
    Email: cryerson@fclaw.com
6
    Attorneys for ArmorWorks Enterprises, LLC
7
    Michael N. Poli, #006431
8   Jeffrey G. Zane, #024172
    POLI & BALL, P.L.C.
9   2999 North 44th Street, Suite 500
    Phoenix, Arizona 85018
10  Telephone: (602) 840-1400
    Email: poli@poliball.com
11  Email: zane@poliball.com
12  Attorneys for ArmorWorks, Inc. and
    William J. Perciballi
13
                        ARIZONA SUPERIOR COURT
14
                        MARICOPA COUNTY
15

16  C SQUARED CAPITAL PARTNERS,        No. CV2011-009812
    LLC, et al.,
17                                      **ARMORWORKS ENTERPRISES,**
                    Plaintiffs,          **LLC'S, ARMORWORKS, INC.'S**
18                                      **AND WILLIAM PERCIBALLI'S**
            v.                           **MOTION FOR STAY OF**
19                                      **EXECUTION OF JUDGMENT**
    WILLIAM JOSEPH PERCIBALLI;          **UNDER 62(A)**
    ARMORWORKS, INC., et al.,
20                                      **(Assigned to the Honorable J.**
                    Defendants.          **Richard Gama)**
21
                                        **(FILED UNDER SEAL)**
22

23  _____
    AND RELATED COUNTERCLAIMS
24

25

26

FENNEMORE CRAIG, P.C.

PHOENIX

1    Pursuant to Arizona Rule of Civil Procedure 62(a), the AW Parties[1] respectfully
2    request that this Court stay enforcement of its Rule 54(b) judgment, dated April 9, 2013
3    (the "Judgment"), pending appeal.

4        The AW Parties previously sought a stay on the bases of Section 12-2108, Arizona
5    Revised Statutes, and Rules 62(f), Arizona Rules of Civil Procedure, and 7.1, Arizona
6    Rules of Civil Appellate Procedure.  The Court denied a stay on the bases of these rules
7    and, in the course of so doing, noted that the AW Parties had not sought relief under Rule
8    62(a).

9        The AW Parties did not initially seek relief under Rule 62(a) because, by its terms,
10   it applies only to "an action for an injunction" and to "a receivership action."  This suit
11   has nothing to do with a receivership.  While there are similarities between this action and
12   an injunctive proceeding, the AW Parties had asked the Court to draw this analogy in the
13   context of both the request for a jury trial and the admission of evidence on the balance of
14   the hardships between the AW Parties and the C Squared Parties.[2]  The C Squared Parties,
15   however, vehemently denied that the relief they sought should be characterized as an
16   injunction and, in its ruling granting the requested declaratory relief, this Court agreed.
17   Minute Entry Ruling, pp. 3-4.  Given the procedural background of this case and the
18   enactment of A.R.S. § 12-2108, the AW Parties could not have foreseen the application of
19   Rule 62(a).[3]

20

---

21   [1]    AW Parties refers to ArmorWorks Enterprises, LLC ("AWE"), ArmorWorks, Inc. ("AWI") and William Perciballi.

22   [2]    C Squared Parties refers to C Squared Capital Partners, LLC ("C Squared") and
23   Anchor Management, LLC ("Anchor").

24   [3]    Further, the dicta in *Kelley v. Arizona Dep't of Corrections*, 154 Ariz. 476, 480,
     744 P.2d 3, 7 (1987), that "non-money judgments are governed by Rule 62(a)" is not a
25   blanket rule and is subject to several exceptions and does not apply to every non-monetary
     judgment.  *See e.g.,* Ariz. R. Civ. App. P. 7(a)(1) (child custody orders); Ariz. R. Civ. P.
26   62(f)(2) (orders directing the sale of perishable property); A.R.S. § 25-325(A) (order
     directing child support or spousal maintenance may not be stayed, pending appeal).

FENNEMORE CRAIG, P.C.

PHOENIX

## I. RULE 62(C) FACTORS SUPPORT A STAY OF EXECUTION OF THE JUDGMENT.

Rule 62(a) provides that "[t]he provisions of subdivision (c) of this Rule govern the suspending, modifying, restoring, or granting of an injunction during the pendency of an appeal." Although the Judgment is not an injunction, the Court has held that Rule 62(a) applies and, therefore, the AW Parties now seek a stay under Rule 62(c). Rule 62(c) reads: "When an appeal is taken from an interlocutory or final judgment granting, dissolving, or denying an injunction, the court in its discretion may suspend, modify, restore, or grant an injunction during the pendency of an appeal upon such terms as to bond or otherwise as it considers proper for the security of the rights of the adverse party."

Because Arizona Rule 62(c) mirrors the federal rule, the standard for obtaining a stay is as follows:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Hilton v. Braunskill*, 481 U.S. 770, 776 (1987) (citations omitted); *see also Smith v. Ariz. Citizens Clean Elections Comm'n*, 212 Ariz. 407, 410 ¶ 10, 132 P.3d 1187, 1190 (2006).[4] Notably,

> [T]he moving party may establish either 1) probable success on the merits and the possibility of irreparable injury; or 2) the presence of serious questions and [that] the balance of hardships tip[s] sharply in favor of the moving party. . . . The greater and less reparable the harm, the less the showing of a strong likelihood of success on the merits need be. Conversely, if the likelihood of success on the merits is weak, the showing of irreparable harm must be stronger.

*Smith*, 212 Ariz. at 410 ¶ 10, 132 P.3d at 1190.

---

[4] As the C Squared Parties noted in their response to the AW Parties' first stay motion, *Smith* addresses the framework for considering a stay request pursuant to ARCAP 7(c). There is little difference between ARCAP 7(C) and ARCP 62(c), namely the former applies to stay requests made in the court of appeals.

FENNEMORE CRAIG, P.C.

PHOENIX

Federal courts have held that novel or difficult legal issues weigh in favor of granting a stay. *See, e.g., Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844-45 (D.C. Cir. 1977) ("What is fairly contemplated is that tribunals may properly stay their own orders when they have ruled on an admittedly difficult legal question and when the equities of the case suggest that the status quo should be maintained."); *Ctr. for Int'l Envtl. Law v. Office of U.S. Trade Rep.*, 240 F. Supp. 2d 21, 22 (D.D.C. 2003) ("That this Court's decision centered on a novel and 'admittedly difficult legal question' weighs in favor of a stay.") (citations omitted).[5]

A.   **The Judicial Estoppel Issue is Novel and There Is A Strong Likelihood that the AW Parties Will Prevail on Appeal.[6]**

As the Court is well aware, there is no Arizona case addressing the judicial estoppel issue presented to the Court.

It is clear that the position taken by the C Squared Parties in the Small Business Association ("SBA") proceeding and the relief the C Squared Parties now seek is entirely inconsistent. The fact that, as noted by the Court, the December 24, 2007 letter to the SBA "identified Anchor as an AWE manager" (Minute Entry, p. 4) does not alter this conclusion. The scope of the "managerial" role claimed by the C Squared Parties in the SBA proceeding was narrowly limited to monitoring C Squared's passive financial interest in AWE. In contrast, after Anchor's reinstatement, now the C Squared Parties seek appointment to Key Management Personnel, a role in which they have never served. *See* AW Parties' Motion for Clarification and Reply in Support of that Motion. Because of the differences in the managerial authority once exercised and now sought, the C Squared Parties' position in this litigation is diametrically opposed to what they

---

[5] AWI and Perciballi discussed the 62(a) factors in their separate reply filed on April 26, 2013. No party has moved for a stay Rule 62(a).

[6] Although there are a number of issues for appeal, the AW Parties focus on the issue of judicial estoppel.

FENNEMORE CRAIG, P.C.

PHOENIX

1  represented to the SBA.

2      Before applying the doctrine of judicial estoppel, courts require that a party

3  establish three elements: "(1) the parties must be the same, (2) the question involved must

4  be the same, and (3) the party asserting the inconsistent position must have been

5  successful in the prior judicial proceeding." *State v. Towery*, 186 Ariz. 168, 182, 920 P.2d

6  290, 304 (1996) (citation omitted).

7      The parties are the same – AWI, AWE, C Squared, Anchor Management and Eric

8  Crown, each of whom were represented by counsel, were fully involved in the SBA

9  proceeding. The question is the same – namely whether the C Squared Parties had the

10 ability or the potential ability to control AWE, either affirmatively or negatively. All of

11 the parties succeeded in the representations to the SBA – AWE retained its small business

12 status and AWE **and its members** reaped the benefit of a long term IDIQ contract that has

13 generated more than $100 million in revenue.

14     The only area of dispute concerns whether and to what extent the C Squared Parties

15 are bound, under the doctrines of judicial estoppel and/or quasi estoppel, by the

16 representations made in the December 24, 2007 letter from AWE's counsel, Christopher

17 Yukins, to the SBA. The AW Parties have argued that the C Squared Parties should be so

18 bound because the December 24, 2007 letter was prepared through a collaborative process

19 involving the C Squared Parties in which any and all changes to the letter that were

20 requested by the C Squared Parties or their counsel were made.

21     The Court rejected the AW Parties' contention, relying upon *Janus Capital Group,*

22 *Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2305 (2011), a case arising under Rule

23 10b-5.

24          Although C Squared Parties reviewed and commented on
           drafts of the December 24, 2007 Letter, AW Parties had
25         ultimate authority over the Letter and, therefore, are the only
           parties that may be bound by the arguments contained herein.
26         *Cf. Janus Capital Group, Inc. v. First Derivative Traders,*

FENNEMORE CRAIG, P.C.

PHOENIX

131 S. Ct. 2296, 2305 (2011) (regarding false statement under Rule 10b-5, "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it…").

Minute Entry at 8. Beyond citing case law for the generic elements of judicial estoppel, *Janus* is the only case law cited by the Court.

*Janus* is factually and analytically distinct. The Supreme Court in *Janus* analyzed the liability of a mutual fund investor (JCM) for false statements under federal securities regulations, which are completely inapposite in this case. The rule of law enunciated in *Janus* is "[f]or purposes of Rule 10b-5." 131 S. Ct. at 2302. Here, the analysis involves common law: whether the C Squared Parties asserted a position inconsistent with the position taken in the December 24, 2007 letter.

The limited authority of *Janus* was recently described in *Federal Housing Finance Agency v. Goldman, Sachs & Co.*, No. 11 Civ.6198 (DLC), 2012 WL 5494923 (S.D.N.Y. Nov. 12, 2012). In the setting of a common law fraud claim against lead defendant Goldman Sachs, Goldman argued that it did not "make" the misrepresentations and material omissions because it did not have "ultimate control" over the fraudulent documents (even though it was the underwriter). *Id.* at *2. The court, however, rejected this argument, writing "[t]his proposition is both factually and legally dubious." *Id.* In particular, the court rejected Goldman's reliance on *Janus* because the Supreme Court's holding therein was predicated on Rule 10b-5:

> The Court's avowedly "narrow" holding with regard to the scope of liability under Rule 10(b)–5 was driven by a number of considerations that are inapplicable to common law fraud claims like those asserted here. First, the Court emphasized repeatedly that its decision was compelled, in part, by "[c]oncerns with the judicial creation of a private cause of action," which require giving "narrow dimensions" to private rights under Rule 10(b)–5. New York's fraud cause of action, however, is not a judicial gloss on a legislative enactment, but rather a right that arises out of the common law unencumbered by the separation-of-powers concerns that

FENNEMORE CRAIG, P.C.

PHOENIX

counsel judicial caution in the context of Rule 10(b)–5.

*Id.* at *3 (emphasis added). The court also noted that *Janus'* narrow interpretation of SEC Rule 10b-5, which was informed by dictionary definitions of words, rendered it "of little relevance here, where there is no statutory text to parse." *Id.* (emphasis added). Finally, the court explained that the Supreme Court in *Janus* could not read 10b-5 broadly without undermining the Supreme Court's express preclusion against aiding and abetting liability for 10b-5 claims, whereas the common law contains no such restrictions on aiding and abetting liability. *Id.* Thus, the court found Goldman potentially liable for the fraudulent documents, despite its lack of "ultimate authority" over the contents. *Id.* at *4.

The *Federal Housing Finance Agency* decision is in accord with other courts that have similarly limited *Janus*. *See Allstate Ins. Co. v. Countrywide Financial Corp.*, 824 F. Supp. 2d 1164, 1186 (C.D. Cal. 2011) ("The [*Janus*] Court adopted a very limited interpretation of the verb "to make," holding that "[o]ne 'makes' a statement by stating it . . . it is the speaker who takes credit - or blame - for what is ultimately said." Under that logic, a related company which substantially participates in, or even drafts, a misrepresentation is not a speaker and therefore not liable. No court has yet addressed whether *Janus'* logic applies to New York common law fraud claims in addition to § 10(b) claims. The Court finds that it does not."); *In re Optimal U.S. Litigation*, 837 F. Supp. 2d 244, 262 (S.D.N.Y. 2011) (*Janus* "applies uniquely to federal securities law claims. . . . Limitations imposed on a cause of action because it is an implied right of action under a federal statute should not be used to limit the common law.").

Even if it were to be argued that hyper-technical federal securities regulations applied in this case, the *Janus* Court's analysis would not. *Janus* addresses the situation where the prospectus did not attribute any statements to the mutual fund investor, which precluded the Court from analyzing whether any indirect statements had been made. 131 S.Ct. at 2305 n. 11 (internal citations omitted) (explaining that the opinion does not

FENNEMORE CRAIG, P.C.

PHOENIX

address "what it means to communicate a 'made' statement indirectly because none of the statements in the prospectuses were attributed, explicitly or implicitly, to JCM. Without attribution, there is no indication that Janus Investment Fund was quoting or otherwise repeating a statement originally "made" by JCM."). In this case, however, the December 24, 2007 letter attributes statements to the C Squared Parties. The C Squared Parties submitted a declaration to the SBA under oath and on penalty of perjury in support of the December 24, 2007 letter, which was cited in the December 24, 2007 letter and used to support the assertions that: (1) the written operating agreement ("Written OA") was ineffective; and (2) the C Squared Parties had no control over AWE.

Additionally, even using the logic of *Janus*, namely, that "the maker of a statement is the person or entity with ultimate authority over the statement," the C Squared Parties, as AWE's 40% owner, did have ultimate authority to control the statements. Wholly apart from C Squared's ownership interest, the December 24, 2007 letter could not have made the statements that it did regarding the C Squared Parties' historical lack of control without the assent of the C Squared Parties because, absent such assent, the statements could have been characterized as untrue. Hence, the C Squared Parties did have "ultimate control" over the pertinent statements.

Finally, even if *Janus* did relieve the C Squared Parties of the statements made in the December 24, 2007 letter, it would not relieve them of the statements made in the Anchor Declaration, executed by Matt Gallaher, Anchor's Chief Financial Officer. The Gallaher declaration goes on to explain in detail the lack of historical involvement, much less control, by C Squared and Anchor in the operations of AWE. Specifically, the declaration states that:

- "Anchor is virtually unknown to the ArmorWorks Enterprises, LLC employees, and representatives of Anchor have almost never visited the ArmorWorks Enterprises, LLC facilities." OSC Hearing Exhibit 61 (Gallaher Declaration, Letter to SBA) at 23.

FENNEMORE CRAIG, P.C.

PHOENIX

1
- "Much of ArmorWorks Enterprises, LLC's work requires security clearances due to the classified nature of the armor being produced for combat operations. Neither Anchor nor any agents of Anchor have [such] clearances . . ." OSC Hearing Exhibit 61 (Gallaher Declaration, to SBA) at 24.

2

3

4
- "Neither Anchor nor its principals have been involved in any government contract awarded to ArmorWorks Enterprises, LLC." OSC Hearing Exhibit 61 (Gallaher Declaration, Letter to SBA) at 24.

5

6
- "Anchor does not have expertise in federal contracting or armor manufacturing . . ." OSC Hearing Exhibit 61 (Gallaher Declaration, Letter to SBA) at 24.

7

8 Gallaher testified that he knew, at the time he signed the Anchor declaration, that the

9 December 24, 2007 letter made the control representation, Matt Gallaher June 18, 2012

10 OSC Hearing Testimony at 112:23-113:12, attached as Exhibit A, and that all of the drafts

11 of the December 24, 2007 letter that Gallaher reviewed contained the control

12 representation. Exhibit A, Gallaher's OSC July 25, 2012 OSC Hearing Testimony at

13 20:17-21.

14     The C Squared Parties and their counsel participated fully in the drafting of the

15 December 24, 2007 letter, made numerous revisions and ***approved*** the final version of the

16 December 24, 2007 letter containing the critical representations regarding the invalidity of

17 the Written OA and the C Squared Parties' lack of control rights over AWE. They went

18 even further, submitting the declaration of their agent, Anchor, in support of the

19 December 24, 2007 letter. The Anchor declaration raised nothing to suggest that the

20 Written OA was legally binding or that the C Squared Parties had any sort of control over

21 AWE. Even subsequent to the SBA's determination, the C Squared Parties remained

22 silent, never stating any disagreement with the representations made to the SBA. *See* AW

23 Parties' Proposed Findings of Fact, ¶¶ 99-129.

24     Courts have applied the judicial estoppel doctrine to situations where a party

25 maintained silence instead of voicing an objection. For example, in *In Re Osyka Corp.*,

26 426 B.R. 653 (Bankr. S.D. Tex. 2010), the court applied judicial estoppel and held that a

1  party's silence at an earlier hearing barred it from asserting a position contrary to its

2  silence. *Id.* at 661-64. Specifically, the court stated that "[i]f Legado had a problem with

3  the form of assignment, Legado, as a co-movant on the Motion to Approve Compromise,

4  was obligated to speak." *Id.* at 663.

5      The same rationale applies here. If the C Squared Parties believed that the

6  December 24, 2007 letter did not accurately describe the enforceability of the Written OA

7  or the issue of control as to AWE, they should have voiced an objection. Instead, the C

8  Squared Parties opted to remain silent on three separate occasions: (1) when they were

9  given the opportunity to suggest revisions to drafts of the December 24, 2007 letter; (2)

10  when they submitted a separate declaration supporting the December 24, 2007 letter; and

11  (3) when they failed to appeal from the SBA's determination. Under these circumstances,

12  the Court should apply judicial estoppel to bar the C Squared Parties from asserting

13  positions contrary to those asserted in the SBA proceeding.

14      The AW Parties respectfully submit that the inapplicability of *Janus* creates a

15  substantial likelihood that the AW Parties will prevail on appeal. At a minimum, it raises

16  serious questions as to the correctness of the Court's ruling on judicial estoppel.

17      **B.**    **The AW Parties Will Be Irreparably Injured Absent a Stay.**

18      While the Court sharply curtailed the ability of the AW Parties to present fully the

19  testimony of James Nagle, Devon Hewitt and Christopher Yukins regarding the nature

20  and scope of the potential irreparable nature to the AW Parties that could result from the

21  reinstatement of Anchor as a manager, the AW Parties have explained that harm in

22  multiple filings. *See, e.g.*, AWE's Post-Hearing Memorandum at 20-22; AWE's

23  Response to OSC Application (9/23/11) at 5-7; AWE's Response to MTD Counterclaims

24  (10/4/11) at 4-5, 17; AWI's Response to MTD Counterclaims (10/5/11) at 4-6, 8; AW

25  Parties' Hearing Memorandum (6/11/12) at 14-23; AW Parties' Response to MIL re

26  Expert Witnesses (6/12/12) at 5-6, 12-13; AWE's Response to Objections re Hearing

1    Memorandum (6/15/12) at 3; AW Parties' Offer of Proof re Excluded Testimony

2    (7/13/12) at 2-4; AW Parties' Reply in Support of Offer of Proof re Excluded Testimony

3    (8/6/12) at 2-5.

4             **1.      Management of AWE Will Be Deadlocked.**

5        The polarized and acrimonious relationship between the parties has been

6    demonstrated throughout this proceeding. The likelihood of a deadlock is increased

7    exponentially by the uncertainty that currently exists as to the nature and extent of the C

8    Squared Parties' control over AWE. *See* AW Parties' Motion for Clarification.

9        The management of AWE with the C Squared Parties' interference or the prospect

10    of a deadlock could not possibly come at a more inopportune time. Due to the winding

11    down of two wars and the collapse of the federal defense budget, AWE faces a critical

12    period. AWE requires stability and undivided management to survive as a viable

13    business. Arizona's Limited Liability Company ("LLC") Act provides that for manager-

14    managed LLCs, each manager is an agent of the LLC for the purpose of carrying on its

15    business in the usual way. *See* A.R.S. § 29-654(B)(2). The LLC Act also gives a

16    "manager" ostensible authority to bind the limited liability company in dealings with third

17    parties unless the third party has actual knowledge that the manager lacks such authority.

18    A.R.S. § 29-654(B)(3). The authority that is statutorily conferred upon Anchor as a result

19    of the Court's Judgment grants the C Squared Parties a level of control they never

20    previously had. Such unprecedented control will cause irreparable harm to the

21    management of AWE, and its ability to survive as a company in this critical time.

22           **2.      Reinstating Anchor Creates Legal Risks and Liability to AWE.**

23        The reinstatement of Anchor as a manager for AWE with authority in excess of

24    what was represented to the SBA in connection with the 2007 Bid Protest creates risks

25    that AWE may lose its small business status, may face suspension or debarment and may

26

1  be exposed to civil and/or criminal liability under the False Claims Act.  *See* AWE's Post-
2  Hearing Memorandum at 20-22.

3  James Nagle, an expert on the Federal False Claims Act, testified that the
4  government can prosecute violations of the Criminal False Claims Act (July 26, 2012
5  OSC Hearing Transcript at 110:15-19, attached as Exhibit B), or it can pursue monetary
6  damages under the Civil False Claims Act. *Id.* at 113:1-5. Nagle also testified that the
7  government can terminate the contract at issue (*id.* at 113:5-8) or debar the contractor. *Id.*
8  at 113:9-114:4. Nagle further noted that debarment for a federal contractor is "as close to
9  a death sentence as you get" (*id.* at 114:5-14), and it is "very difficult for a company to
10 survive debarment." *Id.* at 115:3-13. Similarly, Devon Hewitt, an expert on the Small
11 Business Act, testified that the SBA can pursue suspension or debarment against a
12 contractor that has improperly self-certified itself as a small business. June 19, 2012 OSC
13 Hearing Transcript, at 161:23-163:5, attached as Exhibit C. Thus, any reinstatement of
14 Anchor as a "manager" with rights other than what was represented to the SBA would
15 expose AWE and its members to a real risk of penalties, both civilly and potentially
16 criminally.

17  **C.**   **Staying the Judgment Will Not Injure the C Squared Parties.**

18  Because Anchor's only role as a "manager" of AWE was to monitor C Squared's
19 passive investment in AWE, the C Squared Parties can continue to monitor their financial
20 investment without Anchor being a manager and, indeed, have done so since Anchor's
21 removal. *See* AW Parties' Proposed Facts for the OSC Hearing, ¶145(g). Indeed, Eric
22 Crown admitted that Anchor does not need to be a manager in order to monitor C
23 Squared's investment in AWE. *See* Eric Crown July 25, 2012 OSC Hearing Testimony at
24 53:21-54:8, 54:16-23, attached as Exhibit D. Further, the C Squared Parties continue to
25 receive the same monthly financial data in order to facilitate monitoring of their passive
26 financial investment. *Compare* OSC Hearing Exhibits 297-301 *with* OSC Hearing

1    Exhibits 302-306; David Wirthlin July 26, 2012 OSC Hearing Testimony at 149:23-150:3;

2    153:15-154:4, attached as Exhibit E.

3        **D.**     **The Public Interest Favors Entering a Stay.**

4       Public policy cannot be advanced by permitting the C Squared Parties to make

5    representations as part of a submittal to the federal government, and then to seek an exact

6    opposite judicial declaration. Further, if AWE's management becomes deadlocked in

7    decision-making, this could result in layoffs for a company that employs over 200 people

8    and a slow down in the production of military armor. Such outcomes are contrary to

9    public policy.

10    **II.**     **CONCLUSION**

11       The AW Parties respectfully submit that a stay pending appeal is warranted. The

12    C Squared Parties' only legitimate interest in serving as a manager is to facilitate their

13    review of the financial performance of the Company to monitor C Squared's interest

14    therein. AWE has continued to provide the C Squared Parties with the same level of

15    detailed financial information after Anchor's removal as a manager that it had previously

16    provided. It will continue to do so. Hence, there is no harm to the C Squared Parties from

17    the maintenance of the status quo pending appeal.

18       In contrast, the reinstatement of Anchor as a manager creates potential existential

19    threats to AWE. Because there are at least serious questions regarding the manner in

20    which the Court has addressed the judicial estoppel issue, the AW Parties respectfully

21    request the Court to issue a stay, conditioned upon the provision of such reasonable

22    security as determined necessary to protect the interests of the C Squared Parties.

23

24

25

26

FENNEMORE CRAIG, P.C.

PHOENIX

13

DATED this 2nd day of May, 2013.

POLI & BALL, P.L.C.                          FENNEMORE CRAIG, P.C.

By: _____ b/ permission        By: _____
    Michael N. Poli                           Christopher L. Callahan
    Jeffrey G. Zane                            John J. Balitis, Jr.
    Attorneys for ArmorWorks, Inc. and         Carrie Pixler Ryerson
    William Perciballi                         Attorneys for ArmorWorks Enterprises,
                                               L.L.C.

**ORIGINAL** filed with Court
**COPY** of the foregoing mailed
this 2nd day of May, 2013, to:

Joel P. Hoxie, Esq.
Kelly A. Kszywienski, Esq.
SNELL & WILMER L.L.P.
One Arizona Center
400 East Van Buren
Phoenix, AZ 85004-2202
Attorneys for Plaintiffs

Michael N. Poli, Esq.
Jeffrey G. Zane, Esq.
POLI & BALL, P.L.C.
2999 North 44th Street, Suite 500
Phoenix, AZ 85018
Attorneys for Defendants William J. Perciballi
and ArmorWorks, Inc.

David W. Cowles, Esq.
TIFFANY & BOSCO, P.A.
Camelback Esplanade II – Third Floor
2525 East Camelback Road
Phoenix, AZ 85016-9240
Attorneys for Defendants William J. Perciballi
and ArmorWorks, Inc.

_____
Julie Calvano Tolby

8137096.2/010174.0037

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

FENNEMORE CRAIG, P.C.
PHOENIX

- 15 -

# EXHIBIT A

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

ARMOR WORKS, INC., et al )
)
Plaintiffs, )
)
vs. )    CV 2011-008170
)    CV 2011-009812
TIMOTHY A. CROWN, et al., )
)
Defendants. )
_____ )

Phoenix, Arizona
June 18, 2012

BEFORE:  THE HONORABLE J. RICHARD GAMA
Judge of the Superior Court

REPORTER'S TRANSCRIPT OF PROCEEDINGS

(Oral Argument)

PREPARED FOR:
COPY

MICHELE KALEY, RPR
Certified Court Reporter #50512
kaleym@superiorcourt.maricopa.gov
(602) 506-1247

1    that's all -- that's pages 1 through 22, right?

2        A.   Correct.

3        Q.   And you know, Mr. Gallaher, that that letter that

4    you submitted your declaration under oath in support of,

5    it contained both the Operating Agreement representation

6    and the control representation.

7            You knew that, right?

8        A.   I don't know if I did or didn't.

9        Q.   Well, did you read it?  When you're signing a

10   declaration under penalty of perjury --

11       A.   I certainly read --

12       Q.   All right.  Let me go back to my question.

13       A.   -- pages 23 and 24.

14       Q.   Okay.  Does that mean you signed a declaration

15   under penalty of perjury and only read page pages 23 and

16   24 and did not bother to read the letter?  Is that what

17   you're telling us?

18       A.   What I'm telling you is I am certainly declaring

19   to page 23 and 24.

20       Q.   Did you read the letter?

21       A.   I know I read drafts of the letter.  I don't know

22   if I read the final letter or not.  I assume I did.

23       Q.   Go to page 2.  I mean, this part is in every

24   single draft.  So if you read every single draft, you read

25   this, including the second paragraph below that.  Thank

1  you.  It's, basically, yeah, perfect.

2        It's talking about affiliation.  For the link to

3  be effective, for the chain of affiliation of work, the

4  Crowns would need to exercise common control, et cetera,

5  et cetera.  Our internal review has shown, however, that

6  any chain of affiliation breaks at C Squared because C

7  Squared and its managing agent do not and can not exercise

8  the requisite control.

9        I can show it to you, Mr. Gallaher, but this is

10  in every draft.  So even if you didn't the final letter,

11  you read this in the drafts, right?

12     A.   I'm sure I must have read that at some time.

13     Q.   So when you submitted your declaration under

14  penalty of perjury, you knew this is what I would call the

15  control representation.

16        When you submitted a declaration under penalty of

17  perjury, Mr. Gallaher, you knew that the control

18  representation was in that letter, correct?

19     A.   Again, I can only say I've read the draft.  I

20  don't know if I fully understood everything that was in

21  the draft because there's lots of legal representations,

22  and I'm not an attorney.

23     Q.   So let me make sure I understand.  Are you

24  telling us that, because of a lack of legal training, you

25  didn't understand the significance of this representation

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA


ARMOR WORKS, INC., et al )
)
     Plaintiffs, )
)
    vs. ) CV 2011-008170
) CV 2011-009812
TIMOTHY A. CROWN, et al., )
)
    Defendants. )
)
_____ )


Phoenix, Arizona
July 25, 2012

BEFORE:  THE HONORABLE J. RICHARD GAMA
Judge of the Superior Court


REPORTER'S TRANSCRIPT OF PROCEEDINGS

(Oral Argument)


PREPARED FOR:
COPY


MICHELE KALEY, RPR
Certified Court Reporter #50512
kaleym@superiorcourt.maricopa.gov
(602) 506-1247

1  and correct, right?

2      A.    Correct.

3      Q.    Prior to executing that declaration, you had an

4  opportunity to review preliminary drafts of what became

5  the December 24th letter, Exhibit 61, correct?

6      A.    Please repeat the question.

7      Q.    Sure.  Prior to executing that declaration, you

8  did have an opportunity to review drafts of what

9  ultimately became Exhibit 61, correct?

10     A.    I do remember receiving several drafts of

11  Exhibit 61.

12     Q.    And on June 18th, you testified that you did, in

13  fact, read some of the drafts, at least before executing

14  that declaration.

15          Do you recall that?

16     A.    I do.

17     Q.    Now all of the drafts you reviewed contained

18  various iterations of what Mr. Poli defined as the Control

19  Representation and the Operating Agreement Representation.

20          Would you agree with me on that?

21     A.    Yes.

22     Q.    Prior to the December 20th letter, there was an

23  e-mail from Mr. Yukins that was marked as Exhibit 50.  Let

24  me show that to you.  And it's the second one down here,

25  the e-mail from Mr. Yukins, the second paragraph.

# EXHIBIT
# B

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

ARMOR WORKS, INC., et al )
)
     Plaintiffs, )
)
    vs. )   CV 2011-008170
)   CV 2011-009812
TIMOTHY A. CROWN, et al., )
)
    Defendants. )
)
_____ )

Phoenix, Arizona
July 26, 2012

BEFORE:  THE HONORABLE J. RICHARD GAMA
Judge of the Superior Court

REPORTER'S TRANSCRIPT OF PROCEEDINGS

(Oral Argument)

PREPARED FOR:
COPY

MICHELE KALEY, RPR
Certified Court Reporter #50512
kaleym@superiorcourt.maricopa.gov
(602) 506-1247

1   contract cases.  There's an Armed Services Board.  Now

2   there's a civilian board.  So there's an association of

3   both the judges and the practitioners before those boards.

4        Q.   All of the background you've told us about, has

5   this background provided you with the expertise and

6   experience to understand the requirements of federal

7   government contract law, as well as the ramifications that

8   can arise if there are problems?

9        A.   Yes, I think it has.

10       Q.   Tell me about, and tell the Court about the

11  standard practices and the possible remedies of the

12  federal government if the government concludes that a

13  contractor is or someone associated with a contractor has

14  made a representation, excuse me, a misrepresentation?

15       A.    If the federal government feels that a contractor

16  or a would-be contractor has misrepresented itself in some

17  material fashion, they have four remedies they can take.

18  The criminal remedy, proof beyond a reasonable doubt; the

19  criminal statutes of False Claims Act.

20       Q.   So in other words, the remedies have different

21  burdens of proof?

22       A.   Yes, sir.

23       Q.   Okay.  In other words --

24            MS. KSZYWIENSKI:  Excuse me.  I'm sorry.  We

25  object to that, your Honor.  You've held that he can't

1   proof beyond a reasonable doubt.  The next is the civil,
2   where the government are sued for damages, for example,
3   under the Civil False Claims Act.  It's a lower standard,
4   preponderance of the evidence.  And the government can sue
5   for triple damages.  The third is the contractual remedy
6   where it's, basically, whatever the contracting officer
7   believes is appropriate under the circumstances; possibly
8   termination of the contract for default.

9         And there's the fourth one where I had the
10  quibble with your question.  That's the administrative
11  remedy of debarment where the government can decide, we
12  think, you know, you have tried to cheat us, so we will
13  debar you.  We will not do business with you.  And the
14  reason why I had to quibble when you asked that, when you
15  phrased the question that way, the scary thing about the
16  debarment is, at least in a criminal section, you've got a
17  whole host of due process remedies.

18        In debarment, it's whatever the debarring
19  official for the agency thinks is appropriate.  And you go
20  on the debarred list as soon as someone proposes you for
21  debarment.  And that sounds harsh, but the only way I can
22  analogize it is, if you think JC Penney has cheated you,
23  you don't have to have a hearing to decide if you'll take
24  your business elsewhere.  That's pretty much the way the
25  federal government does it.

1      You know, Mike, you've tried to cheat us.  You
2  are on EPLS, the Excluded Party List System.  Now you may
3  eventually get a hearing, but it's not necessarily a full
4  fledged trial where you get to cross-examine witnesses.
5      Q.   If you're a contractor that all or most of your
6  business is with the federal government and you get
7  debarred, would that be the equivalent of a death sentence
8  for that company?
9      A.   That's as close to a death sentence as you get
10  because you stay on the list normally for three years.
11  And typically, state governments won't touch you.  City
12  governments won't touch you.  Sureties won't touch you.
13  You don't see too many companies that can survive a
14  debarment.
15      Q.   Okay.  So if you get debarred, I take it from
16  your comments, does the contractor have the right to have
17  a trial or evidentiary hearing?
18      A.   There is no right to a trial.  They have a right
19  to appear before the agency debarring official and to
20  present their position.  Very often, what they will do,
21  they -- you're right, government, this is the corrective
22  actions we've taken.  But there is no right to
23  cross-examine witnesses or, you know.
24      Q.   Can they even present witnesses?
25      A.   Depending on the agency.  The agency official may

1  allow them to come in with people to explain their side of

2  it, but that's not set forth in the FAR.

3      Q.   Okay.  I think maybe you addressed this.  But is

4  it, in your experience, that very few contractors that get

5  debarred, if they are a substantial federal contractor can

6  actually survive the process?

7      A.   No.  It's really very difficult to survive that

8  long without any business from your major customer.  I

9  should explain and qualify that.  That does not mean that,

10  if you have a contract today and you're debarred, that the

11  agency must terminate that for convenience, must terminate

12  that -- excuse me.  But they cannot give you any new

13  contracts.

14      Q.   Okay.

15      A.   Without very high level of proof.

16      Q.   I take it they can terminate existing contracts?

17      A.   They can, especially if there's a correlation

18  between the cause of the debarment and particular

19  performance.

20      Q.   Are there difference methods -- I assume there

21  must be, but are there different methods by which the

22  government could learn of a misrepresentation that was

23  made to the government?

24      A.   Yes.  And that's a real problem area.  People

25  come in to see me all the time.  And they've discovered a

# EXHIBIT C

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA


ARMOR WORKS, INC., et al )
)
     Plaintiffs, )
)
     vs. )  CV 2011-008170
)  CV 2011-009812
TIMOTHY A. CROWN, et al., )
)
     Defendants. )
)
_____ )


Phoenix, Arizona
June 19, 2012

BEFORE:  THE HONORABLE J. RICHARD GAMA
Judge of the Superior Court


<u>REPORTER'S TRANSCRIPT OF PROCEEDINGS</u>

(Oral Argument)


PREPARED FOR:
COPY


MICHELE KALEY, RPR
Certified Court Reporter #50512
kaleym@superiorcourt.maricopa.gov
(602) 506-1247

1  does the government do anything in response to that

2  certification to check it automatically?

3      A.  Well, that's changed over time.  It's

4  interesting.  It used to be that they didn't do very much.

5  Now they are required to check ORCA.  Because if you

6  certify in your proposal, they sort of compare it to what

7  the certification is in the database, in ORCA to make sure

8  that you are indeed a small business.  But they are

9  entitled by regulation to accept a self-certification,

10 unless there's a protest.  Because a competitor or the

11 contracting officer can file its own protest on size or

12 status.

13      So typically speaking, for most programs, there

14 is one program -- well, a couple of programs in which you

15 have to actually be eligible and be certified in the

16 program before you can compete.  And that's the 8(a)

17 Program and that's the Veterans First Contracting Program

18 and the HUBZone Program.  So if this certification were to

19 occur in connection with applying for that program.  But

20 if you're just competing on a small business basis,

21 there's no program to apply to.  You just respond to a

22 solicitation and you self-certify.

23      Q.  So if I self-certify, and the SBA find finds out

24 that I miscertified myself as a small business, what are

25 the options available to the Small Business

1  Administration?

2          What can they do?

3      A.    There's a wide variety of actions.

4      Q.    Lets go through them.

5      A.    The SBA or other agencies or the Department of

6  Justice can take them.  The most benign is they can

7  terminate your contract.  The next here up is they can do

8  something called suspend the contractor.

9      Q.    What does that mean?

10     A.    That means that the contractor will not be

11 allowed to perform any government contracts work for a

12 period of, whatever the period of the suspension may be.

13 It could be anywhere from five months to three years to

14 five years.

15         So, frankly, it really is -- if you're suspended

16 for that long, you really can't do business after that

17 because you're put on a list.  You don't do any business.

18 I mean, that kind of hiatus -- government contractors

19 sometimes do commercial work.  But if you're a government

20 contractor, that's pretty much what you do.  So if you get

21 suspended for five years, that's pretty tantamount to

22 shutting down the business.  The third level is

23 debarment --

24     Q.    What is debarment?

25     A.    -- which is permanent.  It says -- well, you can

1  have, actually, you can have a period, again, you can be
2  debarred for five years or you can be debarred for a
3  longer time, in which case you cannot do anything.  You
4  can't be a government contractor, and you can't contract
5  with government contractors.
6         There are also civil penalties, some monetary
7  penalties for making what's known as a false claim.
8  There's something called the Civil False Claims Act.
9  There's also the Program Fraud Remedies Act.
10        And then there are criminal penalties for making
11 a false statement to the government.  And the Small
12 Business Act also provides criminal penalties for making a
13 false statement to SBA.
14    Q.    So we have six possible options or combinations,
15 correct?
16    A.    Right, uh-huh.
17    Q.    And they can do one.  They can do all of them,
18 correct?
19    A.    Yes.
20    Q.    Now in the course of your work in this case, did
21 you review the December 24th submittal written by
22 Mr. Yukins on behalf of ArmorWorks Enterprises?
23    A.    Yes.
24    Q.    And you understand that CPC had filed a protest
25 and that was part of what was submitted to the SBA in

# EXHIBIT D

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

ARMOR WORKS, INC., et al          )
                                  )
          Plaintiffs,             )
                                  )
     vs.                          )     CV 2011-008170
                                  )     CV 2011-009812
TIMOTHY A. CROWN, et al.,         )
                                  )
          Defendants.             )
                                  )
_____   )

Phoenix, Arizona
July 25, 2012

BEFORE:  THE HONORABLE J. RICHARD GAMA
         Judge of the Superior Court

REPORTER'S TRANSCRIPT OF PROCEEDINGS

(Oral Argument)

PREPARED FOR:
COPY

MICHELE KALEY, RPR
Certified Court Reporter #50512
kaleym@superiorcourt.maricopa.gov
(602) 506-1247

1    Q.   You do recall that, when you were deposed on
2  January 25th, I asked you the question I just now asked
3  you?

4    A.   You very well could have, yes.

5         MR. CALLAHAN:  Let me refresh your recollection.
6  EC 31, please, Brittany.

7         (Whereupon, a portion of the deposition of Eric
8  Crown was played in open court.)

9    Q.   BY MR. CALLAHAN:  Does that refresh your
10 recollection as to your deposition?

11   A.   That's something I said, yes.

12   Q.   Now you talked about the last one this morning,
13 about the lack of financial reporting --

14   A.   Uh-huh.

15   Q.   -- that you claim to be receiving, correct?

16   A.   Correct.

17   Q.   But you also told me at your deposition that you
18 could monitor the investment without being a manager,
19 correct?

20   A.   I'm sorry.

21   Q.   You told me at your deposition that Anchor
22 doesn't need to be a manager in order for C Squared to
23 monitor its investment, correct?

24   A.   It probably could accomplish some of that, but it
25 best is done as a manager.

1    Q.   Why do you believe that?

2    A.   Because as of right now, in Bill's mind, I'm not

3  a manager and I receive no information.  So I am not

4  receiving any information right now.  I am not privy to

5  all of the things I was privy to before.  I'm totally shut

6  out of an asset that I own.  I was day-to-day intimately

7  involved, knowing the players, talking to the CFO now the

8  phone does not ring.

9    Q.   You were day-to-day intimately involved with

10  ArmorWorks?

11   A.   Not day-to-day involved.  I had the ability to

12  come to board meetings to talk to people about the

13  financials, to get updates on statuses, and we won the

14  contract that week; you know, that type of, not control,

15  but information.

16   Q.   You still could receive that information,

17  correct?

18   A.   I certainly, Bill certainly has -- ArmorWorks

19  certainly has the capacity to share that information.

20   Q.   And he can share that whether or not you're a

21  manager, correct?

22   A.   I guess he could, but I guess -- we know what

23  he's doing.

24   Q.   Okay.  And you would agree with me that

25  ArmorWorks has performed well financially since the time

# EXHIBIT E

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

ARMOR WORKS, INC., et al )
)
     Plaintiffs, )
)
    vs. )  CV 2011-008170
)  CV 2011-009812
TIMOTHY A. CROWN, et al., )
)
    Defendants. )
)
_____ )

Phoenix, Arizona
July 26, 2012

BEFORE:  THE HONORABLE J. RICHARD GAMA
Judge of the Superior Court

REPORTER'S TRANSCRIPT OF PROCEEDINGS

(Oral Argument)

PREPARED FOR:
COPY

MICHELE KALEY, RPR
Certified Court Reporter #50512
kaleym@superiorcourt.maricopa.gov
(602) 506-1247

1    that?

2    A.    301 is an e-mail from me to William Perciballi,

3    copies Matt Gallaher, Tim Crown, Eric Crown, Beverly

4    Lexvold who is our controller.  And it is the

5    February 2009 financial statements I sent to them on March

6    12, 2009.

7    Q.    And if we look at the attachment to that balance

8    sheets, the statement of operations, the statement of

9    equity, the statements of cash flow, is that information

10   substantially similar to that set forth in Exhibits 297

11   through 300 for the period covered by Exhibit 301?

12   A.    Yes, and it's substantially the same thing.  Just

13   to make a quick note, too.  In my attachment here, I say

14   that this is for the first two months of 2009.  I think I

15   missed sending one in January 2009.  So I'm saying this is

16   for the first two months of 2009.  And the format here,

17   since it's monthly, even though I've missed January, I'm

18   now giving them January and February at the same time.

19   Q.    Now are these reports typical of the information

20   that ArmorWorks Enterprises provided to C Squared, Anchor

21   and the Crowns prior to Anchor's removal?

22   A.    Yes.

23   Q.    Let's move to the post Anchor removal period.  In

24   your opinion, has there been any change in the level of

25   detail provided in the written financial reports provided

1    to C Squared, Anchor and the Crowns?

2        A.    No.  I have continued providing these same

3    monthly financial statements in the exact same format.

4        Q.    Now one of the things Mr. Eric Crown testified to

5    was that he had trouble getting answers back from you.

6              Do you recall that testimony?

7        A.    Yes.

8        Q.    Let me ask you to look at Exhibit 302.  What is

9    Exhibit 302?

10       A.    Exhibit 302 is an e-mail from me to William --

11   well, let's see.  If you go down to the bottom, this is an

12   e-mail from Eric Crown to me saying:  Great year.  Can you

13   get me financial numbers for the year end so I can do my

14   tax estimate?

15       Q.    And when did he send that request to you?

16       A.    He sent that to me on January 14, 2010, at

17   2:55 p.m.

18       Q.    When did you respond?

19       A.    Well, I responded sending it to William

20   Perciballi:  December books will be closed for the

21   auditors by the end of the week, by next week.  Attached

22   are the 2009 estimates provided for estimated taxes 2009

23   tax return to be done by April.

24       Q.    Now are these attachments to this e-mail

25   attachments you provided to Eric Crown?

1    A.    It's the same thing.  It's the same format, same

2  financial statements, same 12-month format.

3    Q.    Let's look at Exhibit 306.  What is it?

4    A.    This is an e-mail from me to William Perciballi,

5  Tim Crown and Eric Crown.  It's the June 2012 financial

6  statement sent on July 16th, 2012.

7    Q.    And if we look at the attachments, any difference

8  in the level of detail or quality of information?

9    A.    Same thing, again.

10    Q.    Now with regard, Mr. Hoxie made a point in making

11  an objection to these exhibits, that Mr. Gallaher

12  testified back in June that, since the removal of Anchor,

13  the provision of this information had become sporadic,

14  maybe a soft term.

15        But when you went through and looked at the

16  documents, did you confirm whether, in fact, since

17  Anchor's removal in July of 2009, there had been anything

18  you would characterize as sporadic?

19    A.    No.  I continued sending these every month.

20  There's been a few months that I missed.  In 36 months

21  since Anchor's removal, I provided this exact e-mail,

22  virtually the same thing, 27 out of 36 months.  There were

23  nine months that I missed.  Most of those were in the

24  December, January, February time frame when we were in

25  audit and waiting to get audit adjustments done.

1    Excluding those months, there were two months that I

2    missed.  But other than that, I've sent them almost every

3    month.  And when I have missed, nobody's asked for them or

4    asked where they are.

5        Q.   On the months you've missed, have you ever

6    received a request, hey, where are the financials, from C

7    Squared, Anchor, Matt Gallaher or either of the Crowns?

8        A.   No.  From time to time, I may get a request at

9    the end of the quarter because they're trying to get taxes

10   done.  But nobody's ever said, why did you miss October of

11   2010.

12       Q.   Now as I look at these attachments, they go back

13   for a period of 12 months; is that correct?

14       A.   Yeah.  The format, you're talking about the

15   format?

16       Q.   Right, the format.

17       A.   Yeah, the format goes back 12 months.  I always

18   pick up the trailing 12 months.

19       Q.   So hypothetically, let's say you missed a report

20   to C Squared in May of 2012.  He didn't complain about it,

21   but you did send it out in June of 2012.

22            Would that also contain the information that

23   would have been provided in May 2012?

24       A.   Well, yes, because it would be picked up in the

25   monthly format that's there.  It would pick it up as one

# EXHIBIT B

1  FENNEMORE CRAIG, P.C.
   Christopher L. Callahan (No. 009635)
2  John J. Balitis, Jr. (No. 011801)
   Carrie Pixler Ryerson (No. 028072)
3  3003 North Central Avenue, Suite 2600
   Phoenix, AZ  85012-2913
4  Telephone:  (602) 916-5000
   Email:  ccallaha@fclaw.com
5  Email:  jbalitis@fclaw.com
   Email:  cryerson@fclaw.com
6
   Attorneys for ArmorWorks Enterprises, LLC
7
   Michael N. Poli, #006431
8  Jeffrey G. Zane, #024172
   POLI & BALL, P.L.C.
9  2999 North 44th Street, Suite 500
   Phoenix, Arizona 85018
10 Telephone: (602) 840-1400
   Email: poli@poliball.com
11 Email: zane@poliball.com
12 Attorneys for ArmorWorks, Inc. and
   William J. Perciballi

13                    ARIZONA SUPERIOR COURT

14                      MARICOPA COUNTY

15

16 ARMORWORKS, INC., an Arizona          No. CV2011-008170 (Parent Case)
   corporation; WILLIAM J. PERCIBALLI, a  No. CV2011-009812
17 single man,
                                          **ARMORWORKS ENTERPRISES,**
                Plaintiffs,               **LLC'S, ARMORWORKS, INC.'S**
18                                        **AND WILLIAM PERCIBALLI'S**
          v.                              **RESPONSE TO PLAINTIFFS'**
19 TIMOTHY A. CROWN and JANE DOE          **NOTICE OF LODGING RULE 54(B)**
   CROWN, husband and wife; C SQUARED     **JUDGMENT**
20 CAPITAL PARTNERS, L.L.C., an Arizona
   limited liability company; ERIC J. CROWN  **AND**
21 and JANE DOE CROWN, husband and
   wife; JOHN DOES 1-X; JANE DOES 1-X;    **CROSS MOTION FOR**
22 BLACK CORPORATIONS 1-X; and           **CLARIFICATION OF THE**
   WHITE PARTNERSHIPS I-X,               **COURT'S FEBRUARY 14, 2013**
23                                        **MINUTE ENTRY**
                Defendants.
24                                        **(Assigned to the Honorable J.**
                                          **Richard Gama)**
25
                                          **(Oral Argument Requested)**
26

| 1 | |
|---|---|
| 2 | AND RELATED COUNTERCLAIMS |
| 3 | C SQUARED CAPITAL PARTNERS, LLC, et al., |
| 4 | Plaintiffs, |
| 5 | v. |
| 6 | WILLIAM JOSEPH PERCIBALLI; ARMORWORKS, INC., et al., |
| 7 | Defendants. |
| 8 | AND RELATED COUNTERCLAIMS |
| 9 | |

## I.  RESPONSE TO PLAINTIFFS' NOTICE OF LODGING 54(B) JUDGMENT

Defendants ArmorWorks, Inc., ArmorWorks Enterprises and William Perciballi (collectively, the "AW Parties") do not oppose Plaintiffs' request for 54(b) certification. The AW Parties, however, respectfully request that the Court resolve the issues raised by the concurrently filed Cross Motion for Clarification before entering the final judgment.

## II.  CROSS-MOTION

The Court's interlocutory February 14, 2013 Minute Entry directs ArmorWorks, Inc. ("AWI") and William Perciballi to "take all necessary actions to amend AWE's Articles of Organization to reflect Anchor's status as a manager of AWE."[1] The Minute Entry is silent on the scope of Anchor's managerial authority following reinstatement. The basis for the Court's directive seems to be its determination that the "purported removal of Anchor as an AWE manager in July 2009 was invalid and without force and legal effect." Accordingly, the Court's order appears designed to restore the *status quo*

---

[1] Anchor refers to Anchor Management, LLC.  AWE refers to ArmorWorks Enterprises, LLC.  AWE, AWI and Perciballi are collectively referred to herein as the AW Parties.

*ante* by placing Anchor in the same position that it occupied prior to its July 13, 2009 removal as a manager.

C Squared Capital Partners, LLC ("C Squared"), Anchor and the Crowns (collectively, the "C Squared Parties") have taken a more expansive view of the Court's ruling. In addition to the reinstatement of Anchor as a manager, the C Squared Parties have claimed that they are now entitled to have a representative designated as Key Management Personnel and that they are no longer bound by a 2011 Confidentiality Agreement, implying that Anchor's managerial authority is coextensive with that of William Perciballi. A copy of the March 4, 2013 letter from Joel Hoxie, in which the C Squared Parties have asserted these positions, is attached as Exhibit A.

Given the March 4, 2013 letter from the C Squared Parties, a disagreement exists between the parties, requiring clarification from the Court. The issue is whether the Court's February 14, 2013 Minute Entry requires any action beyond the reinstatement of Anchor as a manager. The letter from the C Squared Parties' counsel makes it clear that they envision a dramatic expansion in the scope of Anchor's previous managerial authority. In contrast, the AW Parties interpret the Court's order to require restoration of the conditions that existed prior to Anchor's July 2009 removal as a manager (*i.e.*, Anchor is listed as a "manager" with the Arizona Corporation Commission, but does not take an active role in the "management" of AWE, instead using its managerial status to monitor C Squared's passive investment in AWE).[2] Significantly, the AW Parties are not asking the Court to reconsider its decision, but rather are only seeking guidance on an issue not

---

[2] In order to ensure that third parties are not misled regarding the extent of Anchor's "managerial" role, the AW Parties believe that any amendment to the Articles of Organization that reinstates Anchor as a manager must also make clear the limits on Anchor's ability to act in this regard. The failure to delineate such limitations could create an ostensible agency problem for AWE in light of A.R.S. § 29-654(B)(2).

FENNEMORE CRAIG, P.C.

PHOENIX

1   addressed in the February 14, 2013 Minute Entry.  Hence, the AW Parties respectfully

2   request that the Court clarify its ruling.[3]

3       A.    **Analysis**

4           From October 3, 2005 through July 13, 2009, Anchor was listed as a "manager" of

5   AWE with the Arizona Corporation Commission.  In its capacity as a "manager" for

6   AWE, Anchor did not actually "manage" AWE's operations.  Instead, to use the language

7   of Anchor's Chief Financial Officer, Matt Gallaher, Anchor simply "monitor[ed] C

8   Squared's passive investment in ArmorWorks Enterprises, LLC."  In performing this

9   function, "Anchor has never been actively involved in the operations of ArmorWorks

10  Enterprises, LLC."  Declaration of Anchor Management (Exh. 61), ¶ 5; *accord*, Hearing

11  Transcript, 7:2-11 (7/25/12)(M. Gallaher testimony).  There is no disagreement between

12  the parties on this front.

13          The Court's February 14, 2013 Minute Entry only invalidated Anchor's July 2009

14  removal and expressly declined to select an operating agreement to govern AWE.  Until a

15  jury determines which operating agreement is in effect, Anchor's managerial role should

16  be no greater than it was at the time of removal.  When Anchor was removed, the parties

17  had been operating in accordance with the representations made to the Small Business

18  Administration ("SBA") in December 2007.  These representations were contained in a

19  December 24, 2007 letter from Christopher Yukins to Carolyn Bunts, the Declaration of

20  William Perciballi and the Declaration of Anchor Management, executed under penalty of

21  perjury by Anchor's CFO, Matt Gallaher.  Critically, the Court need not look beyond the

22  Anchor Declaration in order to grant the clarification requested by the AW Parties.[4]

23  _____

    [3] Notably, the AW Parties are not asking that the Court decide which operating agreement
24  governs AWE.  The Court declined to rule on this issue in the Minute Entry and, as
    expressed in prior filings, the AW Parties contend that such an issue should be presented
    to a jury.
25  [4] While the AW Parties respectfully disagree with the Court's determination that the C
    Squared Parties are not bound by the statements in the December 24, 2007 letter itself, the
26  AW Parties are not asking the Court to reconsider this determination and the Court need

FENNEMORE CRAIG, P.C.

PHOENIX

The C Squared Parties have acknowledged that they controlled the content of, and agreed with the factual representations in, the Anchor Declaration. *See* C Squared Parties' Proposed Findings of Fact, ¶ 33 ("Anchor provided a declaration that merely acknowledged the missing signature on the 2001 Operating Agreement and the C Squared Parties' historical lack of involvement in AWE's operations."); ¶ 35 ("[T]he parties agreed on all material factual representations made to the SBA."). In fact, Kurt Merschman, the C Squared Parties' counsel during the SBA proceeding, initially drafted Anchor's declaration and asked that Chris Yukins, AWE's counsel, use Anchor's declaration instead of Tim Crown's declaration. Exhibits 48, 49, 57, 141.

With respect to the scope of Anchor's managerial authority, the Anchor Declaration (Exh. 61) details the limited scope of such authority:

- "Although Anchor monitors C Squared's passive investment in ArmorWorks Enterprises, LLC, ***Anchor has never been actively involved in the operations of ArmorWorks Enterprises, LLC***[.]" (emphasis added)
- "Anchor is virtually unknown to the ArmorWorks Enterprises, LLC employees, and representatives of Anchor have almost never visited the ArmorWorks Enterprises, LLC facilities."
- "No representative of Anchor has keys or access badges to the ArmorWorks Enterprises, LLC facilities; such representatives have to sign-in to enter the facility, as any general visitor would."
- "Neither Anchor nor any agents of Anchor have the clearances need [*sic*] to have unescorted access to ArmorWorks Enterprises, LLC facilities."

---

not do so in order to grant the requested clarification. The C Squared Parties' proposed findings of fact acknowledged that "the parties agreed on all material *factual* representations made to the SBA." C Squared Parties' Proposed Findings of Fact, ¶ 35 (emphasis added). At a minimum, those factual recitations include those set forth in the Anchor Declaration executed by Matt Gallaher.

1     • "Neither Anchor not its principals have been involved in any government contract
2        awarded to ArmorWorks Enterprises, LLC."
3     • "[N]either Anchor nor any representative of Anchor has any regular interaction
4        with any employee of ArmorWorks Enterprises, LLC[.]"

5 These representations clearly delineate the scope of Anchor's managerial role. Moreover,

6 Anchor was well aware that AWE was submitting this declaration to the SBA in support

7 of the argument that Anchor did not and could not control AWE. *See* July 25, 2012

8 Transcript at 81:12-15 (Eric Crown testifying that the Crown Parties knew that Anchor's

9 declaration was being offered to support arguments being made in the December 24, 2007

10 letter); June 18, 2012 Transcript at 112:23-113:12 (Matt Gallaher testifying that he knew,

11 at the time he signed the Anchor Declaration, that the December 24, 2007 letter made the

12 representation that neither C Squared nor Anchor nor the Crowns had the expertise or

13 ability to exercise any control over AWE and that historically they had not done so).

14     It is undisputed that the C Squared Parties had ultimate authority over the Anchor

15 Declaration and, under the Court's analysis, they are bound by the representations

16 contained therein. The extent of the managerial authority presently sought for Anchor as

17 a result of the Court's ruling is flatly inconsistent with and significantly greater than the

18 authority conferred upon Anchor or any of the C Squared Parties throughout AWE's

19 history. Nothing in the Court's Minute Entry relieves the C Squared Parties from their

20 express representations in the Anchor Declaration.

21    **B.**   <u>**Conclusion**</u>

22     Until a jury determines which operating agreement is in effect, the AW Parties

23 respectfully request that the Court clarify its order to indicate that Anchor's managerial

24 role after reinstatement is no greater than what it had been at the time of the 2007 SBA

25 protest and at all times from 2005 through 2009. In connection with that clarification, the

26 AW Parties ask the Court to determine that, in any Articles of Amendment that are filed to

Fennemore Craig, P.C.

Phoenix

reinstate Anchor, the AW Parties may include a statement that expressly notes the limitation on Anchor's managerial authority. Specifically, the AW Parties would propose the following:

> Anchor's role as a manager is limited to monitoring the interest of C Squared Capital Partners, LLC in ArmorWorks Enterprises, LLC. Anchor plays no role in the day-to-day operations of the Company and has no authority to transact business with third parties on behalf of the Company or to make statements to third parties that bind the Company. Notwithstanding its listing as a manager, Anchor is not an agent of the Company for the purpose of carrying on the Company's business in the usual way.

The failure to allow such an express limitation on Anchor's authority would have the effect of enlarging Anchor's role beyond the limited role that Anchor, by its own admission through the Anchor Declaration, has historically played.

DATED this 19th day of March, 2013.

POLI & BALL, P.L.C.                    FENNEMORE CRAIG, P.C.


By: */s/ Carrie Pixler Ryerson (w/permission)*    By: */s/ Carrie Pixler Ryerson*
   Michael N. Poli                         Christopher L. Callahan
   Jeffrey G. Zane                         John J. Balitis, Jr.
   Attorneys for ArmorWorks, Inc. and      Carrie Pixler Ryerson
   William Perciballi                      Attorneys for ArmorWorks Enterprises, L.L.C.

FENNEMORE CRAIG, P.C.

PHOENIX

7

| | |
|---|---|
| 1 | **ORIGINAL** filed with Court |
| | **COPY** of the foregoing mailed |
| 2 | this 19th day of March, 2013, to: |
| 3 | |
| 4 | Joel P. Hoxie, Esq. |
| | Kelly A. Kszywienski, Esq. |
| 5 | SNELL & WILMER L.L.P. |
| | One Arizona Center |
| 6 | 400 East Van Buren |
| | Phoenix, AZ 85004-2202 |
| 7 | Attorneys for Plaintiffs |
| 8 | Michael N. Poli, Esq. |
| | Jeffrey G. Zane, Esq. |
| 9 | POLI & BALL, P.L.C. |
| | 2999 North 44th Street, Suite 500 |
| 10 | Phoenix, AZ 85018 |
| | Attorneys for Defendants William J. Perciballi |
| 11 | and ArmorWorks, Inc. |
| 12 | David W. Cowles, Esq. |
| | TIFFANY & BOSCO, P.A. |
| 13 | Camelback Esplanade II – Third Floor |
| | 2525 East Camelback Road |
| 14 | Phoenix, AZ 85016-9240 |
| | Attorneys for Defendants William J. Perciballi |
| 15 | and ArmorWorks, Inc. |
| 16 | |
| 17 | _/s/ Julie Calvano Tolby_ |
| | Julie Calvano Tolby |
| 18 | |
| 19 | 8005586.4/010174.0037 |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |

Fennemore Craig, P.C.

Phoenix

8

# EXHIBIT A



Snell & Wilmer
——— L.L.P. ———
LAW OFFICES

One Arizona Center
400 East Van Buren Street
Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000
602.382.6070 (Fax)
www.swlaw.com

DENVER
LAS VEGAS
LOS ANGELES
LOS CABOS
ORANGE COUNTY
PHOENIX
SALT LAKE CITY
TUCSON

Joel P. Hoxie
602.382.6264
jhoxie@swlaw.com

March 4, 2013

VIA FIRST CLASS U.S. MAIL and EMAIL

Christopher L. Callahan (ccallahan@fclaw.com)
FENNEMORE CRAIG, P.C.
3003 North Central Avenue
Suite 2600
Phoenix, Arizona 85012

     Re:    *C Squared Capital Partners, LLC v. ArmorWorks Enterprises, LLC;*
            <u>Maricopa County Superior Court Case No. CV2011-009812</u>

Dear Chris,

     We write on behalf of C Squared Capital Partners, LLC and Anchor Management, LLC (collectively the "C Squared Parties") to address the C Squared Parties' right to and need for access to information regarding ArmorWorks Enterprises, LLC ("AWE" or the "Company").[1] <u>First</u>, to ensure that the C Squared Parties have access to sufficient information to evaluate AWE's finances and operations and the C Squared Parties' 40% stake in the Company, the C Squared Parties would like to designate a representative to be one of the Key Management Personnel cleared under the Facility Clearance ArmorWorks, Inc. ("AWI") holds. Alternatively (and preferably), AWE would start the process to obtain its own Facilities Clearance under which a representative of the C Squared Parties could be one of the Key Management Personnel. Please let us know which you prefer so we can begin the clearance process.

     <u>Second</u>, the C Squared Parties request that the following information be provided in a timely fashion:

- A list of all financial institutions with whom AWE currently holds any accounts or debt and a listing of the type of account(s) or debt(s) held.

- A list of any security interests currently held in any assets of AWE.

---

[1] As you know, AWE has restricted the C Squared Parties' access to information about AWE over the past several years on the grounds that Anchor was not a manager of AWE and that the C Squared Parties purportedly exposed the AW Parties to a risk of False Claims Act liability. Judge Gama's February 14, 2013 Order, however, eliminates those grounds for limiting the C Squared Parties' right to access AWE information. In addition, we enclose a copy of the letter we received from the Department of Defense confirming that the DOD has closed its investigation regarding the False Claims Act violations AWE has alleged. We assume AWE received a similar notification.

- A list of any transactions entered into from July 13, 2009 to the present with a value equal to or greater than $1,000,000.

- A meeting at AWE between Matt Gallaher and David Wirthlin during which Matt Gallaher may ask questions regarding the Company's finances and David Wirthlin can access whatever non-classified information he needs to answer Matt's questions.

- Copies of any settlement or other agreements AWE entered into with Goldman Sachs & Co. in connection with the lawsuit AWE and AWI filed against Goldman in Arizona District Court, Case No. 2:11-cv-00307-DKD.

- Copies of any patents, trademarks, copyrights, or other intellectual property related to the work AWE has performed since its inception reflecting any and all rights to such intellectual property.

- A meeting between the C Squared Parties' forensic accountants and AWE's auditors. The C Squared Parties will pay for the auditors' time to attend the meeting, but will not pay for AWE's attorneys' time or any work performed by AWE's auditors unless the C Squared Parties specifically request that the work be performed.

- Any and all information regarding the review and approval of any agreements AWE has entered into from June 13, 2009 to the present in which any of the following is a party to the agreement: Mr. Perciballi, AWI, or any entity Mr. Perciballi owns or controls. This request includes, but is not limited to, Mr. Perciballi's January 1, 2010 Indemnification Agreement, any undertaking signed by or on behalf of Mr. Perciballi pursuant to Section 5 of the Indemnification Agreement, and any information or opinions relating to the fairness of any of these transactions to AWE.

Please let us know when this information will be available for the C Squared Parties to review at AWE's offices. If AWE prefers to provide this information electronically, please send the information on a CD or DVD to my attention on or before March 11, 2013. The C Squared Parties, however, will not agree to the continued use of AWE's FTP site for the exchange of information. With respect to the requested meetings with David Wirthlin and AWE's auditors, please contact us by March 8, 2013 with AWE's proposed dates for those meetings.

Third, AWE required the C Squared Parties to enter into the 2011 Confidentiality Agreement restricting the C Squared Parties' use of AWE information because AWE took the



position that C Squared was only a member of AWE, not a manager.[2]  Because the Court has now recognized Anchor's status as an AWE manager, the limits AWE has unilaterally imposed on the C Squared Parties' use of AWE information no longer can be justified.  We therefore consider the 2011 Confidentiality Agreement to be of no further force and effect.

Thank you for your prompt attention to this matter.

Very truly yours,

Snell & Wilmer

Joel P. Hoxie

cc (via e-mail only):    Kelly Kszywienski
Jennifer Nore
Carrie Pixler-Ryerson
John Balitis
Michael Poli
Jeff Zane
Lawrence Moon
Thomas Connelly

16685540

---

[2] *See, e.g.*, Resp. & Mem. of P&A of AWE in Opp'n to Request for Mandamus Relief at 13, *C Squared Capital Partners, LLC v. ArmorWorks Enterprises, LLC*, Maricopa County Superior Court Case No. CV2011-008545 ("Recognizing the distinction between members and managing members, the Delaware Chancery Court has recognized that limitations on the formers' access to records should not apply to the latter." (citation omitted)).

# EXHIBIT C

1    FENNEMORE CRAIG, P.C.
     Christopher L. Callahan (No. 009635)
2    John J. Balitis, Jr. (No. 011801)
     Carrie Pixler Ryerson (No. 028072)
3    3003 North Central Avenue, Suite 2600
     Phoenix, AZ 85012-2913
4    Telephone: (602) 916-5000
     Email: ccallaha@fclaw.com
5    Email: jbalitis@fclaw.com
     Email: cryerson@fclaw.com
6
     Attorneys for ArmorWorks Enterprises, LLC
7
     Michael N. Poli, #006431
8    Jeffrey G. Zane, #024172
     POLI & BALL, P.L.C.
9    2999 North 44th Street, Suite 500
     Phoenix, Arizona 85018
10   Telephone: (602) 840-1400
     Email: poli@poliball.com
11   Email: zane@poliball.com

12   Attorneys for ArmorWorks, Inc. and
     William J. Perciballi

13                    ARIZONA SUPERIOR COURT

14                       MARICOPA COUNTY

15

| | |
|---|---|
| 16  ARMORWORKS, INC., an Arizona corporation; WILLIAM J. PERCIBALLI, a single man, | No. CV2011-008170 (Parent Case) No. CV2011-009812 |
| 17                        Plaintiffs, | **ARMORWORKS ENTERPRISES, LLC'S, ARMORWORKS, INC.'S AND WILLIAM PERCIBALLI'S REPLY IN SUPPORT OF CROSS MOTION FOR CLARIFICATION OF THE COURT'S FEBRUARY 14, 2013 MINUTE ENTRY** |
| 18                           v. | |
| 19  TIMOTHY A. CROWN and JANE DOE CROWN, husband and wife; C SQUARED CAPITAL PARTNERS, L.L.C., an Arizona limited liability company; ERIC J. CROWN and JANE DOE CROWN, husband and wife; JOHN DOES 1-X; JANE DOES 1-X; BLACK CORPORATIONS 1-X; and WHITE PARTNERSHIPS I-X, | |
| 20 | |
| 21 | **(Assigned to the Honorable J. Richard Gama)** |
| 22 | |
| 23                        Defendants. | **(Oral Argument Requested)** |
| 24  AND RELATED COUNTERCLAIMS | |
| 25 | |
| 26  C SQUARED CAPITAL PARTNERS, LLC., et al., | |

FENNEMORE CRAIG, P.C.
PHOENIX

|  |  |
|---|---|
| Plaintiffs, | |
| v. | |
| WILLIAM JOSEPH PERCIBALLI; ARMORWORKS, INC., et al., | |
| Defendants. | |
| AND RELATED COUNTERCLAIMS | |

The issue raised by the AW Parties[1] Cross-Motion for Clarification is the scope of Anchor Management, LLC's authority as a manager. The C Squared Parties[2] utter failure to address this narrow issue in their response highlights the need for the Court to provide the requested guidance.

The AW Parties readily acknowledge that the scope of Anchor's managerial authority was raised in prior briefing. It is equally clear, however, that the Court did not address that issue in the February 14, 2013 Minute Entry. Given the importance of this issue and the Court's silence on this matter, the AW Parties seek clarification.

The Court seemed to reject the AW Parties' judicial estoppel argument on the basis that the parties had represented to the Small Business Administration ("SBA") in December 2007 that Anchor was a manager. According to the Court, the SBA accepted this representation and "nevertheless found AWE was a small business." Minute Entry at 9. Other representations, however, also were made to the SBA by Anchor concerning its role in the operation of the business, which were critical to the SBA's finding that AWE was a small business. Under such reasoning, in the interim, while the parties continue to litigate the issue of which operating agreement is in effect, the Court should hold Anchor

---

[1] AW Parties refers to ArmorWorks Enterprises, LLC ("AWE"), ArmorWorks, Inc. ("AWI") and William Perciballi.
[2] C Squared Parties refers to C Squared Capital Partners, LLC ("C Squared"), Anchor and the Crowns.

to the representations it made to the SBA in the Anchor Declaration regarding the scope of Anchor's managerial authority.

The need for clarification arose because the C Squared Parties unequivocally sought control beyond that ever held by Anchor:

First, to ensure that the C Squared Parties have access to sufficient information to evaluate AWE's finances and operations and the C Squared Parties' 40% stake in the Company, the C Squared Parties would like to designate a representative to be one of the Key Management Personnel cleared under the Facility Clearance ArmorWorks, Inc. ("AWI") holds. Alternatively (and preferably), AWE would start the process to obtain its own Facilities Clearance under which a representative of the C Squared Parties could be one of the Key Management Personnel. Please let us know which you prefer so we can begin the clearance process.

*See* March 4, Letter, attached as Exhibit A to the AW Parties' Cross-Motion for Clarification.[3] In response to the AW Parties' contention that Anchor is trying to expand the scope of its managerial authority, the C Squared Parties claim that "[n]owhere in the March 4 letter do the C Squared Parties make any attempt to exert day-to-day management control over AWE." Response at 5:2. The plain language of the letter belies this assertion. Moreover, if Anchor was **not** attempting to expand its managerial authority, then the C Squared Parties should have no objection to the requested

---

[3] "Key Management Personnel" refers to individuals within AWE that hold security clearances allowing them to have access to information designed as classified by the federal government. AWE cannot merely appoint Anchor as "Key Management Personnel," but rather AWE must obtain a security clearance for the entity and then apply for security clearances for individuals within AWE. Before AWE can even seek a security clearance, however, it must be awarded a contract that would involve exposing AWE to classified information. In short, AWE needs a contractual mechanism by which to even seek a security clearance. In years past, AWE has held such a contact. At present, while AWE is bidding for classified contracts, all of the contracts that AWE holds are non-classified. In any event, the classified information that Anchor would be exposed to if appointed to "Key Management Personnel" is generally the technical specifications of how AWE needs to build the specific armor. Such information would not assist the Crowns in monitoring their financial investment in AWE. The point is, however, that neither Anchor nor C Squared Capital Partners, LLC ("C Squared") have ever been designated "Key Management Personnel." By seeking such an appointment, Anchor, C Squared and the Crowns are asking for greater control and involvement in AWE than ever before.

FENNEMORE CRAIG, P.C.
PHOENIX

1  clarification, namely an order from the Court defining the scope of Anchor's managerial

2  role and clarifying, among other things, that Anchor has no day-to-day control over AWE.

3  In objecting to the requested clarification, the C Squared Parties note that, prior to

4  Anchor's 2009 removal, there was no filing with the Arizona Corporation Commission

5  ("ACC") clarifying Anchor's limited role. On this basis, the C Squared Parties assert that

6  the AW Parties are seeking more than preservation of the pre-removal status quo.

7  Response at 5. The C Squared Parties are incorrect. For years, there was no need to

8  express limitations on Anchor's managerial role in the ACC filings because, as recognized

9  in the Anchor Declaration, which was executed under penalty of perjury by Matt Gallaher,

10  Anchor was never involved in the day-to-day operation of AWE and served as a

11  "manager" only for the limited purpose of monitoring C Squared's financial interest in the

12  Company. The statements and actions of the Crown Parties since 2009, as most clearly

13  demonstrated by their contentions in this litigation and their unabashed demands in the

14  letter of March 4, 2013, have necessitated the limitations in order to preserve the status

15  quo that existed prior to Anchor's removal.

16  The C Squared Parties further argue that the AW Parties' Cross Motion is an

17  attempt at delaying Anchor's reinstatement. To the contrary, the AW Parties suggested to

18  the C Squared Parties a joint stipulation in which the parties would ask the Court to enter

19  a final order pursuant to Arizona Rule of Civil Procedure 54(b). *See* Exhibit 2 to the C

20  Squared Parties' Response at 1-2. Instead, the C Squared Parties filed a unilateral request,

21  which the AW Parties did not oppose. In fact, by seeking 54(b) certification, the C

22  Squared Parties admit that the Court has only entered a non-final, interlocutory ruling that

23  required no action by the AW Parties.

24  Finally, the AW Parties filed the Cross Motion contemporaneous with their

25  response to the 54(b) request because the Court should consider such issues

26

1    simultaneously. To the extent the Court agrees with the C Squared Parties that the Cross

2    Motion should have been styled as a "motion," the AW Parties will re-file it as a motion.

3        When the Court enters a final order reinstating Anchor, the Court must provide

4    guidance on Anchor's managerial role pending resolution of that issue by a jury. In the

5    interim, before a jury can address which operating agreement is in effect, the AW Parties

6    respectfully request that the Court clarify its order to indicate that Anchor's managerial

7    role after reinstatement is no greater than what it had been at the time of the 2007 SBA

8    protest and at all times from 2005 through 2009. To that end, the AW Parties request that

9    the Court permit the AW Parties to include the statement described in the Cross-Motion in

10    any filing with the ACC that reinstates Anchor.

11

12        DATED this 28th day of March, 2013.

13    POLI & BALL, P.L.C.             FENNEMORE CRAIG, P.C.

14

15    By: */s/ Carrie Pixler Ryerson (w/permission)*    By: */s/ Carrie Pixler Ryerson*

16       Michael N. Poli                    Christopher L. Callahan
      Jeffrey G. Zane                     John J. Balitis, Jr.

17       Attorneys for ArmorWorks, Inc. and     Carrie Pixler Ryerson
      William Perciballi                  Attorneys for ArmorWorks Enterprises,

18                                            L.L.C.

19

20

21

22

23

24

25

26

| | |
|---|---|
| 1 | **ORIGINAL** filed with Court |
| | **COPY** of the foregoing mailed |
| 2 | this 28th day of March, 2013, to: |
| 3 | |
| | Joel P. Hoxie, Esq. |
| 4 | Kelly A. Kszywienski, Esq. |
| | SNELL & WILMER L.L.P. |
| 5 | One Arizona Center |
| | 400 East Van Buren |
| 6 | Phoenix, AZ 85004-2202 |
| | Attorneys for Plaintiffs |
| 7 | |
| | Michael N. Poli, Esq. |
| 8 | Jeffrey G. Zane, Esq. |
| | POLI & BALL, P.L.C. |
| 9 | 2999 North 44th Street, Suite 500 |
| | Phoenix, AZ 85018 |
| 10 | Attorneys for Defendants William J. Perciballi |
| | and ArmorWorks, Inc. |
| 11 | |
| | David W. Cowles, Esq. |
| 12 | TIFFANY & BOSCO, P.A. |
| | Camelback Esplanade II – Third Floor |
| 13 | 2525 East Camelback Road |
| | Phoenix, AZ 85016-9240 |
| 14 | Attorneys for Defendants William J. Perciballi |
| | and ArmorWorks, Inc. |
| 15 | |
| 16 | |
| | */s/ Julie Calvano Tolby* |
| 17 | Julie Calvano Tolby |
| 18 | |
| | 8037217.1/010174.0037 |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |

FENNEMORE CRAIG, P.C.
PHOENIX

- 6 -

# EXHIBIT D

RECEIVED

MAY 1 5 2013

SNELL & WILMER

1   FENNEMORE CRAIG, P.C.
    Christopher L. Callahan (No. 009635)
2   John J. Balitis, Jr. (No. 011801)
    Carrie Pixler Ryerson (No. 028072)
3   3003 North Central Avenue, Suite 2600
    Phoenix, AZ 85012-2913
4   Telephone: (602) 916-5000
    Email: ccallaha@fclaw.com
5   Email: jbalitis@fclaw.com
    Email: cryerson@fclaw.com
6
    Attorneys for ArmorWorks Enterprises, LLC
7
    Michael N. Poli, #006431
8   Jeffrey G. Zane, #024172
    POLI & BALL, P.L.C.
9   2999 North 44th Street, Suite 500
    Phoenix, Arizona 85018
10  Telephone: (602) 840-1400
    Email: poli@poliball.com
11  Email: zane@poliball.com

12  Attorneys for ArmorWorks, Inc. and
    William J. Perciballi

13                  ARIZONA SUPERIOR COURT

14                      MARICOPA COUNTY

15
    C SQUARED CAPITAL PARTNERS,      No. CV2011-009812
16  LLC, et al.,
                                     **ARMORWORKS ENTERPRISES,**
17              Plaintiffs,          **LLC'S, ARMORWORKS, INC.'S**
                                     **AND WILLIAM PERCIBALLI'S**
18          v.                       **REPLY IN SUPPORT OF MOTION**
                                     **FOR STAY OF EXECUTION OF**
    WILLIAM JOSEPH PERCIBALLI;       **JUDGMENT UNDER 62(A)**
19  ARMORWORKS, INC., et al.,
                                     **(Assigned to the Honorable J.**
20              Defendants.          **Richard Gama)**

21                                   **(FILED UNDER SEAL)**

22

23
    AND RELATED COUNTERCLAIMS
24

25

26

FENNEMORE CRAIG, P.C.
PHOENIX

1     The AW Parties have requested that the Court stay enforcement of the Judgment

2     pending appeal, pursuant to Arizona Rule of Civil Procedure 62(a). The C Squared

3     Parties argue the AW Parties should have initially moved for a stay under Rule 62 instead

4     of A.R.S. § 12-2108. Response at 2. The Court has already decided this issue, and it has

5     no bearing on the merits of the analysis under Rule 62, which is the subject of the present

6     motion. The C Squared Parties do not suggest otherwise.

7         Accordingly, the issues for decision are: (1) identifying the correct standard for

8     evaluating a stay request; (2) evaluating the AW Parties' chances of success on appeal;

9     (3) balancing the risk of serious injury caused to the AW Parties by improvidently

10    changing the status quo against the alleged injuries to the C Squared Parties caused by

11    maintaining the status quo; and (4) identifying any additional public policy factors that

12    should be considered.

13    I.     **STANDARD FOR OBTAINING A STAY.**

14        There is no real disagreement concerning the standard for obtaining a stay – it is

15    based on the standard for obtaining a preliminary injunction. *See* Motion at 3-4; Response

16    at 2-3. The C Squared Parties suggest in a footnote that the U.S. Supreme Court's *Hilton*

17    standard does not apply in Arizona state courts, but the C Squared Parties do not identify

18    any significant difference between the state and federal standard.[1] The only difference is

19    that the Arizona standard is less stringent because it requires only a *possibility* of

20    irreparable harm, rather than requiring irreparable harm to be "likely" as federal courts

21    must do after *Winter v. NRDC*. *See IB Property Holdings, LLC v. Rancho Del Mar Apts.,*

22    *Ltd.*, 228 Ariz. 61, 64, ¶¶ 6-8, 263 P.3d 69, 72 (App. 2011) (discussing *Winter v. Natural*

23    *Resources Defense Council, Inc.*, 555 U.S. 7 (2008)). Any difference between the state

24    and federal standard favors the AW Parties' position.

---

[1]     In fact, the C Squared Parties themselves cited *Hilton* for the proposition that "federal courts apply the same test" in their response to the previous stay motion. *See* Response in Opposition at 7 n.5 (Apr. 16, 2013).

FENNEMORE CRAIG, P.C.
PHOENIX

1        The C Squared Parties do not deny that Rule 62 allows the Court to maintain the

2   status quo by setting terms on which a stay will be granted.  Motion at 4 citing Rule 62(c).

3   Nevertheless, the C Squared Parties attempt to create the impression that denying a stay is

4   the only option.  Response at 2, 10-11.  The potential harm asserted by the C Squared

5   Parties is entirely financial, and the only thing standing in the way of establishing a

6   reasonable bond to protect the C Squared Parties during the appeal is the fact that the C

7   Squared Parties have made no attempt to quantify any actual or even potential damages.

8   Under these circumstances, denial of a stay is clearly inappropriate – the as-yet unproven

9   possibility of financial harm to the C Squared Parties will be addressed in the ongoing

10  litigation.  Indeed, the Court will have an opportunity to assess damages against either

11  party if necessary as part of the ongoing case.  Meanwhile, the possibility that the C

12  Squared Parties might prove they should recover something in the litigation cannot justify

13  imposing existential risks on *the business that is the subject of the litigation.*

14       The C Squared Parties also do not take issue with the guidance provided in

15  *Washington Metro* and similar cases as to the significance of novel legal issues.  Motion at

16  4 citing, *e.g., Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841,

17  844-45 (D.C. Cir. 1977).  The novel issues in the present case include the application of

18  judicial estoppel in this context as well as the application of A.R.S. § 12-2108, which

19  would entitle the AW Parties to a stay as a matter of right if the AW Parties' interpretation

20  is correct.  Accordingly, the Court should take into account the novelty and difficulty of

21  the issues in determining whether the AW Parties' position is sufficiently meritorious that

22  the status quo should be maintained pending appeal.

23  **II.**   **A STAY IS JUSTIFIED BASED ON THE AW PARTIES' LIKELIHOOD OF**

24        **PREVAILING ON THE MERITS.**

25       The primary strategy employed by the C Squared Parties in addressing the merits is

26  to tilt the playing field by asserting an unreasonably narrow scope of review for the issues

on appeal. While it is true that factual findings and discretionary decisions are reviewed deferentially, findings "induced by an erroneous view of the law" are entitled to no deference on appeal. *Arizona Bd. of Regents v. Phoenix Newspapers, Inc.*, 167 Ariz. 254, 257, 806 P.2d 348, 351 (1991). Similarly, a trial court "abuses its discretion if it commits an error of law." *City of Tucson v. Clear Channel Outdoor, Inc.*, 218 Ariz. 172, 189, ¶ 58, 181 P.3d 219, 236 (App. 2008). Legal errors are subject to de novo review. *IB Property Holdings*, 228 Ariz. at 64, ¶ 5, 263 P.3d at 72. The AW Parties primarily intend to argue legal issues on appeal. The legal issues are novel and at least meritorious enough to warrant caution and justify preservation of the status quo under *Washington Metro*.

### A.  The AW Parties Have a Substantial Likelihood of Success on the *Janus Capital* Issue.

The C Squared Parties' Response and the Court's decision rely substantially on a single case for the proposition that the C Squared Parties did not actively "make" representations to the SBA, so they cannot be estopped by the SBA representations. *See* Response at 4-5 citing *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2305 (2011); Minute Entry at 8. The C Squared Parties argue there are no cases distinguishing *Janus Capital* in the specific context of judicial estoppel, but it is equally true that there are no cases supporting the C Squared Parties' position and applying *Janus Capital* in a similar context. At a minimum, this means the application of a *Janus Capital*-type analysis is a novel legal issue within the meaning of *Washington Metro*. The AW Parties submit that there is a strong potential for the Court of Appeals to apply other cases more analogous and persuasive than *Janus Capital*, so the Court should maintain the status quo during the appeal.

Indeed, it is axiomatic that acquiescence can support estoppel in most contexts. *See, e.g., Ivancovich v. Meier*, 122 Ariz. 346, 350-51, 595 P.2d 24, 28-29 (1979); *Holmes v. Graves*, 83 Ariz. 174, 177-78, 318 P.2d 354, 356 (1957). The C Squared Parties

complain that the AW Parties did not previously cite cases criticizing *Janus Capital* in their briefing on the merits, and suggest the Court of Appeals will find any counterargument to have been waived. Response at 4, n.6. To the contrary, the estoppel issue in general was well developed in the briefing, but the AW Parties could not anticipate that a highly distinguishable and specialized case like *Janus Capital* would bear so much weight in this Court's estoppel analysis. In any event, it is well-established that there is no bar against citing new authority on appeal. *Retzke v. Larson*, 166 Ariz. 446, 449, 803 P.2d 439, 442 (App. 1990).

The C Squared Parties also argue that this Court's decision can be upheld on "independent grounds" regardless of whether the *Janus Capital* analysis can withstand review. Response at 4-6. To begin with, an appellate court will reverse a decision if the trial court committed legal error and the appellate court "cannot say whether the court would have exercised its discretion in the same way" if it applied the correct legal standard. *Clear Channel*, 218 Ariz. at 190, ¶ 64, 181 P.3d at 237.

Moreover, the purported independent grounds for upholding the judgment lack merit. The C Squared Parties argue their position with the SBA was only a legal opinion, not a factual matter, so judicial estoppel cannot be applied. Response at 5-6. The Court of Appeals is likely to disagree because the SBA inquiry was clearly intended to determine the actual facts concerning the C Squared Parties' status, not just the parties' legal opinions about the facts. The C Squared Parties now seek to change the facts by changing the controlling legal documents, contrary to what they represented to the SBA.

The C Squared Parties also argue they did not gain relief in front of the SBA, and that "the SBA's finding" is not inconsistent with the C Squared Parties' status as manager. Response at 6. These points, as juxtaposed in the Response, show the inherent contradiction of the C Squared Parties' position. The SBA granted relief by allowing AWE to maintain its small business status even though Anchor was nominally a manager,

FENNEMORE CRAIG, P.C.

PHOENIX

precisely because Anchor did not have control over AWE as a matter of fact. Although the C Squared Parties' arguments are based on quotations extracted from the Court's decision, it should be acknowledged that the Court of Appeals could take a different view and hold that the C Squared Parties prevailed in the SBA proceeding by taking factual positions that are essentially the opposite of the positions the C Squared Parties are taking today.

## B. The Balance of Hardships Tips Sharply in Favor of the AW Parties.

Both parties are concerned about their management rights being impaired, but if abstract rights were the primary consideration, the irreparable injury analysis would be of minimal significance – the Court would always find that the party who won on the merits should also prevail on the stay motion because the winning party will suffer harm by not having its abstract rights vindicated immediately. And indeed, that is exactly the circular argument the C Squared Parties seem to be making. *See, e.g.*, Motion at 9-10 (arguing Perciballi did not have the right to remove Anchor as manager so "the ones suffering the harm are the C Squared Parties").

This superficial analysis ignores the enormous difference in the type of harm actually alleged by the parties. The AW Parties have identified several realistic scenarios that could result in the destruction of the business. For example:

- **Potential deadlock in the face of major management challenges** – It is indisputable that the business relationship between the parties is acrimonious, and the budgetary turmoil in Washington DC is well-known. AWE may not survive in this environment without a reasonable level of management stability.

- **Unresolved control issues** – The Court granted a 54(b) judgment, but the actual managerial impact of the decision simply has not been resolved yet, including what operating agreement is in effect. The C Squared Parties have taken a series of different positions, including that C Squared should

immediately have access to classified information without the necessity of obtaining a security clearance. *See* Response at 6-8. This type of behavior by a manager would present a threat to any business in the national security industry, and it is unknown when (or if) the Court will resolve the ambiguities.

- **Loss of Small Business Designation and False Claims Liability** – The Motion for Stay recites the extensive record demonstrating that AWE is at risk of losing its small business designation, having its contracts terminated, being debarred from future contracting, and being exposed to liability under the False Claims Act. Motion at 11-12.

The Court has admittedly rejected these arguments as a basis for the AW Parties' position on the merits, but the issue now is different – the Court must determine the risks of disturbing the status quo while the case is on appeal. The parties can argue about how likely these scenarios are, but it is indisputable that destroying the business would constitute serious and irreparable harm to everyone, leaving nothing but finger-pointing and more litigation.

By contrast, the C Squared Parties have identified only two types of harm, neither of which can weigh heavily in the irreparable injury analysis. The most prominent argument, as noted previously, concerns the abstract injury to managerial rights. Response at 9-10. Under the circumstances here, the C Squared Parties had no management rights other than the ability to monitor the business, so this is at most an injury that is vindicated equally well by the Court's decision, regardless of whether there is a stay pending appeal. The Court's decision says what it says, and it will either be overturned or not. No harm is done by granting a stay.

The only other arguable injury is that the C Squared Parties might suffer financial harm because they do not have sufficient access to financial information. Response at 7-8. The only example provided is the possibility that Mr. Perciballi is spending money

1   improperly on classified activities. *Id*. Damages are clearly the appropriate remedy if any
2   impropriety has occurred.  Regardless of whether the Court grants a stay or Anchor is
3   reinstated as a manager, the C Squared Parties cannot have access to classified
4   information without a security clearance, which must be obtained from the federal
5   government and is not dependent on whether a party is appointed a manager under state
6   law.

7       As stated in prior pleadings, the AW Parties have provided the same financial
8   reports to the C Squared Parties following Anchor's removal as a manager that it had
9   provided previously.  It intends to continue doing so.  This Court can harmonize the C
10  Squared Parties' professed concern over access to financial information and ability to
11  monitor the business with the AW Parties' worries regarding the collateral impacts of
12  Anchor's reinstatement simply by directing the AW Parties to continue providing these
13  financial reports to the C Squared Parties during the pendency of the appeal.

14      In short, the AW Parties have identified serious existential risks to the business if a
15  stay is not granted.  The C Squared Parties disagree about how likely those injuries are,
16  but they have identified nothing on the other side of the scale that will be affected by the
17  stay. At most, if the C Squared Parties are eventually able to prove some type of financial
18  injury, it can be compensated in the damages phase of the litigation that will proceed
19  regardless of whether the Court grants a stay of the 54(b) Judgment.

20      C.    **Public Policy Weighs in Favor of the AW Parties.**

21      As with the irreparable injury analysis, the C Squared Parties' public policy analysis
22  collapses into the fact that they won on the merits, so the Court should immediately
23  enforce its decision as a matter of public policy.  Response at 10-11.  The independent
24  public policy considerations are the jobs of the employees who could be laid off and the
25  slow-down in the production of military armor that could result if the company's
26  management is deadlocked.  Whatever the Court's estimation of the likelihood of those

1 risks, they represent a greater risk of irreparable harm than anything put forward by the C

2 Squared Parties.

3 **III.** **CONCLUSION**

4 The AW Parties respectfully submit that a stay pending appeal is warranted. The

5 C Squared Parties' only legitimate interest in serving as a manager is to facilitate their

6 review of the financial performance of the Company to monitor C Squared's interest.

7 AWE has continued to provide the C Squared Parties with the same level of detailed

8 financial information after Anchor's removal as a manager that it had previously

9 provided. It will continue to do so. Hence, there is no harm to the C Squared Parties from

10 the maintenance of the status quo pending appeal.

11 In contrast, Anchor's reinstatement as a manager creates potential existential

12 threats to AWE. Because there are at least serious questions regarding the manner in

13 which the Court has addressed the judicial estoppel issue, the AW Parties respectfully

14 request the Court to issue a stay, conditioned upon the provision of such reasonable

15 security as determined necessary to protect the interests of the C Squared Parties.

16 DATED this 13th day of May, 2013.

17 POLI & BALL, P.L.C.                          FENNEMORE CRAIG, P.C.

18

19 By: _____        By: _____

20    Michael N. Poli                          Christopher L. Callahan
      Jeffrey G. Zane                          John J. Balitis, Jr.
21    Attorneys for ArmorWorks, Inc. and       Carrie Pixler Ryerson
      William Perciballi                       Attorneys for ArmorWorks Enterprises,
                                               L.L.C.
22

23 **ORIGINAL** filed with Court
   **COPY** of the foregoing mailed
24 this 13th day of May, 2013, to:

25

26 Joel P. Hoxie, Esq.

1    Kelly A. Kszywienski, Esq.
     SNELL & WILMER L.L.P.
2    One Arizona Center
     400 East Van Buren
3    Phoenix, AZ 85004-2202
     Attorneys for Plaintiffs
4
     Michael N. Poli, Esq.
5    Jeffrey G. Zane, Esq.
     POLI & BALL, P.L.C.
6    2999 North 44th Street, Suite 500
     Phoenix, AZ 85018
7    Attorneys for Defendants William J. Perciballi
     and ArmorWorks, Inc.
8
     David W. Cowles, Esq.
9    TIFFANY & BOSCO, P.A.
     Camelback Esplanade II – Third Floor
10   2525 East Camelback Road
     Phoenix, AZ 85016-9240
11   Attorneys for Defendants William J. Perciballi
     and ArmorWorks, Inc.

12

13

14   Julie Calvano Tolby

15

16

17   8162657

18

19

20

21

22

23

24

25

26