GALLAGHER & KENNEDY, P.A.
John R. Clemency (Bar No. 009646)
Todd A. Burgess (Bar No. 19013)
Lindsi M. Weber (Bar No. ~~025820~~025820)
Janel M. Glynn (Bar No. 25497)
2575 East Camelback Road
Phoenix, Arizona 85016-9225
Telephone: (602) 530-8000
Facsimile: (602) 530-8500
~~Email:        john.clemency@gknet.com~~
~~todd.burgess@gknet.com~~
~~lindsi.weber@gknet.com~~

~~Proposed~~ Email:        john.clemency@gknet.com
todd.burgess@gknet.com
lindsi.weber@gknet.com
janel.glynn@gknet.com

Attorneys for Debtors

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | Chapter 11 Proceedings |
| ARMORWORKS ENTERPRISES, LLC, ☐ | Case No. 2:13-bk-10332-BMW |
| TECHFIBER, LLC, | Case No. 2:13-bk-10333-~~DPC~~BMW |
| Debtors. | ~~(Motion for Joint Administration Pending~~(Jointly Administered) |
| This Filing Applies to: | |
| X    Both Debtors | |
| ☐    Specified Debtor | |

**AMENDED DISCLOSURE STATEMENT IN SUPPORT OF
AMENDED JOINT PLAN OF REORGANIZATION
DATED ~~JUNE 17~~SEPTEMBER 11, 2013**

3762216v1/22420-0006

# I.
## INTRODUCTION

Pursuant to 11 U.S.C. § 1125, this Amended Disclosure Statement in support of Amended Joint Plan of Reorganization (the "Disclosure Statement") is submitted by ArmorWorks Enterprises, LLC ("ArmorWorks") and its wholly-owned subsidiary TechFiber, LLC ("TechFiber" and together with ArmorWorks, the "Debtors"), debtors and debtors-in-possession in the above-captioned bankruptcy cases (the "Bankruptcy Cases") pending before the United States Bankruptcy Court for the District of Arizona (the "Bankruptcy Court").

The purpose of this Disclosure Statement is to provide adequate information to the holders of claims or interests in this matter so that they may make an informed judgment in exercising their right to vote for acceptance or rejection of the Amended Joint Plan of Reorganization dated June 17September 11, 2013 (the "Plan"), a copy of which is attached as Exhibit "A". In short, the Debtors propose to satisfy all Claims against and Equity Security Interests in the Debtors through a Transaction that provides for the sale of the assets or equity of the Debtors and the non-debtor subsidiaries of ArmorWorks under the Plan.

THE DEBTORS RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN IN ORDER TO MAXIMIZE THE RECOVERY OF YOUR CLAIM.

Capitalized terms used in this Disclosure Statement will correspond to terms defined in the Plan and the Bankruptcy Code. Terms used in this Disclosure Statement that are also defined in the Plan are defined solely for convenience; and the Debtors do not intend to change the definitions of those terms from the Plan. If there is any inconsistency between the Plan and this Disclosure Statement, the Plan is, and will be, controlling.

**II.**
**OVERVIEW OF CHAPTER 11**

**A.** **Information Regarding the Plan and Disclosure Statement.**

The objective of a Chapter 11 case is the confirmation (*i.e.*, approval by the Bankruptcy Court) of a plan of reorganization or liquidation. A Chapter 11 plan describes in detail (and in language appropriate for a legal contract) the means for satisfying the claims against and equity interests in a debtor, or in this case, the Debtors. After a plan has been filed, the holders of claims and equity interests are permitted to vote to accept or reject the plan. Before a debtor can solicit acceptances of its plan, however, Section 1125 of the Bankruptcy Code requires the debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable those parties entitled to vote on the plan to make an informed judgment about the plan and about whether they should accept or reject the plan.

The purpose of this Disclosure Statement is to provide sufficient information about the Debtors and the Plan to enable you to make an informed decision in exercising your right to accept or reject the Plan. Therefore, this Disclosure Statement provides relevant information about the Debtors, their property and financial condition, and the Plan.

This Disclosure Statement will be used to solicit acceptances of the Plan only after the Bankruptcy Court has entered an order approving this Disclosure Statement. Approval by the Bankruptcy Court of this Disclosure Statement means only that the Bankruptcy Court has found that this Disclosure Statement contains sufficient information for the Debtors to transmit the Plan and Disclosure Statement to Creditors and to solicit acceptances of the Plan.

After the Bankruptcy Court has granted approval of this Disclosure Statement and there has been voting on the Plan, the Bankruptcy Court will conduct a Confirmation Hearing concerning whether the Plan should be approved. At the Confirmation Hearing,

Case 2:13-bk-10332-BMW    Doc 210-1    Filed 09/11/13    Entered 09/11/13 15:37:21
Desc Exhibit A    Page 3 of 81

the Bankruptcy Court will consider whether the Plan satisfies the various requirements of the Bankruptcy Code. The Bankruptcy Court also will receive and consider a ballot report prepared by the Debtors that will present a tally of the votes accepting or rejecting the Plan cast by those entitled to vote. Accordingly, all votes are important because they can determine whether the Plan will be confirmed. Once confirmed, the Plan is essentially a new contract between the Debtors, their Creditors, and Equity Security holders and is binding on all Creditors, Equity Security holders and other parties-in-interest in the Debtors' Bankruptcy Case regardless of whether any particular Creditor or Equity Security holder voted to accept the Plan.

**THIS DISCLOSURE STATEMENT IS NOT THE PLAN. FOR THE CONVENIENCE OF CREDITORS AND HOLDERS OF EQUITY INTERESTS, THE PLAN IS SUMMARIZED IN THIS DISCLOSURE STATEMENT. ALL SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY BY THE PLAN ITSELF. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN, THE PLAN WILL CONTROL.**

**B.** **Representations.**

This Disclosure Statement has not been subjected to a certified audit; however, it has been prepared in part from information compiled by the Debtors from records maintained in the ordinary course of business or from information received by the Debtors from third parties. Every effort has been made to be as accurate as possible in the preparation of this Disclosure Statement. Nevertheless, the inclusion of financial information in this Disclosure Statement and exhibits is subject to adjustment, and the Debtors reserve all rights to object to or challenge any Claims that are filed or asserted in the Case.

This is a solicitation by the Debtors only and is not a solicitation by their attorneys, agents, financial advisors, or accountants. No statement or information

concerning the Debtors or their assets or securities is authorized, other than as set forth in the Disclosure Statement.  This Disclosure Statement and the facts and statements made herein have not been approved by, consented to, or endorsed by C Squared Capital Partners, L.L.C. or Anchor Management, LLC.

### III.
### BACKGROUND & EVENTS LEADING TO FILING

**A.**   **The Companies.**

ArmorWorks and its wholly-owned subsidiaries develop advanced survivability technology and design and manufacture high-tech military personal body armor, vehicle armor, aircraft and marine armor, and energy attenuating seats for protection against a broad spectrum of ballistic threats primarily for use in military and nuclear safety and security applications.  ArmorWorks systems are in-service around the world in several United States Military applications.

ArmorWorks' engineering and fabrication services take armor systems projects from concept to production with customer input and collaboration throughout the process. ArmorWorks specializes in all aspects of military armor technology.  ArmorWorks has produced over 1.25 million ceramic armor and composite armor protection components for a variety of personnel armor, aircraft, and vehicle applications.   ArmorWorks primarily is known for, and attributes its success to:

- State-of-the-art ceramic armor and composite armor systems technology;
- High-performance military armor products & designs;
- Engineering & R&D capability to apply technology & designs to production;
- Ballistic testing & analysis capability;
- Military armor production capacity and experience;
- Understanding of Military Armor:  Aerospace, Personnel, Vehicle, and Ship Armor Applications; and
- Patented Armor Systems Technologies.

Formatted: Space Before: 6 pt

1    ArmorWorks sells the majority of its products through two channels.  The primary

2    channel is as a prime contractor for United States Military agencies.  ArmorWorks has

3    contractual relationships with many government entities for the purchase and service of

4    its products, and provides a substantial amount of the armor and protective equipment

5    used by all branches of the United States Military.  The second primary channel involves

6    ArmorWorks subcontracting with other prime government contractors to U.S. Military

7    agencies.

8        Because of (i) the life-critical nature of its products, (ii) the use of critical defense

9    technology including classified national defense, intelligence, and nuclear security

10   information and (iii) the United States Military's critical need for armor to protect its

11   troops in a time of war, ArmorWorks' contracts include special delivery priorities and

12   security and secrecy requirements which subject ArmorWorks to stringent government

13   regulations, requirements, and oversight.

14       ArmorWorks is functioning as, and is exercising the competitive advantage of, a

15   Small Business within the meaning of applicable federal acquisition regulations,

16   including but not limited to 13 C.F.R. § 121.404.  This special status under SBA

17   programs is critical to ArmorWorks' continued success because it provides many

18   advantages that allow ArmorWorks to successfully bid on government contracts and

19   subcontracts. ArmorWorks also enjoys the benefits of a veteran-owned business based, in

20   important part, upon my control over ArmorWorks.

21   **B.    <u>Ownership Structure.</u>**

22       ArmorWorks is an Arizona limited liability company.  ArmorWorks, Inc. ("AWI")

23   is the majority member of ArmorWorks with a 60% interest.   William Perciballi

24   ("Perciballi") is the sole shareholder of AWI and a Manager of ArmorWorks.

25       C Squared Capital Partners, L.L.C. ("C Squared") is a passive investor in

26   ArmorWorks and owns a 40% minority interest.  Timothy Crown and Eric Crown (the

"Crowns") are the sole members of C Squared.  C Squared has no role in the management or control of ArmorWorks.  Nevertheless, a C Squared entity, Anchor Management, LLC, an Arizona limited liability company, is also listed as a Manager of ArmorWorks in certain public records.

There is no written operating agreement for ArmorWorks.  However, ArmorWorks has operated, and continues to operate, under an oral agreement between Perciballi, on behalf of AWI, and the Crowns, on behalf of C Squared.  The parameters of the parties' oral agreement are defined by the testimony and declarations submitted by Perciballi and the Crowns in the 2007 United States Small Business Administration ("SBA") proceedings described below.

**C.    Debtor Subsidiary.**

ArmorWorks is vertically integrated with several wholly-owned subsidiaries providing complementary survivability products as well as components used by ArmorWorks to manufacture the armor products and systems it sells.

The only ArmorWorks' subsidiary that filed a Chapter 11 petition is TechFiber, a wholly-owned Delaware limited liability company that supplies ballistic fiber to ArmorWorks and the armor industry.  The ballistic fiber is used by ArmorWorks to manufacture ceramic armor and composite armor systems.  ArmorWorks filed a Chapter 11 petition for TechFiber to facilitate a sale of the business as part of ArmorWorks' restructuring of its business operations.

**D.    Non-Debtor Subsidiaries.**

Non-debtor subsidiary ShockRide, LLC ("ShockRide") is a wholly-owned Arizona limited liability company that designs, manufactures, and sells energy attenuating seats, which protect passengers from the shock of IED and mine blasts beneath a vehicle.  ShockRide's energy absorption, rollover, and crash protection technology is used in a wide variety of military vehicles with over 70,000 seats in service

worldwide. ShockRide is self-sufficient and does not require any significant restructuring at this time. Therefore, ArmorWorks did not file a chapter 11 petition for ShockRide.

Non-debtor subsidiary Mandall BarrierWorks, LLC ("MBW") is a wholly-owned Delaware limited liability company that designs and produces high-end vaults, vault doors, and armored door systems providing architectural blast protection and security, including passive and reactive high value asset protection systems, safes, security doors, and fixed and portable guard stations for government, military, nuclear, and commercial installations. The company's work in the area of nuclear safety and security requires additional security clearances beyond those required by the Department of Defense. MBW is self-sufficient and does not require any significant restructuring at this time. Therefore, ArmorWorks did not file a chapter 11 petition for MBW.

Non-debtor subsidiary Applied Heat Technologies, LLC ("AHT") is an Arizona limited liability company wholly owned by ArmorWorks that provides portable armor and composite repair products and services. AHT is self-sufficient and does not require any restructuring, and therefore did not file a chapter 11 case.

Non-debtor Protective Ceramics, LLC is a Delaware limited liability company wholly owned by ArmorWorks. Protective Ceramics does not conduct any business operations and likely will be dissolved.

**E.    Foreign Non-Debtor Subsidiaries.**

ArmourWorks International Limited (AIL) is a wholly-owned subsidiary of ArmorWorks located in the United Kingdom that supplies armor and protective products to customers in the United Kingdom and internationally. ArmorWorks Enterprises Canada, ULC is a wholly-owned subsidiary of ArmourWorks International Limited (AIL) located in British Columbia that supplies soft body armor products to the Canadian military and law enforcement communities.

**F.**     **Management Team.**

Perciballi is a Manager and Founder of ArmorWorks. Prior to founding ArmorWorks in 1996, Perciballi was a product manager in the Armor Products Division of Simula, Inc. He began his military career in the U.S. Army ROTC program while attending the University of Massachusetts, Lowell. Perciballi was commissioned as a second lieutenant of the United States Army during his junior year of college. Before being called to active duty during the Persian Gulf War, Perciballi was a mechanical engineer in the U.S. Army Materials Technology Laboratory in Watertown, Massachusetts where he performed critical research and development of armor materials and systems. Perciballi later worked as an engineer in the U.S. Army Ballistic Research Laboratory in Aberdeen Proving Ground, Maryland where he conducted applied research and development of advanced armor systems for combat vehicles. He is a member of the Society of Automotive Engineers (SAE), National Defense Industrial Association (NDIA), Society for the Advancement of Material and Process Engineering (SAMPE), and the National Armor Advisory Board to the National Institute of Justice, the standards organization that issues armor protection standards and protocol. Perciballi has a Bachelor of Science degree in industrial engineering technology from the University of Massachusetts, Lowell. He holds several security clearances issued by the Department of Defense for national security information, and the Department of Energy for Nuclear Security information. Perciballi is the Facility Security Officer for ArmorWorks, Inc., which sponsors ArmorWorks employees' security clearances. He is an internationally published and recognized researcher in the field of ballistic protection, impact energy absorption, and the effects of blast and acceleration on the human body. Perciballi is an inventor listed on several patents issued by the US Patent and Trademark Office. And, he serves on the Secretary of the Army's Advisory Board for armor protection.

David A. Wirthlin ("Wirthlin") is Chief Financial Officer of ArmorWorks. Mr. Wirthlin joined ArmorWorks in June 2004. He has over twenty years experience in

financial and operational management.  Prior to joining ArmorWorks, Wirthlin was a management consultant providing capital acquisition and financial management services to a variety of businesses.  Wirthlin previously served as CFO of Integrated Information Systems, where he coordinated private placements and helped take the company public, and SkyMall where he led the company through a turnaround and restructuring and later helped take the company public.  He began his career with Arthur Andersen as a manager in the firm's operational consulting group.  Wirthlin is a certified public accountant. He holds a Bachelor of Arts in accounting from the University of Utah and a Master of Business Administration from the University of Chicago.

Robert G. Dick ("Dick") is Vice President of Programs and has been instrumental in the success of the business.  He is responsible for the company's armor programs, research and development, and maintaining the company's technical relationships with client engineers and program managers.  Dick has over 20 years of experience working with composite materials and military body armor testing.  Prior to joining ArmorWorks, Mr. Dick managed an FAA-Certified composites repair station and production operation that serviced the commercial airline industry.  He is an FAA-Certified Airframe Technician.

Brad Field ("Field") is the ArmorWorks Director of Corporate Development.  Mr. Field joined ArmorWorks in January, 2009.  Prior to coming to ArmorWorks he was the founder/CEO of Pacific Safety Products Inc. ("PSP"), a publicly traded Canadian company that has been an industry leader in the safety products industry for over 25 years.  Under his leadership, PSP was named one of Canada's fastest growing companies for three years running from 1999 to 2001, and received an Okanagan Science and Technology Innovation award in 2005.  Mr. Fields currently is the General Manager of ArmorWorks Canada.

1   John McGara ("McGara") is the General Manager ShockRide.  Mr. McGara is a
2   retired US Army Ordnance Captain who joined ArmorWorks in 2006.  After initially
3   serving as Vice President of Programs and Engineering, McGara now has responsibility
4   for all manufacturing operations and related support functions for ShockRide.  He has
5   extensive operations and P&L experience in technology businesses, has successfully led
6   several growth businesses and turned struggling operators into industry and quality and
7   performance leaders.  McGara holds a Bachelor of Science degree in Industrial
8   Engineering, from the Ohio State University and an MBA from University of Toledo.

9   Elida Voorbrood ("Voorbrood") is the ArmorWorks General Manager.  Ms.
10  Voorbrood joined ArmorWorks in April 2001 with over 18 years of experience in
11  manufacturing.  Prior to joining ArmorWorks, Voorbrood was an Industrial Engineer for
12  several high profile companies, applying her manufacturing knowledge to processes that
13  expanded from household products to apparel production in companies like Nike, Levi
14  Strauss and Sunbeam-Oster.  At Nike, she oversaw the implementation of an innovative
15  "Pay for Performance" program for the company's Distribution Center facility.  At
16  Sunbeam-Oster, Voorbrood  was responsible for full product and processes transferring
17  as well as setting up new product assembly lines.  Originally from Mexico, Ms.
18  Voorbrood is a graduate of the Technological Institute of Matamoros-Mexico where she
19  earned a Bachelor of Science degree in Industrial Engineering.

20  Richard F. Langner ("Langner") is Vice President Research and Development.
21  Mr. Langner joined ArmorWorks September 2002.  He has over 20 years of mechanical
22  design experience, primarily in the defense industry.  Langner currently leads
23  ArmorWorks's research and development department, which is responsible for all of the
24  company's product design efforts.  Prior to joining ArmorWorks, Mr. Langner was a
25  mechanical engineer at McDonnell Douglas, where he designed, tested and integrated
26  medium caliber automatic cannons for several military platforms, including the Bradley

1  ~~Fighting Vehicle and Apache Attack Helicopter.  He also was an engineering manager for~~
2  ~~Taser International, designing electronic incapacitation devices for law enforcement and~~
3  ~~civilian use.  Langner holds several patents and has others pending.~~

4  **G.     Facilities.**

5       The majority of ArmorWorks' business operations are conducted from leased

6  commercial space in Chandler and Tempe, Arizona.  ArmorWorks' primary facility,

7  located at 305 N. 54th Street, Chandler, Arizona, houses the corporate headquarters,

8  vehicle armor assembly, body armor, flat armor, and applied heat production facilities, as

9  well as research and development.  Additional research and development and storage

10 facilities are located at 205 S. Beck Avenue, Chandler, Arizona.

11      Until February 2013, ShockRide's production facilities and research and

12 development were located at 500 N. 54th Street, Chandler, Arizona.  Effective February

13 1, 2013, in an effort to reduce operating costs, ArmorWorks surrendered the premises to

14 the landlord and relocated the Shockride operations to 305 N. 54th Street.  ~~ArmorWorks~~

15 ~~is attempting~~ The lease for 500 N. 54th Street, Chandler, Arizona was rejected by the

16 Debtors pursuant to the *Order Rejecting Lease Of Nonresidential Real Property Pursuant*

17 *To 11 U.S.C. § 365 For Premises Located At 10 Chandler As Of The Petition Date* signed

18 on 8/7/2013 (Dkt. 148).  ArmorWorks will attempt to negotiate a settlement of the

19 remaining lease obligation with the landlord.

20      In an effort to further consolidate its facilities and reduce operating expenses, on

21 September 6, 2013, the Debtors filed the *Motion to Reject Lease of Non-Residential Real*

22 *Property Pursuant To 11 U.S.C. §365 for Premises Located At 305 N. 54th Street,*

23 *Chandler, Arizona.*  Operations formerly conducted from 305 N. 54th Street are being

24 relocated to other existing facilities.

25

26

1    TechFiber production facilities are located at 6955 South Priest, Tempe, Arizona.
2    Mandall Barrier Works operates from a facility located at 7071 W. Frye Road, Chandler,
3    Arizona.

4    ArmourWorks International Limited (AIL) leases commercial space located at 26
5    Bamel Way, Glouchester Business Park, Brockworth Glouchester GL3 4BH, United
6    Kingdom. ArmorWorks Enterprises Canada, ULC leases commercial space located at
7    Suite B2-8775 Jim Bailey Cresent, Kelowa, BC V4V 2L7, Canada.

8    **H.    U.S. Government Regulations and Compliance.**

9    As a prime contractor and sub-contractor to the U.S. Government, ArmorWorks is
10   subject to stringent government rules, regulations, and compliance, which include
11   requirements that the company self-report any violations and potential violations. The
12   primary regulatory requirements applicable to ArmorWorks are summarized below,
13   although the discussion certainly is not exhaustive.

14   The Federal Acquisition Regulation (FAR) is the principal set of rules in the
15   Federal Acquisition Regulation System. This system consists of sets of regulations
16   issued by agencies of the Federal government of the United States to govern what is
17   called the "acquisition process," that is, the process through which the government
18   purchases goods and services. That process consists of three phases: (1) need recognition
19   and acquisition planning, (2) contract formation, and (3) contract administration. The
20   FAR System regulates the activities of government personnel in carrying out that process.
21   It does not regulate the purchasing activities of private sector firms, except to the extent
22   that parts of it are incorporated into government solicitations and contracts by reference.

23   The FAR is codified in Title 48 of the United States Code of Federal Regulations.
24   It is issued pursuant to the Office of Federal Procurement Policy Act of 1974 (Pub. L. 93-
25   400 and Title 41 of the United States Code), Chapter 7. Statutory authority to issue and
26   maintain the FAR resides with the Secretary of Defense, the Administrator of General

Services, and the Administrator, National Aeronautics and Space Administration, 41 U.S.C. § 421(c)(1), subject to the approval of the Administrator of Federal Procurement Policy, 41 U.S.C. § 405.

Failure to comply with FAR rules and regulations could lead to suspension or debarment, withholding of revenue from government prime contracts or subcontracts, and civil and criminal penalties being imposed on executives of ArmorWorks.

The False Claims Act (31 U.S.C. §§ 3729–3733) (FCA) imposes liability on persons and companies (typically federal contractors) who defraud governmental programs. The FCA establishes liability when any person or entity improperly receives from, or avoids payment to, the Federal government (tax fraud is excepted). The FCA prohibits:

- Knowingly presenting, or causing to be presented a false claim for payment or approval;
- Knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim;
- Conspiring to commit any violation of the False Claims Act;
- Falsely certifying the type or amount of property to be used by the Government;
- Certifying receipt of property on a document without completely knowing that the information is true;
- Knowingly buying Government property from an unauthorized officer of the Government; and
- Knowingly making, using, or causing to be made or used a false record to avoid, or decrease an obligation to pay or transmit property to the Government.

3762216v1/22420-0006

14

1    Depending upon the circumstances, a contractor that makes a false statement may
2  face civil or criminal liability for such a statement.  When the Government relies upon a
3  false statement in awarding a contract, and subsequently makes payments under that
4  contract, the invoices may be considered a false claim.  Lax billing oversight and failure
5  to bill strictly in accordance with contracts also can lead to a false claim.

6    The Truth in Negotiations Act (TINA) requires government contractors to submit
7  cost or pricing data and to certify that such data is current, accurate and complete on the
8  date of final agreement on price, commonly referred to as the "handshake."  Compliance
9  with TINA is an essential part of doing business with the U.S. Government.  Violations
10 of TINA are typically referred to as "defective pricing."  In such cases, the government
11 will require a reduction in the price of the contract along with the payment of penalties
12 and interest costs.  Intentional failure to comply with TINA can result in significant
13 additional penalties for both the company and individual employees.  Beyond defective
14 pricing, if data is knowingly concealed or submitted when known to be false, the
15 company and its employees may be criminally charged, under the False Claims Act, with
16 fraud for submitting false claims or making false statements.

17    International Traffic in Arms Regulations (ITAR) is a set of U.S. Government
18 regulations that control the export and import of defense-related articles and services on
19 the United States Munitions List (USML).  The goal of ITAR is to safeguard U.S.
20 national security and further U.S. foreign policy objectives.  ITAR regulations dictate that
21 information and material pertaining to defense and military related technologies (for
22 items listed on the U.S. Munitions List) may only be shared with U.S. Persons unless
23 authorization from the Department of State is received or a special exemption is used.
24 U.S. Persons (including organizations) can face heavy fines if they have, without
25 authorization or the use of an exemption, provided foreign (non-US) persons with access
26 to ITAR-protected defense articles, services or technical data.

1    In an effort to ensure continued compliance with all applicable government

2  regulations, ArmorWorks has comprehensive government compliance procedures and

3  programs, which include self-reporting requirements, annual reviews, and employee

4  training programs.

5  **I.     History of Dispute with Minority Owner.**

6    In 1996, Perciballi founded the business now operated by ArmorWorks and

7  eventually incorporated AWI, which was then owned by Mr. Perciballi and his former

8  spouse.  In 2001, ArmorWorks was formed when C Squared made a $1,000,000 passive

9  investment in the business.   In exchange for its investment, C Squared was given its 40%

10  membership interest in ArmorWorks.   Mr. Perciballi retained the majority 60%

11  membership interest in ArmorWorks, through AWI, and also retained all operational

12  control of the business.

13    At the time of formation, the Articles of Organization of ArmorWorks listed both

14  C Squared and Mr. Perciballi as managers of ArmorWorks.  However, it was understood

15  then, and always has been the case, that Mr. Perciballi has sole authority to manage the

16  day-to-day operations of ArmorWorks.  C Squared and its principals chose, and agreed,

17  not to interfere in the day-to-day operations of ArmorWorks, and further agreed to remain

18  at all times passive investors.

19    At the time ArmorWorks was formed in 2001, an operating agreement was

20  prepared, but it was never fully executed.  C Squared signed the operating agreement in

21  its capacity as a 40% member, and Anchor Management, LLC ("Anchor"), a limited

22  liability company owned by the principals of C Squared, signed the operating agreement

23  as a manager.  Mr. Perciballi signed the operating agreement, individually, in his capacity

24  as a manager of ArmorWorks.  However, AWI, the majority member, never executed the

25  operating agreement.  As a result, there is no binding or effective written operating

26  agreement for ArmorWorks.

3762216v1/22420-0006                                      16

1    In 2005, Articles of Amendment to the Articles of Organization of ArmorWorks
2  were filed to substitute Anchor in place of C Squared as a passive manager of
3  ArmorWorks.  Anchor's sole function as a manager of ArmorWorks was to monitor C
4  Squared's passive investment in ArmorWorks.  Matthew J. Gallaher is the Chief
5  Financial Officer of Anchor.

6    Despite the absence of a binding written operating agreement for ArmorWorks,
7  the parties did have an understanding as to their respective rights and obligations.  The
8  parties' understanding was described in submissions to the SBA in connection with a
9  challenge by a competitor to the "small business" status of ArmorWorks in 2007.

10    As discussed above, ArmorWorks qualifies as a small business for federal
11  procurement purposes and has won a number of contract awards as a direct result of that
12  status.  In 2007, ArmorWorks was awarded a multi-million dollar contract by the Defense
13  Supply Center Philadelphia ("DSCP") for the provision of enhanced small arms
14  protective inserts.  That award was based on ArmorWorks's small business status; for
15  that procurement, the small business status required ArmorWorks Enterprises, LLC and
16  its affiliates to have fewer than 500 employees.

17    Ceramic Protection Corporation of America ("CPCA") filed a protest of the DSCP
18  award with the SBA, alleging, among other things, that ArmorWorks exceeded the SBA
19  size standard.  In determining whether a business meets the relevant size standard, the
20  SBA will consider the number of employees of the contracting company, as well as the
21  number of employees of affiliates of persons or entities in control of the contracting
22  company.  Therefore, a significant component of ArmorWorks' response to the size
23  protest was focused on establishing who did and did not control ArmorWorks.

24    ArmorWorks made a number of submissions to the SBA in response to the protest,
25  including submissions to establish conclusively that Mr. Perciballi was the sole person in
26  control of ArmorWorks and to eliminate any consideration of entities controlled by Eric

3762216v1/22420-0006                           17

and Timothy Crown who, through C Squared, merely were passive investors in ArmorWorks. ArmorWorks' submissions included a declaration signed by Mr. Gallaher on behalf of Anchor, the Manager of C Squared. Mr. Gallaher's declaration confirmed the following:

- AWI never signed an operating agreement for ArmorWorks;
- Although Anchor monitors C Squared's passive investment in ArmorWorks, Anchor has never been actively involved in the operations of ArmorWorks;
- Anchor is virtually unknown to ArmorWorks's employees and representatives, and representatives of Anchor have almost never visited the ArmorWorks's facilities;
- No representative of Anchor has keys or access badges to the ArmorWorks's facilities, and Anchor representatives have to sign-in to enter the facility, as any general visitor would;
- Much of ArmorWorks's work requires security clearances due to the classified nature of the armor being produced for combat operations, and neither Anchor nor any agents of Anchor have the clearances necessary to have unescorted access to ArmorWorks's facilities;
- Neither Anchor nor its principals have been involved in any government contract awarded to ArmorWorks;
- Anchor does not have expertise in federal contracting or armor manufacturing, and ArmorWorks has no contracts or subcontracts with Anchor;
- ArmorWorks and Anchor do not share any common employees; and
- To Mr. Gallaher's knowledge, neither Anchor nor any representative of Anchor has any regular interaction with any employee of ArmorWorks,

18

1  except for the ArmorWorks's CFO (who interacts with Mr. Gallaher
2  regarding C Squared's holding) and Perciballi.  The CFO, David Wirthlin,
3  from time to time transmitted summary financial information to Mr.
4  Gallaher as it relates to C Squared's financial interest in ArmorWorks.

5  Mr. Perciballi submitted a similar declaration to the SBA on behalf of
6  ArmorWorks confirming that C Squared is a passive investor only and has no
7  management or operation control over ArmorWorks.  True and correct copies of the
8  declarations submitted to the SBA are attached hereto as Exhibit "B".

9  By decision dated December 28, 2007, based in large part on the representations
10 made by Anchor and Mr. Perciballi regarding the status of C Squared as a passive
11 minority owner, the SBA denied the size protest, confirmed ArmorWorks' status as a
12 qualified small business, and affirmed the contract award to ArmorWorks.

13 Despite its representations to the SBA that it is a passive investor, over the past
14 several years, C Squared has sought to assert control over ArmorWorks and to interject
15 itself into the operations of the company.  Among other things, C Squared now claims
16 that the unexecuted operating agreement is binding on the parties, and that Anchor should
17 be reinstated as a manager with control over the operations of ArmorWorks.

18 For instance, in 2008, the principals of C Squared conspired with Goldman Sachs
19 and others in an attempt to leverage Mr. Perciballi's then pending divorce proceedings to
20 obtain a controlling interest in ArmorWorks.    At the time, Goldman Sachs and
21 ArmorWorks were parties to an engagement letter dated October 11, 2004 under which
22 Goldman Sachs was retained as an investment banker and exclusive broker to market the
23 company.    C Squared also has, at times, attempted to interfere with or delay
24 ArmorWorks' ability to extend its revolving credit facility with JPMorgan Chase Bank.
25 The revolving credit facility has since been repaid, but ArmorWorks has been unable to
26 obtain new working capital financing as a result of the ongoing disputes with C Squared.

**Formatted:** No widow/orphan control

1    During ArmorWorks' 2009 annual government compliance review and training,

2    which includes a review of the company's books and records, C Squared's recantation of

3    its 2007 statements to the SBA was reviewed.  At that time, it was determined that C

4    Squared's recantation of its sworn representations to the SBA, in connection with the

5    CPCA bid protest in 2007, could raise concerns under the False Claims Act.

6    Thereafter, in an effort to protect the company from liability and preserve

7    ArmorWorks' small business status, Mr. Perciballi took two actions on behalf of

8    ArmorWorks.  First, he filed Articles of Amendment to the Articles of Organization of

9    ArmorWorks in July 2009 removing Anchor as a listed manager of ArmorWorks.

10   Anchor was removed as a passive manager so that the corporate filings would be

11   consistent with his understanding of C Squared's status as a passive investor, the parties'

12   prior representations to the SBA, and Anchor's status as a paid consultant to

13   ArmorWorks.  Then, in September 2009, Mr. Perciballi self-reported the concerns noted

14   above on behalf of ArmorWorks through a disclosure notice to the Contracting Officer

15   for the Defense Supply Center Philadelphia.

16   Despite its prior representations to the SBA, after Anchor was formally removed

17   as a manager of ArmorWorks, C Squared initiated litigation against ArmorWorks, AWI,

18   and Mr. Perciballi.  *See C Squared Capital Partners, LLC v. ArmorWorks Enterprises,*

19   *LLC*, Maricopa County Superior Court Case No. CV2011-008545; and *C Squared*

20   *Capital Partners, LLC, et al. v. Perciballi, et al.*, Maricopa County Superior Court Case

21   No. CV2011-009812.  In various pleadings, C Squared continues to claim various levels

22   of control over ArmorWorks.

23   Over Perciballi's objection, and that of ArmorWorks and AWI, by Minute Entry

24   Ruling dated February 8, 2013, the Maricopa County Superior Court ordered in CV2011-

25   009812, that AWI and Perciballi "take all actions necessary to amend AWE's Articles of

26   Organization to reflect [Anchor Management's] status as a manager of [ArmorWorks]."

3762216v1/22420-0006

20

On April 9, 2013, the Superior Court entered a Fed.R.Civ.P. 54(b) judgment consistent with the February 8, 2013 Minute Entry Ruling. On May 8, 2013, ArmorWorks, AWI, and Perciballi filed a Notice of Appeal of the April 9, 2013 judgment. The Superior Court denied the parties' request for a stay pending appeal.

Although ArmorWorks, AWI and Perciballi dispute the Court's findings and order, on June 3, 2013, I executed and directed Articles of Correction to be filed with the Arizona Corporation Commission in compliance with the Superior Court's ruling, pending the outcome of the appeal. Perciballi believes that, in addition to creating a potential violation under the False Claims Act, the continuing actions of C Squared threaten ArmorWorks' status as a small business and may compromise ArmorWorks' U.S. Government security clearances, which in turn would threaten ArmorWorks' status as a U.S. Government prime contractor and subcontractor.

C Squared's initial investment in ArmorWorks was has been repaid in full through a return of capital. Since 2001, C Squared has received distributions totaling $21,646,000 (including the return of its initial $1,000,000 investment) on account of its 40% minority interest in ArmorWorks.

**J.      Financial Performance and Events Leading to Chapter 11 Restructuring.**

Historically, the independent certified public accounting firm of Mayer Hoffman McCann P.C. has audited the financial statements of ArmorWorks and its subsidiaries on a consolidated basis. ArmorWorks uses a calendar year accounting cycle.

In 2009, ArmorWorks and its subsidiaries had net income of $14,838,000 on total sales of $190,531,000. Sales declined materially in 2010, to $128,375,000, and ArmorWorks realized a net loss from operations of $11,475,000 based in large measure on a $20 million inventory write-off recorded by the company.

Sales increased dramatically in 2011 to $313,763,000 based in large measure on a $236,247,162 contract awarded to ArmorWorks in late 2010 by AM General for the

production of upgraded armor for the U.S. Military's HMMWV fleet. The increased sales 2011 generated net income of $27,917,000 in 2011. ArmorWorks completed the AM General contract in 2011. ArmorWorks' record sales in 2011 enabled the company to pay-off substantially all of its secured debt, including a $40 million revolving line of credit from JPMorgan Chase, and approximately $3.0 million of secured equipment financing from Chase Equipment Financing.

Despite ArmorWorks strong performance in 2011, the business deteriorated substantially in 2012 tracking an industry-wide defense trend. ArmorWorks experienced a net loss of $9,988,000 on total sales of $100,229,000 in 2012. ArmorWorks' poor performance in 2012 in many ways mirrored that of the defense industry as a whole that continues to suffer from the anticipated and actual implementation of sequestration; from a federal government that cannot agree on a budget; from military force reductions and planned pull-outs in both Iraq and Afghanistan; and from a general belief that defense spending will most likely decrease in the foreseeable future. In this environment, government funding simply is not flowing to military and defense contracts like it once did. For ArmorWorks, the slow-down has manifested itself in follow-on orders to its largest vehicle armor contract that have not materialized, seat programs being delayed or cancelled, and military demand for body armor plates virtually disappearing. As a result, ArmorWorks, like many other defense contractors, is restructuring and reducing the size of its operations.

However, despite the slowdown, ArmorWorks remains optimistic for the future and there are many positives. The company's core strength has been and will continue to be innovation. The company innovated from hard body armor to vehicle armor to seats and to soft protective under and over garments. ArmorWorks has a number of other new technologies and products in the queue. It is in a good market and resource position to continue innovating and delivering new solutions to customers for the long-run.

In the near-term, ArmorWorks continues to operate its business and prepare for the future. The company has contracts and continues to land new orders. The numbers are smaller than the company would like, but it does have business and there are prospects for profitable business in the short-term.

As of May 26, 2013, on a consolidated basis, ArmorWorks had total assets (at book value) of approximately $30,949,00 consisting of: (i) cash of $959,000, (ii) accounts receivable of $3,676,000, (iii) inventory of $8,608,000, (iv) other current assets of $889,000, (v) personal property and equipment of $12,054,000, (vi) intellectual property and intangibles assets of $1,188,000, and (vii) other assets of $3,575,000.

As of May 26, 2013, on a consolidated basis, ArmorWorks had total liabilities (at book value) of approximately $12,040,000 consisting of: (i) trade accounts payable of $5,973,000, (ii) accrued expenses of $2,328,000, (iii) deferred revenue of $1,354,000, (iv) notes payable of $1,810,000, and (v) other long term liabilities of $575,000. More detailed information concerning the assets, liabilities, and financial condition of the Debtors may be found in the statement of financial affairs and schedules filed by each of the Debtors.

Although the companies continue to operate, and believe ultimately they will "weather the storm," the ongoing litigation with C Squared has made it impossible for ArmorWorks and its affiliates to obtain working capital financing to replace the $40 million line of credit paid off in 2012. Without working capital financing, ArmorWorks is in jeopardy of running out of cash in the short term. As discussed below, ArmorWorks has identified a lender that is willing to provide up to $3.5 million of debtor in possession financing.

The working capital financing, if approved and obtained, should be sufficient to allow ArmorWorks to continue to operate and restructure its operations, including (i) divesting business units that no longer fit within the strategic framework of ArmorWorks'

long-term plan; and (ii) reducing the companies' Arizona facilities footprint through the rejection of burdensome long-term leases.

In addition to restructuring its debt, reducing its facilities footprint, and divesting portions of its business, the Debtors are hopeful that the Chapter 11 filing will assist ArmorWorks in resolving the ongoing dispute with C Squared by allowing ArmorWorks to redeem C Squared's 40% minority interest, or alternatively, allow C Squared to purchase the 60% majority interest of AWI. As discussed above, C Squared's efforts to interject itself into a position of control threaten ArmorWorks' small business status, security clearances, and future ability to obtain government contracts. In addition, the demands of the continually escalating litigation from both a time and financial standpoint are detracting from management's ability to operate and grow the business.

**IV.**
**POSTPETITION PROCEEDINGS AND EVENTS**

**A.    Summary of Key Events Related to the Bankruptcy Cases.**

While more detailed information related to the events in the Bankruptcy Cases can be obtained by assessing the Bankruptcy Court's CM/ECF filing system and reviewing the pleadings filed in the jointly administered cases, the following is a summary of certain key bankruptcy-related proceedings and events associated with this Bankruptcy Cases.

1.    The Commencement of the Cases.

On June 17, 2013, the Debtors each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"). The Debtors continues in possession of their property and the management of their businesses as debtors-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed. No Official Committee of Unsecured Creditors has been formed.

2.    First Day Motions.

In order to efficiently administer the Chapter 11 case and accomplish a reorganization of the Debtors that should result in the payment in full of all creditors and equity holders, the Debtors immediately sought: (i) an order providing for the joint administration of the Chapter 11 cases of ArmorWorks and its subsidiaries; (ii) authorization to retain Gallagher & Kennedy, P.A. ("G&K") as the company's general bankruptcy and restructuring counsel; (iii) authorization to retain MCA Financial Group, Ltd. ("MCA") as the company's financial advisor; (iv) authorization to obtain up to $3.5 million of debtor in possession financing, including $875,000 on an emergency basis to fund cash shortfalls; (v) authorization to pay certain prepetition employee wages and continue to honor employee benefits in the ordinary course of business; and (vi) an order determining adequate assurance of payment for future utility services.

Accordingly, concurrent with the filing of their Chapter 11 petitions, the Debtors ArmorWorks filed, for the Court's approval on an interim and final basis, a number of motions and applications (the "First Day Motions") that are necessary to enable the Debtors to operate in Chapter 11 with a minimum disruption and loss of productivity. The Debtors have sought approval of each of the First Day Motions as a critical element in achieving an efficient and successful reorganization of the companies. A description of each of the First Day Motions is provided below.

### Motion for Joint Administration

The Debtors asked the Court to enter an Order transferring the assignment of the TechFiber case to the Judge assigned to the ArmorWorks' (lowest numbered) case and authorizing the joint administration of the Debtors' chapter 11 cases. Joint administration is necessary and appropriate to preserve judicial and estate resources, avoid duplication of efforts and reduce the time and expense associated with administering the Debtors' cases. The Court granted the request for joint administration on June 20, 2013. Dkt. #45.

### Applications For Authorization To Retain G&K And MCA

3762216v1/22420-0006

25

The Debtors sought authorization to employ G&K and MCA as estate professionals (the "Professionals"). The professional services that the Debtors require, and have requested that G&K perform in the case, include the following:

- provide legal advice with respect to the Debtors' powers and duties as debtors-in-possession in the continued operation of their businesses and management of their property;
- prepare necessary applications, motions, answers, orders, reports and other legal papers;
- appear in Court and protect the interests of the Debtors before the Court;
- assist the Debtors with financing and with the collection and disposition of assets, by sale or otherwise;
- assist the Debtors with their ongoing corporate and non-defense regulatory legal needs;
- represent the Debtors in any future collection or other litigation commenced (or to be commenced) by and/or against them;
- assist the Debtors in preparing and confirming a Chapter 11 plan; and
- represent the Debtors in connection with all aspects of their bankruptcy cases and perform all legal services which may be necessary and proper for the Debtors in these proceedings.

The professional services that the Debtors require, and have requested that MCA perform in the case, include the following:

- advise the Debtor in connection with, and assist in the preparation of, bankruptcy schedules and statement of financial affairs, monthly operating reports, and other financial reporting requirements;
- advise the Debtors in connection with, and assist in the preparation of, financial projections;

3762216v1/22420-0006

26

- advise the Debtors in connection with cash collateral and financing issues;
- perform financial analysis of the Debtors' business and operations;
- perform valuation and feasibility analysis;
- advise the Debtors in connection with business and financial restructuring of the company, and in the formulation, negotiation, and confirmation of a chapter 11 reorganization plan;
- provide expert witness and litigation support services in relation to cash collateral, financing, valuation, feasibility, and plan confirmation issues; and
- provide other financial and business consulting services to the Debtors as needed.

The Debtors have asked G&K and MCA (and will ask any other professionals employed in the case) to file interim fee applications on a monthly basis to allow the Debtors, the United States Trustee, creditors and other parties in interest an opportunity to monitor and control the costs and fees of estate Professionals on a current basis. The C Squared Parties filed objections to the G&K and MCA Employment Applications, and a hearing was held on July 12, 2013.  *See* Dkt. #26, 27, 65, 67, 136.  The Court granted the G&K and MCA Employment Applications on July 16, 2013.  Dkt. #113, 114.

<u>Motion To Approve Debtor in Possession Financing</u>

The Debtors ~~do~~did not have sufficient available sources of working capital to operate their businesses without working capital financing.  Based on the Debtors' consolidated 13-week cash budget (the "Budget"), the Debtors were likely ~~will~~to run out of cash in the short term causing immediate and irreparable harm to the Debtors and their estates.  A copy of the Budget is on file with the Court and ~~will be~~was updated throughout the case.

3762216v1/22420-0006

27

**Formatted:** Font: Not Bold, Underline

With the assistance of MCA Financial, the Debtors ~~have been~~ actively ~~seeking~~sought working capital financing for several months to assist the company through the current industry-wide economic slowdown. As discussed above, in light of the ongoing litigation involving C Squared, ArmorWorks has been unable to obtain working capital financing outside of Chapter 11. However, the Debtors located a lender ~~that is~~ willing to provide up to $3.5 million of debtor in possession financing.

Subject only to Bankruptcy Court approval, prepetition the Debtors and Lancelot Armor, LLC, an Arizona limited liability company ("Lender"), executed a Senior Secured Super-Priority Debtor-In-Possession Credit And Security Agreement (the "Credit Agreement") pursuant to which Lender ~~has~~ agreed to provide up to $3.5 million of debtor in possession financing to the Debtors~~.~~ (the "DIP Financing"). The primary terms of the proposed financing ~~are~~were as follows:

- Maximum Loan Amount: $3.5 million available in two (2) disbursements, (i) an initial disbursement of up to $875,000 upon entry of an order approving the financing on an interim basis, and (2) the balance upon entry of a final order approving the financing, subject to availability under the Borrowing Base.

- Use of Proceeds: Borrowers shall use the proceeds of the Loan for (a) working capital; (b) for payment of (i) costs of administration of the Case, and (ii) the fees and expenses described under Section 7.6 of the Credit Agreement; and (c) such Pre-Petition obligations as the Bankruptcy Court shall approve, in each case in a manner consistent with the terms and conditions of the Interim Order and Final Order.

- Collateral: all real and personal property of the Debtors and the non-debtor subsidiaries of ArmorWorks, including a pledge of 100% of ArmorWorks' member interests in all subsidiaries, and a super-priority administrative

expense claim pursuant to 11 U.S.C. § 364(c) and (d). The collateral, priming liens, and super-priority administrative claim are subject to a $250,000 carve-out for the debtors' professionals and any professionals retained by any statutory committee appointed in the cases.

- Interest Rate: 15% with an increase to 21% while any event of default exists.

- Fees: 5% origination fee paid prepetition upon execution of the DIP loan and security agreement, and $2,500 a month collateral monitoring fee.

- Expenses: Debtors responsible for all attorneys' fees and expenses incurred by lender. The Debtors provided a $30,000 expense deposit to the lender prepetition.

- Lockbox: Within 30 days of the initial Advance, Borrowers shall establish a lockbox, into which all of Borrower's receipts from any source whatsoever shall be deposited and to which only AWE shall access for so long as there has been no Event of Default on the Loan and only to the extent that the funds deposited therein are used in strict compliance with the Approved Budget (subject to a 20% monthly variance). Sole control of the lockbox and funds contained therein (together with future deposits therein) shall be turned over to Lender upon an Event of Default, and Lender may thereafter, in its sole and absolute discretion, apply such funds to the Indebtedness in such order and manner as Lender may determine. Upon taking sole control of the lockbox, the Lender shall receive a monthly accounting fee of $5,000 until the Loan has been repaid in full or Borrowers have cured the subject Event of Default to the satisfaction of Lender.

- Maturity Date:  If not paid sooner as provided in the Credit Agreement or any of the Loan Documents, the principal balance outstanding under the Note, together with all accrued interest and all other amounts owed under the Loan Documents shall be due and payable on the earlier to occur of:  (1) the effective date of a plan of reorganization confirmed in the Case, (2) entry of an order converting any of the Case to a case under Chapter 7 of the Bankruptcy Code, (3) entry of an order dismissing the Case (or either of the cases jointly administered as the Case), (4) entry of an order appointing an interim or permanent trustee in the Case, or an examiner with expanded powers to operate or manage the financial affairs, business, or reorganization of Debtors, or (5) entry of an order approving a sale of substantially all of the Debtors' assets under Section 363 of the Bankruptcy Code; or (ii) December 31, 2013 (the "Maturity Date").  Subject to there having been no default or Event of Default hereunder and written notice not less than twenty (20) days prior to the Maturity Date, Borrower may either (i) extend the maturity date to March 31, 2014 for a fee of 1% or (ii) extend the Maturity Date to June 30, 2014 for an additional fee of 1.5% (a total of 2.5% if the 6 month extension is requested before the original Maturity Date, in either case as a percentage of the outstanding Loan balance as of the date of the written notice of exercise of the extension with said fee payable at the time of such notice to Lender.

- Payments:  monthly interest only payments with all amounts due and owing paid on the Maturity Date.

- Stay Relief:  automatic stay is modified to permit the Debtors to grant the liens and super-priority administrative claims, perform acts required under the loan documents, incur the obligations under the loan documents, and

1  allow the Debtors to pay, and the lender to apply, payments under the DIP

2  loan.

3  The C Squared Parties objected to the DIP Financing, and the Court held an

4  evidentiary hearing on July 12, 2013. *See* Dkt. #136. Subsequent to the hearing, the

5  parties reached a resolution to the pending objections, and a stipulated form of order was

6  entered by the Court approving the DIP Facility on a final basis. Dkt. #119.

7  The Debtors do not have a prepetition working capital lender. No creditor has, or

8  to the best knowledge of the Debtors claims, a lien in the Debtors' cash collateral. The

9  only potential secured claims in the cases are limited to the equipment Lessors/lenders

10  listed below that filed UCC-1 financing statements. All landlords that might claim

11  statutory liens for unpaid rent are current as of the Petition Date.

12  De Lage Landen Financial Services claims an interest in two copiers under Lease

13  Nos. 24917245 and 24993595. Magid Glove & Safety Mfg. C. LLC claims an interest in

14  all of the Debtors' work gloves, safety clothing and safety products financed through

15  Magid Glove & Safety Mfg. C. LLC. Toyota Motor Credit Corporation has two (2)

16  UCC-1 Financing Statements on file dated July 27, 2007 and October 15, 2007.

17  However, no continuation statements were filed, so the financing statements lapsed after

18  5 years.

19

20  The Debtors believe that the interests of the foregoing creditors will be adequately

21  protected, and the value of their collateral preserved, through the continuation of the

22  Debtors' business operations and the preservation of the going concern value of the

23  Debtors' assets made possible only by the Debtors' ability to obtain the proposed

24  financing. And, the Debtors are prepared to make regular contract payments post-petition

25  to the secured creditors listed above, if required by the Court, as additional adequate

26  protection of their secured interests.

**Formatted:** Space After: 6 pt

3762216v1/22420-0006                    31

The ability of the Debtors to obtain working capital financing and liquidity through the proposed financing on an emergency basis is critically important. As evidenced by the Budget, absent the requested financing, the Debtors will have insufficient cash to meet payroll, fill orders, and meet other operating expenses in the short term making it impossible for the Debtors to continue to operate and perform under their existing contracts.

<u>Motion to Pay Prepetition Employee Wages, Salaries and Benefits</u>

To minimize the personal hardship that employees will suffer if pre-petition employee-related obligations are not paid when due and to maintain morale of the Debtors' workforce during this critical time, the Debtors sought, on an emergency basis, the entry of an interim order and a final order authorizing the Debtors: (a) to pay and honor certain pre-petition claims that remain outstanding as of the petition date for, among other things, (i) wages, salaries and other compensation, (ii) federal and state withholding taxes and other amounts withheld or deducted (e.g., employees' share of health insurance premiums), and (iii) reasonable and customary business expenses that are reimbursable by the Debtors under company policy; and (b) to pay and honor certain pre-petition claims that remain outstanding as of the petition date related to (i) employee health benefits, (ii) insurance benefits, and (iii) other employee benefits that the Debtors have historically paid in the ordinary course of business. In addition, the Debtors have sought an order authorizing and directing banks and other financial institutions to receive, process, honor, and pay all checks presented for payment and electronic payments related to the employee obligations and benefits.

On a consolidated basis, ArmorWorks and TechFiber employ 123 people. The Debtors employees are paid bi-weekly (every other Thursday) in arrears. The next pay date is June 20, 2013 for the period beginning June 3, 2013 and ending June 16, 2013. Therefore, the majority of the June 20 payroll relates to prepetition wages.

Formatted: Font: Not Bold, Underline

1   Of the Debtors' employees, only Perciballi is an insider within the meaning of 11
2   U.S.C. § 101(31). Perciballi's regular annual salary is $500,000, and his gross bi-weekly
3   salary is $19,230. Perciballi is the only employee of the Debtors owed prepetition wages
4   in excess of the statutory cap of $11,725 for priority treatment that is set by Bankruptcy
5   Code §§ 507(a)(4) and (a)(5). The prepetition gross bi-weekly wages for all other
6   employees is below the statutory cap.

7   The Debtors estimate that its June 20, 2013 gross payroll will total approximately
8   $309,352.29, which will includes payroll taxes and other withholdings. A summary
9   report of the estimated June 20, 2013 payroll (the "Payroll Summary") is attached as an
10  exhibit to the employee wage motion. The Payroll Summary includes: (i) the total gross
11  bi-weekly wages due to each employee as of June 16, 2013, and (ii) the total combined
12  gross bi-weekly wages and accrued PTO for each employee as of June 16, 2013. When
13  the accrued PTO is added to the gross bi-weekly wages as of June 16, 2013, seven of the
14  Debtors' employees are owned amounts in excess of the statutory cap of $11,725.

15  Notwithstanding the foregoing, the Debtors are not seeking to pay Employee
16  Obligations and Benefits to any employee in excess of the statutory cap. If the proposed
17  debtor-in-possession financing is approved, as requested, the Debtors will have sufficient
18  funds available to pay the gross bi-weekly wages due on June 20, 2013 payroll and to
19  honor all Employee Obligations and Benefits going forward.

20  The Debtors' employees perform a variety of functions critical to the operation of
21  the business. The employees' skills, knowledge, and understanding of the business are
22  among the Debtors most valuable assets. If prepetition compensation and benefit
23  amounts are not received by the employees in the ordinary course, they will suffer
24  personal hardship and unnecessary distraction from their duties. Such a result obviously
25  would destroy employee morale and may result in unmanageable employee turnover,

causing immediate and pervasive damage to the Debtors' ongoing business operations. Any significant deterioration in morale at this time will substantially and adversely affect the Debtors and their ability to function, resulting in immediate and irreparable harm to the Debtors and their estates.

The C Squared Parties filed a limited objection to the wage motion. Dkt. #28. The Court granted the Motion to Pay Prepetition Employee Wages, Salaries and Benefits on June 20, 2013. Dkt. #47.

### Motion For An Order Determining Adequate Assurance Of Payment For Future Utility Services

The Debtors currently use the following utility providers for services essential to the business: (1) mobile telephone – AT&T and Verizon; (ii) electric – SRP; (iii) trash disposal – Waste Management; (iv) telephone – Century Link and Avaya, Inc.; and (v) water/sewer – City of Chandler. ArmorWorks does not have deposits with any of its utility providers. Over the years all deposits were refunded based on the company's good payment history and financial stability.

The Debtors sought, on an emergency basis, the entry of an interim order and a final order: (a) finding that the Debtors' utility providers have been provided with adequate assurance of payment within the meaning of Bankruptcy Code §366, pending the entry of a final order; (b) prohibiting the utility providers from altering, refusing, or discontinuing services on account of pre-petition amounts outstanding or the commencement of this case; and (c) determining that the Debtors are not required to provide any additional adequate assurance beyond what is proposed in the motion. Further, the utility motion seeks immediate entry of an order granting the utility motion on an interim basis.

As adequate assurance of future payment, and in lieu of providing any utility deposits, the Debtors have proposed that they pay, and have requested authority to pay,

Formatted: Font: Not Bold, Underline

3762216v1/22420-0006

34

all pre-petition amounts owed to its utility providers in the ordinary course of business. The relief requested in the utility motion is necessary because uninterrupted utility services are critical to the Debtors' continued business operations.  If utility companies cease providing service, the Debtors' business and estate will be severely damaged, jeopardizing its reorganization efforts.  Moreover, the utility companies will not suffer any tangible economic harm because the Debtors will compensate the utility companies in full for all post-petition services that they provide.

Historically, ArmorWorks has made timely and full payments to all utility providers.  To the best of the Debtors' knowledge, there currently are no defaults or arrearages with respect to undisputed utility service invoices.  If the proposed debtor-in-possession financing is approved as requested, the Debtors will have adequate liquidity to continue paying all utility charges on a current basis.  Thus, ArmorWorks has sought authorization to continue its customary practice of paying all utility bills as they become due in the ordinary course of business.

~~THE DEBTORS WILL UPDATE THIS DISCLOSURE STATEMENT PRIOR TO THE HEARING TO CONSIDER ITS APPROVAL TO REFLECT EVENTS SUBSEQUENT TO THE FILING.~~

The C Squared Parties filed a limited objection to the utility motion.  Dkt. #29. The Court granted the Motion For An Order Determining Adequate Assurance Of Payment For Future Utility Services on June 20, 2013.  Dkt. #48.

3.      Official Committee of Unsecured Creditors.

The United States Trustee appointed an Official Joint Committee of Unsecured Creditors (the "Committee") and the Committee retained counsel and financial advisors in the Bankruptcy Case pursuant to the following pleadings:

- Appointment of Official Creditors' Committee (Joint Committee) (Dkt. 83);

- Application to Employ Counsel for the Official Joint Committee of Unsecured Creditors (Dkt. 97);
- ORDER Authorizing Employment of Counsel for the Official Joint Committee of Unsecured Creditors (Dkt. 111);
- Application to Employ Sierra Consulting Group, LLC as Financial Advisor to the Official Joint Committee of Unsecured Creditors (Dkt. 123);
- ORDER Authorizing the Employment and Retention of Sierra Consulting Group as Financial Advisor to the Official Joint Committee of Unsecured Creditors (Dkt. 130); and
- Amended Appointment of Official Creditors' Committee (Dkt. 154).

4.      Motion to Employ Ordinary Course Professionals.

On August 3, 2013, the Debtors filed the First Application To Employ Professionals And Consultants Used By The Debtors In The Ordinary Course Of Business ("Employment Application").  Dkt. #143.

The Employment Application was filed pursuant to 11 U.S.C. §§ 105, 327(e), and 1108, requesting an order authorizing the Debtors to employ certain professionals and consultants used in the ordinary course of business.  An objection to the Employment Application was filed by the C Squared Parties on August 13, 2013.  Dkt. #151.  A hearing was held on an expedited basis on August 29, 2013.  *See* Dkt. #161.  The Court overruled the objections and approved the Employment Application as amended at the hearing.  *See* Dkt. #178.

5.      Motion to Authorize Intercompany Loan.

On August 19, 2013, the Debtors filed the Verified Emergency Motion To Authorize Intercompany Loan To ArmorWorks Enterprises Canada, ULC (the "Loan Motion").  Dkt. #158.  The Loan Motion was filed pursuant to 11 U.S.C. §§ 105 and 363(b), requesting an order authorizing ArmorWorks to make a $500,000 secured loan to

ArmorWorks Enterprises Canada, ULC ("AW Canada") for working capital purposes and to preserve the going concern value of the business. The C Squared Parties filed an objection, and a hearing was held on an expedited basis on August 29, 2013. *See* Dkt. #161; 172. The Court overruled the objections and approved the Loan Motion. Dkt. #176.

      6.    Motion to Employ Houlihan Lokey Capital, Inc.

On September 6, 2013, the Debtors filed the *Application For An Order Approving The Employment Of Houlihan Lokey Capital, Inc. As Debtors' Investment Banker* (Dkt. 186) to pursue a Transaction for the sale of the assets or equity interests of the Debtors under the Plan.

      7.    Filings by C Squared and Anchor Management.

C Squared and Anchor Management have objected to these proceedings and have filed a number of pleadings in the Bankruptcy Case, including:

- Emergency Motion to Dismiss Case /Emergency Motion to Dismiss or, in the Alternative, to Abstain (Dkt. 39);
- Reply in Support of Emergency Motion to Dismiss or, in the Alternative, to Abstain (Dkt. 89);
- Motion in Limine to Preclude Debtors from Offering SBA Final Determination and Related Exhibits and Testimony (Dkt. 90); and
- Emergency Motion to Appoint Trustee (Dkt. 195).

The Debtors filed the following pleadings in response to the motion to dismiss, which remains pending:

- Declaration of Morris C. Aaron, MCA Financial Group, Ltd. (Dkt. 71);
- Response in Opposition to Emergency Motion to Dismiss or, in the Alternative, to Abstain (Dkt. 73);
- Appendix in Support of Response in Opposition to Emergency Motion to

3762216v1/22420-0006

37

Dismiss or, in the Alternative, to Abstain (Dkt. 74 & 75);

- Prehearing Statement of the Debtors Re: Dismissal Motion of C Squared Parties and Request for Entry of Order and Notice of Lodging Proposed Order (Dkt. 79);

- Debtors': (I) Reply In Further Support Of Request For Entry Of Procedures Order; (II) Response To Cross-Motion To Continue Hearing On The Applications To Employ Gallagher & Kennedy, P.A. And MCA Financial Group, Ltd.; And (III) Proposed Agenda For July 12, 2013 Hearing (Dkt. 84); and

- Response To C Squared Parties Motion In Limine To Preclude Debtors From Offering SBA Final Determination And Related Exhibits And Testimony (Dkt. 95).

The Debtors oppose the Motion to Appoint Trustee and will file appropriate pleadings and evidence in response.

MORE DETAILED AND UPDATED INFORMATION REGARDING POST-PETITION EVENTS IN THE BANKRUPTCY CASE CAN BE OBTAINED BY ACCESSING THE DOCKET IN THE BANKRUPTCY CASE ON PACER: https://ecf.azb.uscourts.gov/cgi-bin/DktRpt.pl?122083397291529-L_1_0-1.

## V.
## BUDGET, FINANCIAL FORECAST & PROJECTIONS, AND VALUATION

Pre-petition, the Debtors prepared a detailed long-term financial forecast and projections and a short-term 13-Week Cash Budget. A copy of the most recent Budget is attached hereto as Exhibit "C" and will be updated throughout the Case as necessary. Based on the Debtors' financial forecast and projections, MCA prepared a valuation of the Debtors and the Equity Security interests of each of the Members. A true and correct copy of the MCA Valuation Report is attached hereto as Exhibit "D". Additional financial information regarding the Debtors can be found the bankruptcy schedules and

<span style="color:red">statement of financial affairs filed by each of the Debtors, and in the Debtors' monthly operating reports.</span>

## VI.
## <u>SOURCES OF INFORMATION</u>

The financial information contained in this Disclosure Statement is derived from a number of sources. Values ascribed to Debtors' Assets were provided by the Debtors with input from MCA. Information on Claims of Creditors was obtained from the financial records of the Debtors, and the statements and schedules on file in the Bankruptcy Case.

The information contained in this Disclosure Statement represents the Debtors' best estimate in light of current market conditions and past experience. All the information provided is subject to change and represents the best information available at the time, the actual results may differ.

The accounting and financial information provided by the Debtors is based on Generally Accepted Accounting Principles ("GAAP") and the calculations were prepared by the Debtors' accountants and professionals.

## VII.
## <u>SUMMARY OF THE PLAN</u>

The following provides a summary of the overall structure and classification of claims against or interests in the Debtors and is qualified in its entirety by reference to the Plan, which is attached as Exhibit "A". The statements in this Disclosure Statement include summaries of the provisions contained in the Plan. This summary does not purport to be a complete statement of all terms in the Plan, and reference is made to the Plan for the full and complete statement of such terms. The Plan controls the treatment of Claims against and Equity Security in the Debtors and other parties-in-interest. Where Claims are divided into subclasses in the Plan, each subclass will be considered to be a separate class for all confirmation purposes, including treatment and voting on the Plan.

3762216v1/22420-0006

39

**A.** **Classification and Treatment of Claims and Equity Security.**

The Plan classifies Claims and Equity Security in various Classes according to their right to priority of payments as provided in the Bankruptcy Code. The Plan states whether each Class of Claims or Equity Security are impaired or unimpaired. The Plan provides the treatment each Class will receive under the Plan. In accordance with the requirements of the Bankruptcy Code, Allowed Administrative Expense Claims and Priority Tax Claims are not set forth in Classes and are not entitled to vote on the Plan. The Allowed Claims and Equity Securities against the Debtors' Estates are divided into the following classes:

1.a. Class 1 (Priority Non-Tax Claims ). Class 1 consists of any Priority Non-Tax Claims against the Debtors existing as of the Confirmation Date.

2.b. Class 2 (Secured Tax Claims). Class 2 consists of any Secured Tax Claims against any the Debtors existing as of the Debtors. Confirmation Date.

c. Class 3 (Secured Claims). Class 3 consists of any Secured Claims against any of the Debtors, except Secured Tax Claims.

3.d. Class 4 (ArmorWorks General Unsecured Claims). Class 34 consists of all General Unsecured Claims against ArmorWorks.

d. Class 4 (ArmorWorks Vendor Claims). Class 4 consists of all Vendor Claims against ArmorWorks.

5.e. Class 5 (TechFiber General Unsecured Claims). Class 5 consists of all General Unsecured Claims against TechFiber.

6.f. Class 6 (TechFiber Vendor Member Unsecured Claims). Class 6 consists of all Vendor General Unsecured Claims asserted by any Member against TechFiber. the Debtors.

g. Class 7 (C Squared Claims and Equity Security Interests In ArmorWorks). Class 7 consists of the 40% minority Member Equity Security of C Squared in ArmorWorks, and any and all Claims of C Squared against the Debtors.

8.g. Class 8 (AWI Claims and Equity Security). Class 8 consists of the and the 60% majority Member Equity Security of AWI in ArmorWorks, and any and all Claims of AWI against the Debtors.

3762216v1/22420-0006

40

9.h.     Class 98 (ArmorWorks Equity Security in TechFiber).  Class 98 consists of the 100% Member Equity Security of ArmorWorks in TechFiber.

**B.     Summary of Treatment of Unclassified for Claims Not Impaired Under the Plan.**

1.      DIP Obligations.  The DIP Obligations shall be paid in full and in cash on the Effective Date before the payment of any other Claims against the Debtors, other than Vendor Administrative Claims.  Any dispute regarding the amount of the DIP Obligations shall be resolved by the Bankruptcy Court on an expedited basis prior to the occurrence of the Effective Date.  Notwithstanding anything to the contrary contained in the Plan or the Confirmation Order, the terms of the Final DIP Order shall survive and shall remaining binding and enforceable until the DIP Obligations have been fully paid.

1.2.     Administrative Expense Claims.  Every Creditor holding an Allowed Administrative Claim against the Debtors will be paid, in full satisfaction of their Allowed Claim, after the payment in full of the DIP Obligations: (a) fully and in Cash on or before ten (10) Business Days after the Effective Date if the Claim is then an Allowed Claim; (b) fully and in Cash when and within ten (10) Business Days after the entry of a Final Order allowing the Claim, if the Claim becomes is not an Allowed Claim after as of the Effective Date; (c) as otherwise agreed in writing by the Creditor holding the Allowed Administrative Claim and the Debtors; or (d) as otherwise ordered by the Bankruptcy Court.  Administrative Claims are unimpaired pursuant to the Plan and votes to accept or reject the Plan will not be solicited from Creditors holding Administrative Claims.

2.4.     Vendor Administrative Claims.  The post-petition expenses owed to Vendors will be paid as they are incurred in the ordinary course of business.  Any amounts outstanding as of the Effective Date will be paid in full on the later of the Effective Date, or in the ordinary course of the Debtors' business.  Vendor Administrative Claims are unimpaired pursuant to the Plan and votes to accept or reject

the Plan will not be solicited from Creditors holding Vendor Administrative Claims.

3. 5.    U.S. Trustee Fees.  All fees payable pursuant to section 1930 of Title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on within ten (10) Business Days after the Effective Date, or as due in the normal course of billing and payment.  The Debtors shall be responsible for timely payment of fees incurred pursuant to 28 U.S.C. § 1930(a)(6).  The reorganized Debtors shall file with the Court, and serve on the United States Trustee, a quarterly financial report for each quarter (or portion thereof) that the cases remain open in a format prescribed by the United States Trustee and provided to the Debtor by the United States Trustee, and shall pay such quarterly fees as become due for each quarter post-confirmation that the cases remain open.  No motion or application is required to fix fees payable to the Clerks' Office or the Office of the United States Trustee, as those fees are determined by statute.

4. 6.    Administrative Bar Date. Requests for payment of Administrative Expenses, other than the DIP Obligations, Vendor Administrative Claims and Professional Fee Claims, must be filed and served pursuant to any procedures set forth in the Confirmation Order or notice of entry of the Confirmation Order, no later than thirty (30) days after the Confirmation Date.

5. 7.    Professional Fee Claims. The Bankruptcy Court must approve all requests for the payment of professional compensation and expenses to the extent incurred on or before the Confirmation Date.  Each Professional Person requesting compensation or reimbursement of expenses in the Proceedings pursuant to Sections 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code shall file an application for allowance of final compensation and reimbursement of expenses not later than twenty (20) days after the Confirmation Date.  Nothing herein shall prohibit each Professional Person from requesting interim compensation during the course of the Case pending Confirmation of

Formatted: No underline

Formatted: No underline

Formatted: No underline

this Plan. All fees, costs and disbursements of Professional Persons not heretofore paid through the Effective Date of the Plan, shall be paid in full on the later of the Effective Date or the allowance of the claim.

~~6.~~8. Priority Tax Claims. Priority Tax Claims are certain pre-Petition Date unsecured income, employment and other taxes described by Section 507(a)(8) of the Bankruptcy Code. ~~The Bankruptcy Code requires, and thus this Plan provides, that each holder of a Section 507(a)(8) Priority Tax Claim receives regular installment payments in cash of a total value, as of the Effective Date, equal to the allowed amount of such claim over a period ending not later than five (5) years after the Petition Date, in a manner not less favorable than non-priority, unsecured claims.~~ To the extent <u>Allowed</u> Priority Tax Claims exist on the Confirmation Date, holders of Allowed Priority Tax Claims will be ~~(a)~~ paid<u>: (a) fully and</u> in ~~fill~~<u>Cash</u> on ~~the later of~~ the Effective Date ~~or the allowance of the~~<u>before ten (10) Business Days after the Effective Date if the Claim is then an Allowed</u> Claim~~;~~<u>;</u> or (b) ~~over a period not exceeding five (5) years~~<u>fully and in Cash within ten (10) Business Days</u> after ~~Petition Date, in the sole and absolute discretion of the Debtor~~<u>entry of a Final Order allowing the Claim, if the Claim is not an Allowed Claim as of the Effective Date</u>. Priority Tax Claims will be allowed in the principal amount of the tax due as of the Petition Date, with interest at the applicable statutory rate in accordance with section 511 of the Bankruptcy Code. No amounts attributable to penalties imposed or sought to be imposed by holders of Priority Tax Claims will be paid. <u>Priority Tax Claims are unimpaired pursuant to the Plan and votes to accept or reject the Plan will not be solicited from Creditors holding Priority Tax Claims.</u>

~~7.~~<u>9.</u> Class 1 (Priority Non-Tax Claims). <u>To the extent Allowed</u> Priority Non-Tax Claims ~~are Claims entitled to priority under Section 507 (3), (4), (5), (6), (7) or (8)~~<u>exist on the Confirmation Date, holders</u> of ~~the Bankruptcy Code. Any~~ Allowed

Priority Non-Tax Claims will be paid ~~by the Debtors~~: (a) fully and in ~~full on the later of~~ Cash on or before ten (10) Business Days after the Effective Date ~~or the allowance~~if the Claim is then an Allowed Claim; or (b) fully and in Cash within ten (10) Business Days after the entry of a Final Order allowing the Claim, if the Claim is not an Allowed Claim as of the ~~Claim~~Effective Date. Class 1 Claims are unimpaired under the Plan, and the holders of Class 1 Claims are not entitled to vote on the Plan.

~~9.~~10.    Class ~~9~~8 (ArmorWorks Equity Security ~~Interests~~ in TechFiber). The prepetition Equity Security of ArmorWorks in TechFiber shall be an Allowed interest, and ArmorWorks shall retain all such Equity Security in TechFiber, as reorganized, under the Plan. On the Closing Date, the Equity Security of ArmorWorks in TechFiber shall be disposed of through the Transaction. Class ~~9~~8 Equity Security interests are unimpaired under the Plan, and holders of Class ~~9~~8 Equity Security are not entitled to vote on the Plan.

**C.    Summary of Treatment of Impaired Classes.**

1.    Class 2 (Secured Claims). The Debtors do not believe there are any Class 2 Secured Claims existing against the Debtors as of the Petition Date. Holders of Allowed Class 2 Secured Claims, if any, will retain their prepetition liens in their collateral. Each Claimant holding an Allowed Class 2 Secured Claim will be placed in a separate sub-class of Class 2 for the purposes of voting on the Plan and the treatment of their respective Claims under the Plan. In the ~~sole and absolute~~ discretion of the ~~Debtors~~Disbursing Agent, after consultation with the Managers, Allowed Class 2 Secured Claims shall be satisfied as follows: (a) through the abandonment or transfer of the collateral to the secured creditor within ten (10) ~~days~~Business Days after the later of the Effective Date or the allowance of the Claim, in which case the Claimant shall have the right to assert a General Unsecured Claim paid under Class ~~3~~4 or ~~5~~6, as applicable, for any deficiency to the extent allowable by applicable non-bankruptcy law; or (b)

through equal monthly payments of principal and interest over sixty (60) months with interest any prepetition default under the applicable contract and security documents will be cured on the Effective Date and regular payments will be made to the holder of the Allowed Class 2 Secured Claim after the Effective Date in accordance with the applicable contract; or (c) the Allowed Class 2 Secured Claim will be paid in full within ten (10) Business Days after the Closing Date with interest from and after the Effective Date at the greater of the non-default contract rate of interest or 5% simple interest per annum.  No default interest or other penalties will be paid to holders of Allowed Class 2 Secured Claims.  Class 2 Secured Claims are impaired, and the holders are entitled to vote to accept or reject the Plan.

Formatted: Underline

2.    Class 3 (ArmorWorks General Unsecured Secured Tax Claims).  Class 3 Claims consists of all General Unsecured Secured Tax Claims against ArmorWorks. Allowed Class 3 Claims will accrue interest from the Debtors for 2012 and after the Effective 2013 real or personal property taxes that are past due as of the Petition Date at the rate of 5% per annum simple interest.  Holders of Allowed Class 53 Claims will be paid an initial distribution, retain their liens on the later of the Effective Date or the allowance of their Claim, equal to 20% of the Allowed amount of their Claim. Property that serves as security for repayment of Allowed Class 3 Claims.  The balance of the Allowed Class 3 Claims claims, including post-petition interest at 16% per annum, in accordance with 11 U.S.C. § 511, will be paid in full within ten (10) Business Days after the Closing Date.  Real and personal property taxes for 2013 and beyond that first become due after the Petition Date will be paid in annual distributions, equal to 20% of the Allowed Claim plus accrued interest, beginning on the first anniversary of the Effective Date and continuing on the anniversary date of each subsequent year until paid in full.  All Allowed Class 3 Claims plus interest will be paid in full on or before the later of the fourth anniversary of the Effective Date or allowance of the Claim. the

Case 2:13-bk-10332-BMW    Doc 210-1    Filed 09/11/13    Entered 09/11/13 15:37:21
Desc Exhibit A    Page 45 of 81

ordinary course of business as such taxes become due.  Class 3 General Unsecured Claims are impaired, and the holders are entitled to vote to accept or reject the Plan.

Formatted: Underline

    3.    Class 4 (ArmorWorks VendorUnsecured Claims).  Class 4 consists of all VendorUnsecured Claims against ArmorWorks.  Allowed Class 4 Claims will accrue interest from and after the Effective Date at the rate of 5% per annum simple interest.  HoldersAfter the payment in full of all Administrative Claims and all Priority Claims, holders of Allowed Class 4 Claims will be paid an initial distribution, on the laterlatest of ten (10) Business Days after the EffectiveClosing Date or the allowance of theirthe Claim, equal to 25% of the Allowed amount of their Claim.  The balance of the Allowed.  Class 4 Claims will be paid in annual distributions, equal to 25% of the Allowed Claim plus accrued interest, beginning on the first anniversary of the Effective Date and continuing on the anniversary date of each subsequent year until paid in full.  All Allowed Class 4 Claims plus accrued interest will be paid in full on the later of the third anniversary of the Effective Date or the allowance of the Claim.  Class 4 VendorArmorWorks Unsecured Claims are impaired, and the holders are entitled to vote to accept or reject the Plan.

Formatted: Underline

    4.    Class 5 (TechFiber General Unsecured Claims).  Class 5 consists of all General Unsecured Claims against TechFiber.  Allowed Class 5 Claims will accrue interest from and after the Effective Date at the rate of 5% per annum simple interest.  Holders of Allowed Class 5 Claims will be paid an initial distribution, on the laterlatest of ten (10) Business Days after the EffectiveClosing Date or the allowance of theirthe Claim, equal to 20% of the Allowed amount of their Claim.  The balance of the Allowed Class 5 Claims will be paid in annual distributions, equal to 20% of the Allowed Claim plus accrued interest, beginning on the first anniversary of the Effective Date and continuing on the anniversary date of each subsequent year until paid in full.  All Allowed Class 5 Claims plus interest will be paid in full on or before the later of the

fourth anniversary of the Effective Date or allowance of the Claim.  Class 5 TechFiber General Unsecured Claims are impaired, and the holders are entitled to vote to accept or reject the Plan.

Formatted: Underline

5.    Class 6 (TechFiber VendorMember Unsecured Claims).  Class 6 consists of all Vendorany General Unsecured Claims against TechFiber.  Allowed Class 6 Claims will accrue interest from and after the Effective Date at the rate of 5% per annum simple interest.  Holders of asserted by any Member against the Debtors.  Pursuant to 11 U.S.C. § 510(b), any Allowed Class 6 Claims will be paid an initial distribution, on the later of the Effective Date or the allowance of their Claim, equal to 25% of the Allowed amount of their Claim.  The balance of the subordinate in payment to all other Allowed Claims against the Debtors, all Sale Expenses, all post-petition liabilities of the Reorganized Debtors, and all fees and expenses of the Disbursing Agent.  Allowed Class 6 Claims will be paid in annual distributions, equal to 25% of the Allowed Claim plus accrued interest, beginning on the first anniversary of the Effective Date and continuing on the anniversary date of each subsequent year until paid in full.  All Allowed Class 6 Claims plus interest will be paid in full on or before the later of the third anniversary of the Effective Date or allowance of the Claim.  Class 6 TechFiber Vendor Claims are impaired, and holders are entitled to vote to accept or reject the Plan.

6.    Class 7 (C-Squared Claims and Equity Security).  The holder, as of the Effective Date, of any Allowed Class 7 Claims and Equity Security may elect, in full and final satisfaction of all such Allowed Claims and Equity Security, to (a) accept the Redemption Amount from ArmorWorks; or (b) pay AWI the AWI Purchase Price to acquire AWI's 60% Equity Security interest in ArmorWorks; each in accordance with the following buy-sell procedure:

a.    Buy Sell Procedure.

(1)    Purchase Offer.  On the Effective Date, ArmorWorks shall be

deemed to have offered C Squared the Redemption Amount in exchange for, and in full and final satisfaction of, C Squared's Equity Security interest in ArmorWorks and any and all Claims of C Squared against the Debtors and their Affiliates. Within on the latest of the allowance of the Claim and five business(5) days of the Effective Date, ArmorWorks shall tender to a commercially recognized escrow agent reasonably selected by ArmorWorks (the "Escrow Agent") an amount equal to 2½% of the Redemption Amount as a deposit (the "ArmorWorks' Deposit"); and (ii) forms of instruments pursuant to which AWI's interest in ArmorWorks will be conveyed to C Squared. ArmorWorks' Deposit shall be returned to ArmorWorks at the Closing (defined in 6.6.1(iii) of the Plan) unless it is retained by C Squared pursuant to Section 6.6.1(iv) of the Plan or unless sooner returned pursuant to Section 6.6.1(ii) of the Plan. ArmorWorks' Deposit shall be held in an interest bearing account with the interest being credited to the account of the party ultimately receiving ArmorWorks' Deposit. ArmorWorks and C Squared each shall pay one-half of the costs of the Escrow Agent, regardless of whether C Squared accepts ArmorWorks' offer to redeem or the offer to purchase.

(2)5. C Squared's Election. Within 15 days of the Effective Date, C Squared shall elect (the "C Squared Election") to accept either offer by a written acceptance delivered to ArmorWorks, unconditionally stating that C Squared shall either: (i) buy AWI's interest in the Company at the AWI Purchase Price; or (ii) allow its entire Equity Security interest to be redeemed by ArmorWorks, and all of its after all other Allowed Claims against the Debtors and their Affiliates to be satisfied, all in exchange for its receipt of the Redemption Amount. If C Squared accepts AWI's offer to sell, C Squared shall, simultaneously with such written acceptance, tender to the Escrow Agent an

Formatted: Pleading2_L3, Left, Indent: Left: 0", First line: 0", Line spacing: single, Tab stops: Not at 1"

amount equal to 2 ½% of the AWI Purchase Price to be held as a deposit for the benefit
of AWI (the "C Squared Deposit"). If C Squared fails to accept one of the offers within
15 days of the Effective Date, C Squared shall be deemed to have accepted
ArmorWorks' offer to pay the Redemption Amount to C Squared in full and final
satisfaction of all of C Squared's Equity Security interests in ArmorWorks and all
Claims of C Squared against the Debtors and their Affiliates. If C Squared accepts
AWI's offer to sell, ArmorWorks' Deposit shall be promptly returned to ArmorWorks,
together with any interest thereon. During the pendency of the offers, there shall be no
action taken by ArmorWorks or any Member of ArmorWorks out of the ordinary course
of business which would result in a material change in the assets or liabilities of
ArmorWorks, except any actions specifically contemplated and authorized under the
Plan.have been paid. No interest will be paid to holders of Allowed Class 6 Claims.

(3)    Closing. The closing shall be held at ArmorWorks' principal
place of business on the first Business Day following the 60th day after: (a)
the date of C Squared's Election, or (b) the date upon which C Squared is
deemed to have elected to accept the Redemption Amount, (or on such
other date as may be mutually agreed to in writing by ArmorWorks and C
Squared) (the "Closing").

(4)    Redemption of C Squared Equity. If C Squared accepts, or is
deemed to have accepted, the Redemption Amount, at Closing the C
Squared Class 7 (Equity Security shall be deemed to fully redeemed and
terminated, all Claims of C Squared against the Debtors, their Affiliates,
and Perciballi shall be deemed to be fully satisfied and discharged, and C
Squared shall receive payment of the Redemption Amount as follows:

(a)    cash or other immediately available funds from escrow
in an amount equal to 20% of the Redemption Amount (inclusive of
the ArmorWorks' Deposit); and

Formatted: Underline

(b)   Interests in ArmorWorks).  Class 7 consists of the 40% Member Equity Security of C Squared and the 60% Member Equity Security of AWI in ArmorWorks shall execute and deliver to C Squared a promissory note for the balance of the Redemption Amount, which provides for the original principal balance to be paid in equal yearly installments of principal and interest based on a seven year amortization schedule (the "Note").   The principal balance under the Note shall bear interest at the rate of 10% per annum.  The principal balance of the Note, together with all accrued but unpaid interest thereon, shall be due and payable in full on the 7th anniversary of the date of the Note.  Payments of all or any portion of the unpaid principal balance under the Note may be prepaid from time to time, without premium or penalty. The Note shall also provide that the holder of the Note shall have the right to accelerate the entire balance of the principal and accrued and unpaid interest if any installment of principal or interest is not paid when due and remains unpaid 20 days after written notice of such nonpayment.  Closing adjustments and payments shall be made as are customary in Maricopa County, Arizona, at the time of the sale.

(c)   As security for the payment of all amounts due under the Note, ArmorWorks and AWI will execute and deliver to C Squared a Pledge Agreement granting C Squared a perfected first lien security interest in the Equity Security in ArmorWorks, as reorganized.

(d)   Within ten (10) Business Days of the payment in full of all amounts due and owing under the Note, C Squared shall: (a) deliver the original Note to ArmorWorks marked "CANCELLED" and bearing the signatures of the members of C Squared adjacent to such marking; (b) deliver written confirmation to ArmorWorks and AWI that all security , which shall be Allowed Equity Security interests under the Pledge Agreement have terminated; and (c) cause any UCC-1 Financing Statement filed to perfect the security interests to be terminated.  If C Squared fails to execute, acknowledge or deliver any document required to be delivered pursuant to this subsection, C Squared irrevocably appoints ArmorWorks as its attorney in fact for the sole purpose of executing, acknowledging and delivering same on its behalf pursuant to Section 6.6.1(iv)(f) of the Plan.  Notwithstanding the foregoing power of attorney, and in addition to any other rights which ArmorWorks may have, ArmorWorks shall have the right to apply to a court of competent jurisdiction for specific performance, and C Squared shall not plead as a defense that an adequate remedy exists at law.

(e)   Immediately upon Closing, Anchor Management, LLC shall be deemed removed as a manager of ArmorWorks.

(f)   Failure to Timely Close.  If, at or prior to Closing, ArmorWorks fails to tender the Redemption Amount or fails to perform any other material obligation or covenant required to be performed by it under Section 6.6.1(iv) of the Plan, then the ArmorWorks' Deposit shall be retained by C Squared as liquidated

damages, and C Squared shall have the option to either: (a) purchase the AWI Equity Security interest in ArmorWorks in accordance with Section 6.6.1(v) of the Plan, except that the new "Closing" for the purchase shall be the first Business Day following the 60th Business Day after the original Closing date; or (b) retain its 40% minorityOn the Closing Date, at closing, all Member Equity Security in ArmorWorks, as reorganized.

(5) Purchase of AWI Equity Security. If C Squared elects to purchase the AWI Equity Security, then at Closing AWI shall assign and deliver to C Squared free and clear of all liens, encumbrances and claims of third parties created by AWI, and all Claims of AWI against the Debtors and their Affiliates shall be deemed to be fully satisfied and discharged, in exchange for payment of the AWI Purchase Price to AWI by C Squared, as set forth below, and the following provisions shall apply to the purchase:

(a) cash or other immediately available funds from escrow in an amount equal to 20% of the AWI Purchase Price (inclusive of the C Squared Deposit); and

(b) C Squared shall execute and deliver to AWI a promissory note for the balance of the AWI Purchase Price, which provides for the original principal balance to be paid in equal yearly installments of principal and interest based on a seven year amortization schedule (the "C Squared Note"). The principal balance under the C Squared Note shall bear interest at the rate of 10% per annum. The principal balance of the C Squared Note, together with all accrued but unpaid interest thereon, shall be due and payable in full on the 7th anniversary of the date of the C Squared Note. Payments of all or any portion of the unpaid principal balance under the C Squared Note may be prepaid from time to time, without premium or penalty. The C Squared Note shall also provide that the holder of the C Squared Note shall have the right to accelerate the entire balance of the principal and accrued and unpaid interest if any installment of principal or interest is not paid when due and remains unpaid 20 days after written notice of such nonpayment. Closing adjustments and payments shall be made as are customary in Maricopa County, Arizona, at the time of the sale.

(c) As security for the payment of all amounts due under the C Squared Note, ArmorWorks and C Squared will execute and deliver to AWI a Pledge Agreement granting AWI a perfected first lien security interest in 60% of the Equity Security in ArmorWorks, as reorganized.

(d) Within ten (10) Business Days of the payment in full of all amounts due and owing under the C Squared Note, AWI shall:

(a) deliver the original C Squared Note to C Squared marked "CANCELLED" and bearing the signatures of the members of AWI adjacent to such marking; (b) deliver written confirmation to C Squared and ArmorWorks that all security interests under the Pledge Agreement have terminated; and (c) cause any UCC 1 Financing Statement filed to perfect the security interests to be terminated. If AWI fails to execute, acknowledge or deliver any document required to be delivered pursuant to this subsection, AWI irrevocably appoints C Squared as its attorney in fact for the sole purpose of executing, acknowledging and delivering same on its behalf pursuant to Section 6.6.1(v)(4) of the Plan. Notwithstanding the foregoing power of attorney, and in addition to any other rights which C Squared may have, C Squared shall have the right to apply to a court of competent jurisdiction for specific performance, and AWI shall not plead as a defense that an adequate remedy exists at law.

(e) IP/Employment. If C Squared elects to purchase AWI's Equity Security in ArmorWorks, then at Closing: (a) William Perciballi shall also assign to ArmorWorks any and all of AWI's and Perciballi's right, title and interest in and to all intellectual property rights used in connection with or related to the Debtors in any way (the "Intellectual Property Rights"), as is and without representations or warranties of any kind or nature, pursuant to the terms set forth in the License Agreement, and (b) Perciballi's employment shall be deemed terminated without "Cause" pursuant to the Perciballi Employment Agreement, and all amounts due thereunder for a termination without "Cause" shall be paid immediately by C Squared or ArmorWorks to Perciballi, even if the payment thereof is otherwise permitted or required to be paid over time as provided in the Perciballi Employment Agreement.

(f) Failure to Timely Close. If, at or prior to Closing, C Squared fails to tender the AWI Purchase Price or fails to perform any other material obligation or covenant required to be performed by it under Section 6.6.1(v) of the Plan, then the C Squared Deposit shall be retained by ArmorWorks as liquidated damages, and C Squared shall be deemed to have accepted the Redemption Amount, and the provisions of Section 6.6.1(iv) shall apply, except that the new "Closing" for the redemption shall be the first Business Day following the 60th Business Day after the original Closing date.

Class 7 C Squared Claims and Equity Security interests are impaired, and the holder is entitled to vote to accept or reject the Plan.

7.6. Class 8 (AWI Claims and Equity Security). Subject to the C Squared Election, or any deemed election by C Squared, under Section 6.6 of the Plan, the holder, as of the Effective Date, of the Allowed Class 8 Claims and Equity Security interests, in shall be cancelled. In full and final satisfaction of all such their respective

Member Equity Security in ArmorWorks, each Member first shall receive their Pro Rata share of all cash and any non-cash consideration received by ArmorWorks from the Transaction that is available for distribution to Members after the payment of all Allowed Claims against the Debtor, all Sale Expenses, all fees and expenses of the Disbursing Agent, and all post-petition liabilities of the Reorganized Debtors (to the extent any of the foregoing are not assumed by the buyer at closing under the Transaction). Class 7 Equity Security interests, shall either: (a) retain its Equity SecurityInterests in ArmorWorks, as reorganized; or (b) receive the AWI Purchase Price from C Squared in accordance with Section 6.6.1(v) of the Plan. Class 8 AWI Claims and Equity Security interests are impaired, and the holder isholders are entitled to vote to accept or reject the Plan.

**D.**     <u>Treatment of Executory Contracts and Unexpired Leases.</u>

**Formatted:** Space After: 0 pt

    The Plan contemplates and provides for the assumption, pursuant to Section 365 of the Bankruptcy Code, of any and all Executory Contracts and Unexpired Leases of the Debtors which are in force on the Confirmation Date, except (i) those Executory Contracts and Unexpired Leases which were specifically rejected pursuant to an order of the Court prior to the Confirmation Date, and (ii) those Executory Contracts and Unexpired Leases which are listed on Schedule 9.1 attached to the Plan (or on any amendment to Schedule 9.1 filed on or before the Confirmation Date). Notwithstanding any other provision in the Plan or prior notice of any kind from the clerk of the Bankruptcy Court, any and all Creditors or persons with Claims against the Debtors' Estate arising out of or in connection with or due to the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan shall have thirty (30) days from the Confirmation Date within which to file a proof of claim in the true amount of such Claims. If any such Creditors fail to file such proofs of claim within said thirty (30) day period, then such Creditors shall have no Claims against the Debtors or their Estates,

which Claims arising out of or in connection with or due to the rejection of such Executory Contract or Unexpired Lease, shall be dismissed, released and null and void.

Any Entity who's Claim arises from the rejection of an Executory Contract or Unexpired Lease shall, to the extent such Claim becomes an Allowed Claim, have the rights of a Claimant in Class 34 or 5, as applicable with respect thereto. Any claim filed in accordance with the provisions of Section 9.1 of the Plan shall be treated as a Disputed Claim until the period of time has elapsed within which the Debtors may file an objection to such Claim.

## VIII.
## OVERVIEW OF ADDITIONAL PLAN PROVISIONS

**A.** **Implementation of the Plan.**

1. In General. The Plan is to be implemented in a manner consistent with Section 1123 of the Bankruptcy Code. The Plan

2. Post Confirmation Management of Debtors. Perciballi will be funded direct and manage the day-to-day operations of the Debtors post-confirmation until the Closing Date. Perciballi will consult with Anchor and C Squared before proceeding with any of the following (the "Non-ordinary Course Transactions"):

a. Accept or call for any additional capital contributions;

b. Borrow money for AWE from the Debtors' ongoing banks, other lending institutions, a Member, a Manager or an affiliate of a Member or Manager on such terms as the Members deem appropriate and, in connection therewith, to hypothecate, encumber and grant security interest in the assets of AWE to secure repayment of the borrowed sums;

c. Do any act that would make it impossible to carry on the ordinary business operations, and in some cases, through the sale of assets deemed of AWE;

d. Admit a new Member of AWE;

e. Assign AWE's rights in specific AWE assets, or commingle AWE funds with those of any other person for other than an AWE purpose;

Formatted: Font: Not Bold, No underline

Formatted: Font: Not Bold, No underline

f.      Amend the Articles of Organization;

g.       Make an assignment for the benefit of creditors of AWE, file a new voluntary petition in bankruptcy or appoint a receiver for AWE; or

h.      Cause AWE to be dissolved.

In the event that Anchor or C Squared objects to a Non-ordinary Course Transaction, Perciballi will obtain authorization from the Bankruptcy Court before proceeding with a Non-ordinary Course Transaction.  Perciballi shall communicate openly with Anchor and C Squared and shall provide to Anchor and C Squared, upon request, any and all any non-classified fact(s), data, or document(s) relating to the Debtors; provided, however, that facts, data and documents that are designated as Classified by the Debtors to federal government, or that are designated For Official Use Only ("FOUO") (which gives rise to an exception under the Freedom of Information Act), or are designated as Unclassified Nuclear Information ("UNCI"), shall not be no longer necessary for ongoing operations.  The Debtors intend to obtain shared with Anchor or C Squared or their principals.  Without limiting the foregoing, Perciballi shall hold weekly conference calls with Anchor to provide regular updates and disclosures regarding the business of the Debtors.

        3.      Exit Financing.  Prior to confirmation, the Debtors will arrange for exit financing, to be funded on or before the Effective Date, to repay any debtor in possession financing approved by the Court, to the DIP Obligations, fund Effective Date payments required under the Plan and for working capital., and fund the working capital needs of the Debtors through the Closing Date.  The terms of the exit financing will be approved by the Bankruptcy Court pursuant to the Confirmation Order.

        4.      Transaction.  The Allowed Claims and Equity Security Interests in the Debtor will be satisfied through the proceeds of a Transaction solicited and negotiated by the Sale Agent in accordance with the terms of the Sale Agent Agreement that will obtain the maximum value for Creditors and Members.  The closing of the Transaction is subject to the entry of an order of the Bankruptcy Court approving the Transaction.

**Formatted:** Pleading2_L3, Left, Indent: First line:  0", Line spacing:  single, Widow/Orphan control, Tab stops:  1", List tab

3762216v1/22420-0006

55

Morris C. Aaron of MCA Financial Group, Ltd. will represent the Debtors and the estate in connection with all aspects of the Transaction.  In that regard, and on behalf of the Debtors, Mr. Aaron will (among other things):

        i.      facilitate all informational and related needs of the Sale Agent;

        ii.     ensure transparency in the process leading up to the Transaction;

        iii.    coordinate and facilitate regular and open communications between the Sale Agent, the Managers and Members of the Debtor, and the Committee; and

        iv.    ultimately determine, in his reasonable business judgment after taking into account the views of the Sale Agent, the Managers and Members of the Debtor, and the Committee, the highest and best Transaction to present to the Bankruptcy Court for approval.

If approved, the Transaction shall close no later than the Closing Date.  If the transaction is structured as an asset sale, then all of the assets of ArmorWorks, TechFiber, and all non-debtor subsidiaries of ArmorWorks, will be sold free and clear of all liens pursuant to Bankruptcy Code § 1123(a)(5)(D).  If the Transaction is structured as a sale of the Equity Security of ArmorWorks, then the order of the Bankruptcy Court approving the sale will provide for the cancellation of the prepetition Equity Security Interest in ArmorWorks and the issuance of new Equity Security in the Reorganized Debtor to the buyer effective as of the closing.  All Sale Expenses and the Transaction Fee will be paid from escrow at closing.

      5.    Sale Agent.  The Confirmation Order will provide for the appointment of the Sale Agent.  The rights and obligations of the Sale Agent under the Plan shall be governed by the Sale Agent Agreement, the Plan and the Confirmation Order.  Mr. Aaron will direct the Sale Agent to communicate openly with both Managers and both Members, and Mr. Aaron will direct the Sale Agent to refrain from withholding any fact(s), data or document(s) from any Manager or Member.  Mr. Aaron will direct the Sale Agent to provide to any Manager or Member any and all any fact(s), data or document(s) requested by the Manager or Member.  Furthermore, Mr. Aaron will direct

the Sale Agent to disclose all material information and communication to both Managers and both Members regarding the sale process and the Transaction.  Mr. Aaron will direct the Sale Agent to hold weekly conference calls with the Managers and Members to provide updates and disclosures regarding the sale process.

　　6.　　Disbursing Agent.  The Confirmation Order will provide for the appointment of MCA Financial Group, Ltd. as the Disbursing Agent effective as of the Closing Date.

　　　　a.　　Authority.  The Disbursing Agent shall have all necessary powers and authority on behalf of the Debtors' Estates to:

　　　　　　i.　　determine the Transaction that will be presented to the Court for approval;

　　　　　　ii.　　object to Claims, and complete the Claims objection and Claims administration process under Plan, to the extent that any Claim objections remain unresolved as of the Closing Date;

　　　　　　iii.　　make all disbursements after the Closing Date to holders of Allowed Claims in accordance with the Plan;

　　　　　　iv.　　make all disbursements after the Closing Date to holders of Allowed Equity Security interests in accordance with the Plan;

　　　　　　v.　　pay all post-petition operating and other expenses of the Debtors and their Estates after the Closing Date, to the extent not assumed by the buyer at closing through the Transaction, including Quarterly fees pursuant to 28 U.S.C. Section 1930(a)(6) payable to the Office of the United States Trustee;

　　　　　　vi.　　oversee the completion of any final tax and accounting issues for the Debtors' Estates, including filing all local, state, and federal tax returns and other required filings;

　　　　　　vii.　　file quarterly post-confirmation reports and a final report and accounting with the Bankruptcy Court;

　　　　　　viii.　　to do all other things reasonably necessary to carry out the purpose or intent of the Plan, wind-down the Debtors' Estates, and close the Bankruptcy Case; and

　　　　　　ix.　　seek and obtain the entry of a final decree and an order from the Bankruptcy Court discharging and releasing the

Disbursing Agent and closing the case.

b. Professionals. The Disbursing Agent may retain and compensate professionals (which may include Professional Persons) to reasonably assist the Disbursing Agent in performing its duties under the Plan, on such terms as the Disbursing Agent deems appropriate, without Bankruptcy Court approval.

c. Expenses Incurred on or After the Closing Date. The amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Closing Date (including, without limitation, reasonable attorney and other professional fees and expenses) shall be paid from the proceeds of the Transaction prior to the calculation of any distributions to the Members. The Disbursing Agent shall receive hourly compensation for services rendered in carrying out its duties under the Plan based as follows:

- Senior Managing Directors - $425

- Managing Directors - $350

- Directors - $295

- Administrative and research personnel - $95

d. No Liability of the Disbursing Agent. To the maximum extent permitted by law, the Disbursing Agent and its representatives, principals, employees, and agents, and any professionals employed or retained by the Disbursing Agent shall not have or incur liability to the Estates, any Creditor, Manager, Member, Person or Governmental Unit for an act taken or omission made in good faith in connection with or related to any action taken or omitted by it pursuant to the discretion, power and authority conferred to it by the Plan or the Confirmation Order. The Disbursing Agent shall not be liable to the Estates, any Creditor, Manager, Member, Person or Governmental Unit for any act or omission of the Disbursing Agent, or agent of the Disbursing Agent, or be held to any personal liability whatsoever in tort, contract, or otherwise in connection with the affairs of the Debtors or the Estates, except for liabilities arising from the Disbursing

Agent's bad faith, gross negligence, fraud, willful misfeasance or reckless disregard of duty or law.  The Disbursing Agent shall not be liable except for the performance of any duties and obligations as are specifically set forth in this Plan, and no implied covenants or obligations shall be read into this Plan against the Disbursing Agent.  The Disbursing Agent shall in all respects be entitled to reasonably rely on the advice of counsel with respect to its duties and responsibilities under the Plan.  Entry of the Confirmation Order constitutes a judicial determination that the exculpation provision contained in this Section is necessary to, inter alia, facilitate Confirmation and feasibility and to minimize potential claims arising after the Confirmation Date for indemnity, reimbursement or contribution from the Estates, or their respective property.  The Confirmation Order's approval of the Plan also constitutes a res judicata determination of the matters included in this exculpation provision of the Plan.

    e. Indemnification.  The Disbursing Agent and any employees, agents, attorneys or other professionals retained by the Disbursing Agent (collectively, an "Indemnified Person"), shall be entitled to indemnification out of the Estates against any losses, liabilities, expenses (including attorneys' fees and disbursements), damages, taxes, suits or claims (collectively, "Expenses") which any Indemnified Person may incur or sustain by reason of being or having been the Disbursing Agent, or being or having been employed or retained by the Disbursing Agent, or for performing any functions incidental to such service, employment or retention; provided, however, that the foregoing shall not relieve any Indemnified Person for liability for bad faith, gross negligence, fraud, willful misfeasance or reckless disregard of duty or law.  The indemnification provided in this paragraph shall not be deemed exclusive of any other rights to which any Indemnified Person may be entitled pursuant to any other agreement or otherwise, and shall continue as to a person or entity that has ceased to be the Disbursing Agent, or ceased to be employed or retained by the Disbursing Agent and shall inure to the benefit of the

successor and legal representatives of such person or entity.

f.   Limitation of Liability; Unknown Property.  The Disbursing Agent shall not be personally liable with respect to any liabilities or obligations of the Debtors or their Estates, including, without limitation, those arising under this Plan whether before or after the Closing Date, and all persons dealing with the Debtors or Reorganized Debtors must look solely to the Estates for the enforcement of any claims against the Debtors or the Estates.  The Disbursing Agent shall be responsible for only the assets delivered to him, and shall have no duty to make, nor incur any liability for failing to make, any search for unknown property or for any liabilities.

**B.   Resolution of Claims, Demands, and Causes of Action.**

Only the Debtors shall be entitled to object to Claims.  Any objections to Claims shall be served and filed on or before the later of: (i) one hundred and twenty (120thirty (30) days after the Confirmation Date; (ii) thirty (30) days after a request for payment or proof of Claim is timely filed and properly served; or (iii) such other date as may be fixed by the Bankruptcy Court, whether before or after the dates specified in subsections (i) and (ii) herein.  Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the Creditor if service is effected in any of the following manners: (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004; (b) by first class mail, postage prepaid, on any counsel that has appeared on the Creditor's behalf in the Cases; or (c) by first class mail, postage prepaid, on the signatory on the proof of Claim or other representative identified in the proof of Claim or any attachment thereto.

Notwithstanding any other provision of the Plan, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.  After such time as a Disputed Claim becomes an Allowed Claim, the Debtors or the Disbursing

Agent, as applicable, shall distribute to the holder thereof the distributions, if any, to which such holder is then entitled under the Plan in accordance with the provisions hereof. In respect of Disputed Claims such distributions shall be made within fifteen (15) days after such Disputed Claims become Allowed Claims by Final Order of the Bankruptcy Court or as soon thereafter as practicable.

**C.** **Provisions Concerning Distributions.**

Payments and distributions to be made by the Debtors or Disbursing Agent on or after the Effective Date pursuant to the Plan shall be made on such date, or as soon as practicable thereafter, except as otherwise provided for in the Plan, or as may be ordered by the Court, or as may be agreed to by the Debtors or Disbursing Agent, as applicable, and the Holder of the Claim or Equity Security.

Whenever any payment or distribution to be made under the Plan shall be due on a day other than a Business Day, such payment or distribution shall instead be made, without interest, on the next Business Day, or as soon as practicable thereafter, or as may be agreed to by the Debtors or Disbursing Agent, as applicable, and the holder of the Claim or Equity Security.

Cash payments made pursuant to the Plan shall be made in the currency of the United States, by check drawn on a domestic bank or by wire transfer from a domestic bank. Distributions to all holders of Allowed Claims and Equity Security shall be made (a) at the addresses set forth in the proof of claim filed by such holders (or at last known addresses of such holders if no proofs of claims were filed or the Debtors were notified of a change of address); or (b) at the addresses set forth in any written notices of address change delivered to the Debtors or the Bankruptcy Court; or (c) at the addresses reflected in the Debtors' schedules if no claim shall have been filed and no written notice of an address change has been received by the Debtors. No payments shall be made to a holder

of a Disputed Claim unless and until such Claim becomes an Allowed Claim by a Final Order.

Any other provision of the Plan to the contrary notwithstanding, no payments of fractions of cents will be made. Whenever any payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole cent (rounding down in the case of .5).

Except as otherwise set forth in Section 13.6 of the Plan, if a Holder of an Allowed Claim, or and other claim or interest fails to negotiate a check issued to such Holder under the Plan within ~~one hundred and eighty (180~~sixty (60) days of the date such check was issued by the Debtors or Disbursing Agent, as applicable, then the amount of Cash or other property attributable to such check shall be deemed to be "Unclaimed Distributions," and the payee of such check shall be deemed to have no further Claim or future Claim against the Debtors.

In the event any payment to a holder of a Claim under the Plan remains unclaimed for a period of ~~six (6) months~~sixty (60) days after such distribution has been made (or after such delivery has been attempted), such Unclaimed Distribution and all future distributions to be made to such holders shall be deemed forfeited by such holder.

In the event of any dispute between and among Claimants (including the Entity or Entities asserting the right to receive the disputed payment or distribution) as to the right of any Entity to receive or retain any payment or distribution to be made to such Entity under the Plan, the Debtors or Disbursing Agent, as applicable, may, in lieu of making such payment or distribution to such Entity, make it instead into an escrow account or to a disbursing agent, for payment or distribution as ordered by a court of competent jurisdiction or as the interested parties to such dispute may otherwise agree among themselves.

Formatted: Font color: Auto
Formatted: Font color: Auto

3762216v1/22420-0006

62

**D. Re-Vesting of the Debtors' Property.**

Under the Plan, except as expressly provided for in the Plan or the Confirmation Order, on the Effective Date, the Debtors shall be vested with all remaining property and assets of their respective Estates, free and clear of all claims, liens, charges, and other interests of creditors and interest holders arising prior to the Petition Date.

**E. Retention of Jurisdiction.**

Notwithstanding the entry of the Confirmation Order or the occurrence of Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over this Case and any proceedings related thereto to the fullest extent permitted by the Bankruptcy Code or applicable law, and to make such orders as are necessary or appropriate to carry out the provisions of this Plan. In addition, the Bankruptcy Court shall retain jurisdiction to implement the provisions of the Plan in the manner as provided under Section 1142 of the Bankruptcy Code. More specific information regarding the proposed retention of jurisdiction by the Bankruptcy may be found in Article XI of the Plan.

**F. Effect of Confirmation of Plan.**

1. **Discharge.**

Any liability imposed by the Plan will not be discharged. If Confirmation of this Plan does not occur, the Plan shall be deemed null and void. In such event, nothing contained in this Plan shall be deemed to constitute a waiver or release of any claims against the Debtors or their Estates or any other Persons, or to prejudice in any manner the rights of the Debtors or their Estates or any Person in any further proceeding involving the Debtors or the Estates. The provisions of this Plan shall be binding upon the Debtors, all Creditors and all Equity Security holders, regardless of whether such Claims or Equity Security holders are impaired or whether such parties accept this Plan, upon Confirmation thereof.

2. **Modification of Plan.**

The Debtors may modify the Plan at any time before Confirmation. However, the

1 Bankruptcy Court may require a new Disclosure Statement or re-voting on the Plan if the

2 Debtors materially modify the Plan before Confirmation.  The Debtors may also seek to

3 modify the Plan at any time after Confirmation so long as (a) the Plan has not been

4 substantially consummated, and (b) the Bankruptcy Court authorizes the proposed

5 modification after notice and a hearing.  After Confirmation, the Debtors may, upon

6 Order from the Bankruptcy Court, in accordance with Section 1127(b) of the Bankruptcy

7 Code, remedy any defect or omission or reconcile any inconsistency in this Plan in such

8 manner as may be necessary to carry out the purpose of this Plan.

9       3.     <u>Post-Confirmation Quarterly Fees.</u>

10       Quarterly fees pursuant to 28 U.S.C. Section 1930(a)(6) continue to be payable to

11 the Office of the United States Trustee by the Debtors <u>or Disbursing Agent, as applicable,</u>

12 until such time as the case is converted, dismissed, or closed pursuant to a final decree.

13       4.     <u>Retention of Claims and Causes of Action.</u>

14       Except to the extent any rights, claims, causes of action, defenses, and

15 counterclaims are expressly and specifically released in connection with the Plan or in

16 any settlement agreement approved during the Case: (i) any and all Claims accruing to

17 the Debtors or the Estates shall remain assets of and vest in the Debtors, whether or not

18 litigation relating thereto is pending on the Effective Date, and whether or not any such

19 Claims have been listed or referred to in the Plan, the Disclosure Statement, or any other

20 document filed with the Court, and (ii) neither the Debtors nor the Estate waive, release,

21 relinquish, forfeit, or abandon (nor shall they be estopped or otherwise precluded or

22 impaired from asserting) any Claims or defenses that constitute property of the Debtors

23 or the Estates: (a) whether or not such Claims or defenses have been listed or referred to

24 in this Plan, the Disclosure Statement, or any other document filed with the Bankruptcy

25 Court, (b) whether or not such Claims are currently known to the Debtors, and (c)

26 whether or not a defendant in any litigation relating to such Claims filed a proof of claim

**Formatted:** Space After:  0 pt

in the Case, filed a notice of appearance or any other pleading or notice in the Case, voted for or against this Plan, or received or retained any consideration under this Plan. Without in any manner limiting the scope of the foregoing, notwithstanding any otherwise applicable principle of law or equity, including, without limitation, any principles of judicial estoppel, res judicata, collateral estoppel, issue preclusion, or any similar doctrine, the failure to list, disclose, describe, identify, analyze or refer to any Claim, in the Plan, the Disclosure Statement, or any other document filed with the Court shall in no manner waive, eliminate, modify, release, or alter the Debtors' right to commence, prosecute, defend against, settle, recover on account of, and realize upon any Claim that the Debtors or their Estates have or may have as of the Effective Date.

The Debtors expressly reserves all Claims and defenses for later adjudication by the Debtors and therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Claims and defenses upon or after the Confirmation or Consummation of the Plan based on the Disclosure Statement, the Plan or the Confirmation Order. In addition, the Debtors expressly reserve the right to pursue or adopt Claims that are alleged in any lawsuits in which the Debtors are a defendant or an interested party, against any Person or Governmental Entity, including the plaintiffs or co-defendants in such lawsuits. Any Person or Governmental Entity to whom the Debtors have incurred an obligation (whether on account of services, purchase, sale of goods or otherwise), or who has received services from the Debtors, or who has received money or property from the Debtors, or who has transacted business with the Debtors, or who has leased equipment or property from or to the Debtors should assume that such obligation, receipt, transfer or transaction may be reviewed by the Debtors subsequent to the Effective Date and maybe the subject of an action after the Effective Date, whether or not: (a) such Person or Governmental Unit has Filed a proof of Claim against the Debtors

1  in the Case; (b) such Person's or Governmental Unit's proof of Claim has been objected
2  to by the Debtors; (c) such Person's or Governmental Unit's Claim was included in the
3  Debtors' Schedules; or (d) such Person's or Governmental Unit's scheduled Claim has
4  been objected to by the Debtors or has been identified by the Debtors as contingent,
5  unliquidated or disputed.

6      NO WAIVER OF CLAIMS.  NEITHER THE FAILURE TO LIST A CLAIM IN
7  THE SCHEDULES FILED BY THE DEBTORS, THE FAILURE OF THE DEBTORS
8  OR ANY OTHER PERSON TO OBJECT TO ANY CLAIM FOR PURPOSES OF
9  VOTING, THE FAILURE OF THE DEBTORS OR ANY OTHER PERSON TO
10 OBJECT TO A CLAIM OR ADMINISTRATIVE EXPENSE BEFORE
11 CONFIRMATION OR THE EFFECTIVE DATE, THE FAILURE OF ANY PERSON
12 TO ASSERT A CLAIM OR CAUSE OF ACTION BEFORE CONFIRMATION OR
13 THE EFFECTIVE DATE, THE ABSENCE OF A PROOF OF CLAIM HAVING BEEN
14 FILED WITH RESPECT TO A CLAIM, NOR ANY ACTION OR INACTION OF THE
15 DEBTORS OR ANY OTHER PERSON WITH RESPECT TO A CLAIM, OR
16 ADMINISTRATIVE EXPENSE, OTHER THAN A LEGALLY EFFECTIVE EXPRESS
17 WAIVER OR RELEASE SHALL BE DEEMED A WAIVER OR RELEASE OF THE
18 RIGHT OF THE DEBTORS, BEFORE OR AFTER SOLICITATION OF VOTES ON
19 THE PLAN OR BEFORE OR AFTER CONFIRMATION OR THE EFFECTIVE DATE
20 TO (A) OBJECT TO OR EXAMINE SUCH CLAIM OR ADMINISTRATIVE
21 EXPENSE, IN WHOLE OR IN PART OR (B) RETAIN AND EITHER ASSIGN OR
22 EXCLUSIVELY ASSERT, PURSUE, PROSECUTE, UTILIZE, OTHERWISE ACT OR
23 OTHERWISE ENFORCE ANY CLAIM OR CAUSE OF ACTION AGAINST THE
24 HOLDER OF ANY SUCH CLAIM.

25 **G.**   **General Provisions.**

26      1.    <u>Notices Under the Plan.</u>

Notices, requests, or demands with respect to this Plan shall be in writing and shall be deemed to have been received within five (5) days of the date of mailing, provided they are sent by registered mail or certified mail, postage prepaid, return receipt requested, and if sent to the Debtors, addressed to:

> GALLAGHER & KENNEDY, P.A.
> Attn: John R. Clemency
>      Todd A. Burgess
> 2575 East Camelback Road
> Phoenix, Arizona 85016-9225
> Telephone:  (602) 530-8000
> Facsimile:   (602) 530-8500
> Email:        todd.burgess@gknet.com
>
> Email:        john.clemency@gknet.com
>               todd.burgess@gknet.com

2.  **Withholding Taxes/Setoffs.**

The Debtors or Disbursing Agent, as applicable, shall be entitled to deduct any Federal or State withholding taxes from any payments with respect to Allowed Claims for wages of any kind. The Debtors or Disbursing Agent, as applicable, may, but shall not be required to, set off or recoup against any Claim, and the payments to be made pursuant to the Plan in respect of such Claim, any claims of any nature whatsoever the Debtors or the Estates may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors of any such claim the Debtors may have against such holder.

3.  **Committee.**

On the Effective Date, the Committee shall automatically dissolve and the members thereof and the Professional Persons retained by the Committee in accordance with Section 1103 of the Bankruptcy Code shall be released and discharged from their respective duties and obligations.

4.  **Revocation of Plan.**

The Debtor reserves the right to revoke and withdraw the Plan at any time before

3762216v1/22420-0006                        67

1 Confirmation.

2      5.    <u>Reservation of Rights.</u>

3      The Plan provides that nothing contained therein shall prohibit the Debtors from

4 prosecuting or defending any of its rights as may exist on its own behalf before the

5 Confirmation Date.  If Confirmation of the Plan does not occur, the Plan shall be deemed

6 null and void.  In such event, nothing contained in the Plan shall be deemed to constitute

7 a waiver or release of any Claims by or against the Debtors, their Estates, or any other

8 Person, or to prejudice in any manner, the rights and remedies of the creditors, the

9 Debtors, their Estates, or any Person in any further proceedings involving the Debtors or

10 their Estate.  The filing of the Plan and or any modifications thereto, and the Plan itself

11 shall not constitute a waiver by the Debtor of any and all rights, remedies, objections,

12 causes of action, the Debtors may have or may wish to raise with respect to anything,

13 including, without limitation, any other plan or plans filed or to be filed in this

14 bankruptcy case, all of which rights and objections are hereby reserved.

15      6.    <u>Exemption from Certain Transfer Taxes.</u>

16      Pursuant to Section 1146(a) of the Bankruptcy Code, the issuance, transfer or

17 exchange of a security, or the making or delivery of an instrument of transfer hereunder

18 will not be subject to any stamp, tax, or similar tax.

19      7.    <u>Injunction.</u>

20      THE PLAN PROVIDES THAT, EXCEPT AS OTHERWISE PROVIDED IN

21 THE PLAN OR THE CONFIRMATION ORDER, AND EXCEPT FOR ANY

22 ACTIONS TIMELY FILED PURSUANT TO SECTION 523 OF THE BANKRUPTCY

23 CODE OR ANY CLAIMS DECLARED BY THE COURT TO BE NON-

24 DISCHARGEABLE PURSUANT TO SECTION 523 OF THE BANKRUPTCY CODE,

25 AS OF THE CONFIRMATION DATE, BUT SUBJECT TO THE OCCURRENCE OF

26 THE EFFECTIVE DATE, ALL PERSONS WHO HAVE HELD, HOLD OR MAY

HOLD CLAIMS AGAINST THE DEBTORS OR THEIR ESTATES, OR EQUITY SECURITY IN THE DEBTORS, ARE, WITH RESPECT TO ANY SUCH CLAIMS OR EQUITY SECURITY INTERESTS, PERMANENTLY ENJOINED FROM AND AFTER THE CONFIRMATION DATE FROM: (I) COMMENCING, CONDUCTING OR CONTINUING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY SUIT, ACTION OR OTHER PROCEEDING OF ANY KIND (INCLUDING, WITHOUT LIMITATION, ANY PROCEEDING IN A JUDICIAL, ARBITRAL, ADMINISTRATIVE OR OTHER FORUM) WITH RESPECT TO ANY SUCH CLAIM AGAINST OR AFFECTING THE DEBTORS, THEIR ESTATES OR ANY OF THEIR RESPECTIVE PROPERTY, OR ANY DIRECT OR INDIRECT TRANSFEREE OF ANY PROPERTY OF, OR DIRECT OR INDIRECT SUCCESSOR IN INTEREST TO, ANY OF THE FOREGOING PERSONS, OR ANY PROPERTY OF ANY SUCH TRANSFEREE OR SUCCESSOR; (II) ENFORCING, LEVYING, ATTACHING (INCLUDING, WITHOUT LIMITATION, ANY PRE-JUDGMENT ATTACHMENT), COLLECTING OR OTHERWISE RECOVERING BY ANY MANNER OR MEANS, WHETHER DIRECTLY OR INDIRECTLY, WITH RESPECT TO ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST THE DEBTORS, THEIR ESTATES OR ANY OF THEIR RESPECTIVE PROPERTY, OR ANY DIRECT OR INDIRECT TRANSFEREE OF ANY PROPERTY OF, OR DIRECT OR INDIRECT SUCCESSOR IN INTEREST TO, ANY OF THE FOREGOING PERSONS, OR ANY PROPERTY OF ANY SUCH TRANSFEREE OR SUCCESSOR; (III) CREATING, PERFECTING OR OTHERWISE ENFORCING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY ENCUMBRANCE OF ANY KIND AGAINST THE DEBTORS, THEIR ESTATES OR ANY OF THEIR RESPECTIVE PROPERTY, OR ANY DIRECT OR INDIRECT TRANSFEREE OF ANY PROPERTY OF, OR SUCCESSOR IN INTEREST TO, ANY OF THE FOREGOING PERSONS; (IV) ASSERTING

INITIALLY AFTER THE EFFECTIVE DATE ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND, DIRECTLY OR INDIRECTLY, AGAINST ANY OBLIGATION DUE TO THE DEBTORS, THEIR ESTATES OR ANY OF THEIR RESPECTIVE PROPERTY, OR ANY DIRECT OR INDIRECT TRANSFEREE OF ANY PROPERTY OF, OR SUCCESSOR IN INTEREST TO, ANY OF THE FOREGOING PERSONS; AND (V) ACTING OR PROCEEDING IN ANY MANNER, IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM TO OR COMPLY WITH THE PROVISIONS OF THE PLAN TO THE FULL EXTENT PERMITTED BY APPLICABLE LAW. BY ACCEPTING A DISTRIBUTION PURSUANT TO THE PLAN, EACH HOLDER OF AN ALLOWED CLAIM RECEIVING DISTRIBUTIONS PURSUANT TO THE PLAN WILL BE DEEMED TO HAVE SPECIFICALLY CONSENTED TO THE INJUNCTIONS SET FORTH IN THIS SECTION, AND, EXCEPT AS SET FORTH IN THIS SECTION, WAIVES ANY AND ALL CLAIMS, CAUSES OF ACTION, REMEDIES AND OBJECTIONS OF EVERY KIND AGAINST THE DEBTORS.

        8.    <u>Ratification of Action Taken During Pendency of the Chapter 11 Case.</u>

The Plan provides that the Confirmation Order shall ratify all transactions effected by the Debtors during the period commencing on the Debtors' Petition Date and ending on the Confirmation Date.

        9.    <u>Term of Injunctions or Stays.</u>

The Plan provides that, unless otherwise provided, all injunctions or stays arising before the Confirmation Date in accordance with Sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date, or such later date as provided under applicable law.

        10.    <u>Injunction Against Interference With Plan.</u>

The Plan provides that, upon the entry of the Confirmation Order, all holders of

Claims and Equity Security and other parties in interest, including the Debtors, along with its respective present or former employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

      11.   <u>Exculpation.</u>

      THE PLAN PROVIDES THAT, EXCEPT WITH RESPECT TO OBLIGATIONS UNDER THE PLAN, NEITHER THE DEBTORS, THE COMMITTEE NOR ANY OF THEIR RESPECTIVE MANAGERS, MEMBERS, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR PROFESSIONALS, SOLELY IN THEIR CAPACITY AS SUCH (EACH AN "EXCULPATED PARTY"), SHALL HAVE OR INCUR ANY LIABILITY TO THE DEBTORS AND/OR ANY HOLDER OF ANY CLAIM FOR ANY ACT OR OMISSION IN CONNECTION WITH, OR ARISING OUT OF: (I) THE CASE; (II) THE CONFIRMATION OF THE PLAN; (III) THE CONSUMMATION OF THE PLAN; OR (IV) THE ADMINISTRATION OF THE PLAN OR PROPERTY TO BE DISTRIBUTED PURSUANT TO THE PLAN, EXCEPT FOR FRAUD, WILLFUL MISCONDUCT, RECKLESSNESS OR GROSS NEGLIGENCE; AND, IN ALL RESPECTS, THE DEBTORS, THE COMMITTEE, AND EACH OF THEIR RESPECTIVE MANAGERS, MEMBERS, OFFICERS, DIRECTORS, EMPLOYEES, ADVISORS AND AGENTS SHALL BE ENTITLED TO RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES UNDER THE PLAN.

**IX.**
**FEDERAL TAX CONSEQUENCES**

      Each holder of a claim is urged to consult with its own tax advisor regarding the federal, state, local and other tax consequences of the Plan. No rules have been requested from the Internal Revenue Service with respect to any of the tax aspects of the Plan.

# X.
# VOTING PROCEDURES AND REQUIREMENTS

**A.**    <u>**Parties Entitled to Vote.**</u>

If you hold an Allowed Claim that is "impaired" under the Plan, you are entitled to vote to accept or reject the Plan. Accordingly, to be entitled to vote, your Claim must be "allowed" as set forth in Section 502 of the Bankruptcy Code or temporarily allowed as set forth in Bankruptcy Rule 3018(a). Additionally, Section 1126(f) of the Bankruptcy Code permits you to vote to accept or reject the Plan only if your Claim is "impaired."

**B.**    <u>**Procedures for Voting.**</u>

    1.    <u>Submission of Ballots.</u>

After this Disclosure Statement has been approved by the Bankruptcy Court, all Creditors whose votes are solicited (as explained above) will be sent (a) a ballot, together with instructions for voting (the "<u>Ballot</u>"); (b) a copy of this Disclosure Statement as approved by the Bankruptcy Court; and (c) a copy of the Plan. You should read the Ballot carefully and follow the instructions. Please use only the Ballot sent with this Disclosure Statement. You should complete your Ballot and return it to:

> GALLAGHER & KENNEDY, P.A.
> Attn: Todd A. Burgess
> 2575 East Camelback Road, Suite 1100
> Phoenix, AZ 85016
> Telephone: (602) 530-8000

**TO BE COUNTED, YOUR BALLOT MUST BE RECEIVED AT THE ADDRESS LISTED ABOVE BY 5:00 P.M., MOUNTAIN STANDARD TIME, ON _____, 2013. IF YOUR BALLOT IS NOT TIMELY RECEIVED, IT WILL NOT BE COUNTED IN DETERMINING WHETHER THE PLAN HAS BEEN ACCEPTED OR REJECTED.**

A properly addressed, stamped return envelope will be included with your Ballot.

2. <u>Procedures for Vote Tabulation</u>.

In determining whether the Plan has been accepted or rejected, Ballots will be tabulated in accordance with the Court's Order approving this Disclosure Statement.

3. <u>Withdrawal of Ballots</u>.

A Ballot may not be withdrawn or changed after it is cast unless the Bankruptcy Court permits you to do so after notice and a hearing to determine whether sufficient cause exists to permit the change.

4. <u>Questions and Lost or Damaged Ballots</u>.

If you have any questions concerning voting procedures, if your Ballot is damaged or lost, or if you believe you should have received a Ballot but did not receive one, you may contact Debtors' counsel, Todd Burgess, at the address and telephone number listed above.

**C.** **<u>Summary of Voting Requirements.</u>**

In order for the Plan to be confirmed, the Plan must be accepted by at least one (1) impaired Class of Claims. For a Class of Claims to accept the Plan, votes representing at least two-thirds in claim amount and a majority in number of the Claims voted in that Class (not including votes of insiders) must be cast to accept the Plan.

**IT IS IMPORTANT THAT HOLDERS OF ALLOWED IMPAIRED CLAIMS EXERCISE THEIR RIGHTS TO VOTE TO ACCEPT OR REJECT THE PLAN. THE DEBTORS ASSERT THAT THE TREATMENT OF CREDITORS UNDER THE PLAN IS THE BEST ALTERNATIVE FOR CREDITORS, AND THE DEBTORS RECOMMEND THAT THE HOLDERS OF ALLOWED CLAIMS VOTE IN FAVOR OF THE PLAN.**

The specific treatment of each Class under the Plan is described in the Plan and is summarized in this Disclosure Statement.

**XI.**

**LIQUIDATION ANALYSIS**

The Debtors' Liquidation Analysis is attached as Exhibit "E" and was prepared by MCA with the input and approval of the Debtors.

**XII.**

**CONFIRMATION OF THE PLAN**

**D.    Confirmation Hearing.**

Section 1128(a) of the Bankruptcy Code provides that the Bankruptcy Court, after notice, will hold a Confirmation Hearing on the Plan.  The Confirmation Hearing will be held at the United States Bankruptcy Court, 230 N. First Avenue, Phoenix, Arizona, on _____, 2013, at _____ a.m./p.m.    **THE HEARING MAY BE ADJOURNED FROM TIME TO TIME BY THE COURT WITHOUT FURTHER NOTICE EXCEPT FOR AN ANNOUNCEMENT MADE AT THE HEARING.**

**E.    Objections to Confirmation.**

Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to confirmation of the Plan, regardless of whether it is entitled to vote.  Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.  **IF AN OBJECTION TO CONFIRMATION IS NOT TIMELY MADE, THE COURT NEED NOT RECEIVE AND CONSIDER IT.    ALL OBJECTIONS TO CONFIRMATION OF THE PLAN MUST BE FILED WITH THE BANKRUPTCY COURT AND SERVED ON THE DEBTORS' COUNSEL AT THE ADDRESS SET FORTH ABOVE, ON THE UNITED STATES TRUSTEE, AND ON ANY PARTY-IN-INTEREST WHO HAS REQUESTED NOTICE IN THE DEBTOR'S BANKRUPTCY CASE, BY _____, 2013.**

**F.    Requirements for Confirmation of the Plan.**

1.    Confirmation Under Section 1129(a) of the Bankruptcy Code.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of Section 1129(a) of the Bankruptcy Code have been satisfied, in which event the Bankruptcy Court will enter an order confirming the Plan. Such requirements include, among others:

      a.     That the Debtors have complied with the applicable provisions of Chapter 11, including the provisions of Sections 1122 and 1123 of the Bankruptcy Code governing classification of claims and interests and contents of a plan of reorganization.

      b.     That the Debtors have proposed the Plan in good faith and not by any means forbidden by law.

      c.     That any payment made or promised by the Debtors to any Person for services, costs, or expenses in connection with the Bankruptcy Case or the Plan has been approved by or is subject to approval by the Bankruptcy Court as reasonable.

      d.     That the Debtors have disclosed the identity and affiliations of Persons proposed to serve as officers after confirmation.

      e.     That one or more of the impaired Classes of Claims has voted to accept the Plan.

      f.     That the Plan is in the best interests of holders of Claims and Equity Interests; that is, each holder of an Allowed Claim or Allowed Equity Interest either has accepted the Plan or will receive on account of its Claim or Equity Interest property with a value, as of the Effective Date, that is not less than the amount that the holder of such Claim or Equity Interest would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date.

      g.     That the Plan is feasible; that is, confirmation is not likely to be

followed by the need for liquidation or further reorganization of the Debtors unless that is provided for in the Plan.

2.    The Debtors Believe the Plan Satisfies Bankruptcy Code Requirements.

(a)    Best Interests Test and Liquidation Analysis. Under the best interests test, the Plan is confirmable if, with respect to each impaired Class of Claims or Equity Interests, each holder of an Allowed Claim or Allowed Equity Interest in such Class either: (i) has accepted the Plan; or (ii) will receive or retain under the Plan, on account of its Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code. The Debtors believe the distributions to Creditors under the Plan will meet or exceed the recoveries that Creditors would receive in a Chapter 7 liquidation of the Debtors and their Estates. The Debtors believe that the Plan provides an equal or better return to Creditors than they can otherwise receive under Chapter 7, and therefore the best interests of creditors test is met.

(b)    Feasibility of the Plan. Section 1129(a)(11) of the Bankruptcy Code includes what is commonly described as the "feasibility" standard. In order for the Plan to be confirmed, the Bankruptcy Court also must determine that the Plan is feasible - that is, that the need for further reorganization or a subsequent liquidation of the Debtors is not likely to result following confirmation of the Plan. As set forth in this Disclosure Statement and in the Plan, the Debtors believe the Plan is feasible.

(c)    Acceptance by an Impaired Class. Because the Plan impairs some Classes of Claims, Section 1129(a)(10) of the Bankruptcy Code requires that, for the Plan to be confirmed, at least one impaired Class must accept the Plan by the requisite vote without counting the votes of any "insiders" (as that term is defined

in Section 101(31) of the Bankruptcy Code) contained in that Class. The Debtors believe that at least one impaired Class will vote to accept the Plan.

(d)    Confirmation Under Section 1129(b) of the Bankruptcy Code. Although Section 1129(a)(8) of the Bankruptcy Code requires that the Plan be accepted by each Class that is impaired by the Plan, Section 1129(b) of the Bankruptcy Code provides that the Bankruptcy Court may still confirm the Plan at the request of the Debtors if all requirements of Section 1129(a) of the Bankruptcy Code are met except for Section 1129(a)(8) and if, with respect to each Class of Claims or Equity Interests that (a) is impaired under the Plan, and (b) has not voted to accept the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable." This provision commonly is referred to as a "cramdown." The Debtors have requested cramdown confirmation of the Plan with respect to any such non-accepting Class of Creditors. The Debtors believe that, with respect to such Class or Classes, the Plan meets the requirements of Section 1129(b) of the Bankruptcy Code.

(1)    Unfair Discrimination. A plan of reorganization "does not discriminate unfairly" if: (i) the legal rights of a non-accepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are related to those of the non-accepting class; and (ii) no class receives payments in excess of that which it is legally entitled to receive on account of its Claims or Equity Interests. The Debtors assert that under the Plan: (i) all classes of impaired Claims are being treated in a manner that is consistent with the treatment of other similar classes of Claims; and (ii) no Class of Claims will receive payments or property with an aggregate value greater than the sum of the Allowed Claims in the Class.

Accordingly, the Debtors believe that the Plan does not discriminate unfairly as to any impaired Class of Claims or Equity Interests.

(2) <u>Fair and Equitable Test</u>. The Bankruptcy Code establishes different "fair and equitable" tests for Secured Creditors, Unsecured Creditors, and holders of Equity Interests, as follows:

(i) <u>Secured Creditors</u>. With respect to a secured claim, "fair and equitable" means that a plan provides that either (A) the holder of the secured claim in an impaired class retains the liens securing such claim, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the amount of such allowed claim, and that the holder of such claim receives on account of such claim deferred cash payments totaling at least the amount of such allowed claim, of a value, as of the effective date, of at least the value of such holder's interest in the estate's interest in such property; (B) for the sale, subject to Section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing such claim, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clauses (A) and (C); or (C) the realization by such holder of the "indubitable equivalent" of such claim.

(ii) <u>Unsecured Creditors</u>. With respect to an unsecured claim, "fair and equitable" means that a plan provides that either (A) each impaired unsecured creditor receives or retains property of a value, as of the effective date, equal to the amount of its allowed claim; or (B) the holders of claims and equity interests that are junior

to the claims of the dissenting class will not receive or retain any property under the plan.

        (iii)    <u>Equity Interest Holders</u>. With respect to holders of equity interests, "fair and equitable" means that a plan provides that either (A) each holder will receive or retain under the plan property of a value, as of the effective date, equal to the greater of: (1) the fixed liquidation preference or redemption price, if any, of such interest; or (2) the value of such interest; or (B) the holders of equity interests that are junior to the non-accepting class will not receive any property under the plan.

The Debtors believe the Plan complies with the Claims priority established by the Bankruptcy Code and thus the "fair and equitable" test of the Bankruptcy Code (including the absolute priority rule) is met with respect to the Secured Creditors and the Equity Interest holders under the Plan.

**XIII.**
**ALTERNATIVES TO THE PLAN**

If the Plan is not confirmed, several different events could occur: (1) the Debtors or a third party could propose another plan providing for different treatment of certain Creditors; (2) Secured Creditors, if any, could move for relief from the automatic stay to allow them to foreclose their liens against their collateral, which may be granted by the Court if an alternative plan is not confirmed in a reasonable period of time; (3) the Bankruptcy Court (after appropriate notice and hearing) could dismiss the Bankruptcy Case or convert such to a case under Chapter 7 if an alternative plan is not confirmed in a reasonable period of time; or (4) the Bankruptcy Court could approve a sale of the Debtors' remaining assets to the highest and best bidder an auction sale under Section 363 of the Bankruptcy Code.

**XIV.**
**RECOMMENDATION AND CONCLUSION**

The Debtors believe that the Plan provides the best available alternative for maximizing the recoveries that Creditors will receive from the Debtors' Assets. Therefore, the Debtors recommend that all Creditors and Equity Security holders that are entitled to vote on the Plan vote to accept the Plan.

Dated: September 11, 2013.

**DEBTORS AND DEBTORS-IN-POSSESSION**

**ARMORWORKS ENTERPRISES, LLC, an
Arizona limited liability company**

By: and through:

WILLIAM J. PERCIBALLI

By:  /s/William J. Perciballi
Name:  William J. Perciballi
Its:  Manager and President

**TECHFIBER, LLC, a Delaware limited liability
company by:**

ARMORWORKS ENTERPRISES, LLC, an Arizona
limited liability company, its sole Member

By: and through:

WILLIAM J. PERCIBALLI

By:  /s/William J. Perciballi
Name:  William J. Perciballi
Its:  Manager and President

3762216v1/22420-0006

80

1

2   Prepared and Submitted on behalf of the Debtors by:

3   GALLAGHER & KENNEDY, P.A.
    2575 East Camelback Road
4   Phoenix, Arizona 85016-9225
    Telephone:   (602) 530-8000
5   Facsimile:   (602) 530-8500
    Email:       john.clemency@gknet.com
6                todd.burgess@gknet.com
                 lindsi.weber@gknet.com
7
8   _____ janel.glynn@gknet.com

9   By:   */s/Todd A. Burgess*
10        John R. Clemency (Bar No. 009646)
          Todd A. Burgess (Bar No. 19013)
11        Lindsi M. Weber (Bar No. 025820)

12  Proposed   Janel M. Glynn (Bar No. 25497)

13  Attorneys for Debtors

14

15

16

17

18

19

20

21

22

23

24

25

26

3762216v1/22420-0006                        81