**Formatted:** Highlight

1  **GALLAGHER & KENNEDY, P.A.**      **QUARLES & BRADY LLP**

2  John R. Clemency (Bar No. 009646)    Susan G. Boswell
   Todd A. Burgess (Bar No. 19013)      Lori Winkelman

3  2575 East Camelback Road             One South Church Avenue, Suite 1700
   Phoenix, Arizona 85016-9225          Tucson, Arizona 85701-1621

4  Telephone:  (602) 530-8000           Direct Line: (520) 770-8713
   Facsimile:  (602) 530-8500           Direct Fax: (520) 770-2222

5  Email:   john.clemency@gknet.com     Mobile:  (520) 349-6644
            todd.burgess@gknet.com      Email:   Susan.Boswell@quarles.com

6                                                 Lori.Winkelman@quarles.com
   Attorneys for Debtors                Attorneys for ArmorWorks, Inc. and
                                        William J. Perciballi
7

8              IN THE UNITED STATES BANKRUPTCY COURT

9                  FOR THE DISTRICT OF ARIZONA

10  | In re:                              | Chapter 11 Proceedings                      |
11  |                                     |                                             |
    | ARMORWORKS ENTERPRISES, LLC, ☐      | Case No.  2:13-bk-10332-BMW                 |
12  | TECHFIBER, LLC,                     | Case No.  2:13-bk-10333-BMW                 |
13  |              Debtors.               |                                             |
    |                                     | (Jointly Administered)                      |
14  |-------------------------------------|                                             |
    | This Filing Applies to:             |                                             |
15  |                                     |                                             |
16  | X     Both Debtors                  |                                             |
    | ☐     Specified Debtor              |                                             |
17

18  ~~FOURTH~~FIFTH AMENDED DISCLOSURE STATEMENT IN SUPPORT OF
19  ~~FOURTH~~FIFTH AMENDED JOINT PLAN OF REORGANIZATION

                              **I.**
20                      **INTRODUCTION**

**Formatted:** No widow/orphan control

21      Pursuant to 11 U.S.C. § 1125, this ~~Fourth~~Fifth Amended Disclosure Statement in

22  support of ~~Fourth~~Fifth Amended Joint Plan of Reorganization (the "Disclosure

23  Statement") is submitted by ArmorWorks Enterprises, LLC ("ArmorWorks"), its wholly-

24  owned subsidiary TechFiber, LLC ("TechFiber" and together with ArmorWorks, the

25  "Debtors"), ArmorWorks, Inc. ("AWI") and William J. Perciballi ("Perciballi") (the

26

4042482v8/22420-0006

GALLAGHER & KENNEDY, P.A.
2575 EAST CAMELBACK ROAD
PHOENIX, ARIZONA 85016-9225
(602) 530-8000

Debtors, AWI and Perciballi are sometimes collectively referred to herein as the "Plan Proponents"). The purpose of this Disclosure Statement is to provide adequate information to the holders of claims or interests in this matter so that they may make an informed judgment in exercising their right to vote for acceptance or rejection of the ~~Fourth~~Fifth Amended Joint Plan of Reorganization dated ~~May 27~~June 17, 2014 (the "Plan"), a copy of which is attached as Exhibit "A". The Plan provides for the reorganization of the Debtors and the satisfaction of all Allowed Claims against and Allowed Member Equity Interests in the Debtors in accordance with the Bankruptcy Code.

THE PLAN PROPONENTS RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN IN ORDER TO MAXIMIZE THE RECOVERY OF YOUR CLAIM.

Capitalized terms used in this Disclosure Statement will correspond to terms defined in the Plan and the Bankruptcy Code. Terms used in this Disclosure Statement that are also defined in the Plan are defined solely for convenience; and the Plan Proponents Debtors do not intend to change the definitions of those terms from the Plan. If there is any inconsistency between the Plan and this Disclosure Statement, the Plan is, and will be, controlling.

**II.**
**OVERVIEW OF CHAPTER 11**

**A.      Information Regarding the Plan and Disclosure Statement.**

The objective of a Chapter 11 case is the confirmation (*i.e.*, approval by the Bankruptcy Court) of a plan of reorganization or liquidation. A Chapter 11 plan describes in detail (and in language appropriate for a legal contract) the means for satisfying the claims against and equity interests in a debtor, or in this case, the Debtors. After a plan has been filed, the holders of claims and equity interests that are impaired by the plan are permitted to vote to accept or reject the plan. Before a debtor can solicit

4042482v8/22420-0006

2

acceptances of its plan, however, Section 1125 of the Bankruptcy Code requires the debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable those parties entitled to vote on the plan to make an informed judgment about the plan and about whether they should accept or reject the plan.

The purpose of this Disclosure Statement is to provide sufficient information about the Debtors and the Plan to enable you to make an informed decision in exercising your right to accept or reject the Plan. Therefore, this Disclosure Statement provides relevant information about the Debtors, their property and financial condition, and the Plan.

This Disclosure Statement will be used to solicit acceptances of the Plan only after the Bankruptcy Court has entered an order either approving or conditionally approving this Disclosure Statement. Approval by the Bankruptcy Court of this Disclosure Statement means only that the Bankruptcy Court has found that this Disclosure Statement contains sufficient information for the Plan Proponents to transmit the Plan and Disclosure Statement to Creditors and to solicit acceptances of the Plan.

After the Bankruptcy Court has granted approval or conditional approval of this Disclosure Statement and there has been voting on the Plan, the Bankruptcy Court will conduct a Confirmation Hearing concerning whether the Plan should be approved. At the Confirmation Hearing, the Bankruptcy Court will consider whether the Plan satisfies the various requirements of the Bankruptcy Code. The Bankruptcy Court also will receive and consider a ballot report prepared by the Plan Proponents that will present a tally of the votes accepting or rejecting the Plan cast by those entitled to vote. Accordingly, all votes are important because they can determine whether the Plan will be confirmed. Once confirmed, the Plan is essentially a new contract between the Debtors, their Creditors, and Member Equity Interest holders and is binding on all Creditors, Member Equity Interest holders and other parties-in-interest in the Debtors' Bankruptcy Cases

4042482v8/22420-0006

3

regardless of whether any particular Creditor or Member Equity Interest holder voted to accept the Plan.

**THIS DISCLOSURE STATEMENT IS NOT THE PLAN. FOR THE CONVENIENCE OF CREDITORS AND HOLDERS OF MEMBER EQUITY INTERESTS, THE PLAN IS SUMMARIZED IN THIS DISCLOSURE STATEMENT. ALL SUMMARIES OF THE PLAN ARE QUALIFIED IN THEIR ENTIRETY BY THE PLAN ITSELF. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN, THE PLAN WILL CONTROL.**

**B.    Representations.**

This Disclosure Statement has not been subjected to a certified audit; however, it has been prepared in part from information compiled by the Debtors from records maintained in the ordinary course of business or from information received by the Debtors from third parties. Every effort has been made to be as accurate as possible in the preparation of this Disclosure Statement. Nevertheless, the inclusion of financial information in this Disclosure Statement and exhibits is subject to adjustment, and the Debtors reserve all rights to object to or challenge any Claims that are filed or asserted in the Case.

This is a solicitation by the Plan Proponents only and is not a solicitation by the attorneys, agents, financial advisors, and accountants retained by the Plan Proponents. No statement or information concerning the Debtors or their assets or securities is authorized, other than as set forth in the Disclosure Statement.

**III.
BACKGROUND & EVENTS LEADING TO FILING**

**A.    The Companies.**

ArmorWorks and its wholly-owned subsidiaries develop advanced survivability technology and design and manufacture high-tech military personal body armor, vehicle armor, aircraft and marine armor, and energy attenuating seats for protection against a broad spectrum of ballistic threats primarily for use in military and nuclear safety and

security applications. ArmorWorks systems are in-service around the world in several United States Military applications.

ArmorWorks' engineering and fabrication services take armor systems projects from concept to production with customer input and collaboration throughout the process. ArmorWorks specializes in all aspects of military armor technology. ArmorWorks has produced over 1.25 million ceramic armor and composite armor protection components for a variety of personnel armor, aircraft, and vehicle applications. ArmorWorks primarily is known for, and attributes its success to:

- State-of-the-art ceramic armor and composite armor systems technology;
- High-performance military armor products & designs;
- Engineering & R&D capability to apply technology & designs to production;
- Ballistic testing & analysis capability;
- Military armor production capacity and experience;
- Understanding of Military Armor: Aerospace, Personnel, Vehicle, and Ship Armor Applications; and
- Patented Armor Systems Technologies.

ArmorWorks sells the majority of its products through two channels. The primary channel is as a prime contractor for United States Military agencies. ArmorWorks has contractual relationships with many government entities for the purchase and service of its products, and provides a substantial amount of the armor and protective equipment used by all branches of the United States Military. The second primary channel involves ArmorWorks subcontracting with other prime government contractors to U.S. Military agencies.

Because of (i) the life-critical nature of its products, (ii) the use of critical defense technology including classified national defense, intelligence, and nuclear security information and (iii) the United States Military's critical need for armor to protect its troops in a time of war, ArmorWorks' contracts include special delivery priorities and

4042482v8/22420-0006

5

security and secrecy requirements which subject ArmorWorks to stringent government regulations, requirements, and oversight.

**B.   <u>Ownership Structure.</u>**

ArmorWorks is an Arizona limited liability company.  ArmorWorks, Inc. ("AWI") is the majority member of ArmorWorks with a 60% interest.  C Squared Capital Partners, L.L.C. ("C Squared") owns a 40% minority interest in ArmorWorks.

**C.   <u>Debtor Subsidiary.</u>**

ArmorWorks is vertically integrated with several wholly-owned subsidiaries providing complementary survivability products as well as components used by ArmorWorks to manufacture the armor products and systems it sells.

The only ArmorWorks' subsidiary that filed a Chapter 11 petition is TechFiber, a wholly-owned Delaware limited liability company that supplies ballistic fiber to ArmorWorks and the armor industry.  The ballistic fiber is used by ArmorWorks to manufacture ceramic armor and composite armor systems.  ArmorWorks filed a Chapter 11 petition for TechFiber to facilitate a sale of the business as part of ArmorWorks' restructuring of its business operations.

**D.   <u>Non-Debtor Subsidiaries.</u>**

Non-debtor subsidiary ShockRide, LLC ("ShockRide") is a wholly-owned Arizona limited liability company that designs, manufactures, and sells energy attenuating seats, which protect passengers from the shock of IED and mine blasts beneath a vehicle.  ShockRide's energy absorption, rollover, and crash protection technology is used in a wide variety of military vehicles with over 70,000 seats in service worldwide.

Non-debtor subsidiary Mandall BarrierWorks, LLC ("MBW") is a wholly-owned Delaware limited liability company that designs and produces high-end vaults, vault doors, and armored door systems providing architectural blast protection and security,

4042482v8/22420-0006

6

including passive and reactive high value asset protection systems, safes, security doors, and fixed and portable guard stations for government, military, nuclear, and commercial installations. The company's work in the area of nuclear safety and security requires additional security clearances beyond those required by the Department of Defense.

Non-debtor subsidiary Applied Heat Technologies, LLC ("AHT") is an Arizona limited liability company wholly owned by ArmorWorks that provides portable armor and composite repair products and services.

Non-debtor Protective Ceramics, LLC is a Delaware limited liability company wholly owned by ArmorWorks. Protective Ceramics does not conduct any business operations and likely will be dissolved.

**E.**     **Foreign Non-Debtor Subsidiaries.**

ArmourWorks International Limited (AIL) is a wholly-owned subsidiary of ArmorWorks located in the United Kingdom that supplies armor and protective products to customers in the United Kingdom and internationally. ArmourWorks Enterprises Canada, ULC is a wholly-owned subsidiary of ArmourWorks International Limited (AIL) located in British Columbia that supplies soft body armor products to the Canadian military and law enforcement communities.

**F.**     **Management Team.**

William J. Perciballi ("Perciballi") is a Manager and Founder of ArmorWorks. Prior to founding ArmorWorks in 1996, Perciballi was a product manager in the Armor Products Division of Simula, Inc. He began his military career in the U.S. Army ROTC program while attending the University of Massachusetts, Lowell. Perciballi was commissioned as a second lieutenant of the United States Army during his junior year of college. Before being called to active duty during the Persian Gulf War, Perciballi was a mechanical engineer in the U.S. Army Materials Technology Laboratory in Watertown, Massachusetts where he performed critical research and development of armor materials

4042482v8/22420-0006                     7

and systems.  Perciballi later worked as an engineer in the U.S. Army Ballistic Research Laboratory in Aberdeen Proving Ground, Maryland where he conducted applied research and development of advanced armor systems for combat vehicles.  He is a member of the Society of Automotive Engineers (SAE), National Defense Industrial Association (NDIA), Society for the Advancement of Material and Process Engineering (SAMPE), and the National Armor Advisory Board to the National Institute of Justice, the standards organization that issues armor protection standards and protocol.  Perciballi has a Bachelor of Science degree in industrial engineering technology from the University of Massachusetts, Lowell.  He holds several security clearances issued by the Department of Defense for national security information, and the Department of Energy for Nuclear Security information.  Perciballi is the Facility Security Officer for ArmorWorks, Inc., which sponsors ArmorWorks employees' security clearances.  He is an internationally published and recognized researcher in the field of ballistic protection, impact energy absorption, and the effects of blast and acceleration on the human body.  Perciballi is an inventor listed on several patents issued by the US Patent and Trademark Office.  And, he serves on the Secretary of the Army's Advisory Board for armor protection.

David A. Wirthlin ("Wirthlin") is Chief Financial Officer of ArmorWorks.  Mr. Wirthlin joined ArmorWorks in June 2004.  He has over twenty years' experience in financial and operational management.  Prior to joining ArmorWorks, Wirthlin was a management consultant providing capital acquisition and financial management services to a variety of businesses.  Wirthlin previously served as CFO of Integrated Information Systems, where he coordinated private placements and helped take the company public, and SkyMall where he led the company through a turnaround and restructuring and later helped take the company public.  He began his career with Arthur Andersen as a manager in the firm's operational consulting group.  Wirthlin is a certified public accountant.  He

4042482v8/22420-0006

8

holds a Bachelor of Arts in accounting from the University of Utah and a Master of Business Administration from the University of Chicago.

Robert G. Dick ("Dick") is Vice President of Programs and has been instrumental in the success of the business. He is responsible for the company's armor programs, research and development, and maintaining the company's technical relationships with client engineers and program managers. Dick has over 20 years of experience working with composite materials and military body armor testing. Prior to joining ArmorWorks, Mr. Dick managed an FAA-Certified composites repair station and production operation that serviced the commercial airline industry. He is an FAA-Certified Airframe Technician.

Brad Field ("Field") is the ArmorWorks Director of Corporate Development. Mr. Field joined ArmorWorks in January, 2009. Prior to coming to ArmorWorks he was the founder/CEO of Pacific Safety Products Inc. ("PSP"), a publicly traded Canadian company that has been an industry leader in the safety products industry for over 25 years. Under his leadership, PSP was named one of Canada's fastest growing companies for three years running from 1999 to 2001, and received an Okanagan Science and Technology Innovation award in 2005. Mr. Fields currently is the General Manager of ArmorWorks Canada.

John McGara ("McGara") is the General Manager ShockRide. Mr. McGara is a retired US Army Ordnance Captain who joined ArmorWorks in 2006. After initially serving as Vice President of Programs and Engineering, McGara now has responsibility for all manufacturing operations and related support functions for ShockRide. He has extensive operations and P&L experience in technology businesses, has successfully led several growth businesses and turned struggling operators into industry and quality and performance leaders. McGara holds a Bachelor of Science degree in Industrial Engineering, from the Ohio State University and an MBA from University of Toledo.

Elida Voorbrood ("Voorbrood") is the ArmorWorks General Manager. Ms. Voorbrood joined ArmorWorks in April 2001 with over 18 years of experience in manufacturing. Prior to joining ArmorWorks, Voorbrood was an Industrial Engineer for several high profile companies, applying her manufacturing knowledge to processes that expanded from household products to apparel production in companies like Nike, Levi Strauss and Sunbeam-Oster. At Nike, she oversaw the implementation of an innovative "Pay for Performance" program for the company's Distribution Center facility. At Sunbeam-Oster, Voorbrood was responsible for full product and processes transferring as well as setting up new product assembly lines. Originally from Mexico, Ms. Voorbrood is a graduate of the Technological Institute of Matamoros-Mexico where she earned a Bachelor of Science degree in Industrial Engineering.

**G. Facilities.**

The majority of ArmorWorks' business operations are conducted from leased commercial space in Chandler and Tempe, Arizona. Until recently, ArmorWorks' primary facility, located at 305 N. 54th Street, Chandler, Arizona, housed the corporate headquarters, vehicle armor assembly, body armor, flat armor, and applied heat production facilities, as well as research and development. Additional research and development and storage facilities are located at 205 S. Beck Avenue, Chandler, Arizona.

Until February 2013, ShockRide's production facilities and research and development were located at 500 N. 54th Street, Chandler, Arizona. Effective February 1, 2013, in an effort to reduce operating costs, ArmorWorks surrendered the premises to the landlord and relocated the Shockride operations to 305 N. 54th Street. The lease for 500 N. 54th Street, Chandler, Arizona was rejected by the Debtors pursuant to the *Order Rejecting Lease Of Nonresidential Real Property Pursuant To 11 U.S.C. § 365 For Premises Located At 10 Chandler As Of The Petition Date* signed on 8/7/2013 (Dkt. 148).

ArmorWorks will attempt to negotiate a settlement of the remaining lease obligation with the landlord.

In an effort to further consolidate its facilities and reduce operating expenses, on September 6, 2013, the Debtors filed the *Motion to Reject Lease of Non-Residential Real Property Pursuant To 11 U.S.C. §365 for Premises Located At 305 N. 54th Street, Chandler, Arizona*. On November 25, 2013, the Bankruptcy Court entered an Order approving the rejection of the lease. [Dkt. 412]. Operations formerly conducted from 305 N. 54th Street are being relocated to other existing facilities.

TechFiber production facilities are located at 6955 South Priest, Tempe, Arizona. On October 25, 2013, the Debtors filed a *Motion to (I) Reject Lease Of Real Property Located at 6955 South Priest Drive Lease; and (II) Approve Lease Of Real Property Located at 901 E. Madison Ave*. On November 25, 2013, the Bankruptcy Court entered an Order approving the rejection of the lease. [Dkt. 413].

Mandall Barrier Works operates from a facility located at 7071 W. Frye Road, Chandler, Arizona.

ArmourWorks International Limited (AIL) leases commercial space located at 26 Bamel Way, Glouchester Business Park, Brockworth Glouchester GL3 4BH, United Kingdom. ArmorWorks Enterprises Canada, ULC leases commercial space located at Suite B2-8775 Jim Bailey Cresent, Kelowa, BC V4V 2L7, Canada.

**H.** **U.S. Government Regulations and Compliance.**

As a prime contractor and sub-contractor to the U.S. Government, ArmorWorks is subject to stringent government rules, regulations, and compliance. The primary regulatory requirements applicable to ArmorWorks are summarized below, although the discussion certainly is not exhaustive.

The Federal Acquisition Regulation (FAR) is the principal set of rules in the Federal Acquisition Regulation System. This system consists of sets of regulations issued by agencies of the Federal government of the United States to govern what is called the "acquisition process," that is, the process through which the government purchases goods and services. The FAR is codified in Title 48 of the United States Code of Federal Regulations.

The False Claims Act (31 U.S.C. §§ 3729–3733) (FCA) imposes liability on persons and companies (typically federal contractors) who defraud governmental programs. The FCA establishes liability when any person or entity improperly receives from, or avoids payment to, the Federal government (tax fraud is excepted).

The Truth in Negotiations Act (TINA) requires government contractors to submit cost or pricing data and to certify that such data is current, accurate and complete on the date of final agreement on price, commonly referred to as the "handshake." Compliance with TINA is an essential part of doing business with the U.S. Government.

International Traffic in Arms Regulations (ITAR) is a set of U.S. Government regulations that control the export and import of defense-related articles and services on the United States Munitions List (USML). The goal of ITAR is to safeguard U.S. national security and further U.S. foreign policy objectives.

In an effort to ensure continued compliance with all applicable government regulations, ArmorWorks has comprehensive government compliance procedures and programs, which include self-reporting requirements, annual reviews, and employee training programs.

### I.     Dispute with Minority Owner.

Over the past several years, Perciballi and AWI have been involved in litigation with C Squared and Anchor over, among other things, control of ArmorWorks. Perciballi and AWI contend that C Squared is a passive investor and that Anchor does not have co-

4042482v8/22420-0006

12

management authority over ArmorWorks. C Squared and Anchor contend that C Squared is not merely a passive investor and that Anchor does have co-management authority over ArmorWorks. All litigation and disputes between Perciballi and AWI, on one hand, and C Squared and Anchor, on the other hand, have been resolved pursuant to the C Squared Settlement, conditioned only on the confirmation of the Plan and AWI's payment of the C Squared Settlement Amount on or before the Effective Date of the Plan.

**J.    Financial Performance and Events Leading to Chapter 11 Restructuring.**

Historically, the independent certified public accounting firm of Mayer Hoffman McCann P.C. has audited the financial statements of ArmorWorks and its subsidiaries on a consolidated basis. ArmorWorks uses a calendar year accounting cycle.

In 2009, ArmorWorks and its subsidiaries had net income of $14,838,000 on total sales of $190,531,000. Sales declined materially in 2010, to $128,375,000, and ArmorWorks realized a net loss from operations of $11,475,000 based in large measure on a $20 million inventory write-off recorded by the company.

Sales increased dramatically in 2011 to $313,763,000 based in large measure on a $236,247,162 contract awarded to ArmorWorks in late 2010 by AM General for the production of upgraded armor for the U.S. Military's HMMWV fleet. The increased sales 2011 generated net income of $27,917,000 in 2011. ArmorWorks completed the AM General contract in 2011. ArmorWorks' record sales in 2011 enabled the company to pay-off substantially all of its secured debt, including a $40 million revolving line of credit from JPMorgan Chase, and approximately $3.0 million of secured equipment financing from Chase Equipment Financing.

Despite ArmorWorks strong performance in 2011, the business deteriorated substantially in 2012 tracking an industry-wide defense trend. ArmorWorks experienced a net loss of $9,988,000 on total sales of $100,229,000 in 2012. ArmorWorks' poor performance in 2012 in many ways mirrored that of the defense industry as a whole that

4042482v8/22420-0006

13

continues to suffer from the anticipated and actual implementation of sequestration; from a federal government that cannot agree on a budget; from military force reductions and planned pull-outs in both Iraq and Afghanistan; and from a general belief that defense spending will most likely decrease in the foreseeable future. In this environment, government funding simply is not flowing to military and defense contracts like it once did. For ArmorWorks, the slow-down has manifested itself in follow-on orders to its largest vehicle armor contract that have not materialized, seat programs being delayed or cancelled, and military demand for body armor plates virtually disappearing. As a result, ArmorWorks, like many other defense contractors, is restructuring and reducing the size of its operations.

However, despite the slowdown, ArmorWorks remains optimistic for the future and there are many positives. The company's core strength has been and will continue to be innovation. The company innovated from hard body armor to vehicle armor to seats and to soft protective under and over garments. ArmorWorks has a number of other new technologies and products in the queue. It is in a good market and resource position to continue innovating and delivering new solutions to customers for the long-run.

In the near-term, ArmorWorks continues to operate its business and prepare for the future. The company has contracts and continues to bid on new orders. The numbers are smaller than the company would like, but it does have business and there are prospects for profitable business in the short-term.

As of May 26, 2013, on a consolidated basis, ArmorWorks had total assets (at book value) of approximately $30,949,00 consisting of: (i) cash of $959,000, (ii) accounts receivable of $3,676,000, (iii) inventory of $8,608,000, (iv) other current assets of $889,000, (v) personal property and equipment of $12,054,000, (vi) intellectual property and intangibles assets of $1,188,000, and (vii) other assets of $3,575,000.

As of May 26, 2013, on a consolidated basis, ArmorWorks had total liabilities (at

book value) of approximately $12,040,000 consisting of: (i) trade accounts payable of $5,973,000, (ii) accrued expenses of $2,328,000, (iii) deferred revenue of $1,354,000, (iv) notes payable of $1,810,000, and (v) other long term liabilities of $575,000. More detailed information concerning the assets, liabilities, and financial condition of the Debtors may be found in the statement of financial affairs and schedules filed by each of the Debtors.

At the time the Bankruptcy Cases were filed, the Debtors believed that the debtor in possession financing would be sufficient to allow ArmorWorks to continue to operate and restructure its operations, including (i) divesting business units that no longer fit within the strategic framework of ArmorWorks' long-term plan; and (ii) reducing the companies' Arizona facilities footprint through the rejection of burdensome long-term leases.

## IV.
## POSTPETITION PROCEEDINGS AND EVENTS

**A.    Summary of Key Events Related to the Bankruptcy Cases.**

While more detailed information related to the events in the Bankruptcy Cases can be obtained by assessing the Bankruptcy Court's CM/ECF filing system and reviewing the pleadings filed in the jointly administered cases, the following is a summary of certain key bankruptcy-related proceedings and events associated with this Bankruptcy Cases.

1.    The Commencement of the Cases.

On June 17, 2013, the Debtors each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"). The Debtors continue in possession of their property and the management of their businesses as debtors-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed.

4042482v8/22420-0006

15

2. First Day Motions.

In order to efficiently administer the Chapter 11 case and accomplish a reorganization of the Debtors that should result in the payment in full of all creditors and equity holders, the Debtors immediately sought: (i) an order providing for the joint administration of the Chapter 11 cases of ArmorWorks and its subsidiaries; (ii) authorization to retain Gallagher & Kennedy, P.A. ("G&K") as the company's general bankruptcy and restructuring counsel; (iii) authorization to retain MCA Financial Group, Ltd. ("MCA") as the company's financial advisor; (iv) authorization to obtain up to $3.5 million of debtor in possession financing, including $875,000 on an emergency basis to fund cash shortfalls; (v) authorization to pay certain prepetition employee wages and continue to honor employee benefits in the ordinary course of business; and (vi) an order determining adequate assurance of payment for future utility services.

Accordingly, concurrent with the filing of their Chapter 11 petitions, the Debtors filed, for the Court's approval on an interim and final basis, a number of motions and applications (the "First Day Motions") that are necessary to enable the Debtors to operate in Chapter 11 with a minimum disruption and loss of productivity. The Debtors have sought approval of each of the First Day Motions as a critical element in achieving an efficient and successful reorganization of the companies. A description of each of the First Day Motions is provided below.

Motion for Joint Administration

The Debtors asked the Court to enter an Order transferring the assignment of the TechFiber case to the Judge assigned to the ArmorWorks' (lowest numbered) case and authorizing the joint administration of the Debtors' chapter 11 cases. Joint administration is necessary and appropriate to preserve judicial and estate resources, avoid duplication of efforts and reduce the time and expense associated with administering the Debtors' cases. The Court granted the request for joint administration on June 20, 2013. Dkt. #45.

<u>Applications For Authorization To Retain G&K And MCA</u>

The Debtors sought authorization to employ G&K and MCA as estate professionals (the "Professionals"). The C Squared Parties filed objections to the G&K and MCA Employment Applications, and a hearing was held on July 12, 2013. *See* Dkt. #26, 27, 65, 67, 136. The Court granted the G&K and MCA Employment Applications on July 16, 2013. Dkt. #113, 114.

<u>Motion To Approve Debtor in Possession Financing</u>

The Debtors did not have sufficient available sources of working capital to operate their businesses without working capital financing. Based on the Debtors' consolidated 13-week cash budget (the "Budget"), the Debtors were likely to run out of cash in the short term causing immediate and irreparable harm to the Debtors and their estates. A copy of the Budget is on file with the Court and was updated throughout the case.

With the assistance of MCA Financial, the Debtors actively sought working capital financing for several months to assist the company through the current industry-wide economic slowdown. Subject only to Bankruptcy Court approval, prepetition the Debtors and Lancelot Armor, LLC, an Arizona limited liability company ("Lender"), executed a Senior Secured Super-Priority Debtor-In-Possession Credit And Security Agreement (the "Credit Agreement") pursuant to which Lender agreed to provide up to $3.5 million of debtor in possession financing to the Debtors (the "DIP Financing").

The C Squared Parties objected to the DIP Financing, and the Court held an evidentiary hearing on July 12, 2013. *See* Dkt. #136. Subsequent to the hearing, the parties reached a resolution to the pending objections, and a stipulated form of order was entered by the Court approving the DIP Facility on a final basis. Dkt. #119.

<u>Motion to Pay Prepetition Employee Wages, Salaries and Benefits</u>

To minimize the personal hardship that employees would suffer if pre-petition employee-related obligations were not paid when due and to maintain morale of the

4042482v8/22420-0006

17

Debtors' workforce during the Bankruptcy Cases, the Debtors sought, on an emergency basis, the entry of an interim order and a final order authorizing the Debtors: (a) to pay and honor certain pre-petition claims that remain outstanding as of the petition date for, among other things, (i) wages, salaries and other compensation, (ii) federal and state withholding taxes and other amounts withheld or deducted (e.g., employees' share of health insurance premiums), and (iii) reasonable and customary business expenses that are reimbursable by the Debtors under company policy; and (b) to pay and honor certain pre-petition claims that remain outstanding as of the petition date related to (i) employee health benefits, (ii) insurance benefits, and (iii) other employee benefits that the Debtors have historically paid in the ordinary course of business. In addition, the Debtors sought an order authorizing and directing banks and other financial institutions to receive, process, honor, and pay all checks presented for payment and electronic payments related to the employee obligations and benefits.

The C Squared Parties filed a limited objection to the wage motion. Dkt. #28. The Court granted the Motion to Pay Prepetition Employee Wages, Salaries and Benefits on June 20, 2013. Dkt. #47.

<u>Motion For An Order Determining Adequate Assurance Of Payment For Future Utility Services</u>

As of the Petition Date, the Debtors used the following utility providers for services essential to the business: (1) mobile telephone – AT&T and Verizon; (ii) electric – SRP; (iii) trash disposal – Waste Management; (iv) telephone – Century Link and Avaya, Inc.; and (v) water/sewer – City of Chandler. ArmorWorks does not have deposits with any of its utility providers. Over the years all deposits were refunded based on the company's good payment history and financial stability.

The Debtors sought, on an emergency basis, the entry of an interim order and a final order: (a) finding that the Debtors' utility providers have been provided with adequate assurance of payment within the meaning of Bankruptcy Code §366, pending

4042482v8/22420-0006

18

the entry of a final order; (b) prohibiting the utility providers from altering, refusing, or discontinuing services on account of pre-petition amounts outstanding or the commencement of this case; and (c) determining that the Debtors are not required to provide any additional adequate assurance beyond what is proposed in the motion. Further, the utility motion sought immediate entry of an order granting the utility motion on an interim basis.

As adequate assurance of future payment, and in lieu of providing any utility deposits, the Debtors proposed that they pay, and requested authority to pay, all pre-petition amounts owed to its utility providers in the ordinary course of business. The relief requested in the utility motion was necessary because uninterrupted utility services were critical to the Debtors' continued business operations. If utility companies ceased providing service, the Debtors' business and estate would have been severely damaged, jeopardizing their reorganization efforts.

The C Squared Parties filed a limited objection to the utility motion. Dkt. #29. The Court granted the Motion For An Order Determining Adequate Assurance Of Payment For Future Utility Services on June 20, 2013. Dkt. #48.

3. Official Committee of Unsecured Creditors.

The United States Trustee appointed an Official Joint Committee of Unsecured Creditors (the "Committee") and the Committee retained counsel and financial advisors in the Bankruptcy Case pursuant to the following pleadings:

- Appointment of Official Creditors' Committee (Joint Committee) (Dkt. 83);
- Application to Employ Counsel for the Official Joint Committee of Unsecured Creditors (Dkt. 97);
- Order Authorizing Employment of Counsel for the Official Joint Committee of Unsecured Creditors (Dkt. 111);

- Application to Employ Sierra Consulting Group, LLC as Financial Advisor to the Official Joint Committee of Unsecured Creditors (Dkt. 123);
- Order Authorizing the Employment and Retention of Sierra Consulting Group as Financial Advisor to the Official Joint Committee of Unsecured Creditors (Dkt. 130); and
- Amended Appointment of Official Creditors' Committee (Dkt. 154).

4.    <u>Motion to Employ Ordinary Course Professionals.</u>

On August 3, 2013, the Debtors filed the First Application To Employ Professionals And Consultants Used By The Debtors In The Ordinary Course Of Business ("Employment Application"). Dkt. #143.

The Employment Application was filed pursuant to 11 U.S.C. §§ 105, 327(e), and 1108, requesting an order authorizing the Debtors to employ certain professionals and consultants used in the ordinary course of business. An objection to the Employment Application was filed by the C Squared Parties on August 13, 2013. Dkt. #151. A hearing was held on an expedited basis on August 29, 2013. *See* Dkt. #161. The Court overruled the objections and approved the Employment Application as amended at the hearing. *See* Dkt. #178.

5.    <u>Motion to Authorize Intercompany Loan.</u>

On August 19, 2013, the Debtors filed the Verified Emergency Motion To Authorize Intercompany Loan To ArmorWorks Enterprises Canada, ULC (the "Loan Motion"). Dkt. #158. The Loan Motion was filed pursuant to 11 U.S.C. §§ 105 and 363(b), requesting an order authorizing ArmorWorks to make a $500,000 secured loan to ArmorWorks Enterprises Canada, ULC ("AW Canada") for working capital purposes and to preserve the going concern value of the business. The C Squared Parties filed a response, and a hearing was held on an expedited basis on August 29, 2013. *See* Dkt. #161; 172. The Court approved the Loan Motion. Dkt. #176.

On June 16, 2014, the Debtors filed the Verified Emergency Motion For Interim And Final Orders: (I) Approving Second Forbearance Agreement And Third Amendment To Dip Credit Agreement; (II) Authorizing A New Advance Under Dip Facility; (III) Authorizing Additional Funding By The Debtors To ArmorWorks Enterprises Canada, ULC; And (IV) Granting Related Relief (the "Second Loan Motion").  Dkt. #649.   The Second Loan Motion requested an order, among other things, authorizing a new advance under the DIP Facility and authorizing the Debtors to loan up to an additional $550,000 to AW Canada.

        6.      Motion to Employ Houlihan Lokey Capital, Inc.

On September 6, 2013, the Debtors filed the *Application For An Order Approving The Employment Of Houlihan Lokey Capital, Inc. As Debtors' Investment Banker* (Dkt. 186) to pursue a Transaction for the sale of the assets or equity interests of the Debtors under the Plan.  The C Squared Parties filed an objection to the employment of Houlihan Lokey (Dkt. 191).  By Order entered October 18, 2013, the Court approved the employment of Houlihan Lokey (Dkt. 319).

        7.      Filings by C Squared and Anchor Management.

C Squared and Anchor Management have objected to these proceedings and have filed a number of pleadings in the Bankruptcy Case, including:

- Emergency Motion to Dismiss Case /Emergency Motion to Dismiss or, in the Alternative, to Abstain (Dkt. 39);
- Reply in Support of Emergency Motion to Dismiss or, in the Alternative, to Abstain (Dkt. 89);
- Motion in Limine to Preclude Debtors from Offering SBA Final Determination and Related Exhibits and Testimony (Dkt. 90); and
- Emergency Motion to Appoint Trustee (Dkt. 195).

The Debtors filed the following pleadings in response to the motion to dismiss and

4042482v8/22420-0006

21

motion to appoint Chapter 11 Trustee:

- Declaration of Morris C. Aaron, MCA Financial Group, Ltd. (Dkt. 71);
- Response in Opposition to Emergency Motion to Dismiss or, in the Alternative, to Abstain (Dkt. 73);
- Appendix in Support of Response in Opposition to Emergency Motion to Dismiss or, in the Alternative, to Abstain (Dkt. 74 & 75);
- Prehearing Statement of the Debtors Re: Dismissal Motion of C Squared Parties and Request for Entry of Order and Notice of Lodging Proposed Order (Dkt. 79);
- Debtors': (I) Reply In Further Support Of Request For Entry Of Procedures Order; (II) Response To Cross-Motion To Continue Hearing On The Applications To Employ Gallagher & Kennedy, P.A. And MCA Financial Group, Ltd.; And (III) Proposed Agenda For July 12, 2013 Hearing (Dkt. 84); and
- Response To C Squared Parties Motion In Limine To Preclude Debtors From Offering SBA Final Determination And Related Exhibits And Testimony (Dkt. 95).
- Preliminary Response in Opposition to Emergency Motion to Appoint Chapter 11 Trustee (Dkt. 228).

    8.    Joint Motion for Approval of Governance Protocol for Sale and Non-Ordinary Course Transactions.

On September 18, 2013, the Debtors and the Committee filed a *Joint Motion for Approval of Governance Protocol for Sale and Non-Ordinary Course Transactions and Retention Grant Lyon as Independent Debtor Representative* (the "Sale Protocol Motion") (Dkt. 226). The C Squared Parties objected to the Sale Protocol Motion (Dkt. 254). On October 4, 2013, the Court read its decision on the record granting the Sale

22

Protocol Motion (Dkt. 282). On October 7, 2013, the Court entered the *Order Granting Joint Motion for Approval of Governance Protocol for Sale and Non-Ordinary Course Transactions, and Retention of Grant Lyon as Independent Debtor Representative* (Dkt. 291). On December 19, 2013, the Court entered the *Stipulated Order Amending And Clarifying Governance Protocol For Sale And Non-Ordinary Course Transactions, And Retention Of Grant Lyon As Independent Debtor Representative* [Docket 452].

9. <u>The Houlihan Lokey Sale Process.</u>

The Debtors, with the assistance of Houlihan Lokey and the Independent Debtor Representative, extensively marketed the assets and business of the Debtors and the non-debtor subsidiaries of ArmorWorks in the hopes of completing a going concern sale as a means of resolving the Bankruptcy Cases. In an effort to facilitate a sale of the business, the Debtors, the Committee, C Squared, Anchor, AWI, and Perciballi filed the *Third Amended Joint Plan Of Reorganization Dated December 16, 2013* [Dkt. 442] and the *Third Amended Disclosure Statement In Support Of Third Amended Joint Plan Of Reorganization* [Dkt. 443]. The plan provided a mechanism for the sale of ArmorWorks' business, either through a sale substantially all of the assets of the Debtors free and clear of liens, claims and interests, or through a sale of the equity in the Reorganized Debtors, and the distribution of the proceeds to creditors and equity holders. On December 30, 2014, the Court entered the *Order (1) Approving Disclosure Statement; (2) Fixing Time For Accepting Or Rejecting The Plan; And (3) Setting Initial Confirmation Hearing And Objection Deadline* [Dkt. 467].

On January 8, 2014, the Debtors filed the *Debtors Motion For Orders: (1) Approving A Sale Of Debtors Assets Free And Clear Of Liens, Claims And Interests, Or An Equity Sale Under Third Amended Joint Plan Of Reorganization, (2) Approving Assumption And Assignment Of Unexpired Leases And Executory Contracts, (3) Approving Certain Bid And Auction Procedures, (4) Setting Date And Time For Hearing*

4042482v8/22420-0006

23

*On Proposed Sale, And (5) Approving Form And Notice Of Auction And Sale Hearing* [Dkt. 472]. And on January 18, 2014, the Court entered the *Order Establishing Bid Procedures, Setting Date And Time Of Sale Hearing, And Setting Related Deadlines* [Dkt. 492] (the "Sale Procedures Order").

Under the terms of the Sale Procedures Order, the deadline for potential bidders to submit bids in connection with the proposed sale was February 7, 2014. The Debtors did not receive any qualified bids by the bid deadline. As a result, on February 19, 2014, the Debtors filed the *Notice Of: (I) Withdrawal Of Sale Motion; And (II) Suspension Of Certain Deadlines Related To Third Amended Joint Plan Of Reorganization Dated December 16, 2013* [Dkt. 546].

10.     Negotiations Leading to Current Plan.

After the Houlihan Sale Process failed to generate any qualified bids, C Squared and AWI executed the Settlement and Release Agreement dated May 14, 2014 (the "C Squared Settlement"). A true and correct copy of the C Squared Settlement is attached hereto as Exhibit "E". Additionally, the Plan Proponents and Diversis Capital, LLC executed an *ArmorWorks Enterprises, LLC Restructuring Plan Funding Term Sheet* dated May 23, 2014 (the "Plan Funding Term Sheet"), a copy of which is attached hereto as Exhibit "F". Pursuant to the terms of the Plan Funding Term Sheet, in exchange for 100% of the equity interests in reorganized AWE, Investor shall: (a) contribute $3,000,000 in cash to AWE for payment of claims and administrative expenses; (b) cause Perciballi and AWI to contribute to Reorganized AWE all intellectual property used in the businesses of the Debtors that is owned or controlled by Perciballi or AWI; and (c) fund the payment of certain obligations of AWI ((a) and (b) together, the "Plan Contributions"). Also on the Effective Date, (d) Investor shall contribute the equity interests in Reorganized AWE to AWI, along with certain cash, and will receive 67.566.9% of the common equity and 100% of the class A preferred

24

equity in AWI; (e) Perciballi shall receive ~~22.5~~23.1% of the common equity in AWI; and (f) 10% of the common equity in AWI shall be reserved for a management bonus pool ((a) through (f), collectively, the "Corporate Restructuring Transactions"). Concurrent with the closing of the Corporate Restructuring Transactions, Perciballi will receive additional funds from Investor ~~to: (i) fund in full the C Squared Settlement; (ii) fund the purchase of the intellectual property owned by AWI and/or Perciballi being contributed to Reorganized AWE in the Corporate Restructuring Transactions; (iii) repay working capital loans made by Perciballi to ArmorWorks Canada; and (iv) fund other items.~~ as more particularly described in Exhibit "G" attached hereto.

MORE DETAILED AND UPDATED INFORMATION REGARDING POST-PETITION EVENTS IN THE BANKRUPTCY CASE CAN BE OBTAINED BY ACCESSING THE DOCKET IN THE BANKRUPTCY CASE ON PACER: https://ecf.azb.uscourts.gov/cgi-bin/DktRpt.pl?122083397291529-L_1_0-1.

## V.
## FINANCIAL INFORMATION

During the Bankruptcy Case, the Debtors prepared and have continually updated a 15 Week Cash Budget. A copy of the most recent budget is attached hereto as Exhibit "B". The Debtors long-term projections in support of the Plan are attached hereto as Exhibit "C". ADDITIONAL FINANCIAL INFORMATION REGARDING THE DEBTORS CAN BE FOUND IN THE BANKRUPTCY SCHEDULES AND STATEMENT OF FINANCIAL AFFAIRS FILED BY EACH OF THE DEBTORS, AND IN THE DEBTORS' MONTHLY OPERATING REPORTS FILED IN THE BANKRUPTCY CASES BY ACCESSING THE DOCKET IN THE BANKRUPTCY CASE ON PACER: https://ecf.azb.uscourts.gov/cgi-bin/DktRpt.pl?122083397291529-L_1_0-1.

4042482v8/22420-0006

25

**VI.**
**SOURCES OF INFORMATION**

The financial information contained in this Disclosure Statement is derived the Formatted: No widow/orphan control books and records of the Debtors. The information contained in this Disclosure Statement represents the Debtors' best estimate in light of current market conditions and past experience. All the information provided is subject to change and represents the best information available at the time, the actual results may differ. The accounting and financial information provided by the Debtors is based on Generally Accepted Accounting Principles ("GAAP") and the calculations were prepared by the Debtors' accountants and professionals.

**VII.**
**SUMMARY OF THE PLAN**

The following provides a summary of the overall structure and classification of claims against or interests in the Debtors and is qualified in its entirety by reference to the Plan, which is attached as Exhibit "A". The statements in this Disclosure Statement include summaries of the provisions contained in the Plan. This summary does not purport to be a complete statement of all terms in the Plan, and reference is made to the Plan for the full and complete statement of such terms. The Plan controls the treatment of Claims against and Member Equity Interest in the Debtors and other parties-in-interest. Where Claims are divided into subclasses in the Plan, each subclass will be considered to be a separate class for all confirmation purposes, including treatment and voting on the Plan.

**A.      Classification and Treatment of Claims and Member Equity Interests.**

The Plan classifies Claims and Member Equity Interests in various Classes according to their right to priority of payments as provided in the Bankruptcy Code. The Plan states whether each Class of Claims or Member Equity Interests are impaired or unimpaired. The Plan provides the treatment each Class will receive under the Plan. In accordance with the requirements of the Bankruptcy Code, Allowed Administrative

4042482v8/22420-0006

26

Expense Claims and Priority Tax Claims are not set forth in Classes and are not entitled to vote on the Plan.  The Allowed Claims ~~and Equity Securities~~ against the Debtors' Estates are divided into the following classes:

     a.    <u>Class 1 (Priority Non-Tax Claims).</u>  Class 1 consists of any Priority Non-Tax Claims against the Debtors existing as of the Confirmation Date.

     b.    <u>Class 2 (Secured Tax Claims).</u>  Class 2 consists of any Secured Tax Claims against the Debtors existing as of the Confirmation Date.

     c.    <u>Class 3 (Secured Claims).</u>  Class 3 consists of any Secured Claims against any of the Debtors, except Secured Tax Claims.

            a.    <u>Class 3(a) (Secured Claim of US Bank)</u>
            b.    <u>Class 3(b) (Other Secured Claims)</u>

     d.    <u>Class 4 (ArmorWorks General Unsecured Claims).</u>  Class 4 consists of all General Unsecured Claims against ArmorWorks.

            a.    <u>Class 4(a) (Cash Out Option).</u>
            b.    <u>Class 4(b) (Full Payment Option).</u>

     e.    <u>Class 5 (TechFiber General Unsecured Claims).</u>  Class 5 consists of all General Unsecured Claims against TechFiber.

            a.    <u>Class 5(a) (Cash Out Option).</u>
            b.    <u>Class 5(b) (Full Payment Option).</u>

     f.    <u>Class 6 (Member Equity Interests In ArmorWorks).</u>  Class 6 consists of the Member Equity Interests in ArmorWorks.

     g.    <u>Class 7 (ArmorWorks' Member Equity Interest in TechFiber).</u>  Class 7 consists of the 100% Member Equity Interest of ArmorWorks in TechFiber.

     h.    <u>Class 8 (Subsidiary General Unsecured Claims).</u>  Class 8 consists of all General Unsecured Claims asserted by any Subsidiary against the Debtors.

**B.**    <u>**Summary of Treatment for Claims Not Impaired Under the Plan.**</u>

     1.    <u>DIP Obligations.</u>  Unless paid sooner, or a different treatment is consented to in writing by a particular DIP Lender, the DIP Obligations shall be paid in full and in cash on the Effective Date before the payment of any other Claims against the Debtors, other than Vendor Administrative Claims.  Any dispute regarding the amount of any

Formatted: Justified

DIP Obligations shall be resolved by the Bankruptcy Court on an expedited basis prior to the occurrence of the Effective Date. Notwithstanding anything to the contrary contained in the Plan or the Confirmation Order, the terms of the DIP Orders and all liens granted to DIP Lenders shall survive and shall remaining binding and enforceable until the DIP Obligations have been fully paid. Upon payment in full of the DIP Obligations, all liens granted to the DIP Lenders shall be deemed fully and forever released and discharged.

2. <u>Administrative Expense Claims.</u> Every Creditor holding an Allowed Administrative Expense Claim against the Debtors will be paid, in full satisfaction of their Allowed Claim, after the payment in full of the DIP Obligations: (a) fully and in Cash on or before ten (10) Business Days after the Effective Date if the Claim is then an Allowed Claim; (b) fully and in Cash within ten (10) Business Days after the entry of a Final Order allowing the Claim, if the Claim is not an Allowed Claim as of the Effective Date; (c) as otherwise agreed in writing by the Creditor holding the Allowed Administrative Expense Claim and the Debtors; or (d) as otherwise ordered by the Bankruptcy Court. Allowed Administrative Expense Claims are unimpaired pursuant to the Plan and votes to accept or reject the Plan will not be solicited from Creditors holding Allowed Administrative Expense Claims.

3. <u>Vendor Administrative Claims.</u> The post-petition expenses owed to Vendors will be paid as they are incurred in the ordinary course of business. Any amounts outstanding as of the Effective Date will be paid in full on the later of the Effective Date, or in the ordinary course of the Debtors' business. Vendor Administrative Claims are unimpaired pursuant to the Plan and votes to accept or reject the Plan will not be solicited from Creditors holding Vendor Administrative Claims.

4. <u>U.S. Trustee Fees.</u> All fees payable pursuant to section 1930 of Title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation

4042482v8/22420-0006

28

Hearing, shall be paid within ten (10) Business Days after the Effective Date, or as due in the normal course of billing and payment. The Reorganized Debtors shall be responsible for timely payment of fees incurred pursuant to 28 U.S.C. § 1930(a)(6). The Reorganized Debtors or the AWE Liquidating Trust, as applicable, shall file with the Bankruptcy Court, and serve on the United States Trustee, a quarterly financial report for each quarter (or portion thereof) that the cases remain open in a format prescribed by the United States Trustee and provided to the Debtor by the United States Trustee, and shall pay such quarterly fees as become due for each quarter post-confirmation that the cases remain open. No motion or application is required to fix fees payable to the Clerks' Office or the Office of the United States Trustee, as those fees are determined by statute.

     5.    <u>Administrative Bar Date</u>. Requests for payment of Administrative Expenses, other than the DIP Obligations, Vendor Administrative Claims and Professional Fee Claims, must be filed and served pursuant to any procedures set forth in the Confirmation Order or notice of entry of the Confirmation Order, no later than thirty (30) days after the Effective Date.

     6.    <u>Professional Fee Claims</u>. The Bankruptcy Court must approve all requests for the payment of professional compensation and expenses to the extent incurred on or before the Effective Date. Each Professional Person requesting compensation or reimbursement of expenses in the Cases pursuant to Sections 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code shall file an application for allowance of final compensation and reimbursement of expenses not later than thirty (30) days after the Effective Date. Nothing herein shall prohibit each Professional Person from requesting interim compensation during the course of the Case pending Confirmation of this Plan. All fees, costs and disbursements of Professional Persons not heretofore paid through the Effective Date of the Plan, shall be paid fully and in Cash on the later of the Effective

Case 2:13-bk-10332-BMW    Doc 656-1    Filed 06/17/14    Entered 06/17/14 19:06:12
Desc Exhibit A (redline disclosure statement)    Page 29 of 72

Date or within ten (10) Business Days after the entry of a Final Order allowing the Claim.

7.  <u>Priority Tax Claims.</u>  Priority Tax Claims are certain pre-Petition Date unsecured income, employment and other taxes described by Section 507(a)(8) of the Bankruptcy Code.  To the extent Allowed Priority Tax Claims exist on the Effective Date, holders of Allowed Priority Tax Claims will be paid:  (a) fully and in Cash on or before ten (10) Business Days after the Effective Date if the Claim is then an Allowed Claim; or (b) fully and in Cash within ten (10) Business Days after the entry of a Final Order allowing the Claim, if the Claim is not an Allowed Claim as of the Effective Date. Priority Tax Claims will be allowed in the principal amount of the tax due as of the Petition Date, with interest at the applicable statutory rate in accordance with section 511 of the Bankruptcy Code.  No amounts attributable to penalties imposed or sought to be imposed by holders of Priority Tax Claims will be paid.  Priority Tax Claims are unimpaired pursuant to the Plan and votes to accept or reject the Plan will not be solicited from Creditors holding Priority Tax Claims.

8.  <u>Class 1 (Priority Non-Tax Claims).</u>  To the extent Allowed Priority Non-Tax Claims exist on the Effective Date, holders of Allowed Priority Non-Tax Claims will be paid:  (a) fully and in Cash on or before ten (10) Business Days after the Effective Date if the Claim is then an Allowed Claim; or (b) fully and in Cash within ten (10) Business Days after the entry of a Final Order allowing the Claim, if the Claim is not an Allowed Claim as of the Effective Date.  Class 1 Claims are unimpaired under the Plan, and the holders of Class 1 Claims are not entitled to vote on the Plan.

9.  <u>Class 7 (ArmorWorks' Member Equity Interest in TechFiber).</u>  The 100% Member Equity Interest of ArmorWorks in TechFiber shall be an Allowed interest under the Plan.  ArmorWorks shall retain its Member Equity Interest in TechFiber, as reorganized under the Plan.  Class 7 Interests are unimpaired under the Plan, and holders

4042482v8/22420-0006

30

[Formatted: Justified, Outline numbered + Level: 3 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 0.56" + Tab after: 1.06" + Indent at: 0.06"]

of Class 7 Interests are not entitled to vote on the Plan.

**C.** **Summary of Treatment of Impaired Classes.**

1. Class 2 (Secured ~~Tax~~ Claims). ~~The Debtors do not believe there are any~~ Class ~~2~~ Claims consists of all Secured ~~Tax~~ Claims against the Debtors ~~existing as of the Petition Date.~~for 2012 and 2013 real or personal property taxes. Holders of Allowed Class 2 ~~Secured~~ Claims~~, if any,~~ will retain their ~~prepetition~~ liens on the Property that serves as security for repayment of Allowed Class 2 Claims. In the discretion of the Reorganized Debtors, Allowed Class 2 claims, including post-petition interest in ~~their collateral.~~accordance with 11 U.S.C. § 511 and A.R.S. § 42-18053, will be paid (a) in full within ten (10) Business Days after the later of the Effective Date or the date the Claim is Allowed, or (b) in full within five (5) years of the Petition Date through regular equal monthly payments of principal and interest. Class 2 Claims are impaired and the holders of Class 2 Claims are entitled to vote to accept or reject the Plan.

2. Class 3 (Secured Claims). Each Claimant holding an Allowed Class ~~2~~3 Secured Claim will be placed in a separate sub-class of Class ~~2~~3 for the purposes of voting on the Plan and the treatment of their respective Claims under the Plan. Other than the Class 3(a) Secured Claim of US Bank, the Debtors do not believe there are any Class 3 Secured Claims against the Debtors existing as of the Petition Date.

**Class 3(a) (Secured Claim of US Bank).** US Bank asserts a Secured Claim in the amount of $1,600. Holders of Allowed Class 3(a) Secured Claims will retain their prepetition liens in their collateral. Any Allowed Class 3(a) Secured Claim of US Bank will be paid in full within one hundred and eighty (180) days after the later of the Effective Date or the date the Claim is Allowed, with interest from and after the Effective Date at the rate of 3.25% simple interest per annum. No default interest or other penalties will be paid to holders of

Allowed Class 3(a) Secured Claims.  Class 3(a) Secured Claims are impaired, and the holders of Class 3(a) Claims are entitled to vote to accept or reject the Plan.

1. **Class 3(b) (Other Secured Claims).**  Holders of Allowed Class 3(b) Secured Claims, if any, will retain their prepetition liens in their collateral.  In the discretion of the Reorganized Debtors, Allowed Class 23(b) Secured Claims shall be satisfied as follows:  (a) through the abandonment or transfer of the collateral to the secured creditor within ten (10) Business Days after the later of the Effective Date or the allowance of the Claim, in which case the Claimant shall have the right to assert a General Unsecured Claim paid under Class 4 or 5, as applicable, for any deficiency to the extent allowable by applicable non-bankruptcy law; or (b) any prepetition default under the applicable contract and security documents will be cured on the Effective Date and regular payments will be made to the holder of the Allowed Class 3(b) Secured Claim after the Effective Date in accordance with the applicable contract; or (c) the Allowed Class 23(b) Secured Claim will be paid in full within ten (10) Business Days after the later of the Effective Date or the date the Claim is Allowed, with interest from and after the Effective Date at the greater of the non-default contract rate of interest or 3.25% simple interest per annum.  No default interest or other penalties will be paid to holders of Allowed Class 23(b) Secured Claims.  Class 23(b) Secured Claims are impaired, and the holders of Class 23(b) Claims are entitled to vote to accept or reject the Plan.

2. Class 3 (Secured Tax Claims).  Class 3 Claims consists of all Secured Tax Claims against the Debtors for 2012 and 2013 real or personal property taxes.  Holders of Allowed Class 3 Claims will retain their liens on the Property that serves as security for repayment of Allowed Class 3 Claims.  In the discretion of the Reorganized Debtors, Allowed Class 3 claims, including post-petition interest in accordance with 11 U.S.C. § 511 and A.R.S. § 42-18053, will be paid (a) in full within ten (10) Business Days after

the later of the Effective Date or the date the Claim is Allowed, or (b) in full within five (5) years of the Petition Date through regular equal monthly payments of principal and interest. Class 3 Claims are impaired and the holders of Class 3 Claims are entitled to vote to accept or reject the Plan.

3. Class 4 (ArmorWorks Unsecured Claims). Class 4 consists of all Unsecured Claims against ArmorWorks. Holders of Allowed Class 4 Claims may elect Option A or Option B below for the payment of theiron the Ballot to be placed and treated in sub-class Class 4(a) or will, absent the election, be automatically placed in subclass Class 4(b) below. Each of sub-class Class 4(a) and Class 4(b) will vote to accept or reject the Plan and the votes in each sub-class to either accept or reject the Plan will be determined pursuant to Bankruptcy Code § 1126(c). The Holder of an Allowed Class 4 Claim will receive the following in payment for such Allowed Class 4 Claim:

Class 4(a) (Cash Out Option A:): In full and final satisfaction of its Allowed Class 4(a) Claim, the holder who elects to be included in Class 4(a) will be paid a lump sum cash payment equal to 2030% of its Allowed Class 4(a) Claim on the later of (i) ten (10) Business Days after the Effective Date, if the Claim is then an Allowed Claim; or (ii) ten (10) Business Days after the entry of a Final Order allowing the Claim, if the Claim is not an Allowed Claim as of the Effective Date. Class 4(a) Claims are impaired, and the holders are entitled to vote to accept or reject the Plan.

Class 4(b) (Full Payment Option B:): Allowed Class 4(b) Claims will accrue interest from and after the Effective Date at the rate of 2% per annum simple interest. In full and final satisfaction of its Allowed Class 4(b) Claim, the holder will be paid the full amount of its Allowed Class 4(b) Claim in five annual partial distributions beginning on the first anniversary of the Effective Date as follows: on the first anniversary of the Effective Date, 5% of the Allowed Class 4(b) Claim, plus accrued interest, shall be paid;

4042482v8/22420-0006

33

on the second anniversary of the Effective Date, 10% of the Allowed Class 4(b) Claim, plus accrued interest, shall be paid; on the third anniversary of the Effective Date, 20% of the Allowed Class 4(b) Claim, plus accrued interest, shall be paid; on the fourth anniversary of the Effective Date, 30% of the Allowed Class 4(b) Claim, plus accrued interest, shall be paid; and on the fifth anniversary of the Effective Date, 35% of Allowed Class 4(b) Claim, plus accrued interest, shall be paid. In each case, the distribution shall be made on the later of the distribution date or the date that is ten (10) Business Days after the entry of a Final Order allowing the Claim.

Class 4(b) Claims are impaired, and the holders are entitled to vote to accept or reject the Plan.

4. Class 5 (TechFiber Unsecured Claims). Class 5 consists of all Unsecured Claims against TechFiber. ~~Holders of Allowed Class 5 Claims may elect Option A or Option B below for the payment of their~~Holders of Allowed Class 5 Claims may elect on the Ballot to be placed and treated in sub-class Class 5(a) or will, absent the election, be automatically placed in subclass Class 5(b) below. Each of sub-class Class 5(a) and Class 5(b) will vote to accept or reject the Plan and the votes in each sub-class to either accept or reject the Plan will be determined pursuant to Bankruptcy Code § 1126(c). The Holder of an Allowed Class 5 Claim will receive the following in payment for such Allowed Class 5 Claim:

Class 5(a) (Cash Out Option ~~A:~~): In full and final satisfaction of its Allowed Class 5(a) Claim, the holder who elects to be included in Class 5(a) will be paid a lump sum cash payment equal to ~~20~~30% of its Allowed Class 5(a) Claim on the later of (i) ten (10) Business Days after the Effective Date, if the Claim is then an Allowed Claim; or (ii) ten (10) Business Days after the entry of a Final Order allowing the Claim, if the Claim is not an Allowed Claim as of the

4042482v8/22420-0006

34

Formatted: Normal, Justified, Indent: Left: 0.5", First line: 0.5", Line spacing: Exactly 24 pt

Formatted: Normal, Justified, Indent: Left: 0.5", First line: 0.5", Line spacing: Exactly 24 pt

Effective Date.  Class 5(a) Claims are impaired, and the holders are entitled to vote to accept or reject the Plan.

**Class 5(b) (Full Payment Option B.):**  Allowed Class 5(b) Claims will accrue interest from and after the Effective Date at the rate of 2% per annum simple interest.  In full and final satisfaction of its Allowed Class 5(b) Claim, the holder will be paid the full amount of its Allowed Class 5(b) Claim in five annual partial distributions beginning on the first anniversary of the Effective Date as follows: on the first anniversary of the Effective Date, 5% of the Allowed Class 5(b) Claim, plus accrued interest, shall be paid; on the second anniversary of the Effective Date, 10% of the Allowed Class 5(b) Claim, plus accrued interest, shall be paid; on the third anniversary of the Effective Date, 20% of the Allowed Class 5(b) Claim, plus accrued interest, shall be paid; on the fourth anniversary of the Effective Date, 30% of the Allowed Class 5(b) Claim, plus accrued interest, shall be paid; and on the fifth  anniversary of the Effective Date, 35% of Allowed Class 5(b) Claim, plus accrued interest, shall be paid.  In each case, the distribution shall be made on the later of the distribution date or the date that is ten (10) Business Days after the entry of a Final Order allowing the Claim.

Class 5(b) Claims are impaired, and the holders are entitled to vote to accept or reject the Plan.

5.      Class 6 (Member Equity Interests in ArmorWorks).  The Member Equity Interests in ArmorWorks shall be extinguished under the Plan on the Effective Date. Class 6 Member Equity Interests are impaired under the Plan, and holders of Class 6 Interests are deemed to reject the Plan pursuant to Section 1126(g) of the Bankruptcy Code.

6.      Class 8 (Subsidiary General Unsecured Claims).  Class 8 consists of all General Unsecured Claims asserted by any Subsidiary against the Debtors.  All Class 8 Claims shall be deemed settled and compromised on the Effective Date on account of

the benefits the Subsidiaries will realize as a result of the reorganization of ArmorWorks pursuant to the terms of the Plan.  Class 8 Subsidiary General Unsecured Claims are impaired under the Plan, but will be deemed to accept the Plan.

**D.**     **Treatment of Executory Contracts and Unexpired Leases.**

1.     The Plan contemplates and provides for the assumption and/or assignment, as of the Effective Date, pursuant to Section 365 of the Bankruptcy Code, of any and all Executory Contracts and Unexpired Leases of the Debtors which are in force on the Effective Date, except (i) those Executory Contracts and Unexpired Leases which are specifically rejected pursuant to an order of the Bankruptcy Court prior to the Effective Date, and (ii) those Executory Contracts and Unexpired Leases listed on the Schedule of Rejected Contracts attached thereto (or on any amendment to the Schedule of Rejected Contracts filed on or before the Confirmation Date).  The Debtors will reject the License Agreement between ArmorWorks and Perciballi for the licensing of certain intellectual property held or controlled by Perciballi.  Pursuant to the transaction between the Investor and Perciballi and AWI, the intellectual property which is subject to the license will be contributed by Perciballi to ArmorWorks.  Perciballi will not assert any claim against the Debtors for rejection of the license agreement.  The Debtors, with the consent of the Plan Proponents, shall have the right, at any time prior to the Confirmation Date, to amend the Contract Schedules to provide for the assumption or rejection of an Executory Contract or Unexpired Lease pursuant to this Section 9.1.1 of the Plan.

2.     The Confirmation Order (except as otherwise provided therein) shall constitute an order of the Bankruptcy Court pursuant to Section 365 of the Bankruptcy Code, effective as of the Effective Date, approving the assumptions, assignments and rejections hereunder.  Each contract and lease assumed and/or assigned pursuant to

Section 9.1.1 shall be assumed and/or assigned only to the extent that any such contract or lease constitutes an Executory Contract or Unexpired Lease. Assumption and/or assignment of a contract or lease pursuant to Section 9.1.1 shall not constitute an admission by the Debtors or the Reorganized Debtors, as applicable, that such contract or lease is an Executory Contract or Unexpired Lease or that the Debtors or the Reorganized Debtors, as applicable, have any liability thereunder. All Executory Contracts and Unexpired Leases that are assumed and/or assigned will be assumed and/or assigned under their present terms or upon such terms as are agreed to in writing between the applicable Debtor and the counterparty to such contract or lease, with the consent of the Plan Proponents.

       3.      The Schedule of Assumed Contracts attached to the Plan will identify, with respect to each Executory Contract and Unexpired Lease to be assumed and/or assigned, the relevant Cure Amount for each Executory Contract or Unexpired Lease. The Debtors will serve the Schedule of Assumed Contracts on the non-Debtor counterparties to each such Executory Contract or Unexpired Lease prior to the Confirmation Hearing. Each such counterparty shall have until the earlier of: (a) the date that is five (5) Business Days prior to the Confirmation Hearing; or (b) thirty (30) days from the date of service of the Schedule of Assumed Contracts to file an objection to the assumption and/or assignment of their Executory Contract or Unexpired Lease (whether the objection relates to the Cure Amount or otherwise). If any objections are filed and cannot be resolved by agreement, the Bankruptcy Court shall hold a hearing to determine the Cure Amount with respect to such Executory Contract or Unexpired Lease or to otherwise resolve the objection, which hearing may be the Confirmation Hearing. Any party failing to object to the assumption and/or assignment of their Executory Contract or Unexpired Lease as set forth above shall be forever barred from asserting, collecting or seeking to collect from the Debtors or the Reorganized Debtors any

37

amounts in excess of the Cure Amount or from otherwise objecting to the assumption and/or assignment of such Executory Contract or Unexpired Lease. Notwithstanding the foregoing, or anything else in Article 9 of the Plan, with respect to any Executory Contract or Unexpired Lease which is the subject of an objection, the Reorganized Debtors shall retain the right, until five (5) Business Days following any order resolving such objection having become a Final Order, to reject such Executory Contract or Unexpired Lease by amending the Contract Schedules. Within ten (10) days of the later of the Effective Date or the date that an order of the Bankruptcy Court establishing the Cure Amount of such Executory Contract or Unexpired Lease becomes a Final Order, or as otherwise agreed with the counterparty to each Executory Contract or Unexpired Lease, the Reorganized Debtors shall pay the Cure Amounts to the non-Debtor parties to such Executory Contracts and Unexpired Leases being assumed and/or assigned.

        4.      Notwithstanding any other provision in the Plan or prior notice of any kind from the clerk of the Bankruptcy Court, any and all Creditors or persons with Claims against the Debtors' Estate arising out of or in connection with or due to the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan shall have thirty (30) days from the earlier of: (i) the Effective Date, or (ii) the entry of an order of the Bankruptcy Court rejecting such Executory Contract or Unexpired Lease, within which to file a proof of claim in the true amount of such Claim. If any such Creditor fails to file a proof of claim within said thirty (30) day period, then such Creditor shall have no Claim against the Debtors, their Estates or the Reorganized Debtors, which Claims arising out of or in connection with or due to the rejection of such Executory Contract or Unexpired Lease, shall be dismissed, released and null and void.

                a.      Any Person, Entity or Governmental Unit whose Claim arises from the rejection of an Executory Contract or Unexpired Lease shall, to the extent such Claim becomes an Allowed Claim, have the rights of a Claimant in Class 4 or 5, as

38

applicable with respect thereto.

        b.    Any claim filed in accordance with the provisions of Article 9 hereof shall be treated as a Disputed Claim until the period of time has elapsed for filing an objection to such Claim.

    5.    On the Effective Date, all contracts, leases, and other agreements entered into by any or all of the Debtors on or after the Petition Date, which agreements have not been terminated in accordance with their terms on or before the Effective Date, shall be deemed assumed and assigned to the Reorganized Debtors.

**VIII.**
**OVERVIEW OF ADDITIONAL PLAN PROVISIONS**

**A.**    **Implementation of the Plan.**

    1.    <u>In General</u>.  The Plan is to be implemented in a manner consistent with Section 1123 of the Bankruptcy Code and the Debtors and the Reorganized Debtors, as applicable, are authorized to take any and all actions that may be necessary or appropriate to implement the terms of the Plan.

    2.    <u>Issuance of Equity Interests in Reorganized ArmorWorks and Related Transactions</u>.  On the Effective Date, in exchange for 100% of the equity interests in reorganized AWE Investor shall:  (a) contribute $3,000,000 in cash to AWE for payment of claims and administrative expenses, (b) cause Perciballi and AWI to contribute to Reorganized AWE all intellectual property used in the businesses of the Debtors that is owned or controlled by Perciballi or AWI, and (c) fund the payment of certain obligations of AWI ((a) and (b) together, the "Plan Contributions").  Also on the Effective Date, (d) Investor shall contribute the equity interests in Reorganized AWE to AWI, along with certain cash, and will receive ~~67.5~~66.9% of the common equity and 100% of the class A preferred equity in AWI; (e) Perciballi shall receive ~~22.5~~23.1% of the common equity in AWI; and (f) 10% of the common equity in AWI shall be reserved for a management bonus pool. ((a) through (f), collectively, the "Corporate

4042482v8/22420-0006

39

Formatted: Justified

Restructuring Transactions"). Concurrent with the closing of the Corporate Restructuring Transactions, Perciballi will receive additional funds from Investor ~~to: (i) fund in full the C Squared Settlement; (ii) fund the purchase of the intellectual property owned by AWI and/or Perciballi being contributed to Reorganized AWE in the Corporate Restructuring Transactions; (iii) repay working capital loans made by Perciballi to ArmorWorks Canada; and (iv) fund other items~~ as more particularly described in Exhibit "G" attached hereto.

    3.   ~~Additional Funding. The Plan will~~ Additional Funding. The Cash Out Option for the Class 4(a) (ArmorWorks Unsecured Claims) and Class 5(a) (TechFiber Unsecured Claims) will be funded in part from the cash payment from the AWE Investor and in part from a cash contribution from Perciballi of up to $500,000 in order to pay a maximum of 30% of the Allowed amount of the electing general unsecured creditor's claim. Two-thirds (2/3) of the amount of the Cash Out Option for Classes 4(a) and 5(a) will be funded by the AWE Investor and one-third of the amount of the Cash Out Option for Classes 4(a) and 5(a) will be funded by Perciballi up to a maximum contribution from Perciballi of $500,000. The Plan will also be funded from ongoing business operations and from the proceeds of the sale of assets deemed to be no longer necessary to the ongoing operations of the business. The Debtors also may obtain a working capital line of credit to replace the DIP Facility.

    4.   Revesting of Debtors' Assets in the Reorganized Debtors.

        a.   Except as otherwise expressly provided in this Plan, pursuant to Sections 1123(a)(5), 1123(b)(3) and 1141(b) of the Bankruptcy Code, all of the Debtors' assets shall automatically be retained and revested in the relevant Reorganized Debtor or its respective successor, free and clear of all Claims, liens, contractually-imposed restrictions, charges, encumbrances and interests of creditors and equity security holders on the Effective Date, with all such Claims,

4042482v8/22420-0006

40

liens, contractually-imposed restrictions, charges, encumbrances and interests being extinguished except as otherwise provided in this Plan.

b.    As of the Effective Date, each Reorganized Debtor may acquire and dispose of property and settle and compromise Claims without supervision of the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than those restrictions expressly imposed by this Plan and the Confirmation Order.  Without limiting the foregoing, each Reorganized Debtor may pay the charges it incurs for professional fees, disbursements, expenses or related support services after the Effective Date without any application to the Bankruptcy Court.

5.    <u>Corporate Action.</u>  Pursuant to section 1142 of the Bankruptcy Code and any applicable provisions of the business corporation law of any applicable state, the entry of the Confirmation Order shall constitute authorization for the Debtors and the Reorganized Debtors to take or cause to be taken all corporate and limited liability company actions necessary or appropriate to consummate and implement the provisions of this Plan prior to, on and after the Effective Date, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court, including, without limitation:   (a) the cancellation of all of the issued and outstanding Member Equity Interests in ArmorWorks; (b) the issuance of the new equity of Reorganized ArmorWorks to Investor; (c) the election of directors, managers and officers in accordance with this Plan; (d) the adoption of the Reorganized Debtors' organizational documents, which shall supersede the prior certificates of incorporation, articles of organization, limited liability company agreements, operating agreements, by-laws or other organizational documents, as appropriate, of each of the Reorganized Debtors; and (e) all actions as are necessary or appropriate to close or dismiss the Case. All such actions shall be deemed to have occurred and shall be in effect pursuant to

41

applicable non-bankruptcy law and the Bankruptcy Code, without any requirement of further action by the members, stockholders, directors or managers of the Debtors, the Reorganized Debtors or any of their affiliates. On the Effective Date, the appropriate officers, directors, members and managers of the Debtors and the Reorganized Debtors are authorized and directed to execute and deliver the agreements, documents and instruments contemplated by this Plan in the name of and on behalf of the Debtors and/or the Reorganized Debtors, as applicable.

      6.    <u>Organizational Documents.</u>  Any prepetition written or oral operating agreement applicable to ArmorWorks shall be deemed terminated and of no further force or effect as of the Effective Date, and, after contribution of the membership interests in AWE to AWI by the Investor pursuant to the terms of the Plan, AWI shall be entitled to file amended articles of organization for Reorganized ArmorWorks reflecting AWI's 100% member interest in Reorganized ArmorWorks.

      7.    <u>Post Confirmation Pre-Effective Date Management of Debtors.</u>

      a.    <u>Perciballi.</u>  Perciballi will direct and manage all of the day-to-day operations of the Debtors post-confirmation until the Effective Date.

      b.    <u>Independent Debtor Representative.</u>  Until the Effective Date, the Independent Debtor Representative shall have and shall continue to exercise all of the powers and duties described in the Protocol and Protocol Order with respect to Non-Ordinary Course Transactions. On the Effective Date, the Independent Debtor Representative shall be discharged and released from any and all duties, obligations and responsibilities under the Protocol and the Protocol Order.

      8.    <u>Post Effective Date Management of the Debtors.</u>  On the Effective Date, the existing Managers shall be deemed discharged and released from any and all duties, obligations and responsibilities, and the management, control and operation of each Reorganized Debtors shall become the general responsibility of the respective members,

4042482v8/22420-0006

42

managers, board members and/or officers elected or appointed in accordance with applicable non-bankruptcy law. Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, the initial members and managers of each Reorganized Debtor shall be comprised of the individuals set forth on Schedule 8.8 to the Plan. Each such member and manager will serve from the Effective Date until his or her successor is duly elected or appointed and qualified or until his or her earlier death, resignation or removal in accordance with the terms of the certificate of incorporation and bylaws (or comparable constituent documents) of the respective Reorganized Debtor and state law.

9. <u>Release of Liens.</u> Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document to be assumed, entered into or delivered in connection with the Plan, on the Effective Date and consistent with the treatment provided for Claims and Interests in Article 5 and 6 of the Plan, all liens on, in or against the Reorganized Debtors' Assets shall be fully released and discharged, and all of the right, title and interest of any holder of Liens, including any rights to any collateral thereunder, shall revert to the Reorganized Debtors and their successors and assigns, as applicable. As of the Effective Date, the Reorganized Debtors shall be authorized but not required to execute and file Form UCC-3 Termination Statements or such other forms as may be necessary or appropriate to implement the provisions of ~~this~~ Section 8.1~~09 of the Plan~~.

10. <u>No Successor Liability.</u> The Reorganized Debtors and AWI are not, and shall not be, successors to the Debtors by reason of any theory of law or equity, and none shall have any successor or transferee liability of any kind or character, except that the Reorganized Debtors shall assume the obligations specified in the Plan and the Confirmation Order.

11. <u>Effectuating Documents; Further Transactions.</u> The Reorganized Debtors

or their designees, as applicable, shall be authorized to (a) execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan and (b) certify or attest to any of the foregoing actions.

   12. **Mutual Releases Relating to the C Squared Settlement.**

~~a. On the Effective Date, the C Squared Parties unconditionally and forever release and discharge the Debtors and the Reorganized Debtors, and/or any and/or all of their affiliates, members, investors, officers, directors, agents, servants, employees, attorneys, and persons in active concert or participation with them (including without limitation, Investor and/or any and/or all of their affiliates, members, investors, officers, directors, agents, servants, employees, attorneys, and persons in active concert or participation with it), in each case, from all disputes, controversies, suits, actions, causes of action, Claims, other claims, assessments, demands, expenses, debts, sums of money, damages, judgments, liabilities, liens and obligations of any kind whatsoever, upon any legal or equitable theory (whether contractual, common law, statutory, federal, state, local or otherwise), whether known or unknown, that the C Squared Parties ever had, now have or hereafter can, shall or may have from the beginning of time, by reason of any matter, cause or thing whatsoever, relating to the C Squared Parties' investment in and relationship with the Debtors from the beginning of time until the Effective Date; provided, however, that such release and discharge shall not be construed to prevent or preclude the C Squared Parties from enforcing the rights and remedies afforded to them under the terms of the Plan or the C Squared Settlement.~~

   a. **[DELETED].**

Formatted: Justified

b.      On the Effective Date, the AWI Parties unconditionally and forever release and discharge the Debtors and the Reorganized Debtors, and/or any and/or all of their affiliates, members, investors, officers, directors, agents, servants, employees, attorneys, and persons in active concert or participation with them, in each case, from all disputes, controversies, suits, actions, causes of action, Claims, other claims, assessments, demands, expenses, debts, sums of money, damages, judgments, liabilities, liens and obligations of any kind whatsoever, upon any legal or equitable theory (whether contractual, common law, statutory, federal, state, local or otherwise), whether known or unknown, that the AWI Parties ever had, now have or hereafter can, shall or may have from the beginning of time, by reason of any matter, cause or thing whatsoever, relating to the AWI Parties' investment in and relationship with the Debtors from the beginning of time until the Effective Date; provided, however, that such release and discharge shall not be construed to prevent or preclude the AWI Parties from enforcing the rights and remedies afforded to them under the terms of the Plan or the C Squared Settlement.

c.      On the Effective Date, the Debtors and the Reorganized Debtors unconditionally and forever release and discharge each of the C Squared Parties and the AWI Parties, and/or any and/or all of their affiliates, members, investors, officers, directors, agents, servants, employees, attorneys, and persons in active concert or participation with them, in each case, from all disputes, controversies, suits, actions, causes of action, Claims, other claims, assessments, demands, expenses, debts, sums of money, damages, judgments, liabilities, liens and obligations of any kind whatsoever, upon any legal or equitable theory (whether contractual, common law, statutory,

**federal, state, local or otherwise), whether known or unknown, that the Debtors or Reorganized Debtors ever had, now have or hereafter can, shall or may have from the beginning of time, by reason of any matter, cause or thing whatsoever, relating to the such parties' investment in and relationship with the Debtors from the beginning of time until the Effective Date.**

        d.     **Notwithstanding the injunctions and releases in the Plan and the Confirmation Order, nothing contained in the Plan, the Confirmation Order or any other document filed in these bankruptcy proceedings shall limit or release the Debtors', the Reorganized Debtors', the AWI Parties' or the C Squared Parties' obligations under the Plan, the Confirmation Order or the C Squared Settlement, as applicable.**

**B.**      **Conditions Precedent to Confirmation and the Effectiveness of Plan.**

     1.     <u>Conditions to Confirmation.</u>    The following shall be conditions to Confirmation unless such conditions shall have been duly waived ~~pursuant to Section 15.3 of the Plan~~:

Formatted: Justified

         a.     The Confirmation Order has been entered in form and substance reasonably acceptable to the Plan Proponents and Investor. <u>This condition precedent may be waived only by unanimous agreement of the Plan Proponents and Investor.</u> If the Plan Proponents and Investor are unable to reach an agreement with any party regarding the form and substance of the Confirmation Order, the Bankruptcy Court will resolve all such disputes between the parties; and

         b.     All documents necessary to the implementation of the Plan shall be in form and substance reasonably satisfactory to ~~AWI, the Debtors~~<u>the Plan Proponents and Investor. This condition precedent may be waived only by unanimous agreement of the Plan Proponents</u> and Investor.

2.    Conditions to the Effective Date.  The following shall be conditions to the occurrence of the Effective Date unless such conditions shall have been duly waived as provided below:

a.    The Confirmation Order in form and substance acceptable to the Plan Proponents and Investor shall have become a Final Order, except that the Plan Proponents reserve the right to cause the Effective Date to occur notwithstanding the pendency of an appeal of the Confirmation Order.  This condition precedent may be waived only by unanimous agreement of the Plan Proponents and Investor.

b.    The Plan and all documents necessary to implement the Plan shall be in form and substance reasonably satisfactory to the Plan Proponents and Investor, and shall have been executed and delivered to the applicable parties.  This condition precedent may be waived only by unanimous agreement of the Plan Proponents and Investor.

c.    ArmorWorks shall have unconditionally and irrevocably received the Plan Contributions from Investor and Perciballi in accordance with Article 8.2 of the Plan.  This condition precedent may be waived only by unanimous agreement of the Plan Proponents, Perciballi and Investor.

d.    Written acknowledgement by the C Squared Parties that they have received the C Squared Settlement Amount is a condition precedent to the effectiveness of the Plan.  The foregoing condition precedent is waiveable only with the express prior written consent of the C Squared Parties.  Despite any provision of the Bankruptcy Code to the contrary, including but not limited to § 1127, the Plan Proponents affirmatively waive the right to modify the Plan to remove, edit or modify this condition precedent.  Notwithstanding the foregoing, in the event that the Bankruptcy Court authorizes the removal, edit or modification

4042482v8/22420-0006

47

of this condition precedent without the C Squared Parties' prior written consent, the Plan Proponents acknowledge and agree that the removal, edit or modification of this condition precedent without the C Squared Parties' written consent would constitute a material modification of the Plan mandating an amended disclosure statement and re-balloting of the Plan.

3. _Absence of Waiver or Satisfaction Conditions._ In the event all conditions to the effectiveness of the Plan are not satisfied, or waived in accordance with the foregoing provisions, the Plan shall be deemed null and void without any further action of the Bankruptcy Court. In such event, nothing contained in ~~the~~this Plan shall be deemed to constitute a waiver or release of any claims by or against the Debtors, their Estates, or any other Persons, or to prejudice in any manner the rights of the Debtors, their Estates, or any other Persons in any further proceeding in the Bankruptcy Court or any other court or proceeding.

**C.** **Resolution of Claims, Demands, and Causes of Action.**

1. _Objections to Claims._ Only the Debtors and Reorganized Debtors shall be entitled to object to Claims. Any objections to Claims shall be served and filed on or before the later of: (i) sixty (60) days after the Effective Date; (ii) thirty (30) days after a request for payment or proof of Claim is timely filed and properly served; or (iii) such other date as may be fixed by the Bankruptcy Court, whether before or after the dates specified in subsections (i) and (ii) herein. Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the Creditor if service is effected in any of the following manners: (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004; (b) by first class mail, postage prepaid, on any counsel that has appeared on the Creditor's behalf in the Cases; or (c) by first class mail, postage prepaid, on the signatory on the proof of Claim or other representative identified in the proof of Claim or any attachment

4042482v8/22420-0006

48

thereto.

2. _Payments and Distributions with Respect to Disputed Claims._ Notwithstanding any other provision hereof, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

3. _Distributions After Allowance._  After such time as a Disputed Claim becomes an Allowed Claim, the Debtors shall distribute to the holder thereof the distributions, if any, to which such holder is then entitled under the Plan in accordance with the provisions hereof.  In respect of Disputed Claims such distributions shall be made within fifteen (15) days after such Disputed Claims become Allowed Claims by Final Order of the Bankruptcy Court or as soon thereafter as practicable.

**D.**    **Provisions Concerning Distributions.**

1. _Time of Distributions under the Plan._  Payments and distributions to be made on or after the Effective Date pursuant to the Plan shall be made on such date, or as soon as practicable thereafter, except as otherwise provided for in the Plan, or as may be ordered by the Court, or as may be agreed to by the Debtors or Reorganized Debtors, as applicable, and the Holder of the Claim or Member Equity Interest.

2. _Payment Dates._  Whenever any payment or distribution to be made under the Plan shall be due on a day other than a Business Day, such payment or distribution shall instead be made, without interest, on the next Business Day, or as soon as practicable thereafter, or as may be agreed to by the Debtors and the holder of the Claim or Member Equity Interest.

3. _Manner of Payments under the Plan._  Cash payments made pursuant to the Plan shall be made in the currency of the United States, by check drawn on a domestic bank or by wire transfer from a domestic bank.  Distributions to all holders of Allowed Claims and Member Equity Interests shall be made (a) at the addresses set forth in the

4042482v8/22420-0006

49

[Formatted: Justified]

proof of claim filed by such holders (or at last known addresses of such holders if no proofs of claims were filed or the Debtors were notified of a change of address); or (b) at the addresses set forth in any written notices of address change delivered to the Debtors or the Bankruptcy Court; or (c) at the addresses reflected in the Debtors' schedules if no claim shall have been filed and no written notice of an address change has been received by the Debtors. No payments shall be made to a holder of a Disputed Claim unless and until such Claim becomes an Allowed Claim by a Final Order.

4.    Fractional Cents.    Any other provision of the Plan to the contrary notwithstanding, no payments of fractions of cents will be made.    Whenever any payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole cent (rounding down in the case of .5).

5.    Non-Negotiated Checks.    If a Holder of an Allowed Claim, or any other claim or interest fails to negotiate a check issued to such Holder under the Plan within sixty (60) days of the date such check was issued by the Reorganized Debtors, then the amount of Cash or other property attributable to such check shall be deemed to be "Unclaimed Distributions," and the payee of such check shall be deemed to have no further Claim or future Claim against the Debtors or the Reorganized Debtors.

6.    Unclaimed Distributions.    In the event any payment to a holder of a Claim under the Plan remains unclaimed for a period of sixty (60) days after such distribution has been made (or after such delivery has been attempted), such Unclaimed Distribution and all future distributions to be made to such holders shall be deemed forfeited by such holder.

7.    Disputed Payments or Distributions.    In the event of any dispute between and among Claimants (including the Entity or Entities asserting the right to receive the disputed payment or distribution) as to the right of any Entity to receive or retain any

4042482v8/22420-0006

50

payment or distribution to be made to such Entity under the Plan, the Reorganized Debtors may, in lieu of making such payment or distribution to such Entity, make it instead into an escrow account or to a disbursing agent, for payment or distribution as ordered by a court of competent jurisdiction or as the interested parties to such dispute may otherwise agree among themselves.

**E.** **Retention of Jurisdiction.**

1.      Notwithstanding the entry of the Confirmation Order or the occurrence of Effective Date, the Bankruptcy Court shall retain jurisdiction over this Case and any proceedings related thereto to the fullest extent permitted by the Bankruptcy Code or applicable law, and to make such orders as are necessary or appropriate to carry out the provisions of this Plan.

2.      In addition, the Bankruptcy Court shall retain jurisdiction to implement the provisions of the Plan in the manner as provided under Section 1142 of the Bankruptcy Code.   If the Bankruptcy Court abstains from exercising, or declines to exercise jurisdiction, or is otherwise without jurisdiction over any matter set forth in this Section, or if the Debtors elect to bring an action or proceeding in any other forum, then this Section shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction by any other court, public authority, or commission having competent jurisdiction over such matters.

3.      Without limiting the foregoing, the Bankruptcy Court shall retain jurisdiction of the Case for the following matters:

a.      To enable the  Debtors to consummate any and all proceedings which may have been brought before or after the entry of the Confirmation Order, to set aside Liens or encumbrances, to challenge or object to the allowance of Claims and to recover any preferences, transfers, assets or damages to which a Debtor may be entitled under the applicable provisions of the Code or other

4042482v8/22420-0006

51

federal, state or local law;

b. To adjudicate all controversies concerning the classification or allowance of a Claim or Equity Security;

c. To adjudicate all disputes regarding or relating in any way to Claims, Equity Security, and the Plan;

d. To hear and determine all claims or motions arising from or seeking the rejection of any Executory Contracts or Unexpired Leases, and to consummate the rejection and termination thereof or with respect to any Executory Contracts or Unexpired Leases to which an application or motion for rejection or termination is filed before entry of the Confirmation Order;

e. To liquidate damages in connection with any disputed, contingent or unliquidated Claims;

f. To adjudicate all claims to a security or ownership interest in any property of the Debtors or in any proceeds thereof, including the adjudication of all claims asserted by Creditors and Holders of Equity Security;

g. To adjudicate all claims or controversies arising out of any purchases, sales, or contracts made or undertaken by the Debtors during the pendency of the Proceedings;

h. To adjudicate, determine and resolve any and all adversary proceedings, applications, motions, and contested or litigated matters, instituted before the closing of the Case;

i. To recover all Assets and properties of the Debtors, wherever located;

j. To adjudicate and determine any cause of action provided for under the Plan or pursuant to the Confirmation Order;

k. To make orders as are necessary or appropriate to carry out the

4042482v8/22420-0006

52

provisions of the Plan, or in aid of confirmation and consummation of the Plan;

l. To hear and determine any application to modify the Plan in accordance with Section 1127 of the Bankruptcy Code, to remedy any defect or omission, or reconcile any inconsistency in the Plan, the Disclosure Statement or any Order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects hereof;

m. To hear and determine all matters concerning state, local and federal taxes in accordance with Sections 346, 505 and 1146 of the Bankruptcy Code;

n. To determine any and all applications, adversary proceedings, and contested or litigated matters properly before the Bankruptcy Court before or after the Confirmation Date;

o. To hear and determine all controversies, suits and disputes, if any, as may arise with regard to orders of the Bankruptcy Court in the Case entered on or before the Confirmation Date; and

p. To enter an Order closing the Case.

**F.** **Effect of Confirmation of Plan.**

1. <u>Discharge.</u> Any liability imposed by the Plan will not be discharged. If Confirmation of this Plan and/or the conditions precedent to the effectiveness of the Plan are not satisfied, the Plan shall be deemed null and void. In such event, nothing contained in this Plan shall be deemed to constitute a waiver or release of any claims against the Debtors or their Estates or any other Persons, or to prejudice in any manner the rights of the Debtors, their Estates, and/or any Person in any further proceeding involving the Debtors, their Estates and/or any Person. The provisions of this Plan shall be binding upon the Debtors, all Creditors and all Member Equity Interest holders, regardless of whether such Claims or Member Equity Interest holders are impaired or whether such parties accept this Plan, upon Confirmation thereof.

2.    Modification of Plan.  TheExcept as provided in Section 15.2.4 of the Plan, the Plan Proponents may modify the Plan at any time before Confirmation. However, the Bankruptcy Court may require a new Disclosure Statement or re-voting on the Plan if the Plan Proponents materially modify the Plan before Confirmation.  The Plan Except as provided in Section 15.2.4 of the Plan, the Plan Proponents may also seek to modify the Plan at any time after Confirmation so long as (a) the Plan has not been substantially consummated, and (b) the Bankruptcy Court authorizes the proposed modification after notice and a hearing.  After Confirmation, the Plan Proponents may, upon Order from the Bankruptcy Court, in accordance with Section 1127(b) of the Bankruptcy Code, remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose of this Plan.

3.    Post-Confirmation Quarterly Fees.  Quarterly fees pursuant to 28 U.S.C. Section 1930(a)(6) continue to be payable to the Office of the United States Trustee by the Reorganized Debtors until such time as the Case is converted, dismissed, or closed pursuant to a final decree.

4.    Retention of Claims and Causes of Action.  Except to the extent any rights, claims, causes of action, defenses, and counterclaims are expressly and specifically released or assigned in connection with this Plan or in any settlement agreement approved during the Case: (i) any and all Claims accruing to the Debtors or the Estates shall remain assets of and vest in the Reorganized Debtors whether or not litigation relating thereto is pending on the Effective Date, and whether or not any such Claims have been listed or referred to in the Plan, the Disclosure Statement, or any other document filed with the Bankruptcy Court, and (ii) neither the Debtors nor the Estate waive, release, relinquish, forfeit, or abandon (nor shall they be estopped or otherwise precluded or impaired from asserting) any Claims or defenses that constitute property of the Debtors or the Estates: (a) whether or not such Claims or defenses have been listed

4042482v8/22420-0006

54

or referred to in this Plan, the Disclosure Statement, or any other document filed with the Bankruptcy Court, (b) whether or not such Claims are currently known to the Debtors, and (c) whether or not a defendant in any litigation relating to such Claims filed a proof of claim in the Case, filed a notice of appearance or any other pleading or notice in the Case, voted for or against this Plan, or received or retained any consideration under this Plan. Without in any manner limiting the scope of the foregoing, notwithstanding any otherwise applicable principle of law or equity, including, without limitation, any principles of judicial estoppel, res judicata, collateral estoppel, issue preclusion, or any similar doctrine, the failure to list, disclose, describe, identify, analyze or refer to any Claim or cause of action, in the Plan, the Disclosure Statement, or any other document filed with the Bankruptcy Court shall in no manner waive, eliminate, modify, release, or alter the Debtors' right to commence, prosecute, defend against, settle, recover on account of, and realize upon any Claim that the Debtors or their Estates have or may have as of the Effective Date.

Except to the extent any rights, claims, causes of action, defenses, and counterclaims are expressly and specifically released or assigned in connection with this Plan or in any settlement agreement approved during the Case, the Debtors and Reorganized Debtors, as applicable, expressly reserve all Claims and defenses for later adjudication by the Reorganized Debtors and therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Claims and defenses upon or after the Confirmation or Consummation of the Plan based on the Disclosure Statement, the Plan, and/or the Confirmation Order. In addition, the Debtors and Reorganized Debtors, as applicable, expressly reserve the right to pursue or adopt Claims that are alleged in any lawsuits in which the Debtors are a defendant or an interested party, against any Person or Governmental Entity, including

55

the plaintiffs or co-defendants in such lawsuits. Any Person or Governmental Entity to whom the Debtors have incurred an obligation (whether on account of services, purchase, sale of goods or otherwise), or who has received services from the Debtors, or who has received money or property from the Debtors, or who has transacted business with the Debtors, or who has leased equipment or property from or to the Debtors should assume that such obligation, receipt, transfer or transaction may be reviewed by the Debtors and Reorganized Debtors, as applicable, subsequent to the Effective Date and maybe the subject of an action after the Effective Date, whether or not: (a) such Person or Governmental Unit has Filed a proof of Claim against the Debtors in the Case; (b) such Person's or Governmental Unit's proof of Claim has been objected to by the Debtors; (c) such Person's or Governmental Unit's Claim was included in the Debtors' Schedules; or (d) such Person's or Governmental Unit's scheduled Claim has been objected to by the Debtors or has been identified by the Debtors as contingent, unliquidated or disputed.

5.    NO WAIVER OF CLAIMS.  NEITHER THE FAILURE TO LIST A CLAIM IN THE SCHEDULES FILED BY THE DEBTORS, THE FAILURE OF THE DEBTORS OR ANY OTHER PERSON TO OBJECT TO ANY CLAIM FOR PURPOSES OF VOTING, THE FAILURE OF THE DEBTORS OR ANY OTHER PERSON TO OBJECT TO A CLAIM OR ADMINISTRATIVE EXPENSE BEFORE CONFIRMATION OR THE EFFECTIVE DATE, THE FAILURE OF ANY PERSON TO ASSERT A CLAIM OR CAUSE OF ACTION BEFORE CONFIRMATION OR THE EFFECTIVE DATE, THE ABSENCE OF A PROOF OF CLAIM HAVING BEEN FILED WITH RESPECT TO A CLAIM, NOR ANY ACTION OR INACTION OF THE DEBTORS OR ANY OTHER PERSON WITH RESPECT TO A CLAIM, OR ADMINISTRATIVE EXPENSE, OTHER THAN A LEGALLY EFFECTIVE EXPRESS WAIVER OR RELEASE SHALL BE DEEMED A WAIVER OR

4042482v8/22420-0006

56

Formatted: Justified

RELEASE OF THE RIGHT OF THE DEBTORS, BEFORE OR AFTER
SOLICITATION OF VOTES ON THE PLAN OR BEFORE OR AFTER
CONFIRMATION OR THE EFFECTIVE DATE TO (A) OBJECT TO OR EXAMINE
SUCH CLAIM OR ADMINISTRATIVE EXPENSE, IN WHOLE OR IN PART OR (B)
RETAIN AND EITHER ASSIGN OR EXCLUSIVELY ASSERT, PURSUE,
PROSECUTE, UTILIZE, OTHERWISE ACT OR OTHERWISE ENFORCE ANY
CLAIM OR CAUSE OF ACTION AGAINST THE HOLDER OF ANY SUCH
CLAIM.

**G.** **General Provisions.**

    1.    <u>Notices Under the Plan.</u>

Notices, requests, or demands with respect to this Plan shall be in writing and shall

be deemed to have been received within five (5) days of the date of mailing, provided

they are sent by registered mail or certified mail, postage prepaid, return receipt

requested, and:

    <u>if sent to the Debtors, addressed to:</u>

        GALLAGHER & KENNEDY, P.A.
        John R. Clemency
        Todd A. Burgess
        2575 East Camelback Road
        Phoenix, Arizona 85016-9225
        Telephone:  (602) 530-8000
        Facsimile:   (602) 530-8500
        Email:      john.clemency@gknet.com
                 todd.burgess@gknet.com

**Formatted:** Justified

4042482v8/22420-0006

57

if sent to AWI or Perciballi, addressed to:

QUARLES & BRADY, LLP
Susan G. Boswell
Lori Winkelman
One South Church Avenue, Suite 1700
Tucson, Arizona 85701-1621
Direct Line: (520) 770-8713
Direct Fax: (520) 770-2222
Mobile:  (520) 349-6644
Email:  Susan.Boswell@quarles.com
         Lori.Winkelman@quarles.com

2.    Withholding Taxes/Setoffs.  The Reorganized Debtors shall be entitled to deduct any Federal or State withholding taxes from any payments with respect to Allowed Claims for wages of any kind.  The Reorganized Debtors may, but shall not be required to, set off or recoup against any Claim, and the payments to be made pursuant to the Plan in respect of such Claim, any claims of any nature whatsoever the Debtors or the Estates may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or Reorganized Debtors, as applicable, of any such claim the Debtors may have against such holder.

3.    Committee.  On the Effective Date, the Committee shall automatically dissolve and the members thereof and the Professional Persons retained by the Committee in accordance with Section 1103 of the Bankruptcy Code shall be released and discharged from their respective duties and obligations.

4.    Revocation of Plan.  The Plan Proponents reserve the right to revoke and withdraw the Plan at any time before Confirmation.

5.    Reservation of Rights.  Nothing contained herein shall prohibit the Debtors from prosecuting or defending any of its rights as may exist on its own behalf before the Effective Date.  If Confirmation of the Plan does not occur, the Plan shall be deemed null and void.  In such event, nothing contained in the Plan shall be deemed to constitute

4042482v8/22420-0006

58

a waiver or release of any Claims by or against the Debtors, their Estates, or any other Person, or to prejudice in any manner, the rights and remedies of the creditors, the Debtors, their Estates, or any Person in any further proceedings involving the Debtors or their Estate.  The filing of the Plan and or any modifications hereto, and the Plan itself shall not constitute a waiver by the Plan Proponents of any rights, remedies, objections, or causes of action they may have or may wish to raise with respect to anything, including, without limitation, any other plan or plans filed or to be filed in this bankruptcy case, all of which rights and objections are hereby reserved.

6.      Exemption from Certain Transfer Taxes.  Pursuant to Section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of a security, or the making or delivery of an instrument of transfer hereunder will not be subject to any stamp, tax, or similar tax.

7.      Injunction.  Except as otherwise provided in the Plan or the Confirmation Order, and except for any actions timely filed pursuant to Section 523 of the Bankruptcy Code or any Claims declared by the Bankruptcy Court to be non-dischargeable pursuant to Section 523 of the Bankruptcy Code, as of the Confirmation Date, but subject to the occurrence of the Effective Date, all Persons who have held, hold or may hold Claims against the Debtors or their Estates, or Member Equity Interests in the Debtors, are, with respect to any such Claims or Member Equity Interests, permanently enjoined from and after the Confirmation Date from:  (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) with respect to any such Claim  against or affecting the Debtors, their Estates or any of their respective property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons, or any property of any such transferee or successor; (ii) enforcing, levying, attaching

(including, without limitation, any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, with respect to any judgment, award, decree or order against the Debtors, their Estates or any of their respective property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons, or any property of any such transferee or successor; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, their Estates or any of their respective property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons; (iv) asserting initially after the Effective Date any right of setoff, subrogation, or recoupment of any kind, directly or indirectly, against any obligation due to the Debtors, their Estates or any of their respective property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan to the full extent permitted by applicable law. By accepting a distribution pursuant to the Plan, each holder of an Allowed Claim receiving distributions pursuant to the Plan will be deemed to have specifically consented to the injunctions set forth in this section, and, except as set forth in this Section, waives any and all claims, causes of action, remedies and objections of every kind against the Debtors.

8.    <u>Term of Injunctions or Stays.</u>  Unless otherwise provided, all injunctions or stays arising before the Confirmation Date in accordance with Sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date, or such later date as provided under applicable law.  For the avoidance of doubt, ~~this~~ Section 14.13 of the Plan does not apply to the permanent injunction set forth in Section ~~15~~14.12 of the Plan.

4042482v8/22420-0006

60

9. <u>Injunction Against Interference With Plan.</u> Upon the entry of the Confirmation Order, all holders of Claims and Member Equity Interests and other parties in interest, including the Debtors, along with its respective present or former employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

10. <u>Exculpation.</u> Except with respect to obligations under the Plan, neither the Debtors, AWI, the Committee, the Independent Debtor Representative, Odyssey Capital Group, LLC, Investor, nor any of their respective Representatives, all solely in their capacity as such (each an "Exculpated Party"), shall have or incur any liability to the Debtors for any act or omission in connection with, or arising out of: (i) the Case; (ii) the confirmation of the Plan; (iii) the consummation of the Plan; or (iv) the administration of the Plan or property to be distributed pursuant to the Plan, except for fraud, willful misconduct, recklessness or gross negligence; and, in all respects, each Exculpated Party shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

**IX.**
**FEDERAL TAX CONSEQUENCES**

Each holder of a claim is urged to consult with its own tax advisor regarding the federal, state, local and other tax consequences of the Plan. No rules have been requested from the Internal Revenue Service with respect to any of the tax aspects of the Plan.

**X.**
**VOTING PROCEDURES AND REQUIREMENTS**

**A.** **Parties Entitled to Vote.**

If you hold an Allowed Claim that is "impaired" under the Plan, you are entitled to vote to accept or reject the Plan. Accordingly, to be entitled to vote, your Claim must be "allowed" as set forth in Section 502 of the Bankruptcy Code or temporarily allowed as

set forth in Bankruptcy Rule 3018(a).  Additionally, Section 1126(f) of the Bankruptcy Code permits you to vote to accept or reject the Plan only if your Claim is "impaired."

**B.      Procedures for Voting.**

      1.      Submission of Ballots.

After this Disclosure Statement has been approved by the Bankruptcy Court, all Creditors whose votes are solicited (as explained above) will be sent (a) a ballot, together with instructions for voting (the "Ballot"); (b) a copy of this Disclosure Statement as approved by the Bankruptcy Court; and (c) a copy of the Plan.  You should read the Ballot carefully and follow the instructions.  Please use only the Ballot sent with this Disclosure Statement.  You should complete your Ballot and return it to:

> GALLAGHER & KENNEDY, P.A.
> Attn:  Rachel Milazzo
> 2575 East Camelback Road, Suite 1100
> Phoenix, AZ  85016
> Telephone:  (602) 530-8000

**TO BE COUNTED, YOUR BALLOT MUST BE RECEIVED AT THE ADDRESS LISTED ABOVE BY 5:00 P.M., MOUNTAIN STANDARD TIME, ON _____, 2014.  IF YOUR BALLOT IS NOT TIMELY RECEIVED, IT WILL NOT BE COUNTED IN DETERMINING WHETHER THE PLAN HAS BEEN ACCEPTED OR REJECTED.**

A properly addressed, stamped return envelope will be included with your Ballot.

      2.      Procedures for Vote Tabulation.

In determining whether the Plan has been accepted or rejected, Ballots will be tabulated in accordance with the Court's Order approving this Disclosure Statement.

      3.      Withdrawal of Ballots.

A Ballot may not be withdrawn or changed after it is cast unless the Bankruptcy Court permits you to do so after notice and a hearing to determine whether sufficient cause exists to permit the change.

4.      Questions and Lost or Damaged Ballots.

If you have any questions concerning voting procedures, if your Ballot is damaged or lost, or if you believe you should have received a Ballot but did not receive one, you may contact Debtors' counsel, Todd Burgess, at the address and telephone number listed above.

**C.      Summary of Voting Requirements.**

In order for the Plan to be confirmed, the Plan must be accepted by at least one (1) impaired Class of Claims.  For a Class of Claims to accept the Plan, votes representing at least two-thirds in claim amount and a majority in number of the Claims voted in that Class (not including votes of insiders) must be cast to accept the Plan.

**IT IS IMPORTANT THAT HOLDERS OF ALLOWED IMPAIRED CLAIMS EXERCISE THEIR RIGHTS TO VOTE TO ACCEPT OR REJECT THE PLAN.  THE DEBTORS ASSERT THAT THE TREATMENT OF CREDITORS UNDER THE PLAN IS THE BEST ALTERNATIVE FOR CREDITORS, AND THE DEBTORS RECOMMEND THAT THE HOLDERS OF ALLOWED CLAIMS VOTE IN FAVOR OF THE PLAN.**

The specific treatment of each Class under the Plan is described in the Plan and is summarized in this Disclosure Statement.

## XI.

## LIQUIDATION ANALYSIS

The Debtors' Liquidation Analysis is attached as Exhibit "D" and was prepared by MCA with the input and approval of the Debtors.

## XII.

## CONFIRMATION OF THE PLAN

**D.      Confirmation Hearing.**

Section 1128(a) of the Bankruptcy Code provides that the Bankruptcy Court, after notice, will hold a Confirmation Hearing on the Plan.  The Confirmation Hearing will be

4042482v8/22420-0006                                   63

held at the United States Bankruptcy Court, 230 N. First Avenue, Phoenix, Arizona, on

**_____, 2014, at _____ a.m./p.m. THE HEARING MAY BE ADJOURNED FROM TIME TO TIME BY THE COURT WITHOUT FURTHER NOTICE EXCEPT FOR AN ANNOUNCEMENT MADE AT THE HEARING._**

E.     <u>**Objections to Confirmation.**</u>

Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to confirmation of the Plan, regardless of whether it is entitled to vote. Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014. **IF AN OBJECTION TO CONFIRMATION IS NOT TIMELY MADE, THE COURT NEED NOT RECEIVE OR CONSIDER IT. ALL OBJECTIONS TO CONFIRMATION OF THE PLAN MUST BE FILED WITH THE BANKRUPTCY COURT AND SERVED ON COUNSEL FOR THE PLAN PROPONENTS AT THE ADDRESSES SET FORTH ABOVE, ON THE UNITED STATES TRUSTEE, AND ON ANY PARTY-IN-INTEREST WHO HAS REQUESTED NOTICE IN THE DEBTOR'S BANKRUPTCY CASE, BY _____, 2014.**

F.     <u>**Requirements for Confirmation of the Plan.**</u>

1.     <u>Confirmation Under Section 1129(a) of the Bankruptcy Code.</u>

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of Section 1129(a) of the Bankruptcy Code have been satisfied, in which event the Bankruptcy Court will enter an order confirming the Plan. Such requirements include, among others:

a.     That the Debtors have complied with the applicable provisions of Chapter 11, including the provisions of Sections 1122 and 1123 of the Bankruptcy Code governing classification of claims and interests and contents of a plan of reorganization.

b.     That the Plan Proponents have proposed the Plan in good faith and

1    not by any means forbidden by law.

2         c.    That any payment made or promised by the Debtors to any Person

3    for services, costs, or expenses in connection with the Bankruptcy Case or the Plan

4    has been approved by or is subject to approval by the Bankruptcy Court as

5    reasonable.

6         d.    That the Plan Proponents have disclosed the identity and affiliations

7    of Persons proposed to serve as officers after confirmation.

8         e.    That one or more of the impaired Classes of Claims has voted to

9    accept the Plan.

10        f.    That the Plan is in the best interests of holders of Claims and Equity

11   Interests; that is, each holder of an Allowed Claim or Allowed Equity Interest

12   either has accepted the Plan or will receive on account of its Claim or Equity

13   Interest property with a value, as of the Effective Date, that is not less than the

14   amount that the holder of such Claim or Equity Interest would receive if the

15   Debtors were liquidated under Chapter 7 of the Bankruptcy Code on the Effective

16   Date.

17        g.    That the Plan is feasible; that is, confirmation is not likely to be

18   followed by the need for liquidation or further reorganization of the Debtors unless

19   that is provided for in the Plan.

20   2.    The Plan Satisfies Bankruptcy Code Requirements.

21        (a)    Best Interests Test and Liquidation Analysis.    Under the best

22   interests test, the Plan is confirmable if, with respect to each impaired Class of

23   Claims or Equity Interests, each holder of an Allowed Claim or Allowed Equity

24   Interest in such Class either:  (i) has accepted the Plan; or (ii) will receive or retain

25   under the Plan, on account of its Claim or Interest, property of a value, as of the

26   Effective Date, that is not less than the amount such holder would receive or retain

if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code. The Plan Proponents believe the distributions to Creditors under the Plan will meet or exceed the recoveries that Creditors would receive in a Chapter 7 liquidation of the Debtors and their Estates. The Plan Proponents believe that the Plan provides an equal or better return to Creditors than they can otherwise receive under Chapter 7, and therefore the best interests of creditors test is met.

(b)     Feasibility of the Plan. Section 1129(a)(11) of the Bankruptcy Code includes what is commonly described as the "feasibility" standard. In order for the Plan to be confirmed, the Bankruptcy Court also must determine that the Plan is feasible - that is, that the need for further reorganization or a subsequent liquidation of the Debtors is not likely to result following confirmation of the Plan. As set forth in this Disclosure Statement and in the Plan, the Plan Proponents believe the Plan is feasible.

(c)     Acceptance by an Impaired Class. Because the Plan impairs some Classes of Claims, Section 1129(a)(10) of the Bankruptcy Code requires that, for the Plan to be confirmed, at least one impaired Class must accept the Plan by the requisite vote without counting the votes of any "insiders" (as that term is defined in Section 101(31) of the Bankruptcy Code) contained in that Class. The Plan Proponents believe that at least one impaired Class will vote to accept the Plan.

(d)     Confirmation Under Section 1129(b) of the Bankruptcy Code. Although Section 1129(a)(8) of the Bankruptcy Code requires that the Plan be accepted by each Class that is impaired by the Plan, Section 1129(b) of the Bankruptcy Code provides that the Bankruptcy Court may still confirm the Plan at the request of the Debtors if all requirements of Section 1129(a) of the Bankruptcy Code are met except for Section 1129(a)(8) and if, with respect to each Class of Claims or Equity Interests that (a) is impaired under the Plan, and (b) has not

voted to accept the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable." This provision commonly is referred to as a "cramdown." The Plan Proponents have requested cramdown confirmation of the Plan with respect to any such non-accepting Class of Creditors. The Plan Proponents believe that, with respect to such Class or Classes, the Plan meets the requirements of Section 1129(b) of the Bankruptcy Code.

(1) Unfair Discrimination. A plan of reorganization "does not discriminate unfairly" if: (i) the legal rights of a non-accepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are related to those of the non-accepting class; and (ii) no class receives payments in excess of that which it is legally entitled to receive on account of its Claims or Equity Interests. The Debtors and the Committee assert that under the Plan: (i) all classes of impaired Claims are being treated in a manner that is consistent with the treatment of other similar classes of Claims; and (ii) no Class of Claims will receive payments or property with an aggregate value greater than the sum of the Allowed Claims in the Class. Accordingly, the Plan Proponents believe that the Plan does not discriminate unfairly as to any impaired Class of Claims or Equity Interests.

(2) Fair and Equitable Test. The Bankruptcy Code establishes different "fair and equitable" tests for Secured Creditors, Unsecured Creditors, and holders of Equity Interests, as follows:

(i) Secured Creditors. With respect to a secured claim, "fair and equitable" means that a plan provides that either (A) the holder of the secured claim in an impaired class retains the liens securing such claim, whether the property subject to such liens is

retained by the debtor or transferred to another entity, to the extent of the amount of such allowed claim, and that the holder of such claim receives on account of such claim deferred cash payments totaling at least the amount of such allowed claim, of a value, as of the effective date, of at least the value of such holder's interest in the estate's interest in such property; (B) for the sale, subject to Section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing such claim, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clauses (A) and (C); or (C) the realization by such holder of the "indubitable equivalent" of such claim.

(ii) <u>Unsecured Creditors</u>. With respect to an unsecured claim, "fair and equitable" means that a plan provides that either (A) each impaired unsecured creditor receives or retains property of a value, as of the effective date, equal to the amount of its allowed claim; or (B) the holders of claims and equity interests that are junior to the claims of the dissenting class will not receive or retain any property under the plan.

(iii) <u>Equity Interest Holders</u>. With respect to holders of equity interests, "fair and equitable" means that a plan provides that either (A) each holder will receive or retain under the plan property of a value, as of the effective date, equal to the greater of: (1) the fixed liquidation preference or redemption price, if any, of such interest; or (2) the value of such interest; or (B) the holders of equity interests that are junior to the non-accepting class will not receive any property under the plan.

4042482v8/22420-0006

68

The Plan Proponents believe the Plan complies with the Claims priority established by the Bankruptcy Code and thus the "fair and equitable" test of the Bankruptcy Code (including the absolute priority rule) is met with respect to the Secured Creditors and the Equity Interest holders under the Plan.

### XIII.
### ALTERNATIVES TO THE PLAN

If the Plan is not confirmed, several different events could occur: (1) the Debtors or a third party could propose another plan providing for different treatment of certain Creditors; (2) Secured Creditors, if any, could move for relief from the automatic stay to allow them to foreclose their liens against their collateral, which may be granted by the Court if an alternative plan is not confirmed in a reasonable period of time; or (3) the Bankruptcy Court (after appropriate notice and hearing) could dismiss the Bankruptcy Case or convert such to a case under Chapter 7 if an alternative plan is not confirmed in a reasonable period of time.

### XIV.
### RECOMMENDATION AND CONCLUSION

The Plan Proponents believe that the Plan provides the best available alternative for maximizing the recoveries that Creditors will receive from the Debtors' Assets. Therefore, the Plan Proponents recommend that all Creditors and Member Equity Interest holders that are entitled to vote on the Plan vote to accept the Plan.

///

///

///

Formatted: Font: 13 pt

[REMAINDER OF PAGE LEFT BLANK]

Dated:  ~~May 27~~June 17, 2014   **DEBTORS AND DEBTORS-IN-POSSESSION**

**ARMORWORKS ENTERPRISES, LLC**, an Arizona limited liability company

By and through:

WILLIAM J. PERCIBALLI

By:  */s/William J. Perciballi*
Name:  William J. Perciballi
Its:  Authorized Representative

**TECHFIBER, LLC**, a Delaware limited liability company by:

ARMORWORKS ENTERPRISES, LLC, an Arizona limited liability company, its sole Member

By and through:

WILLIAM J. PERCIBALLI

By:  */s/William J. Perciballi*
Name:  William J. Perciballi
Its:  Authorized Representative

**ARMORWORKS, INC.**

By:  */s/William J. Perciballi*
Name:  William J. Perciballi
Its:    Authorized Representative

**WILLIAM J. PERCIBALLI**

*/s/William J. Perciballi*

4042482v8/22420-0006

71

| | |
|---|---|
| 1 | |
| 2 | Prepared and Submitted on behalf of the Debtors by: |
| 3 | GALLAGHER & KENNEDY, P.A. |
| 4 | |
| 5 | By: _/s/Todd A. Burgess (019013)_ |
| | John R. Clemency |
| 6 | Todd A. Burgess |
| | 2575 East Camelback Road |
| 7 | Phoenix, Arizona 85016-9225 |
| | Telephone: (602) 530-8000 |
| 8 | Facsimile: (602) 530-8500 |
| | Email: john.clemency@gknet.com |
| 9 | todd.burgess@gknet.com |
| 10 | |
| 11 | Prepared and Submitted on behalf of ArmorWorks, Inc. and William J. Perciballi by: |
| 12 | **QUARLES & BRADY, L.L.P.** |
| 13 | |
| 14 | By: _/s/Susan G. Boswell (with permission)_ |
| | Susan G. Boswell |
| 15 | Lori Winkelman |
| | One South Church Avenue, Suite 1700 |
| 16 | Tucson, Arizona 85701-1621 |
| | Direct Line: (520) 770-8713 |
| 17 | Direct Fax: (520) 770-2222 |
| | Mobile: (520) 349-6644 |
| 18 | Email: Susan.Boswell@quarles.com |
| | Lori.Winkelman@quarles.com |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |

4042482v8/22420-0006                                    72